# EXHIBITS

```
 1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF MISSISSIPPI
 2

   UNITED STATES OF AMERICA      .      Cause No. 3:07CR192
 3
            Plaintiff            .      Oxford, Mississippi
 4                                      July 2, 2008
            v.                   .      9:51 a.m.
 5                               .

   DAVID ZACHARY SCRUGGS         .
 6
            Defendant            .
 7   . . . . . . . . . . . . . . .

 8        SENTENCING AS TO COUNT 1 OF THE INFORMATION
            BEFORE THE HONORABLE NEAL B. BIGGERS
 9              U.S. SENIOR DISTRICT JUDGE

10   APPEARANCES:

11   For the Government:         United States Attorney's Office
                                 Northern District of Mississippi
12                               BY:  THOMAS W. DAWSON, ESQ.
                                 BY:  ROBERT H. NORMAN, ESQ.
13                               900 Jefferson Avenue
                                 Oxford, Mississippi  38655-3608
14
     For the Defendant:          TODD P. GRAVES, ESQ.
15                               NATHAN GARRETT, ESQ.
                                 Graves, Bartle & Marcus, LLC
16                               1100 Main Street
                                 Suite 2600
17                               Kansas City, Missouri 64105
                                 816-256-3173
18
                                 MICHAEL C. MOORE, ESQ.
19                               Michael Moore Law Firm, LLC
                                 10 Canebrake Boulevard, Suite 150
20                               Post Office Box 321048
                                 Flowood, Mississippi 39232
21
     Court Reporter:             Rita Davis Sisk
22                               911 Jackson Avenue, Room 369
                                 Oxford, Mississippi  38655
23                               (662) 281-3027

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

Exhibit A

1          **THE COURT:**  All right.  The next case on the docket

2   is *U.S. v. David Zachary Scruggs*.  Who's with him?  Are they

3   here?  (Pause)  Come up, gentlemen.  All right.  Let's get some

4   order back there.  All right.  In this case -- it's Docket No.

5   CR192, *U.S. v. David Zachary Scruggs*.

6          Mr. Graves, are you ready to proceed on that?

7          **MR. GRAVES:**  We are, Your Honor.

8          **THE COURT:**  All right.  And who's going to be

9   representing -- Mr. Dawson, you're representing the Government?

10          **MR. DAWSON:**  Yes, sir.  We are.

11          **THE COURT:**  All right.  Let your client come up,

12   Mr. Graves.

13          (Parties complying.)

14          **THE COURT:**  Mr. Scruggs, on a previous day, you

15   entered a plea of guilty to the crime of misprision of a

16   felony.  You're up before the Court now for sentencing.  Is

17   there anything you wish to -- before we get into that, I want

18   to look at the sentencing guidelines in this case.

19          Mr. Graves, I got your memorandum yesterday that you sent

20   in.  And you are aware of the guidelines that were set in the

21   underlying offense at the previous hearing of the Court.  You

22   have filed some comments on those -- some objections to those

23   guidelines that were set then.  Do you want to stand by -- I

24   read your objections, read the response from the Government.

25   Do you want to stand by the record as it stands now before the

1    Court, or do you wish to make any comments on any of those

2    objections?

3           **MR. GRAVES:**  Your Honor, I'm sorry, there was nothing

4    new that we hadn't argued before in our memorandum.  We'll

5    stand on the pleadings as filed.

6           **THE COURT:**  All right.  Does the Government agree to

7    do that also?

8           **MR. DAWSON:**  Yes, sir.  We had thought about, late

9    yesterday afternoon, filing a response.  We discussed it with

10   counsel, and they assured us that there was nothing new in

11   their memorandum that they had not already presented to the

12   probation service.  And in view of that representation -- and,

13   quite frankly, some technical problems with our ECF -- we

14   decided not to file but just to respond as the Court would

15   indicate.

16          **THE COURT:**  Very well.  All right.  Then, looking at

17   the guidelines as computed by the probation office, the Court

18   finds in this case that the basic offense level is 12, the

19   specific offense characteristics are 18, bottom four points;

20   but they're adjusted down because of the statute to 19 because

21   in misprision of a felony the offense level can be no more than

22   19.  So the Court finds that is the base offense level.

23          To give the defendant credit for adjustment of

24   responsibility, deducts 3 points; so the total offense level in

25   this case is 16.  And the defendant has a criminal history

Exhibit A

1  category of one.  So that will be the guidelines in the case.

2  And that calls for a -- with a total offense level of 16 and a

3  criminal history category of one, the guideline range of

4  imprisonment is 21 to 27 months and a fine of 5,000 to 50,000.

5      All right.  Now, Mr. Graves, is there anything you wish

6  to -- well, I'll ask you first, Mr. Scruggs, is there anything

7  you wish to state prior to sentencing?

8          **THE DEFENDANT:**  Yes, sir, Your Honor.

9          **THE COURT:**  All right.

10         **THE DEFENDANT:**  I am deeply sorry and regretful for

11 my involvement in this case.  I wish that I could go back and

12 change what happened a year ago.  And I should have stopped

13 what happened, and I should have objected to what happened; and

14 I didn't do that.  And that's why I'm here today.  And I -- for

15 that, I'm deeply sorry and remorseful.  And I ask this Court's

16 forgiveness.  And my challenge now is to try to rebuild my

17 life, Your Honor.  Thank you.

18         **THE COURT:**  All right.  Mr. Graves?

19         **MR. GRAVES:**  Just two short sentences, Your Honor.

20 The defendant spent a great deal of time discussing this, the

21 tragedy that this is for him personally, of his own making.  He

22 understands -- he's ashamed beyond what I think he can even

23 express to the Court, and I think -- I would ask the Court to

24 take into consideration that the main individual in this case

25 was this defendant's father and his mentor.  And I think that

Exhibit A

1  that should be something that the Court considers as it thinks

2  about the sentence.

3        **THE COURT:**   I usually only hear from one attorney.

4  Do you want to say anything, Mr. Moore?

5        **MR. MOORE:**   Judge, the only thing I will say, because

6  I've known Zach since he was a little boy, what has occurred in

7  this case is completely out of character for him.  And I've

8  counseled with him and worked with him over the last year, and

9  I can promise the Court that he is very remorseful and very

10 contrite and ashamed, ashamed of what has occurred.

11       **THE COURT:**   Okay.   Anything the Government wishes to

12 add?

13       **MR. DAWSON:**   If it please the Court, consistent with

14 the plea agreement that we executed sometime ago prior to the

15 defendant's entering a plea to this particular charge, we

16 agreed that we would recommend to the Court, based on all the

17 facts and circumstances, that the defendant receive a probated

18 sentence.  We meant that then and we mean that now.  And we

19 submit that to the Court for its consideration.

20       **THE COURT:**   All right.  Well, as counsel and the

21 Government both know, and as the Court pointed out at the plea,

22 any pleas for leniency by the Government or anyone else are not

23 binding on the Court.  And the Court primarily is bound by the

24 sentencing guidelines that are the law, regardless of what any

25 individuals ask for.

Exhibit A

1      Your case is a sad case, Mr. Scruggs, as your attorney

2   eloquently stated.  The primary actor in this case was your

3   father.  It would not have happened without him.  And it makes

4   it even sadder that you, his son, was brought into it.

5      The evidence in this case shows that you were fully aware

6   of this corruption -- attempted corruption of Judge Lackey.

7   You took that order that Balducci brought up to your law office

8   that -- the corrupt order that was attempted to be bought from

9   Judge Lackey.  And you made comments on it.  You said where

10  commas should be and what things should be said about it, what

11  the order should say.

12      And based on some of those tapes that you -- that were

13  played at the request of your attorney -- or your father's

14  attorney, Mr. Keker, and which I heard because they were

15  produced, I just -- it was just clear that you not only knew

16  what was going on, you were participating in what was going on.

17  You helped write that order.

18      You shake your head, Mr. Moore; but I heard the tapes.  He

19  wrote -- he suggested what should be in that order, that

20  corrupted order.  Have you heard that?

21      **MR. MOORE:**  Judge, I've listened to every tape,

22  interviewed every witness.

23      **THE COURT:**  Well, then, you've heard that if you've

24  listened to every tape.

25      **MR. MOORE:**  I did Judge --

Exhibit A

1          **THE COURT:**  He commented on it.

2          **MR. MOORE:**  -- and I hope I get a chance to respond.

3          **THE COURT:**  Well, you've had your chance to respond.

4     Well, you can respond to that; you can respond to that.  Go

5     ahead.

6          **MR. MOORE:**  Thank you, Your Honor.  Zach Scruggs

7     never had any knowledge whatsoever that there was any

8     conspiracy to bribe a judge in this case.  Zach Scruggs, on

9     March 28th, was at a meeting about a --

10         **THE COURT:**  He's not being sentenced for conspiracy

11    to bribe a judge.

12         **MR. MOORE:**  I understand, Judge.

13         **THE COURT:**  He's being sentenced for misprision of a

14    felony.  But the underlying offense is the corruption of Judge

15    Lackey.  He knew that Judge Lackey was being corrupted, and he

16    had an order there that he was looking at that was part of --

17    that was an order that was being bought from Judge Lackey -- or

18    being taken -- persuaded -- at the very least, that he --

19    you're saying he knew -- that I know he knew -- was that this

20    order was the result of a corruption or attempted corruption of

21    Judge Lackey.

22         **MR. MOORE:**  Right.  Your Honor, I --

23         **THE COURT:**  And whether it was for money or whatever

24    else is really immaterial; it was a corrupt order.

25         **MR. MOORE:**  The only difference -- and I don't want

1  to offend the Court.  But the only difference is, is that the

2  only thing Zach knew was that Tim Balducci went to have a

3  conversation with Judge Lackey.  He never knew that anybody

4  conspired to bribe a judge or to do something untoward.

5       The tape that you're talking about is a tape that occurred

6  after Tim Balducci came to the Scruggs Law Firm on November the

7  1st, wired up, wearing a wire, walked up the stairs, saying he

8  was there to meet with two individuals, Sid Backstrom and Dick

9  Scruggs.

10      Zach Scruggs, all the evidence would show, happened to

11 walk in the room that day.  He was never a part of that.  And

12 that's the only evidence the Government ever had in this case.

13 And that may be a distinction without a difference in Your

14 Honor's mind, but it's a distinction in Zach's mind.

15      **THE COURT:**  Well, that's something you can argue.

16 Whether or not that's true remains open.  He hasn't pled guilty

17 to being part of the bribery.  And he's not being sentenced for

18 part of the bribery.

19      You know, when Mr. Backstrom -- who's admitted he was part

20 of the bribe -- and your client are as close as they were,

21 they're up there in that office every day talking about

22 their -- the legal projects of the firm -- and it's hard to --

23 it's kind of a stretch of credulity to believe that Backstrom

24 never mentioned that money was being sent down to Judge Lackey.

25 You can claim that; you can argue that.  And as far as the law

1  is concerned, I'm going to base the sentence on that.  But

2  whether or not I believe that is something else.

3          **MR. MOORE:**  One thing I'd say, Judge, is -- and I

4  know you've listened to some of the tapes, but I've listened to

5  all of them.  And if the Government has a different view, they

6  can say it.  With all of the conversations, hundreds of

7  conversations, that were wiretapped and taped, there's no

8  mention of Zach Scruggs in this case anywhere.  He just --

9          **THE COURT:**  I understand all of that.  That's not

10  part of this hearing.

11      What do you say, Mr. Dawson?

12          **MR. DAWSON:**  I'd have to disagree with that

13  statement.  Mr. Scruggs -- Zach Scruggs is mentioned on some of

14  the tapes.

15          **THE COURT:**  That was my recollection also.  And

16  another thing that impressed me negatively about this, frankly,

17  is that when you, Mr. Scruggs, and Mr. Backstrom were talking

18  with Mr. Balducci over this order that he had brought to you

19  before it had been entered by Judge Lackey, it was an order

20  that you were commenting on how it should read and what it

21  should say -- and you've told me that you have a great respect

22  and love for the legal field, for the legal profession.  And

23  I'm -- I'm not questioning that.

24      But you certainly had no great respect for the Circuit

25  Court of Lafayette County or Judge Lackey, because the tapes

1   show that you told Mr. Balducci and Mr. Backstrom that we need

2   to hurry up and get this order signed before some other asshole

3   gets the case.  Now, that's a total thumb in your nose at the

4   Lafayette County Circuit Court.  And it contradicts your

5   statement to the Court that you have a great love and respect

6   for the legal profession.

7        Based on these considerations, and based on the sentencing

8   guidelines that have been furnished the Court, you have no

9   criminal history.  I'm taking into consideration the

10  Government's plea bargain with you.  Of course, I told you when

11  the plea bargain was entered into it was not a binding plea

12  agreement.

13       If, really, the Government and defendants were serious on

14  something that would bind the Court to a specific sentence, it

15  would have been an 11(c)(1)(C) plea agreement like

16  Mr. Backstrom had which bound the Court.

17       **MR. MOORE:**  Your Honor, we were informed by the

18  Government on that matter -- we asked for a binding plea and

19  the Government --

20       **THE COURT:**  You didn't get it.  You were here when he

21  entered a plea of guilty.  It was not an 11(c)(1)(C); I told

22  you it was not binding.

23       **MR. MOORE:**  Judge, we know that.  I just --

24       **THE COURT:**  Well, all right.  Then, if I want you to

25  say anymore, Mr. Moore, I'll ask for it.

Exhibit A

1          **MR. MOORE:**  Judge, I appreciate that.  I thought a

2   lawyer could always respond to the Court respectfully.

3          **THE COURT:**  No, you do not.  I didn't ask you to

4   respond.  I wasn't saying anything to you; I was saying it to

5   your client.

6          **MR. MOORE:**  I apologize if I've offended the Court in

7   some way representing my client, Your Honor.

8          **THE COURT:**  Well, you know, it's not -- I'm not going

9   to argue with you about it, but there's no -- this was never an

10  11(c)(1)(C) plea agreement.

11         **MR. MOORE:**  The only response I hope your -- it's

12  okay for me to respond now.  The only response I have is we

13  attempted to do a binding plea, and the Government informed us

14  that this Court would not accept a binding plea on probation.

15  And that's why we did not do it that way.

16         **THE COURT:**  Okay.  So it was not an 11(c)(1)(C).

17         **MR. MOORE:**  That's right, Your Honor.

18         **THE COURT:**  All right.  Then we're in agreement on

19  that.  But as I was saying, I am giving some weight to the

20  Government's recommendation for leniency.  The guidelines are

21  from 21 to 27 months.  Pursuant to the Sentencing Reform Act of

22  1984, it is the judgment of the Court that the defendant, David

23  Zachary Scruggs, is hereby committed to the custody of the

24  Bureau of Prisons to imprisoned for a term of 14 months on

25  Count 1 of this charge.

Exhibit A

1        Upon release from imprisonment, you'll be placed on

2   supervised release for a term of one year.  The defendant shall

3   comply with strict mandatory conditions while he's on

4   supervised release.  I'm not going to go over all of those at

5   this time.  The probation officer will go over them with you at

6   that time.  But suffice it to say, Mr. Scruggs, if you violate

7   any of them, it means that you'll be back up before the Court

8   for additional service.

9        It's further ordered that -- the Court has gone below the

10  guideline range on the imprisonment time.  The Court is of the

11  opinion that the Court should and does hereby depart above the

12  guideline range to the statutory fine.  And the Court has

13  considered the need for the combined sentence to reflect the

14  seriousness of the offense and to offset the cost of the

15  Government for the imprisonment and supervision of the

16  defendant, which is estimated at $2,100 a month for

17  imprisonment and $1,700 a month for supervision after release.

18  So the fine in this case will be $250,000.

19       Now, do you want to report to the institution that's

20  designated for your service on your own?

21            MR. GRAVES:  Yes, Your Honor.  We'd like to ask for a

22  report and --

23            MR. MOORE:  Judge, we'd respectfully ask the Court in

24  this case -- I believe the August 4th date was set for the

25  others.  This is probably a bit extraordinary for the Court,

Exhibit A

1  but Mr. Scruggs's wife is pregnant with their third child.  The

2  child is due in October.  I wondered if the Court would show

3  this defendant mercy enough to allow him to report after his

4  child is born.

5          THE COURT:  You may file a written motion to that

6  effect, the Court will consider it.

7          MR. MOORE:  We will, Your Honor.  We'd ask -- an

8  additional request would be -- the fine is $250,000 -- that he

9  be given 30 days to pay that fine.

10          THE COURT:  That'll be granted.

11          MR. MOORE:  Thank you.

12          THE COURT:  All right.  So that we'll have some

13  record that -- Mr. Scruggs, that you want to report on your

14  own -- Ms. Morris -- this will be a statement that you agree to

15  do that and that you will -- and it will not be necessary for

16  the marshals to take you.

17      (Parties complying.)

18          MR. MOORE:  Judge, one other request that the other

19  defendants had -- and we were not prepared to do that today --

20  is that we have not given any consideration whatsoever to where

21  Mr. Scruggs would go.  And we know that is strictly up to the

22  Bureau of Prisons, but we know that the Court's recommendation

23  sometimes carries some weight.  Could I include that in our

24  motion on the time to report due to his wife's pregnancy?

25  Could I include a recommendation for your consideration?

Exhibit A

1          **THE COURT:**  You may include a request for a specific

2    institution.

3          **MR. MOORE:**  Thank you, sir.

4          **THE COURT:**  All right.  If there's nothing else, you

5    gentlemen may be excused.

6          **MR. GRAVES:**  Thank you, Your Honor.

7          **MR. DAWSON:**  Thank you, Your Honor.

8          **THE COURT:**  All right.  The Court's going to be in

9    recess for 15 minutes.

10              (THE HEARING ENDED AT 10:14 a.m.)

11

12                  C E R T I F I C A T I O N

13         "I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter, July
14    2nd, 2008."
                          /s/ Rita Davis Sisk
                          RITA DAVIS SISK, RPR, BCR, CSR #1626
15                        Official Court Reporter

16

17

18

19

20

21

22

23

24

25

**1**

```
 1          UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF MISSISSIPPI
 2
    UNITED STATES OF AMERICA      Cause No. 3:07CR192
 3
       Plaintiff      Oxford, Mississippi
 4                    February 21, 2008
       v.             9:30 a.m.
 5
    RICHARD F. "DICKIE" SCRUGGS
 6  DAVID ZACHARY SCRUGGS
    SIDNEY A. BACKSTROM
 7
       Defendants
 8
 9           MOTION HEARING
         BEFORE THE HONORABLE NEAL B. BIGGERS
10          U.S. SENIOR DISTRICT JUDGE
    APPEARANCES:
11
12
    For the Government:   United States Attorney's Office
13                        Northern District of Mississippi
                          BY: THOMAS W. DAWSON, ESQ.
14                        BY: ROBERT H. NORMAN, ESQ.
                          BY: DAVID A. SANDERS, ESQ.
15                        900 Jefferson Avenue
                          Oxford, Mississippi 38655-3608
16
    For the Defendant
17  Richard F. "Dickie" Scruggs:
                          JOHN W. KEKER, ESQ.
18                        BROOK DOOLEY, ESQ.
                          JAN NIELSON LITTLE, ESQ.
19                        TRAVIS LEBLANC, ESQ.
                          WARREN BRAUNIG, ESQ.
20                        Keker & Van Nest, LLP
                          710 Sansome Street
21                        San Francisco, California 94111-1704
22
23
24
25
```

**2**

```
 1  For the Defendant
    David Zachary Scruggs:
 2                        TODD P. GRAVES, ESQ.
                          NATHAN GARRETT, ESQ.
 3                        Graves, Bartle & Marcus, LLC
                          1100 Main Street
 4                        Suite 2600
                          Kansas City, Missouri 64105
 5                        816-256-3173
 6  For the Defendant
    Sidney A. Backstrom:
 7                        FRANK W. TRAPP, ESQ.
                          JAMES W. CRAIG, ESQ.
 8                        Phelps Dunbar
                          111 East Capitol Street, Suite 600
 9                        Post Office Box 23066
                          Jackson, Mississippi 39225-3066
10                        601-352-2300
11                        J. RHEA TANNEHILL, JR., ESQ.
                          Tannehill & Carmean, PLLC
12                        400 South Lamar Boulevard, Suite C
                          Post Office Box 1383
13                        Oxford, Mississippi 38655
                          662-236-9996
14
15
16
    Court Reporter:   Rita Davis Sisk
17                    911 Jackson Avenue, Room 369
                      Oxford, Mississippi 38865
18                    (662) 281-3027
19
20  Proceedings recorded by mechanical stenography, transcript
21  produced by computer.
22
23
24
25
```

**3**

```
 1       (CALL TO ORDER OF THE COURT)
 2          THE COURT:  All right.  Gentlemen, yesterday, I think
 3  we decided that we would start today with the motion to dismiss
 4  Counts 2, 3, and 4.  But since this 404(b) material is fresh on
 5  all of our minds, we won't have to reiterate it to talk about
 6  that motion.  If you gentlemen are ready to go to the 404(b)
 7  material, I prefer to do that.  If you're not, we can go back
 8  to the 2, 3, and 4.
 9          MR. KEKER:  We're ready, Your Honor.
10          MR. NORMAN:  We are, Your Honor.
11          THE COURT:  Okay.  Well, let's go to the 404(b),
12  Mr. Keker.  Just one second.  I saw Mr. Trapp stand up.  You
13  were going to talk on the --
14          MR. TRAPP:  I just wanted to say good morning, Your
15  Honor.  I'm so far down here I wasn't sure if you could see me.
16          THE COURT:  Barely.  All right, Mr. Keker.
17          MR. KEKER:  Mr. Trapp's worried (inaudible).  The
18  404(b) has two issues, as the Court well knows.  I'm not going
19  to talk about the law very much on the first one.  But the
20  first issue is whether or not the evidence is just there to
21  show character, bad character, or is there some intent,
22  motivation, opportunity, plan, scheme; is it relevant to one of
23  the enumerated issues of 404(b).
24       The second part of 404(b) is equally and maybe more
25  important; and that is, if you determine that there is some
```

**4**

```
 1  probative value, does that probative value substantially
 2  outweigh the risks that are basically 403 risks, unfair
 3  prejudice, confusion of the issues, causing to delay in the
 4  trial.
 5       We believe that this evidence about Wilson v. Scruggs,
 6  which is a case that was before a lot of judges from 1994 on,
 7  but among them was Judge DeLaughter in Hinds County, meets
 8  both -- does not meet either one of these tests.  At most, it's
 9  character evidence; and second, it's -- it would lead to a lot
10  of unfair prejudice, confusion of issues, and so on.  And I
11  think you got a taste of this yesterday.
12       I'm not about to talk to you about what the law in this
13  area is because you know it very well.  You got a taste for
14  Balducci.  Balducci says in response -- Mr. Balducci says in
15  response to a question from the prosecutor, how did you know
16  when you were there agreeing to bribe a judge that -- and you'd
17  never talked to Mr. Scruggs about bribing a judge, and you're
18  agreeing to bribe a judge, how did you know that the Scruggs --
19  Scruggs would cover it for you, cover this money?  He's paying
20  money to a judge.
21       And Mr. Balducci, who was a witness -- I think you could
22  see he was somewhat motivated to help the prosecution -- says
23  "because he bribed another judge."  You say, well, excuse me?
24  What other judge?  Judge DeLaughter, he said, was bribed.  How
25  was he bribed?  Was he bribed with money?  No, it wasn't money.
```

5

1  But I believe -- he offered him a federal judgeship? No, he
2  didn't offer him a federal judgeship. He offered to try to get
3  him on a list for a federal judgeship. Well, okay. That's
4  very interesting.
5      What was Judge DeLaughter suppose to do? Vague -- I mean,
6  I'm not sure what Judge DeLaughter was suppose to do. He
7  certainly -- and that case didn't involve money. Mr. Langston
8  has said, in front of all the lawyers here, in front of them, I
9  believe; over and over and over again, that he knows of no
10 money that ever went towards Judge DeLaughter.
11     THE COURT: You say Mr. Langston?
12     MR. KEKER: Mr. Langston is the person who --
13     THE COURT: I know who he is, but I don't know where
14 he -- how do you know what he said to him?
15     MR. KEKER: Here's how we know, because when he
16 entered his plea before Judge Mills, here's what happened: He
17 was representing Mr. Scruggs. Mr. Zach Scruggs' lawyer,
18 Mr. Farese, at some point while this case was pending, took
19 Mr. Langston, Mr. Scruggs' lawyer. So this is Mr. Zach
20 Scruggs's lawyer takes Dick Scruggs' lawyer into the Government
21 and they make a deal for Mr. Langston.
22     And Mr. Langston gets -- and goes to Judge Mills, not to
23 you; and they make a -- they put a lid on it, and he is now
24 cleared for all crimes, known and unknown, according to his
25 plea agreement. And he is the witness -- and we have no idea

6

1  what was motivating Mr. Langston --
2      THE COURT: I think the plea agreement said related
3  and unrelated.
4      MR. KEKER: Beg your pardon. Beg your pardon.
5  Related and unrelated. But all -- as I understand it, all
6  crimes. And we expect the Government to call -- and when they
7  gave us 404(b) notice, they said "good and sufficient notice is
8  for you to go read his allocution of the plea where Mr. Dawson
9  described what the offense was." And he said that the offense
10 was from December of 2006 until March of 2007 there was a
11 conspiracy to influence Judge DeLaughter by promising him to
12 recommend -- get him on a list or something for a federal
13 judgeship. And in return, they were going to get favorable
14 rulings.
15     Now, there's a lot of things that are interesting about
16 that and a lot of things that I think you need to consider as
17 you go forward and think about whether or not this evidence is
18 going to make the trial of this indictment a fair one. First
19 of all, let's just start with Mr. Scruggs strongly denies any
20 kind of bribe or corruption in the Wilson v. Scruggs case,
21 doesn't know of any; and we believe that this minitrial would
22 show that there wasn't any.
23     The issue of favorable rulings, we don't know what they're
24 talking about. There were some favorable rulings to
25 Mr. Scruggs; but most importantly, there were unfavorable

7

1  rulings to Mr. Scruggs. And indeed, the summary judgment
2  motion in that case was denied. Other motions were denied. I
3  can show them to you if you want to. The case went to trial.
4  When the case went to trial, Judge DeLaughter had been trying
5  to get that case settled for a long time, as any decent judge
6  would have.
7      And after the case was in trial, it finally did settle;
8  and this whole dispute between Mr. Wilson and the Scruggs firm
9  ended up with Mr. Wilson getting close to $4 million as you
10 heard yesterday, not as much as he wanted but not a goose egg.
11 Every decision in that case -- and I challenge them to point to
12 one decision that -- that this doesn't fit -- was correct on
13 the law. You read those -- order after order after order,
14 they're right; they make sense.
15     Judge DeLaughter did what was apparently an excellent job.
16 He made the decisions that any good judge would have made; it
17 was a contract case. The thing of value in that case,
18 Mr. Scruggs doesn't appoint judges. Senator Lott, Senator
19 Cochran don't appoint judges. No one knows of any
20 recommendation that Mr. Scruggs has ever made for a judgeship
21 that has been accepted as a recommendation from a senator.
22     These senators and Mr. Scruggs are from different
23 political wings. Judge DeLaughter, as I understand it, is a
24 democrat. So -- and again, it's the White House that appoints
25 judges, not the senators.

8

1      And then, what judgeships are they talking about? There
2  were three during this period, and I think it's worth noting.
3  Judge Lee went senior in April. Judge Jordan, two weeks later,
4  was appointed to take his position. Judge Barbour went senior
5  in February of 2006. Judge Southwick was appointed in June,
6  before the trial of this Wilson v. Scruggs case.
7      THE COURT: Southwick was to the circuit.
8      MR. KEKER: Okay. Then I got that wrong. I thought
9  that Southwick -- Judge Barbour's position was filled by
10 somebody, and I've got it wrong. I'm not sure who it --
11     THE COURT: I'm not sure it's ever been filled.
12     MR. KEKER: Oh, I'd understood -- we've got some --
13 he was announced as a circuit court judge. Is he the one that
14 replaced Judge Pickering when that didn't work out?
15     THE COURT: Yes.
16     MR. KEKER: I think that's right. So there was an
17 announcement in June that Southwick was taking Judge Barbour's
18 place in the district court and -- or at least was nominated
19 for that; and then, apparently, they changed and put him on the
20 Fifth Circuit.
21     THE COURT: Well, Barbour's position, I think, is
22 still open, isn't it?
23     MR. KEKER: And that's what Mr. LeBlanc was just
24 telling me. And then Judge Bramlette announced senior status
25 in March of that year and Judge Ozerden in September was

9

1  appointed to that position.  But -- so whatever the vacancies
2  were, they were all filled during the time that the Government
3  alleges this conspiracy happened.  And this -- the notion of a
4  quid pro quo just sort of doesn't line up, doesn't make any
5  sense.
6        The Judge Ozerden position, by the way, was always
7  designated -- or people, at least, understood that it was
8  probably going to go to a south Mississippi, south coast
9  person.
10       If the issue is whether or not there's anything criminal
11  or wrong or even unusual about Mississippi lawyers or
12  California lawyers or any other state lawyers recommending to
13  people that they know a good judge for a federal judgeship,
14  whether or not they have cases pending before them, then we'll
15  have to try that issue.
16       Because we know that some of the most -- I mean, one
17  particularly, highly, highly respected lawyer in Jackson was
18  recommending Judge DeLaughter to Senator Lott at the same time;
19  and this lawyer happened to have in his office many cases
20  before Judge DeLaughter.  People who don't have cases before a
21  judge could look forward to having cases before a judge.
22  People who don't have cases now maybe had cases in the past and
23  so on.  Recommending a good judge to the federal bench is not a
24  crime.
25       So the point is, to get through this, to get the experts

10

1  to talk about what this case was about, how Judge DeLaughter
2  ruled, what happened when, what work the lawyers did, would
3  really swamp the case that the indictment is about and has
4  very, very little to do with it.
5        It is unfair -- let me start out with, the most huge
6  unfairness here is for the defendant Zach Scruggs and Sid
7  Backstrom.  It's my contention that the Government doesn't
8  contend, at least hasn't so far, that the evidence is
9  admissible or relevant as to either of them.
10       So this would be one of those deals where they would
11  suggest to you that we try the case for a week; we work very
12  hard to understand Wilson v. Scruggs, we talk about all these
13  orders; we call experts; and then your instruction to the jury
14  that they should just ignore this evidence when it comes to
15  considering the cases of Dick Scruggs' son and his partner,
16  Mr. Backstrom.
17       I mean, it's just not going to work, Your Honor; and I
18  think a judge of your experience can evaluate that, obviously,
19  for yourself.  It's unfair to Dick Scruggs.  If the Government
20  wants to bring this case as a separate charge, I guess they
21  will do it.  There's nothing anybody can do about that.  But
22  the idea that Langston, who was the counsel of record in Wilson
23  v. Scruggs -- they say that he just popped on the scene in, I
24  think, January and filed an appearance, January of 2006.
25       He was -- he filed an appearance in the Hinds County

11

1  action, but he'd been in this case since at least 2004.  The
2  case was in Federal Court in the Southern District of
3  Mississippi.  Judge Lee stayed it so that state court action
4  could proceed for sort of an accounting action, and then there
5  was more to do in federal court.  He'd been involved in it for
6  a long time.  He wasn't a newcomer to the case.
7        Another reason of unfairness which we don't -- we haven't
8  played out yet is that there's various privileges involved here
9  that may be invoked and may make it difficult for us to get all
10  the evidence that we need to counter whatever it is
11  Mr. Langston feels like saying.
12       And I just raise -- I asked the Government if they would
13  accommodate us by getting witnesses that I believe were under
14  their control to the hearing.  And they informed me -- and they
15  very graciously did that.  Mr. Langston is available if you
16  want to hear from him.  But I asked about Mr. Ed Peters, who is
17  the local formal D.A., local lawyer in Hinds County that was
18  hired.
19       And, again, if it's a crime to hire -- if the charges that
20  they were worried about getting hometowned in Hinds County,
21  then that's true; they were worried about it.  Judge
22  DeLaughter's former law clerk was on the other side, was -- had
23  good relations with Judge DeLaughter, was advising the lawyers,
24  Mr. Merkel and others, about how to litigate that side of the
25  case.

12

1        Mr. Scruggs side of the case, through Joey Langston, hired
2  Mr. Ed Peters, who was also both a friend, former boss,
3  professional colleague of Judge DeLaughter, had a lot of cases
4  before him.  Still has a lot of cases before him I believe.
5  But that's what it was.  I don't think that's -- certainly,
6  it's not a crime.  It's not unusual.  And it doesn't lead to
7  the charge here.
8        So what we've learned when we asked for Ed Peters to come
9  here is that they informed us that his lawyer said he might
10  take the Fifth.  I don't know.  We'll still try.  Judge
11  DeLaughter, I don't know what the situation is going to be
12  there.
13       I do know that both Senators Lott and Cochran, who we
14  understand make these recommendations by consensus, not by one
15  person deciding things, have speech and debate clause with the
16  United States Constitution privileges, which they may or may
17  not assert; I just don't know.  But they certainly are
18  important witnesses.
19       This gives us about a month if you decide to let this in.
20  We've got to go out and get experts to study this file and come
21  in and testify about the fact that these were good, honest,
22  true, supported by law, fair, proper rulings.  That's going to
23  take a lot of time.
24       And then another unpleasant loose end is the one I already
25  mentioned.  The idea that Mr. Zach Scruggs' lawyer thought that

13

1 it was okay to take Mr. Dick Scruggs' lawyer into the
2 Government and insist that these are really separate matters;
3 therefore, he doesn't have a conflict, is something I suppose
4 we'd have to get into.
5       So -- I don't know what to say about -- I mean, I can
6 argue it more legally.  But this really does sound like one of
7 those instances where a trial judge, using his discretion, has
8 to decide -- maybe to put it -- put it to the Government.  I
9 mean, if the Government says that they want to prosecute
10 Mr. Dick Scruggs for this and call it a crime, then we ought to
11 do it all at once.  We'll try that case.  But it won't be with
12 Sid and Zach because they're not -- under 8(b), they couldn't
13 be joined to that case.
14      And I guess the basic question is, if the Government
15 thinks they have a case that they can prove beyond a reasonable
16 doubt; they need to the grand jury, they brought it back;
17 you've heard a lot about it, why shouldn't they just go ahead
18 and do that and not, basically, divert the jury into some other
19 direction?
20      I believe that if you're thinking about this it would be
21 very useful for you to hear from Mr. Langston, not for a long
22 time, but -- and from Mr. Peters, too, about what the contours
23 of this allegation are so that you can decide whether or not it
24 makes any sense to try them as 404(b) in this case.  And we
25 would ask you to do that.  We'd ask for a hearing where I can

14

1 examine Mr. Langston about some of these matters for a little
2 while, whatever time limit you want to put on it.
3       THE COURT:  All right.  Now, you know, Mr. Keker, the
4 Court's not going to give you a license to compete with Marco
5 Polo for a fishing expedition, as we got into yesterday almost.
6 And I'm not sure that a defendant is anything more than
7 reasonable notice by the prosecution of what -- of the
8 substance, the gist, of what they intend to prove, if it's
9 allowed, in a 404(b)-type testimony.
10      So the fact -- there is law to the effect, previous
11 similar cases, that the -- that this notice requirement of
12 404(b) does not supersede the Jencks Act, which limits you to
13 your discovery, as you know.  I'm not even sure you're entitled
14 to know what Mr. Langston is going to say until after he
15 testifies on direct.
16      Of course, they can give you the substance of what he says
17 if they're ordered to, you know, earlier than that, like
18 they've done on these other witnesses.  But I want to hear what
19 the Government has to say about Mr. Langston being called to
20 testify in this case, in this hearing.
21      MR. KEKER:  Could I respond just real briefly?
22      THE COURT:  Yes.
23      MR. KEKER:  The purpose of putting Mr. Langston on is
24 not some right -- what we're saying is there's -- I think I
25 said enough and you know enough about the dangers of this kind

15

1 of evidence so that it would be well within your power, and in
2 this case would make a lot of sense, to have a Rule 104 of the
3 Federal Rules of Evidence hearing where a trial judge can
4 insist on a proffer, and the proffer can come in whatever form.
5       It can come from the Government; it can come from the
6 witness.  But before Mr. Langston -- and I am not talking about
7 Jencks Act.  Before he gets up and talks to a jury who's
8 supposed to be trying this case about Judge Lackey getting a
9 cash bribe in this case, that we all know about, and
10 Mr. Langston completely clutters it up with these allegations,
11 which are far afield and we don't believe have any probative
12 value, but to the extent that they -- that you think otherwise,
13 we're just off on a frolic and a detour and a whole other case.
14      And then afterwards you think, Gee -- and then we stand up
15 after Mr. Langston testifies and say, We need the Jencks Act
16 material, and we need a continuance, and we need all this stuff
17 to counter these allegations.  We've got a real trial problem
18 on our hands, and we will try to avoid it.  But one way to deal
19 with it is to put Mr. Langston up and make a good firm decision
20 now after you listen to him, that I don't want to get into this
21 in this trial.
22      If the Government thinks this is a crime, they have a way
23 to deal with it; they can bring a charge.  If they just want to
24 kind of use it to clutter up this case, then we're not going to
25 let them do that.  That's where we think you ought to come out.

16

1 And then, as I said, they're about to argue their
2 severance motion.  But it seems to me that they haven't over --
3 I mean, we can talk about limiting instructions to the jury all
4 we want.  But those of us who have tried cases for a long time
5 know there are certain kinds of things that can't be overcome
6 by limiting instructions.
7       THE COURT:  All right.  As I understand the
8 Government's position at this point -- I'll like to hear what
9 they have to say about it -- they would contend -- I'm drawing
10 this conclusion from their brief that they filed in opposition
11 to your motion to disallow 404(b), that they intend to offer
12 this for the purpose of proving intent.  That's as I understand
13 their position at this time.
14      Now, 404(b) also allows testimony of previous bad acts to
15 prove absence of mistake or misunderstanding, as you know.
16 Now, if Mr. Scruggs got on the stand and said, Well, this a
17 mistake, I gave -- this a mistake.  Mr. Balducci and I
18 misunderstood each other.  The money that I gave him -- I did
19 not understand it was to be for -- to bribe Judge Lackey.  I
20 was giving it to him for some work he had done for me, and it
21 was all a mistake.
22      Now, would that 404(b) evidence of Mr. Langston also be
23 available to show the absence of a mistake, if that defense
24 were put on by you?
25      MR. KEKER:  I think the Government would argue at

17

1    that point something diff -- they wouldn't argue 404(b); they'd
2    argue impeachment. I mean -- or -- and they might to the
3    extent that they did, but that's not the situation that we
4    have. The situation that we have -- I mean, I can see
5    Mr. Scruggs testimony opening the door to various things that
6    otherwise might not be admissible in this trial.
7        But I can also see it not opening the door, and it's
8    not -- we don't know whether Mr. Scruggs is going to testify or
9    not. It depends on what the Government does. What we're
10   talking about now and what I'm moving to exclude is use in the
11   case in chief of this information as required by 404(b). And I
12   think that's a much different -- and really, I guess I should
13   make that clear.
14       We're not asking you to make a decision about what
15   evidence can come in on cross-examination. We may ask you to
16   make that decision during the trial or something before we put
17   Mr. Scruggs on but -- and try to get advanced rulings. But
18   we're not asking for that now. We're asking for, Should this
19   come in, in the Government's case in chief?
20       THE COURT: Okay. I understand. Mr. Norman.
21       MR. NORMAN: Good morning, Your Honor. We spent
22   yesterday hearing that Mr. Scruggs had no criminal intent. I
23   took that as the gist of the motion to dismiss yesterday, that
24   the Government had created some crime, that Mr. Scruggs had no
25   intention of violating the law. And now we stand before you

18

1    arguing the 404(b) that goes directly to that point.
2        Your Honor, I'd like to talk first about the Wilson case
3    and then talk about why I believe its relevance outweighs its
4    prejudicial value. Wilson is interesting in several respects.
5    First, what strikes me about this case, unlike most cases we
6    try in this courtroom, these aren't unsophisticated people.
7    These are extremely sophisticated lawyers at the top of their
8    game, at the top of their trade.
9        There was no effort to get Bobby DeLaughter to break the
10   law. There was no effort to get Bobby DeLaughter to rule in
11   violation of the law. That would have been foolish, and these
12   men are smart. What they wanted Bobby DeLaughter to do was
13   shade the law at every opportunity, to ensure a victory they
14   probably would have anyway. And that's an irony that's
15   interesting in both these cases, both in the matter involving
16   Judge Lackey and in the matter involving Mr. Wilson.
17       There is every reason to believe that the Scruggs Law Firm
18   probably would have prevailed in both those cases. The strange
19   part about this is that wasn't good enough. They had to have
20   an edge. And that resulted in efforts to corrupt judges free,
21   if possible, because these are businessmen. They know the
22   value of a dollar. Free, if possible.
23       But if it was necessary to pay, they were willing to do
24   that. Not only because of the $30 million at stake, the $26.5
25   million at stake, but also because of the status involved.

19

1        Your Honor, in the Wilson case, Mr. Langston and
2    Mr. Balducci came into that case when it became clear that
3    Mr. Dunbar wasn't being as successful as Mr. Scruggs would
4    like. And Bobby DeLaughter, sitting on the bench, had a best
5    friend, a best friend in the world; he'd worked for as an
6    assistant DA, when he tried the cases that they've made movies
7    about. That boss, of course, as everybody knows, was Ed
8    Peters. And it was common knowledge that the two were tight.
9        The brief testimony of Joey Langston would be that they
10   hired Bobby DeLaughter. And at first, we heard they hired him
11   as a consultant --
12       THE COURT: You mean Ed Peters.
13       MR. NORMAN: Ed Peters, I'm sorry. No money went to
14   Bobby DeLaughter. They hired Ed Peters to be a consultant.
15   What struck me first was, That makes no sense. Ed Peters has
16   been a prosecutor, like me, for 30 years. Like me, he knows
17   nothing about civil litigation. Why pay him a million dollars
18   to bring him in to advise sophisticated civil lawyers on how to
19   try civil cases? That's absurd.
20       They brought him in -- as Joey Langston would testify,
21   they brought him in and paid him a million dollars, $50,000
22   cash, followed by monthly payments making up a million dollars
23   to corruptly influence his best friend, Bobby DeLaughter. And
24   then, to be sure, they dangled a federal judgeship in front of
25   him.

20

1        Now, everybody in this courtroom knows Mr. Scruggs doesn't
2    have the ability himself to do that. But he has the
3    connections to the senator. Counsel opposite would argue that
4    the senator does not appoint judges. And everyone in this
5    courtroom knows that, best of all, Your Honor. But Your Honor
6    also knows how valuable it is to have a senator put you on the
7    list. And that's what happened.
8        And Joey Langston would say they made sure Bobby
9    DeLaughter knew they caused that to happen. And they did it in
10   the middle of trial when it was critical. Did Bobby DeLaughter
11   violate the law --
12       THE COURT: What do you mean they did it in
13   middle of the trial?
14       MR. NORMAN: As the case was pending and approaching
15   its completion, after, I think, ten years of litigation -- this
16   happened in March when the case was settling -- going to trial
17   and then settling in the summer of 2006. As Joey Langston and
18   Tim Balducci took over the representation of the Scruggs Law
19   Firm, commencing some time, I think, in the fall of 2005 but
20   really getting hot in December 2006 and culminating in August
21   of 2006 when the matter settled.
22       By the time the matter got to trial, the judges' rulings
23   had whittled away at the plaintiff's case to the point where
24   Bobby DeLaughter said from the bench to counsel for both sides,
25   "I don't know why you want to try this case, nothing's left but

21

1 bragging rights." And he was right.
2     It is true that there was a judgment against the Scruggs
3 Law Firm. But it's important to know it was a victory for them
4 because they paid no new money. That's what they'd already
5 paid Wilson. They, in effect, won on the merits.
6     And they did that not by asking Bobby DeLaughter to
7 actually break the law --
8     THE COURT: I don't know. You still haven't
9 explained my question. What do you mean in the middle of the
10 trial?
11     MR. NORMAN: In the middle of the pendency of the
12 case, I should have said, Your Honor, not in the actual trial
13 of the case, the pendency of the case. I'm sorry.
14     Your Honor, the testimony would be brief from
15 Mr. Balducci, about what you heard yesterday. The testimony at
16 trial from Mr. Langston would be brief, about what you've heard
17 from me this morning. That testimony would also implicate Zach
18 Scruggs. Joey Langston is prepared to testify that Zach
19 Scruggs was fully aware of what was going on in the Wilson
20 case. It will not implicate Sid Backstrom.
21     However, the Peterson case stands for the proposition that
22 if 404(b) evidence is admissible against a defendant, then with
23 a proper limiting instruction, it is admissible in the case in
24 chief. Now, as we all know, this Court has complete discretion
25 in this matter; and in the event the Court decides to allow

22

1 this evidence, it could be in the case in chief or it could be
2 in rebuttal.
3     I'd like to address that point very briefly, without
4 citing a case from another circuit that I cited in my brief,
5 because I don't think the Court will find that particularly
6 persuasive.
7     But as you know, Your Honor, the Beechum test is that,
8 first, this extrinsic evidence must be relevant to a question
9 that's critical to the trial of our case. And second, the
10 probative value has to outweigh the prejudicial effect, where
11 the intent involved in the extrinsic acts is the very same
12 intent that's alleged and that must be proven by the Government
13 in this case. The Beechum decision stands for the proposition
14 That, in and of itself, satisfies the relevancy prong of the
15 Beechum test. Obviously, the Court still has to make that
16 determination; and that's discretionary with the Court.
17     Then the question is, Is it overly prejudicial? And the
18 Beechum court suggested that we consider the similarity of
19 these two, the extrinsic offense and the charged offense, in
20 making the decision whether or not the probative value
21 outweighs the prejudicial effect. What are the similarities?
22 First, these two offenses both involved --
23     THE COURT: Okay. I think -- I understand the
24 similarities from what was said yesterday. But what is your
25 position on the extent of discovery that would be available to

23

1 the defendants, as far as expanding the length of the trial;
2 and what would be the -- what would you have to prove in order
3 to prove that this action, alleged action, by Mr. Scruggs was a
4 similar crime? Would you have to prove the same elements that
5 you have in this case, that you have to prove in this case? Or
6 would it just be that Mr. Langston said it happened and that's
7 it?
8     MR. NORMAN: First, Your Honor, I think it's
9 important to start by saying that the evidence of extrinsic
10 acts doesn't have to be a crime at all. Simple bad acts are
11 sufficient if they're relevant. However, in this case, it was
12 a crime; and that's part of the similarity between the two
13 offenses. The standard of proof that we must use, Beechum
14 says, "This Court should determine, before admitting that
15 evidence, that a reasonable jury could find on that evidence
16 that the extrinsic acts actually occurred."
17     THE COURT: All right. But would you have to prove,
18 for example, the Title 18, 666, material that you have to prove
19 in this case?
20     MR. NORMAN: No, Your Honor. Because of the fact
21 that all is required is bad acts. We believe that crime
22 occurred; but we don't have to prove that. We have to prove
23 that a bad act occurred that is relevant to something other
24 than general character in this case.
25     Now, counsel opposite also brought up privileges. I don't

24

1 know if the Court wants me to address that or not, but I'd like
2 to. Because I'd like for the Court to know that when
3 Mr. Farese brought Mr. Langston in to plead guilty to this
4 offense of attempting to bribe a judge in the Southern
5 District, attempting to corruptly influence that judge, he
6 obtained written waivers from both, both Mr. Zach Scruggs and
7 Mr. Langston, before doing that. And I've not seen them. I
8 haven't asked to. I haven't cross-examined him, but I'm sure
9 they're available if need be.
10     Your Honor, as far as a privilege, any attorney/client
11 privilege goes, as the Court well knows, if a lawyer and his
12 client are involved in a crime together, there is no privilege.
13 Now, we don't anticipate any executive privilege on the part of
14 a senator. I don't believe you're going to see that as a
15 problem. So I don't see that privilege will be an issue.
16     What kind of notice are they required to have?
17     THE COURT: Okay. You don't need to go into that.
18 I've looked at that in your briefs. But who would you
19 anticipate calling if this type material were allowed into
20 evidence, what witnesses?
21     MR. NORMAN: Your Honor, we'd already have Tim
22 Balducci on the stand; and I would ask him, basically, what I
23 asked him yesterday. That would probably be the first time
24 this issue would be before the Court for your determination.
25 Secondly, we would call Joey Langston. And his testimony, I

25

1  believe I could -- the direct examination, I could do in five
2  minutes.  We would call Senator Lott, and I believe his
3  testimony would be short, sir.
4       THE COURT:  All right.  Thank you.
5       MR. KEKER:  Could I respond to some of that?
6       THE COURT:  Yes, you may.
7       MR. KEKER:  Let me start -- I think the goal posts
8  are moving a little bit here.  They're not going to prove a
9  crime; they're going to prove a, quote, bad act.  And I'm now
10  not sure what the bad act is.  It's not bribing Judge
11  DeLaughter; it's not paying him to influence any opinion.  It's
12  paying him to shade the law?  What law was -- there was no law
13  shaded.
14       They're going to prove that Ed Peters, who was a friend of
15  the judge and a former boss and a person who has many cases
16  before him and does a lot of work before him and is a person
17  that lots of lawyers in this state hire as local counsel when
18  they go down to Hinds County because he knows -- he's part of
19  the courthouse crowd, to balance Mr. Kirksey, the judge's
20  former law partner, who's there for the same reason
21  Mr. Merkel's got him.
22       We are going to try that and try to explain to this jury
23  that, you know, that's not really -- that's kind of -- maybe
24  it's the way things are done.  Maybe you like it; maybe you
25  don't like it.  But it doesn't have anything to do, ladies and

26

1  gentlemen, with the charge that's before you.
2       But we're going to spend a lot of time trying that because
3  what they're -- they aren't willing to say it's a crime.
4  They're not willing -- if they think it's a crime, then they
5  can carry out their professional responsibilities and deal with
6  it.  They have grand jury power.  But -- so, first of all, that
7  concerns me.
8       And then second of all, the idea that they are going to
9  call Tim Balducci, who has some hearsay, and Joey Langston, who
10  has his deal and whatever he's going to say about this, and
11  that that's going to be the end of it; and that we're just
12  suppose to sit there and cross-examine them for five minutes
13  after they testify for five minutes, is not on any planet that
14  I'm knowledgeable about.
15       We want to call -- they -- just in this presentation,
16  there's a lot of people who have been accused of a lot of
17  nastiness.  And if nothing else, they ought to have the right
18  to come forward and say the way they see it.  Mr. Peters, if we
19  can get him on the stand, we'll put him on the stand.  Judge
20  DeLaughter, if we can get him on the stand, we'll put them on
21  the stand.  Senators Lott and Cochran, we want them both.
22       And then we want the lawyers in Jackson who have cases
23  pending before Judge DeLaughter, like Joey Langston, who are
24  recommending Judge DeLaughter as a federal judge because they
25  think he's a good judge.  A lot of people think he's a very

27

1  good judge.
2       When you get into this file and find out what this case is
3  about, it was decided -- before Judge DeLaughter even got ahold
4  of it, it was decided that the contract between Mr. Scruggs and
5  Mr. Wilson was clear and unambiguous; and we're not going to
6  have parole evidence; and your rights depend on the word
7  existing and the word is.
8       It's one of those trials about what does is mean?  And
9  Judge DeLaughter wrote an opinion saying, "Is is what it is,
10  and existing means existing."  And what he told these people
11  is, "I'm strictly construing the contract and that leads to
12  simply an accounting."
13       And when the accounting was all done, it turned out that
14  the $6 million that Mr. Scruggs had paid Mr. Wilson was enough,
15  so that Mr. Wilson wasn't owed more money.  And at that point,
16  when Mr. Wilson figured that out and figured that he was --
17  that's what the bragging rights is about.  But this case went
18  to trial, summary judgment was denied, a lot of money changed
19  hands in Mr. Wilson's favor.  It was a fair and fully litigated
20  thing.
21       Mr. Langston -- and I think we'll bring this out, and I
22  think Mr. Langston's got enough ego that he'll probably admit
23  this -- did a heck of a job.  He took advantage of a foolish
24  effort by Mr. Wilson's lawyers to say to the judge, we want --
25  we want you to determine under this existing -- what is due

28

1  under the contract.  And once that was determined, it turned
2  out that Mr. Scruggs had paid, by the $6 million, enough money
3  to cover all of the claims that Mr. -- that Mr. Wilson had.
4       So all of that is going to have to be litigated.  And at
5  the end of it, the jury and, I think, you are going to be left
6  scratching your heads thinking, What has this got to do with,
7  and haven't we really gone way away from the things that the
8  jurors are sworn to do, which is make a decision about the
9  charges in this indictment.
10       He says that this shows intent.  I don't see the intent at
11  all the same.  Mr. Balducci, at the behest of Judge Lackey,
12  said, Okay, I'll bribe you.  And the question in that case is
13  whether or not Mr. -- I mean, various cases -- whether or not
14  Mr. Scruggs joined that conspiracy, and so on.
15       But nobody contends that a bribe to Judge Lackey for an
16  order is some kind of -- I mean, is okay.  It's clearly a
17  corrupt act.  The jury is going to understand that.  And the
18  question is, Who was responsible for it?  And, so, whatever the
19  intent is in that case, they have to -- nobody's going to
20  wonder whether or not if you knowingly are making a cash bribe
21  to a judge you have that kind of intent.
22       Over here, what they are going to have to do is figure
23  out, Is there anything wrong?  And now we're getting -- is it a
24  bad act to hire Mr. Peters?  And this million dollars, by the
25  way, Your Honor, this -- they've said in their proffer there

29

1  was a reverse contingency fee. If you guys do better than X,
2  you get some money. And they did better than X, and they got
3  some money. It wasn't, up front, here's a million dollars to
4  go do something.
5      So I think, just this discussion, is kind of getting --
6  now they say -- before they didn't say; but now, I guess, they
7  say that Mr. Zach Scruggs -- I don't thoroughly understand.
8  But, clearly, Mr. Backstrom is not involved in this and -- is
9  not involved in these allegations. And the idea that he has to
10  sit through this is a big problem.
11     So this keeps moving. I mean, we now know -- here's what
12  you know, the similar act, it was not an effort to get Judge
13  DeLaughter to violate the law. It was not an effort -- it was
14  not involving any money to Judge DeLaughter or anything of
15  value, except that at some point -- oh, and you asked about
16  chronology. Let me make sure that this is straight because
17  we've gotten some discovery on this.
18     Senator Lott called Judge DeLaughter on about March 29th.
19  Said, I understand you're interested in a judgeship; why don't
20  you send me a resume. Turns out he already had resumes from
21  other people, that had sent him Judge DeLaughter's. This is
22  March 29th of 2006. Judge DeLaughter wrote him a letter and
23  sent it the next day. It's dated March 30th.
24     Two of the judgeships were gone very quickly, Judge --
25  well, at least one of them was. Judge Jordan was appointed

30

1  very soon after that. The trial in this case wasn't until
2  August. Summary judgment rulings, some of which went against
3  the Scruggs firm, were in July. So there -- it's not -- it
4  doesn't connect up. It's not like this case. It doesn't add
5  anything. And in fact, it detracts. We'll be spending a lot
6  of time dealing with something that has really nothing to do
7  with this indictment. If they can prove this indictment, let
8  them do it.
9      MR. NORMAN: Your Honor, excuse me. Counsel opposite
10  misstated one fact, unintentionally I know.
11     THE COURT: All right. You may rebut shortly.
12     MR. NORMAN: All I wanted to say to the Court is that
13  at one point counsel opposite said there was no money up front
14  to Ed Peters, and that isn't true. It is true that there was a
15  reverse contingency agreement; and because of that agreement, a
16  lot of this money went to Mr. Peters. But $50,000 of -- amount
17  went to Mr. Peters up front in cash in a plain brown envelope
18  with the statement being made, "There's no 1099 on this."
19     MR. KEKER: And I don't think the evidence -- maybe
20  we can find out. Is there going to be any evidence that
21  Mr. Scruggs said, Pay Mr. Peters as a consultant without a 1099
22  or in cash; or was that something -- as I understand the
23  evidence, that's something that Mr. Peters -- I mean,
24  Mr. Balducci and Mr. Langston cooked up.
25     THE COURT: All right. Well, we'll see, maybe. The

31

1  Court is fully advised at this point of what the evidence is
2  that the Government wishes to introduce under 404(b), fully
3  apprised sufficiently to rule on this motion. I do not feel at
4  this time that there's -- that any testimony by any witness
5  would be productive or would add anything that's necessary to
6  be known to the Court before ruling on it.
7      The Court wants to take this motion under advisement and
8  read a couple of cases that have been presented to me in your
9  briefs again before ruling. And the Court will take this
10  motion of 404(b) under advisement and rule on it within a few
11  days.
12     All right. Who is going to represent the defendants on
13  the dismissal of Counts 2, 3, and 4?
14     MS. LITTLE: Your Honor, I will. I'm Jan Little from
15  Keker & Van Nest.
16     THE COURT: All right, Ms. Little.
17     MS. LITTLE: Thank you. Good morning, Your Honor.
18     THE COURT: Good morning.
19     MS. LITTLE: Counts 2, 3, and 4 charge the defendants
20  with violating 18 USC Section 666(a)(2), which criminalizes the
21  offer of a thing of value to an agent of a state or local
22  Government with an intent to influence him in connection with
23  any business or transactions of such Government agency provided
24  that the Government or agency receives over $10,000 in federal
25  funding in a one-year period surrounding the charge.

32

1      Now, the Government here claims that Judge Henry Lackey is
2  an agent of two entities, Lafayette County and the
3  Administrative Office of the Courts. There are three questions
4  that Your Honor must answer in evaluating our motion. First,
5  is Judge Lackey an agent of either Lafayette County or the
6  Administrative Office?
7      Second, if so, was the purported bribe made in connection
8  with any of the business of Lafayette County or the
9  Administrative Office? And third, if both of those things are
10  true, is it constitutional, under these facts, to apply the
11  statute to this conduct? And we respectfully submit that the
12  answer to each of these questions is no. This conduct cannot
13  be charged under Section 666.
14     First, we'll start with the agency question; and we'll
15  start with the statute. The Statute 666 defines an agent as a
16  person authorized to act on behalf of an organization or
17  Government; and they give the example of servant, employee,
18  officer, manager, or representative.
19     And then in the Fifth Circuit, the Phillips case -- I
20  think both sides agree that the Phillips case sets forth
21  various factors that are considered in applying this statute.
22  Your Honor, Judge Lackey of the Third Circuit Court of
23  Mississippi is not an agent of Lafayette County. Lafayette
24  County is one of eight counties in the third circuit, but he is
25  not an employee or officer of Lafayette County.

33

1    We start with the Mississippi Constitution. Article I of
2    the Mississippi Constitution sets forth the three branches of
3    Government. Article V discusses the executive branch and
4    includes in Section 135 and 138 the county officers under the
5    executive branch, including sheriff, coroner, assessor, clerks
6    of court, members of the board of supervisors, but not judges.
7        THE COURT:  If he's not an agent of the county or the
8    Administrative Office of the Courts, who is he an agent of?
9        MS. LITTLE:  He's a member of the judicial branch.
10   It is a separate branch of Government.
11       THE COURT:  Is he an agent of any governmental
12   institution?
13       MS. LITTLE:  I suppose he'd be an agent of -- I mean,
14   he's an agent of the courts, of the Supreme Court. I mean, it
15   comes under the judicial branch, Article VI, which has the
16   judicial branch, as opposed to article V, which is the
17   executive branch.
18       THE COURT:  I think the statute also says a manager,
19   doesn't it, an agent or a manager of a governmental unit?
20       MS. LITTLE:  Yes. But Judge Lackey is not a manager
21   of Lafayette County either nor is he manager of the
22   administrative offices of the U.S. -- excuse me -- of the
23   courts. I say U.S. Courts; I'm thinking Your Honor certainly
24   wouldn't consider yourself a manager of the AO of the federal
25   judiciary.

34

1        THE COURT:  No. Well, I don't know. But anyway --
2    sometimes I think they're the manager of us.
3        MS. LITTLE:  I think Mr. Meacham thinks that, Your
4    Honor, but --
5        THE COURT:  Yes. But he's gone now.
6        MS. LITTLE:  Okay.
7        THE COURT:  But, at any rate, does not a circuit
8    judge manage some of the moneys of the county?
9        MS. LITTLE:  Your Honor, the legislature will
10   appropriate moneys that can used for courthouse facilities and
11   the like. But that doesn't make Judge Lackey a manager of the
12   county any more than -- you know, Your Honor has to sign CJA
13   vouchers, for example. Those are moneys that are appropriated
14   by the U.S. Treasury. They're appropriated down.
15       You have to sign the vouchers for those moneys to be paid
16   for indigent defense, but that doesn't make you an agent of the
17   U.S. Treasury, nor does it make you an agent of the
18   Administrative Office. It's the three branches of Government
19   each have their roles. The legislature appoints the funds, and
20   they're used by the Courts as necessary.
21       This is in the Hosford case, and the Supreme Court of
22   Mississippi discusses this, how it's the legislature's
23   obligation to provide the funding that's necessary for the
24   courts to do their business. But that does not create an
25   agency relationship.

35

1        With respect to -- let me just talk for a minute about the
2    Administrative Office. I think the Mississippi Constitution
3    answers the question for Lafayette County. It's a separate
4    branch of Government, period. With respect to the
5    Administrative Office, we can look to the Mississippi Code,
6    Section 9-21-3 -- or excuse me -- dash 1, which is cited in our
7    brief, which says that the Administrative Office of the Court's
8    purpose is to administer the nonjudicial business of the
9    courts. That sort of answers it right there.
10       Judge Lackey is doing the judicial business and the
11   Administrative Office does the nonjudicial business. Judge
12   Lackey is not an agent of the Administrative Office. And
13   again, if you apply the Phillips' test, the Administrative
14   Office does not set the judge's duties; the Administrative
15   Office does not supervise the judges, does not pay the judges'
16   salaries. Those all come from the state; they do not come from
17   the Administrative Office of the Courts.
18       The second factor that Your Honor must consider is whether
19   this alleged bribe happened in connection with any of the
20   business of either Lafayette County or the Administrative
21   Office. And again, this is really -- it's tied to the agency
22   question. It's really, Is there an action that's in the scope
23   of the agent's power?
24       And again, Judge Lackey does not conduct the business of
25   Lafayette County. He conducts the judicial business, but he

36

1    doesn't operate funds or do any of the business of Lafayette
2    County. I mean, the business he conducts is settling disputes
3    between private litigants. And Lafayette County could even be
4    a litigant before Judge Lackey. But he does not conduct
5    Lafayette County's business.
6        THE COURT:  Well, could a -- under your theory, could
7    a circuit judge ever be a party to a 666(e) charge?
8        MS. LITTLE:  Yes, if there's some relationship to
9    some moneys involved. For example, the Castro case cited in
10   our brief talks about kickbacks to a judge in order to get
11   public defender appointment moneys paid. Or, for example,
12   there's the Massey and the Grubb case which involved judges
13   spending moneys for the hiring of detectives.
14       So when there's a bribe to a judge that somehow involves
15   the judge doing something involving moneys, then there can be a
16   666 violation. Here, the claim is that a bribe was paid to
17   influence a judge's ruling, has nothing to do with anything
18   with the public funds. It's simply to influence a ruling
19   between private parties.
20       And interestingly, the only cases where that kind of
21   conduct has happened -- they're out of circuit. But the Frega
22   case in San Diego -- this is a huge investigation in San Diego
23   involving 12 years' worth of corruption where plaintiffs'
24   lawyers were paying superior court judges to influence their
25   rulings in cases. And Judge Rafeedie in San Diego said that

37

1  cannot be a 666 violation.
2      Similarly, the McCormick case out of Massachusetts cited
3  in our brief has to do with bribes to police officers in order
4  to not investigate something.  Again, the Court said, that
5  can't be a 666 violation.  Because it's not -- there's no
6  involvement of the public funds there.  It's simply paying a
7  public official to influence their decision-making, but not to
8  influence their involvement with public moneys, as was the case
9  in Castro and Massey.
10     So unless there's some kind of tie to the money -- that's
11  the point of the Phillips case in Louisiana.  There has to be
12  some connection between the bribe and the money, some
13  expenditure of public money; and that's not present here.
14     Finally, Your Honor, on the constitutional point, in order
15  for this conduct to be punishable and be constitutional, there
16  has -- as I just mention, there has to be some connection to
17  money being influenced.  This 666 comes under the Necessary and
18  Proper Clause of the Constitution, the spending power.  There's
19  got to be some nexus to money some how now.
20     Now, the Sabri case says you don't have to show a direct
21  connection between the crime and specific federal dollars,
22  because money is liquid and you don't have to tie it right to
23  the federal dollars.  But there's got to be some connection to
24  some expenditure of money somewhere or else it's
25  unconstitutional as applied.

38

1      So for these reasons, this conduct cannot be reached by
2  666.  And Your Honor asked exactly the right question, Can a
3  judicial officer ever be charged?  Yes, if the judicial officer
4  is being bribed in order to do something to spend public
5  moneys, like pay an indigent defense counsel, like pay for a
6  private detective.
7      But when a judge is being bribed to influence rulings
8  between private parties -- the Frega case, the McCormick case
9  say, no, that cannot be a 666 violation.
10     THE COURT:  All right.  Well, are you familiar with
11  the Fifth Circuit case that holds -- that if a judicial officer
12  is merely corrupt and can be bribed, that that in itself
13  threatens the integrity of the federal funds, that that
14  judicial officer has some ability to control?
15     MS. LITTLE:  Is it the Lipscomb case?
16     THE COURT:  Even though there was no money involved
17  in the act that he was bribed for, Fifth Circuit case?
18     MS. LITTLE:  No.
19     THE COURT:  Well, I don't have it.  Let's see --
20     MS. LITTLE:  Is it maybe the Lipscomb case or the --
21  I'm not sure which case you're talking about.
22     THE COURT:  Well, let's see.  U.S. -- wait a minute.
23  No, this is another case.  Oh, well, you cited the case from
24  San Diego; but that was, as you said in your brief -- correctly
25  so -- in the Patrick Frega case, U.S. v. Patrick Frega -- which

39

1  was the Southern District of California.  As you said, Judge
2  Rafeedie held that the federal bribery statute did not apply
3  because there was no money.
4      But, as you correctly cited later in one of your
5  footnotes, that was before the Sabri v. U.S. which held that it
6  was not necessary to have a nexus between the federal funds and
7  the act charged.
8      MS. LITTLE:  That's right, Your Honor.  But there
9  still has to be a connection to some kind of funds.  And if you
10  look at the Sabri case, it talks about that.  It says,
11  Otherwise, you would just criminalize purely local acts; and
12  that would upset the federal state balance that our
13  Constitution holds so dear.  There's got to be some kind of
14  connection to some funds.
15     Sabri talks -- first of all, Sabri is -- of course, it's a
16  facial challenge.  It's not a challenge to the law as applied.
17  But what's important is in Sabri it talks about -- it says,
18  "Congress has the power to keep a watchful eye on expenditures
19  and to protect spending objects from the menace of local
20  administrators on the take."
21     So while Sabri says you don't have to show a direct link
22  to the actual federal dollars, because, as Sabri points out,
23  dollars are dollars, they are fungible, it's liquid.  But you
24  still have to have some connection to spending, to funding.
25  Otherwise, you just have a purely local crime.

40

1      In the Fischer case, that's discussed.  Otherwise, you're
2  going to have a situation where purely local offenses, which
3  are punishable by state law, end up coming into federal court
4  where they don't belong.
5      Mississippi has a state court -- a state bribery statute
6  that could apply here.  Just as in the Frega case, Judge
7  Rafeedie noted that the California Penal Code, Section 93,
8  which criminalizes bribery of local people.  That does not --
9  that's enough.  The state's rights can punish that conduct if
10  they want to, but that doesn't mean the case belongs in federal
11  court.
12     THE COURT:  If this state statute was the one that
13  was going to control, who would prosecutor that?
14     MS. LITTLE:  That would be up to the state D.A.
15     THE COURT:  I know; I know.  But I've read recently
16  that the Attorney General said he wouldn't prosecute this case.
17     MS. LITTLE:  I think there's district attorneys,
18  there's other folks, that could prosecute it.
19     THE COURT:  All right.  No.  I mean, just because one
20  state institution says they would not take on the case doesn't
21  mean that that would give this Court jurisdiction.
22     MS. LITTLE:  That's exactly right.
23     THE COURT:  I said that sort of facetiously.  But the
24  case -- the Fifth Circuit case that I had in mind when I asked
25  you about it was U.S. v. Albert Lipscomb.  Are you familiar

41

1  with that case?
2      MS. LITTLE:  Yes.  The Lipscomb case is -- frankly,
3  I'm not quite sure what to do with it.  It's a very long
4  opinion, about a hundred pages.  You have -- Judge Wiener,
5  writes a very lengthy opinion on discussing the Phillips test
6  and whatnot.  Judge Duhé concurs in the result but not in that
7  analysis, and then Judge Smith dissents.  So I'm not even sure
8  what precedential value the Lipscomb case has.
9      It's very scholarly and interesting to read, but I'm not
10  sure that it has -- because there's a concurring opinion that
11  doesn't join in that particular analysis, I'm not sure how much
12  value it has to us.  Thank you.
13      THE COURT:  Okay.  Thank you.  Mr. Sanders?
14      MR. SANDERS:  Your Honor, I don't think the Lipscomb
15  case has any value to the defense position in this case either.
16  I want to respond -- I can respond to defense counsel's
17  arguments in the same order she made them.
18      First of all, I want to respond to her agency argument.
19  The Government's position is that Judge Lackey was an agent of
20  the Administrative Office of Courts and of Lafayette County.
21  As defense counsel pointed out, the first place to look is the
22  statute itself, subsection D(1) of 666 points out that the
23  definition of an agent, for purposes of this statute, is
24  whether he's a representative authorized to act on behalf of
25  the agency at issue.

42

1      As to -- and just as an example, as to the Administrative
2  Office of Courts, Mississippi's statute, 9-1-36 -- I think I've
3  cited in my brief -- points out that certain funds come to the
4  Administrative Office of Courts and those funds are then sent
5  to the various circuit judges in the state.
6      I think he receives $40,000 per year for staffing.  He
7  receives $4,000 a year for supplies.  He receives $4,000 for
8  rent, as an example, if he wants to rent office space.  And in
9  fact, Judge Lackey does use that money as well.  He certainly
10  is authorized to act on behalf of the Administrative Office
11  with that money.  In fact, when he gets that money, he then
12  goes out and hires his staff.
13      It's up to Judge Lackey who he's going to hire as a law
14  clerk, for instance, or a court administrator, Ms. Monette, for
15  instance, Judge Lackey hires.  He even is authorized to decide
16  where he wants to rent property.  He chooses the supplies.
17  When they send him $4,000 for supplies, they don't actually
18  send him a $4,000 check.  He actually goes out and purchases
19  everything he needs and then sends an invoice to the court.  So
20  certainly when he is out looking, he is authorized to act on
21  behalf of the Administrative Office.
22      Under the Phillips case -- and I'm not certain how much
23  precedential value Phillips has left.  Judge Jolly relied very
24  heavily on principles that were abrogated by, I think, the
25  Supreme Court in Sabri.  But a few of the factors that Judge

43

1  Jolly pointed to in the Phillips case were, for instance,
2  whether or not the principal had control over the agent.
3      In this case, back to 9-1-36, as I pointed out in the
4  response, judges -- circuit judges have to come up with a plan,
5  a personnel plan; and they have to then submit that plan as to
6  how they're going to be utilizing the funds of the
7  Administrative Office.
8      And pursuant to the statute, I cited the statute and
9  quoted it, They then determine whether they'll accept that plan
10  or not.  They're certainly exercising authority over them when
11  they decide whether or not they're going to allow him to
12  utilize a particular plan.
13      Another example, as I pointed out, is whether he can rent
14  a particular property or not.  If Judge Lackey wanted to rent
15  his own building, for instance, then he's -- he must then
16  provide an appraisal for the value of that property.  And then
17  it's up to the Administrative Office of Courts whether or not
18  they're going to be willing -- they're willing to pay money for
19  him to rent that particular property.  It's just another
20  example of them having control over him.
21      Whether he has control over -- another question that comes
22  out of the Phillips case, whether Judge Lackey has control over
23  employees of the Administrative Office of Courts comes, again,
24  right out of 9-1-36.  The statute provides specifically that
25  the employees working for him, the specific ones who are

44

1  considered employees of the Administrative Office, are there at
2  the will and pleasure of the circuit judges.  So he certainly
3  has control over his court administrator, for instance, who is
4  seen as an employee of the Administrative Office.
5      The Phillips case, as I know the Court is aware, was
6  actually a case with a tax assessor of the state of
7  Louisiana and whether or not he was an agent of the Louisiana
8  Parish.  It's a case that is pretty fact specific as well.  As
9  this Court is aware, I'm sure -- and as every first year law
10  student is aware -- when you learn in law school a rule of law
11  and your textbook tells you that 49 states have followed that
12  particular rule of law, you realize pretty quickly that that
13  one state is almost always going to be Louisiana.
14      So the tax administrator's position as is opposed to
15  the -- as it relates to the parish doesn't have a great deal of
16  value when we're looking at a circuit judge in the state of
17  Mississippi.
18      But one of the other points they look to is whether or not
19  the parish paid the tax assessor's salary in Louisiana.  They
20  pointed out that the parish had nothing to do with his salary.
21  In this case, we don't dispute that the state pays Judge
22  Lackey's salary; but it's certainly administered and goes
23  through the Administrative Office of Courts.
24      As to Lafayette County, whether or not Judge Lackey is an
25  agent of Lafayette County, again, we're looking to see whether

45

1  he's authorized to act on behalf of the county.  It almost goes
2  without saying that a circuit judge acts routinely on behalf of
3  Lafayette County.  First and foremost, the orders he signs are
4  headed by "in the United States -- or "in the Circuit Court of
5  Lafayette County."  I'm making the same mistake defense counsel
6  made.
7      But as examples of him acting on behalf of Lafayette
8  County, when Judge Lackey is hearing cases at the courthouse
9  here on the square, he may be assessing fines to certain
10  parties, perhaps to an attorney who shows up late.  All of
11  those fines go straight to the general fund of Lafayette
12  County, certainly acting on behalf of the county.
13      He is the one who chooses who will be the county's victim
14  assistance coordinator, for instance.  He selects the public
15  defender.  As I pointed out in my response brief, just recently
16  in Lafayette County I think there were a number of supervisors
17  who wanted to change the public defender.  I think it was
18  Mr. Ken Coghlan, who was involved in this case at one point.
19  And Judge Lackey wouldn't allow it.  He was certainly acting on
20  behalf of the county.
21      If the public defenders, for instance, have a conflict of
22  interest -- as I pointed out in my response -- it's Judge
23  Lackey who then, for the county, selects a private individual.
24  That private individual who represents an indigent defendant
25  would also submit to Judge Lackey his bill at the end of the

46

1  day; and it's Judge Lackey who determines whether or not the
2  county is going to pay that much.  I could go on.
3      I mean, Judge Lackey is going to order the county to pay
4  any expenses, for instance, that that particular defense
5  counsel wants.  If he wanted a psychiatric evaluation or if he
6  wanted a witness from across country.  I know that different
7  attorneys oftentimes ask for that stuff, and the supervisors
8  wring their hands because the judge is ordering the county to
9  pay those kinds of expenses.
10      Whether Judge Lackey has control over county employees, I
11  don't think there's anybody over in the courthouse who would
12  say that Judge Lackey doesn't have control over them, from the
13  circuit clerk all the way down to law clerks, court reporters,
14  anyone else who the Administrative Office and the county both
15  pay their salaries.
16      Finally -- well, not finally.  Secondly, as to whether or
17  not there is a connection with the bribe paid in this case and
18  a business transaction or series of transactions of the
19  Administrative Office or Lafayette County, as I pointed out in
20  my response, certainly cases being heard in circuit courts in
21  the state of Mississippi today are very real parts of the
22  business -- anyone who is in business, anyone who's practicing
23  law in the state now, circuit courts are a very real part of
24  their business.
25      And any sort of contract dispute -- parties to contracts

47

1  are always aware that if they are unable to resolve conflicts
2  that the circuit courts are going to be there to help them
3  resolve these conflicts.  If they want to then go into the
4  court, they're going to pay -- as I pointed out in my
5  response -- a fee.  They're going to pay $107.  For instance,
6  Johnny Jones, in this case, paid $107 to have the circuit court
7  provide a service, to have Judge Lackey hear the case, to have
8  a court administrator work the case.
9      THE COURT:  One thing I didn't understand about your
10  brief, you said that these fees to bring a case into court, to
11  file a case, you listed a hundred dollars or something for him
12  to file a civil case.  And then you listed something like $370
13  to file a criminal case.  Who pays that in a criminal case?
14      MR. SANDERS:  Yes, sir, I believe the district
15  attorney's office pays that.
16      THE COURT:  Really?
17      MR. SANDERS:  I'm not certain of that.  I just know
18  that to bring a criminal case in circuit court --
19      THE COURT:  You mean the district attorney's office
20  has to pay $370 every time they file an indictment?
21      MR. SANDERS:  I'm not certain one way or the other.
22  I think there's a $300 fee for every criminal case that is
23  brought, but I don't know who pays that.
24      THE COURT:  It's probably never collected.  It'd
25  probably be by the defendant.

48

1      MR. SANDERS:  It may well be.
2      THE COURT:  Taxed as court costs to the defendant.
3  But I don't think it's paid up front; when you file an
4  indictment, somebody has to pay $370.
5      MR. SANDERS:  May not be.  I may have gotten that
6  wrong.  I do know though, however, in a civil case.  As we're
7  talking about before us now, that the plaintiff does pay a $107
8  fee when he files his complaint.
9      Obviously, when he files that complaint, he is expecting a
10  service to be provided from Judge Lackey, from all the staff,
11  from the county employees, everyone working that case.
12  Portions of that $107 fee go to pay employees of the
13  Administrative Office of Courts and go to pay salaries of the
14  county employees.
15      Obviously, as well, the bribe paid to Judge Lackey was
16  certainly in connection with Judge Lackey's position as a
17  circuit judge.  So I think clearly the bribe paid in that was
18  absolutely in connection with a business transaction of both
19  the Administrative Office and Lafayette County.
20      Finally, their argument that this statute is
21  unconstitutional as applied to them in this case.  The first
22  argument they make is that public money must be implicated.
23  That's not my interpretation of the Sabri decision.  In fact,
24  the Sabri decision made it clear that there didn't have to be
25  any connection for jurisdiction purposes between the forbidden

49

1   conduct and the federal funds.
2        THE COURT:  What were the facts in the Sabri
3   decision?
4        MR. SANDERS:  In the Sabri decision, I do believe
5   that Sabri was a developer in Minnesota; and he was bribing
6   someone, I believe on a city council, something like that; so
7   that he would then be able to avoid certain ordinances, certain
8   zoning regulations, that kind of thing, I believe that was it.
9        The Court, though, eventually ruled that --
10       THE COURT:  What about the Lipscomb case, the Fifth
11  Circuit case that Ms. Little said she didn't have any --
12  much -- didn't like?
13       MR. SANDERS:  Yes, sir.
14       THE COURT:  What are the facts of that?
15       MR. SANDERS:  Your Honor, I'm not familiar with the
16  facts of the Lipscomb case, and I'm not because when I was
17  doing the research and reading everything up to this case, I
18  felt like Lipscomb -- the decision that Lipscomb made, as well
19  as Moeller, I believe, those decisions were so completely
20  abrogated by the Sabri case because they were -- they spent a
21  great deal of time and effort discussing whether or not there
22  had to be a connection to the federal funds.  And when Sabri
23  came in, they ruled there didn't have to be any connection
24  whatsoever.
25       I think that Lipscomb was made post Salinas.  And Salinas

50

1   had intimated that that was the case but hadn't come right out.
2   They had put some language in the Salinas case that looked like
3   there may still need to be some connection in some instance,
4   and that's kind of what the Lipscomb case discussed.  And then
5   the Sabri decision came in next and made it clear that there
6   didn't need to be any connection.
7        Their position that there has to be a connection to at
8   least some funds, then, Your Honor, is -- essentially, as I
9   pointed out in my brief, their arguing -- logic would dictate
10  that they must be arguing that, Well, then there has to be a
11  connection to state or local funds.  And that just -- that
12  doesn't make sense in an argument that there's no federal
13  jurisdiction.
14       If the Court has said there doesn't have to be a
15  connection to federal money, then certainly the Court didn't
16  mean that there -- but there does have to be a connection to
17  state or local money to confer jurisdiction on the federal
18  courts.  I don't think state or local money would have anything
19  whatsoever to do with jurisdiction in Federal Court.
20       And then, finally, they argued that the behavior in this
21  case was just too attenuated to confer a federal interest in crime.
22  And as I said in my brief, I think that's precisely what the
23  defendants were arguing in Sabri, and that's precisely what the
24  Supreme Court ruled did not have to be done.
25       THE COURT:  All right.  Thank you.

51

1        MS. LITTLE:  Your Honor, very briefly?
2        THE COURT:  Yes.
3        MS. LITTLE:  I'd like to respond to a couple of
4   points.  Mr. Sanders referred to the business of office space
5   being provided -- or money for office being provided by the
6   Administrative Office.  In fact, my understanding is that -- at
7   least for the office supplies and rent, the money does not come
8   from the Administrative Office.  It comes from the treasury --
9   from the state treasury and is certified by the Supreme Court.
10       But in any case, if you look at the Phillips case,
11  footnote 13 talks about the fact that the parish there provides
12  office space and the like; but that doesn't make Mr. Phillips,
13  as the tax collector, an agent of the parish.  And similarly,
14  the Hosford case in the Mississippi Supreme Court talks about
15  the fact that the legislature -- as part of, again, separation
16  of powers, the legislature is required to appropriate funds in
17  order for the judiciary to do its job, but that does not create
18  an agency relationship.
19       Briefly, on the Lipscomb case, Lipscomb involved a Dallas
20  city counsel person, as I recall.  But it did not involve a
21  judge.  And what I'm thinking about is essentially the
22  Government hasn't cited a single case where a circuit court or
23  a state court judge is prosecuted under Section 666 for being
24  bribed for a ruling.  That's what this case is about, and I'm
25  not aware of any case where 666 has been applied in that

52

1   situation, the situation that we have before us.
2        Finally, I just wanted to point out that, yes, there's got
3   to be some kind of -- after Sabri, there still has to be some
4   kind of connection to money.  I don't mean to argue that it's
5   only purely state and local money.  There's got to be a pool of
6   money where there are some federal funds flowing into it.
7   That's what the Sabri case talks about.  It talks about the
8   liquidity of money.  There has to be a pool of money, some of
9   which is federal.
10       The Sabri case points out that 666 was enacted to kind of
11  fill some gaps in 641 and 201.  641 is theft of federal moneys
12  and 201 is federal bribery.  And what 666 was meant to do was
13  fill some gaps there where you have, for example, theft of a
14  pool of money, some of which is federal and some isn't.  And
15  666 is also meant to fill a gap in 201 where you have bribery
16  of a state court official who has some connection to federal
17  moneys, that's what 666 was intended to do.
18       What Sabri says, is, okay, well you have these kind of
19  mixed state and federal funding situations.  You don't have to
20  trace the crime right to those particular dollars and quarters
21  and $20 bills that are federal; you don't have to do that.  But
22  there still has got to be some connection to this pool of
23  money, otherwise you can't get to the Necessary and Proper
24  Clause of the Constitution.  There's got to be some connection
25  to money, and that's what Sabri says.

53

1    Again, "Congress has the power to keep a watchful eye on
2    expenditures and protect spending objects from the menace of
3    local administrators on the take." Here, Judge Lackey was
4    allegedly bribed to issue a ruling between two private parties.
5    There's no expenditure of public moneys of any kind involved.
6         THE COURT: All right. Thank you.
7    All right. We will be in recess now for 15 minutes.
8         (AFTER A SHORT BREAK, THE PROCEEDING CONTINUED)
9         (CALL TO ORDER OF THE COURT)
10        THE COURT: All right. The Court is -- tell her to
11   come back in here, please. The Court is -- has considered the
12   arguments and the briefs filed by the attorneys on their motion
13   to dismiss Counts 2, 3, and 4, and finds that -- that the -- a
14   circuit judge does have duties that makes him or her an agent
15   or a manager of a county in which the circuit court sits and of
16   the Administrative Office of the Court in that the judge has
17   authority to hire certain employees, pay them from county
18   funds, or from AO funds.
19        He has the authority to buy supplies. He has the
20   authority to appoint public defenders, to levy fines whose
21   moneys go into the county treasury. And from which treasury,
22   he can expend certain funds for other purposes. He also has
23   the -- or she -- has the authority to appoint deputy court
24   clerks during term times of Court and set per diem rates for
25   those clerks and how many days they would be paid.

54

1         And even though the order -- this order of the -- of Judge
2    Lackey in this case, which he was allegedly given money to
3    issue, did not affect any federal funds or any funds at all,
4    the Court has reviewed two cases that it believes is
5    controlling in this case.
6         The Fifth Circuit obviously gives a much more liberal
7    interpretation to Title 18, Section 666, than does the Ninth
8    Circuit in the cases that were cited by the attorney for the
9    defendant. The Ninth Circuit obviously has held that there
10   must be some affecting of federal -- of money by the issuing of
11   the order, if 666 is to apply. The Fifth Circuit has held the
12   opposite.
13        The Lipscomb case in the Fifth Circuit was -- had a
14   factual basis of a city councilman who was -- who had bribed
15   a -- or a city councilman who had been bribed by a taxi cab
16   company to issue certain votes and to -- in favor of the taxi
17   cab company, did not involve expenditure of funds and that was
18   held to incur jurisdiction.
19        That case said specifically that a corrupt or state
20   official who has real responsibility for, or often participates
21   in, the allocation of federal funds is a threat to the
22   integrity of those funds even if they are not actually directly
23   affected by his corruption.
24        Also in the Fifth Circuit, the Salinas case was a case
25   which did not involve the expenditure of any funds by the

55

1    corrupt act of the Government official. In that case, it was a
2    sheriff who allowed, for a fee, certain contact visits by the
3    girlfriends or wives of the federal prisoners who were kept in
4    the county jail temporarily. And the Fifth Circuit held in
5    that case that that was sufficient to violate -- to invoke
6    jurisdiction on -- under 666(e).
7         And they said specifically, Section 666(a)(1)(B) does not
8    require the Government to prove the bribe in question, had a
9    demonstrative -- demonstrated effect on federal funds. The
10   enactment's plain language is expansive and unqualified, both
11   as to the bribes forbidden and the entities covered,
12   demonstrating by its reference to quote any business or
13   transaction. And that is not confined to transactions
14   affecting federal funds.
15        So based on the liberal -- more liberal interpretation of
16   the Fifth Circuit Court of Appeals than the Ninth Circuit, the
17   Court is of the opinion that the motion to dismiss Counts 2, 3,
18   and 4 should be denied. And it will be so ordered. Of course,
19   the Court reserves the right to supplement this order,
20   delivered orally from the bench, at a later time.
21        All right. It's 11:25. We will be in recess now until
22   one o'clock and, at that time, take up -- start on the
23   remaining motions, which will be the two motions for severance
24   and the motion for a change of venue. I am not prejudging by
25   change of venue that -- well, change of venue is still on the

56

1    table, it's still in play, regardless of the Court's ruling on
2    the suppression of the wiretaps.
3         Because the suppression of wiretaps alone would not
4    dismiss this case. So change of venue is still relevant. And
5    we'll take those two motions up -- those three motions up at
6    one o'clock, starting with the two motions to sever; and then
7    the remaining motion will be the change of venue. We'll be in
8    recess until one o'clock.
9         (AFTER A LUNCH BREAK, THE PROCEEDING CONTINUED)
10        (CALL TO ORDER OF THE COURT)
11        THE COURT: We have two motions to sever. Which
12   motion do the defendants want to take up first, Mr. Backstrom
13   or Mr. Scruggs?
14        MR. GRAVES: Mr. Scruggs' motion, Your Honor.
15        THE COURT: Very well.
16        MR. GRAVES: Good afternoon, Your Honor. My name's
17   Todd Graves, along with -- Nathan Garrett's here at counsel
18   table with me. We represent Zachary Scruggs. The motion
19   before us is the motion to sever Mr. Zachary Scruggs from this
20   trial, and I want to basically go right to Rule 14. We've
21   briefed this pretty extensively, but the gravamen of Rule 14 is
22   prejudice; and that's what I want to focus on.
23        And in the Zafiro case in 1992 the U.S. Supreme Court
24   said, quote, there is a serious risk that a joint trial would
25   compromise a specific trial right of one of the defendants or

57

1   prevent the jury from making a reliable judgment about guilt or
2   innocence." They went on to say the defendants are tried
3   together in a complex case, and they have markedly different
4   degrees of culpability.  This risk is heightened.
5       And I think there's essentially three reasons why there's
6   a high risk of prejudice in this case.  The first reason is
7   there's a huge disparity in terms of the proof that the
8   Government's prepared to offer about Zachary Scruggs and about
9   the other defendants in this case.  That's not to suggest that
10  I think the other proof will be sufficient to a jury; but
11  there's -- under any analysis, there's a huge spread.
12      There are only, really, three thin threads that we wrote
13  about in our motion coming into this that connect Mr. Zach
14  Scruggs to this case; and those are only incriminating if you
15  already believe that he knew that there was a major afoot, if
16  there was a major afoot to bribe the judge and that he knew
17  about it.  Otherwise, those three thin threads in and of
18  themselves are not incriminating.
19      Something that Your Honor said earlier in response to -- I
20  think it was a motion for outrageous conduct, was that there
21  was ample evidence that there was more than passive conduct on
22  behalf of all the defendants.  And respectfully, I would
23  disagree with that.  I don't know that there is any evidence of
24  more than passive conduct on behalf of Zachary Scruggs, and I
25  think in that motion alone the outrageous conduct motion -- his

58

1   position is different than the other defendants.
2       To say that his actions in this case, from what we've been
3   provided, is passive would overstate his involvement in this
4   case.  The three threads we talked about, one of them was the
5   initial meeting.  He was present at the initial meeting in
6   March when there was a discussion about attempting to influence
7   the judge in some manner, about the arbitration order.
8       Well, the Government has conceded yesterday -- or my
9   understanding of what I heard was there is no allegation that
10  that meeting, in and of itself, was -- would support the
11  indictment.  And, so, I think one of three threads that I came
12  to this hearing with doesn't even exist; so now we're down to
13  two threads that we have to deal with.
14      The second thread is that Zachary Scruggs was in a
15  conference room when an order was delivered.  And the
16  description of what took place when this order was delivered, I
17  think -- and again, I'm not perhaps -- perhaps I'm mistaken,
18  but I think it's the only place he's even mentioned in any of
19  the tapes in this case.
20      He was sitting in a conference room behind the reception
21  station.  The Scruggs Law Firm, the way it's laid out, there's
22  a little conference room with some books in there, right behind
23  that.  He's sitting there working.  Mr. Balducci comes up to
24  deliver an order and walks in and hands it to him.  And I don't
25  see how that even connects him to this case.  It was an order

59

1   related to this case; but especially if you haven't already
2   decided that he's a member of this conspiracy, it doesn't
3   connect him to this case.
4       The third thread is the one we heard about yesterday that
5   said that Mr. Zach Scruggs may have been in the room when Tim
6   Balducci, who was only coming up into that office that day
7   because he was a Government agent and going up to incriminate
8   others based on the conduct he'd been caught with -- Zach
9   Scruggs allegedly was in a room for a small portion of the
10  conversation.
11      There's no allegation -- you can listen to the tape.  He
12  doesn't even say anything.  This Government agent makes
13  statements that at best would be confusing to a person and, at
14  worst, would be gibberish.  And Mr. Zach Scruggs says nothing.
15  And somehow, that is evidence that he has joined a conspiracy.
16      And one of the things that I found interesting after we
17  were given the grand jury transcripts yesterday, even the
18  agent's description of what took place in that room when
19  Mr. Balducci went in the office and spoke to Sid Backstrom and
20  Zach Scruggs was in the room for a period of time -- the
21  Government's description of that to the grand jury is not
22  accurate.
23      I'm not suggesting in any way that he went in and lied
24  about it.  What I'm suggesting is it's such a fine point that
25  this has come down to about what was said on a particular day

60

1   and that, therefore, Zach Scruggs belongs in this case; that
2   even the change of one word or two is pretty important.  And
3   the phrasing of it and the description to the grand jury and
4   the tape, I think, are significantly different.  Again --
5       THE COURT:  Would you be more specific on how it was
6   inaccurate?
7       MR. GRAVES:  Yes, I would, Your Honor.  And I don't
8   have page numbers on these transcripts, so it's hard for me to
9   describe it.  This is the grand jury transcript of 11-06 of
10  William Delaney.  And toward the back of what I have -- again,
11  I don't have a page number.  His description, quote,
12  Mr. Balducci to go back to Judge Lackey.  This is a paraphrase
13  of Mr. Delaney of Mr. Balducci's -- what he said in that room
14  on that day.
15      Mr. Balducci to go back to Judge Lackey on the first.
16  Quote, plus the fact that you still owe me $10,000 from your
17  original agreement." That's not in the tape.  That's not what
18  was said.  And that would be a pretty incriminating statement
19  if that was said.
20      Second one -- I only have two, Your Honor -- the next
21  page.  Quote -- paraphrased quote of Mr. Delaney paraphrasing
22  the statement of Mr. Balducci, what Mr. Balducci would say,
23  quote, you guys are paying for it, so you might as well get it
24  the way you like it.  And they both agreed that it is fine as
25  it is.

61

1  After Mr. Balducci talked with Zach Scruggs and Sid
2  Backstrom about this order and that they had paid for it and
3  get it like they wanted it, he did later have -- and it goes on
4  and that -- again, I'm not alleging that the agent purposely
5  misled the grand jury.  What I'm alleging is it's a jumbling of
6  what actually happened.
7  And because it's such a fine pint and one thin thread that
8  his involvement in this case depends on, those changing of the
9  wording that "you paid for it; you still owe me 10,000," that's
10  pretty significant as to his position in this case.
11  Mr. Scruggs is not -- Mr. Zach Scruggs -- and it sounds
12  silly to say that, but that's the way we're going to have to
13  conduct this trial.  But Mr. Zach Scruggs is not even mentioned
14  in the September 25th or the October 16th affidavit.  When Tim
15  Balducci gives his preamble before he goes up to attempt to
16  incriminate members of this firm, he says, "I'm going up to
17  talk to Sid Backstrom and possibly to Dick Scruggs."
18  Mr. Zach Scruggs wasn't even mentioned in the preamble.  I
19  think that the evidence will show, based on the evidence, that
20  I know anything about -- we can't even show -- the Government
21  can't even show that he was a willing participant in an
22  unlawful conspiracy.  Yet I think it is also very possible that
23  he might be convicted solely on the basis of the weight of the
24  evidence against others, including his father.  And I think
25  that goes to the heart of prejudice.

62

1  Let me step aside here very quickly.  If the Court were
2  inclined to leave Mr. Zach Scruggs in this case, I think that
3  we are entitled to a James hearing based on the things I just
4  said.  The standard of evidence is a preponderance that the
5  declarant and the defendant were members of the conspiracy, the
6  same conspiracy.
7  The statement was made during the course of the conspiracy
8  and was made in the furtherance of the conspiracy.  And I think
9  that this is the unusual case where it is unclear whether they
10  could meet the standard by a preponderance, let alone by a
11  reasonable doubt, that Mr. Zach Scruggs was even a member of an
12  unlawful conspiracy.  So that's the first thing.
13  The second thing is just the fact that his name is
14  Scruggs.  Beyond the total distance of evidence between he and
15  the other defendants, his name is Scruggs.  And Dick Scruggs'
16  name is obviously Scruggs.  And as they said in the Auerbach
17  case, which admittedly wasn't a case about severance -- it was
18  a case about ineffective assistance at counsel because they
19  didn't get severance or didn't ask for severance.
20  Quote, the father/son relationship makes a motion for
21  severance far more compelling than in the usual case of
22  unrelated codefendants.  That was from Auerbach, from the
23  Eighth Circuit in 1984.  Something that came up earlier here
24  this morning that I think makes it even more compelling is, as
25  we were talking about the 404(b) evidence, one of counsel for

63

1  the Government said, "In the Wilson case, the Scruggs Law Firm
2  was the defendant."
3  Well the Scruggs Law Firm wasn't the defendant in the
4  Wilson case.  That was a different situation before the Scruggs
5  Law Firm existed.  And if that would have gone horribly wrong
6  for Mr. Dick Scruggs' position in that case, it wouldn't have
7  cost Zach Scruggs a dime.  So that is the kind of confusion
8  that I fear that we're going to have to deal with throughout
9  this case.
10  And even Mr. Keker, who, through no intent but an intent
11  to try to describe who he's talking about and the difference in
12  these -- he said, when he was making one of his motions --
13  arguments earlier referred to Zach Scruggs as Dick Scruggs'
14  son.  And those are the sort of descriptive elements that I
15  think would lead to prejudice.
16  Yesterday, throughout the whole hearing -- and we tried to
17  keep track, and perhaps with a transcript -- which I haven't
18  been through -- I might be off by one.  But I think only once
19  or twice throughout the whole hearing when Mr. Scruggs was
20  referred to was it made clear whether they were talking about
21  Mr. Dick Scruggs or Mr. Zach Scruggs.  And again, that element
22  of confusion would lead to prejudice.
23  Based on this huge canyon of evidence, as I see it -- and
24  based on that, I don't see how a curative instruction could
25  bridge that canyon by telling the jury to put this out of their

64

1  mind and sort this out when we, as counsel, counsel for the
2  defense, the Court, the witnesses, can't seem to sort it out at
3  certain points.
4  The last thing I want to point out, not including the
5  distance in degree of evidence between the parties, the fact
6  that the Scruggs name is going to be very confusing.  The
7  Scruggs Law Firm is called the Scruggs Law Firm.  There's four
8  partners, there is not just three partners in the firm; there
9  are four partners in the firm.
10  Even beyond all that confusion, now we go into the 404(b)
11  evidence; and as I said a minute ago, that deals only with Dick
12  Scruggs for the purposes of this motion.  And by assurances
13  that counsel have been given previously, that case, the 404(b)
14  case, there was no indication that Mr. Zach Scruggs was going
15  to be a subject or a target or had anything to do with that
16  case.  That was my understanding.  I believe that's going to be
17  the Government's position for the purpose of this motion.
18  This morning, that got clouded up a little bit; but I
19  don't think that's the Government's position this afternoon.
20  For purposes of this motion, he has nothing to do with that
21  case.  The Scruggs Law Firm wasn't involved; and I think that,
22  again, it's not just distance, because that -- courts have said
23  that that's not always enough to grant a severance, distance,
24  father/son name and relationship.  You throw in the 404(b)
25  evidence.

65

1    I think that, in sum, what you start with is this huge
2  spread in the evidence. You pile on the 404(b) evidence
3  related to a wholly separate matter, having nothing to do with
4  Zach Scruggs; and you wrap all that evidence and the confusion
5  of the name, as it's recited here in the Court in the
6  father/son relationship; and what you have is a recipe for a
7  joint trial that will compromise the fundamental right and
8  prejudice the fundamental right of Zach Scruggs to be judged
9  fairly and impartially based on his conduct and his conduct
10  alone, his knowledge and his knowledge alone, and his intent
11  and his intent alone. And I think that calls for severance.
12    THE COURT: I heard something like you did this
13  morning -- I believe from Mr. Norman -- that perhaps Zach
14  Scruggs would also be a party to the 404(b). Did you hear
15  that?
16    MR. GRAVES: What was really interesting about that,
17  Your Honor, was it wasn't -- we've been led to believe that he
18  wasn't part of the 404(b). In fact, his previous counsel, as
19  part of the waiver of the conflict that we heard about, said
20  that the Government had assured him he wasn't a subject or a
21  target.
22    And then this morning, the very interesting nuance that I
23  heard wasn't, Zach Scruggs will be part of it; but there is
24  404(b) evidence against Dick Scruggs, and Sid Backstrom will
25  not be part of that evidence, not saying Zach will or won't be

66

1  part of it. And that is exactly the kind of confusion we are
2  talking about, those sort of nuances.
3    THE COURT: In the notice, the 404(b) notice you got,
4  did they mention Zach Scruggs as being a party to that
5  evidence?
6    MR. GRAVES: The notice is not that detailed. It's
7  basically a letter saying to look at the previous pleadings and
8  the previous --
9    THE COURT: Okay.
10    MR. GRAVES: -- filings. But they did not mention --
11  one, they did not mention Zach Scruggs. Two, they
12  specifically, unless counsel was mistaken -- in the conflict
13  waiver letter that this defendant was given, they specifically
14  said he wasn't the subject or a target of that investigation.
15  And I can only go based on what previous counsel was told.
16    THE COURT: Okay. All right. Thank you.
17    MR. GRAVES: Thank you, Your Honor.
18    THE COURT: Does the Government wish to respond?
19    MR. DAWSON: Yes, sir. I didn't know whether the
20  Court wanted to -- since we responded to the severance in a
21  combined fashion, if you wanted to hear it individually or all
22  at once?
23    THE COURT: Well, I'd rather here it individually
24  since the reasons are different.
25    MR. DAWSON: All right, sir. Generally speaking,

67

1    Your Honor, with respect to severance and joinder -- and I know
2  that the Court is thoroughly familiar with those issues --
3  there is no claim under Rule 8 of a misjoinder. As counsel
4  opposite said, they seek relief only under Rule 14, which is
5  the discretionary authority of the Court to grant a severance
6  in certain circumstances.
7    And those certain circumstances are that there can -- has
8  to be a showing of compelling prejudice against which the Court
9  is unable to afford protection. Severance has been held by the
10  cases that we have cited in our brief to be a drastic relief,
11  and movants have a heavy burden to demonstrate that without
12  such relief a fair trial cannot be obtained.
13    Just because there is a quantitative difference between
14  evidence in a multi-defendant case is not sufficient to warrant
15  severance. If that were the case, you could never have a
16  multi-defendant -- and certainly a multi-defendant conspiracy
17  case because just about in every one of those types of cases
18  the quantitative difference between the defendants is present.
19  However, in conspiracy cases, the evidence -- once a conspiracy
20  is established, the evidence is admissible against all the
21  co-conspirators.
22    Now, the Fifth Circuit has made it plain in joint trials,
23  especially in conspiracy cases, that severance is frowned upon.
24  And it's not favored at all. All evidence is admissible
25  against all co-conspirators. Now, there's a good reason for

68

1  that, because you essentially have to try the same case twice
2  or three times because there is no significant advantage if all
3  evidence is admissible against all defendants.
4    Now, with respect to the allegations that were made by
5  counsel opposite, I think that he's certainly -- not
6  intentionally, but understated the evidence with respect to
7  Zach Scruggs. In November, the first transcript, which was
8  attached to the response -- I believe the response involving
9  outrageous Government conduct -- there is considerable
10  discussion between Balducci, Mr. Backstrom, and Zach Scruggs.
11    And I won't detail all of it; but Mr. Balducci says,
12  "Zach, let me bring you up to speed. All right. This is on
13  the Judge Lackey deal. Okay? You know I came by here last
14  week, and I gave you that order." And it goes on to
15  describe -- and the three of them have a discussion about the
16  order that was provided to Judge Lackey -- or Judge Lackey was
17  considering entering as a result of having been paid the
18  $40,000.
19    Now, this is not just a normal conversation between
20  attorneys concerning a case about an order a judge has under
21  consideration. Mr. Balducci is not an attorney of record in
22  the Jones v. Scruggs case. He is not a party to it. He has no
23  interest in it. In fact, the Scruggs Law Firm has a very
24  reputable firm representing them at that time, the Daniel Coker
25  Horton law firm.

69

1   It is clear to anyone in that conversation that something
2   criminal is in -- afoot. Simply because, later on in the
3   conversation with Backstrom and Zach Scruggs in the room, the
4   statement is made, We need to get this right like we want it
5   because we're paying for it. There is not one single
6   objection. There's not one single, What do you mean, Tim
7   Balducci? What have you done? What are you talking about? So
8   it is clear that there's much more evidence just out of that
9   conversation than the Court was led to believe.
10   Now, the other objection, I think, to a joint trial asking
11   the Court for exercise of its discretion relates to the 404(b)
12   evidence. Now, it is true that the 404(b) evidence is mainly
13   against Dick Scruggs, one of the co-conspirators. However,
14   between the time that this response was prepared and this
15   hearing began, we became aware of some evidence that might
16   indicate that Zach Scruggs had some knowledge of the back door
17   attempt to influence Judge DeLaughter.
18   We've told counsel about that evidence, as Mr. Norman
19   indicated today. But I also told counsel that -- for the
20   purpose of this motion for severance, that we would assume for
21   the sake of argument that both Zach Scruggs and Sid Backstrom
22   were not implicated in the 404(b) evidence. And while I'm
23   mentioning that 404(b) evidence, I think it is clear -- the
24   Court should understand -- it is clear from the Government that
25   this will be not the full-fledged trial of the Wilson case.

70

1   All the 404(b) evidence -- its purpose is to show the
2   intent of the persons to whom the 404(b) evidence is admitted
3   against. And that would be to show that they attempted to --
4   and conspired to influence. It doesn't mean that we have to
5   prove all the way down the line that Judge DeLaughter was in
6   fact influenced or impugned by the evidence.
7   THE COURT: What did Joey Langston plead guilty to?
8   MR. DAWSON: I'm sorry?
9   THE COURT: What did Joey Langston plead guilty to?
10   MR. DAWSON: He pled guilty to the precise charge,
11   that is, conspiracy to corruptly influence Judge DeLaughter.
12   He pled guilty to a conspiracy charging himself, Richard F.
13   "Dickie" Scruggs, and others. And the evidence to show it
14   would be very brief in this sense.
15   THE COURT: Well, my question -- what I was asking
16   about specifically, I heard Mr. Norman say today, he's not sure
17   that that was a crime, that they committed a crime by that
18   conspiracy; that he's not charging a crime.
19   MR. DAWSON: No, sir. I don't think that's what he
20   said. I think what he said, or meant to say, was that it is
21   not necessary to prove for 404(b) purposes that in fact it was
22   a crime and the fact that Judge DeLaughter was in fact
23   corruptly influenced.
24   THE COURT: He said something about, You don't have
25   to show a crime; you just have to show bad acts.

71

1   MR. DAWSON: That is correct.
2   THE COURT: Which implies that that wasn't a crime.
3   MR. DAWSON: Yes, sir.
4   THE COURT: I wondered why Langston would plead
5   guilty if it's not a crime.
6   MR. DAWSON: That's correct. The point is, in order
7   to be guilty of a conspiracy to corruptly influence, that can
8   be done between people who attempt to do that without going all
9   the way down the line and proving that the judge was actually
10   influenced corruptly. And that's what Joey Langston pled
11   guilty to and is prepared to testify about, direct contact with
12   Dickie Scruggs and others with respect to what they planned to
13   do to adversely and corruptly influence the decision by Judge
14   DeLaughter.
15   Once that conspiracy is formed and an overt act is done in
16   furtherance of that conspiracy, it matters not whether or not
17   Judge DeLaughter was ever actually influenced. And I think
18   that's what the import of what Mr. Norman said was this
19   morning.
20   THE COURT: Do you not have to go further and show
21   that -- that they carried out some overt act in attempting to
22   carry forward with that plan, to make that plan come into
23   fruition?
24   MR. DAWSON: We will show that. We will absolutely
25   show that, with clear evidence. However, if -- hypothetically

72

1   speaking, if what -- if all we had was just a discussion
2   between Dickie Scruggs and Joey Langston about, Let's go
3   influence the judge; and here's how we'll do it, do X, Y,
4   and Z, I think that would be a bad act in the sense of showing
5   his intent with respect to this case. Now -- you see what I'm
6   saying?
7   THE COURT: Is that all you're going to show in this
8   case?
9   MR. DAWSON: No, that's not all we're going to show.
10   I said if that's all you had that would be enough to show
11   Dickie Scruggs' intent to corruptly influence the judicial
12   process. But we're going to show more than that. We're going
13   to show the actual conspiracy and an overt act in furtherance
14   of the conspiracy.
15   So -- but the reason that we said, for the purpose of
16   argument, that we would assume that both Backstrom and Zach
17   Scruggs were not involved in the 404(b) evidence is because of
18   the case of the United States v. Peterson in which the Fifth
19   Circuit held that in a conspiracy case where 404(b) evidence
20   was admissible against one co-conspirator but not admissible
21   against the other two, that the Court's limiting instructions
22   were sufficient to guard against any speculative prejudice or
23   any actual prejudice that might have existed.
24   The -- it is clear, under Fifth Circuit law that we cited
25   in our brief and in our response, that the mere fact -- and I

73

1  think Zafiro, the Supreme Court case, even alluded to this.
2  The mere fact that you might make an argument that you have a
3  better chance of being acquitted with a separate trial is not
4  sufficient to warrant a severance. And in this case, we do not
5  believe that a severance is appropriate.
6      And moreover, if the Court were to deny severance, that
7  doesn't mean the Court can't revisit that issue as the case
8  develops. We don't think that that would change the Court's
9  ruling. But if something would happen, unforeseen, that would
10  cause a drastic prejudicial effect that the Court felt like
11  that it could not protect the defendant, then you could always
12  grant a severance at that time.
13      It's not something we recommend. I just point out that --
14  under Rule 14, that that is a continuing situation with respect
15  to the granting or denying of severance.
16      THE COURT: All right. Now, Mr. Dawson, under your
17  duty to give notice to the defendants under 404(b), what do you
18  plan on doing? What's the Government's position as to how much
19  detail you must go into in telling them what the synopsis of
20  the evidence is you plan on presenting? I've heard Mr. Norman
21  say three witnesses you anticipate calling. But I'm still not
22  clear on --
23      MR. DAWSON: What the adequate notice is?
24      THE COURT: Well, and I'm not clear on -- yes. And
25  if you don't think you should tell -- should state at this time

74

1  what all the evidence is you plan on presenting -- I heard
2  Mr. Norman say something about he doesn't -- he's not sure that
3  somebody committed a crime in the Wilson case. And they don't
4  have to charge -- they may not charge anybody because they're
5  not sure it was a crime. Who is it that you're not sure
6  committed the crime, I guess?
7      MR. DAWSON: Well, just for the sake of argument, you
8  could argue that Judge DeLaughter made a decision that could be
9  upheld, and that he -- there was a lack of evidence to show
10  beyond a reasonable doubt that he actually was influenced in
11  his decision. That does not mean that Dickie Scruggs, Joey
12  Langston, and others didn't conspire to corruptly influence
13  him. I think -- in fact, that's what Mr. Langston has pled
14  guilty to.
15      THE COURT: So this -- I think Mr. Norman mentioned
16  this morning that when Judge DeLaughter took a proposed order
17  and showed it to Peters and Balducci and Langston, said, Is
18  this okay with you -- basically what you're charging happened
19  in this case with Judge Lackey. Are you saying that that's not
20  sufficient to show --
21      MR. DAWSON: No, sir, I'm not. I will say to the
22  Court that that case is under active investigation. It is
23  under active investigation. It is under active investigation
24  by the Public Integrity Section of the United States Department
25  of Justice in Washington, D.C. even as we speak.

75

1      THE COURT: All right.
2      MR. DAWSON: Now, if the Court has any additional
3  questions with respect to the severance concerning Zach
4  Scruggs -- I think at one point he did make that -- or one
5  issue that he raised that I have not addressed -- and that is
6  the pretrial publicity as a basis for a severance.
7      I'm not sure I quite understand that because whether you
8  try them separately or together, his name is still going to be
9  Zach Scruggs; and he's still going to have -- work for the
10  Scruggs Law Firm. I don't know how you change that. So I
11  don't think that -- that that ground as urged -- it seems to me
12  to be a nonsegregate in an argument. And if the Court has any
13  other questions?
14      THE COURT: No, not at this time.
15      MR. DAWSON: Thank you, sir.
16      THE COURT: Mr. Graves?
17      MR. GRAVES: A couple of points if I may. I find it
18  very ironic that in the very motion to sever Zach Scruggs from
19  this case because of the inability -- one of our points is that
20  the jury, no matter what the curative instruction is, is not
21  going to be able to set aside what's before them. In the very
22  motion of that, when the Government concedes, it's not arguing
23  that 404(b) included.
24      Most of the discussion and the argument is about the
25  404(b) evidence against Mr. Dick Scruggs. The fact is, if you

76

1  look at everything they provided us -- again, I'm working off
2  memory -- I don't think that Zach Scruggs' name is mentioned
3  anywhere in those.
4      And this goes to the point, one of things I just heard,
5  quote, some evidence that might indicate some knowledge. And
6  we're talking about a person being tried under the United
7  States Constitution based on his knowledge, his intent; and the
8  prejudice here, I think, is clear.
9      Fairness and prejudice is the standard that the Court gets
10  to decide. I'm not suggesting that the Fifth Circuit has
11  demanded that you make a particular decision in this case. But
12  I certainly think that this is beyond the normal case. This
13  isn't two drug dealers, and one we've got a little more
14  evidence against him than we've got against the other.
15      This is the case where the distance between what is going
16  to be available, going back to the Wilson case, going through
17  all the evidence in this case, is enormous. And not only is
18  that distance the name is the same, you know, his father is on
19  trial; and the confusion between the 404(b) evidence, the name,
20  and everything. I think is a very real --
21      THE COURT: Well, Mr. Graves, do you consider now
22  that you have all of the evidence that they're going to
23  present? Do you have it in your -- you have knowledge of all
24  their evidence at this point?
25      MR. GRAVES: Well, Your Honor, obviously, I don't

77

1  have all the Jencks evidence and everything in every matter.
2  But I believe that the Government in good faith would
3  acknowledge there may be some other things here or there, but
4  that is basically what his involvement in this case comes down
5  to.
6      And I think it really comes down to that November 1st
7  tape. And that's something that was just spoken about a minute
8  ago. And the thing -- again, if you're viewing this from the
9  lens of -- if you know that there's a conspiracy and somebody
10  starts talking about sweet potatoes, that might mean something
11  for you. If you're in a room and someone comes in and delivers
12  a message, you've got things on your mind, this sweet potatoes
13  thing, and even if you heard it, it's a pretty odd thing.
14      If there was a true conspiracy and everyone was in on it,
15  it'd be like -- it would be like Agent Delaney's testimony was.
16  You still owe me ten grand; I owe the judge some money. Let's
17  get this thing right and get this over with. It wouldn't be, I
18  got to haul a load of sweet potatoes and this other gibberish.
19      From that moment on, you never hear Zach Scruggs' voice
20  again. There's no discussion. I don't know that the
21  Government can show he was in the room then. But whether he
22  was or he wasn't, he clearly wasn't in the room after that
23  point. And I don't know that that shows any intent to join a
24  conspiracy.
25      And this other issue of perhaps they were earwigging the

78

1  judge, perhaps they were doing things that were improper under
2  a bar standard, that's very different than a criminal standard.
3  That's a very different matter. And I don't know that proof
4  that someone understands that an individual is earwigging a
5  judge -- if that's the case, there are a few other law firms
6  here in town that would suffer under that standard.
7      THE COURT: Well, no, certainly earwigging a judge is
8  not criminal, even though it's highly improper; but I don't
9  think that's an issue. All right. Thank you.
10      MR. GRAVES: Thank you, Your Honor.
11      THE COURT: All right. Mr. Trapp, are you going to
12  speak for your client, Mr. Backstrom?
13      MR. TRAPP: Yes, Your Honor. Your Honor, I'd like to
14  move directly to what I believe are the three areas that
15  warrant Mr. Backstrom from being tried with Mr. Richard
16  Scruggs, the senior partner, and the person who is identified
17  with the Scruggs Law Firm.
18      First, there is a disparity in the amount of evidence as
19  it relates to Mr. Backstrom versus the evidence that relates to
20  Mr. Scruggs in this case. Essentially, Your Honor --
21      THE COURT: Now, let me ask -- are you asking -- and
22  Mr. Graves too, as I understand your motions. You're not
23  asking just for severance for Mr. Richard Scruggs; you're
24  asking for a severance from each other also, from Backstrom --
25      MR. TRAPP: I'm just asking for a severance from

79

1  Mr. Richard Scruggs, Your Honor.
2      THE COURT: Well, Mr. Graves, what were you asking?
3      MR. GRAVES: Your Honor, we're asking for a severance
4  from this case and --
5      THE COURT: You want a severance also from Backstrom?
6      MR. GRAVES: That would be our position, Your Honor.
7      THE COURT: Okay. Now, Mr. Trapp, you're only asking
8  for a severance from Richard Scruggs?
9      MR. TRAPP: That's correct, Your Honor.
10      THE COURT: Not from Zach Scruggs?
11      MR. TRAPP: That's correct. Your Honor, the case
12  against Mr. Backstrom boils down to essentially four tapes,
13  those are October 18, 31, November 1, November 13. The
14  credibility of Mr. Balducci -- I don't even believe the
15  Government would call Mr. Patterson after the Court grants the
16  severance, and we were tried separate.
17      And at trial against Mr. Backstrom -- and if the Court
18  included Zach Scruggs, Mr. Scruggs would be relatively short,
19  right at a week, I believe, Your Honor. The only tape that
20  they have referred to that they would want to use against
21  Mr. Backstrom that has anything relating to Mr. Richard Scruggs
22  is a November 1st tape, and that is easily separated because
23  Balducci has the conversation that the Court has heard about
24  where neither -- what they didn't tell you is, I think, and
25  to -- Mr. Zach Scruggs is leaving the office, which is

80

1  reflected.
2      And Mr. Backstrom having had a -- is reading from this
3  order that they presented to him, and then had some
4  conversation about the order -- they don't do anything with the
5  proposed order from Judge Lackey. But he's reading into the
6  record -- on the tape and reading an order actually aloud as
7  this sweet potato.
8      And actually, the way he says it, Your Honor -- of course,
9  you remember I love this sweet potato because sweet potato
10  sometimes means Vardaman sweet potato or some variety of it.
11  Sometimes it means order; sometimes it means money. So it just
12  goes to show sweet potatoes have more uses than we've thought
13  of here.
14      Your Honor, the real -- if that was the only reason I
15  could offer the Court for a severance, I believe the Court
16  would be quick to deny it. But it's not the only reason. And
17  the primary reason that we are seeking a severance is 404(b)
18  evidence. And in the Supreme Court decision which dealt with
19  whether or not antagonistic defenses -- and we are not
20  asserting antagonistic defenses.
21      In that case, that's the Zafiro, if I am saying it right,
22  Your Honor, Z-a-f-i-r-o, Zafiro case, the Supreme Court itself
23  notices or specifically observed that there is a serious risk
24  when there's a joint trial that could compromise or prevent a
25  jury from making a reliable judgment. And I'm paraphrasing.