DAILY COPY   DIRECT - BALDUCCI   25

1 to put Mr. Balducci on or do you want me to put him on? How do
2 you want to proceed?
3     THE COURT: What do you say to that, Mr. Norman?
4     MR. NORMAN: Your Honor, I believe the ordinary way
5 of doing things, where we call our witness and they
6 cross-examine him, lends itself to a more reasonable
7 presentation. That's what we recommend, sir.
8     THE COURT: All right. Is he available now?
9     MR. NORMAN: Yes, sir.
10    THE COURT: All right. Let him come in.
11 (THE WITNESS IS SWORN)
12    TIM BALDUCCI, GOVERNMENT'S WITNESS, SWORN
13         DIRECT EXAMINATION
14    THE CLERK: State your name clearly for the record.
15    THE WITNESS: Tim Balducci.
16    MR. NORMAN: May I proceed, Your Honor.
17    THE COURT: You may.
18    MR. KEKER: Your Honor, could I move so I can see
19 Mr. Balducci? I'm blocked.
20    THE COURT: You may. You can sit back there by
21 Mr. Craig, if you like.
22    MR. NORMAN: May I proceed, sir.
23    THE COURT: Yes, sir.
24 BY MR. NORMAN:
25 Q. Good morning, Mr. Balducci.

DAILY COPY   DIRECT - BALDUCCI   26

1 A. Morning, Mr. Norman.
2 Q. Would you tell us, please, about your former occupation;
3 what have you done for a living most of your adult life?
4 A. Well, for the last 16 years, I've practiced law as an
5 attorney.
6 Q. All right. And can you tell us very briefly what kind of
7 law you practiced.
8 A. Yes, sir. Essentially every type of law that there is to
9 practice. When I first started out practicing law, I did just
10 general, small town law practice; hometown-lawyer-type stuff.
11 I was a public defender for Lafayette County and Marshall
12 County for about six years where I did criminal defense work
13 and also did general civil practice.
14    After that, I practiced for about six years doing
15 primarily insurance defense work representing insurance
16 companies, billable-hour-type work. And after that, practiced
17 again doing primarily plaintiff's work; the last part of my
18 career doing more what we would refer to as mass tort,
19 class-action-type work.
20 Q. Mr. Balducci -- and I'm trying to keep this brief -- did
21 you ever represent Richard Scruggs, Dickie Scruggs?
22 A. Several times.
23 Q. Okay. As his attorney?
24 A. Yes, sir.
25 Q. All right. And do you know Circuit Judge Henry Lackey?

DAILY COPY   DIRECT - BALDUCCI   27

1 A. Yes, sir.
2 Q. How do you know him?
3 A. I've known Judge Lackey for my entire legal career. I
4 first met him when I started practicing in Oxford as public
5 defender. He was the circuit judge who was responsible for
6 hearing the cases in Lafayette and Marshall County where I was
7 public defender, so I tried -- I don't know how many cases --
8 many, many cases in front of him and handled probably thousands
9 of cases over that period of time in front of him.
10 Q. How would you characterize your relationship with Judge
11 Lackey?
12 A. Judge Lackey was -- he was a mentor to me. As a young
13 lawyer, he took me in his court, taught me the practice of law
14 from the bench, showed me my mistakes, congratulated me on my
15 successes, counseled me on my failures. We became close
16 friends, not just in a professional sense but more in a
17 personal sense as well; and I really looked up to him.
18 Q. Fast forward now. Are you familiar with a case filed
19 March 15th in the Circuit Court of Lafayette County,
20 Mississippi, styled -- approximately styled Jones, et al v.
21 Scruggs, et al?
22 A. Yes, sir.
23 Q. And do you recall whether or not you were present at a
24 meeting sometime between the 15th of March, that being the
25 filing date of that case, and the 28th of March, a meeting with

DAILY COPY   DIRECT - BALDUCCI   28

1 Judge Lackey; do you know whether or not between those two
2 dates, somewhere between the 15th and the 28th, you had
3 occasion to be present inside the Scruggs Law Firm where there
4 was a discussion involving Jones v. Scruggs?
5 A. Yes, sir, I was.
6 Q. What were the circumstances of that meeting? Were you
7 there to meet about Jones v. Scruggs?
8 A. I did not know when I was asked to come over for a meeting
9 that that was going to be part of the meeting, no, sir.
10 Q. Do you recall who was present in attendance at that
11 meeting?
12 A. Yes, sir.
13 Q. Who, please?
14 A. Myself; my business partner, Steve Patterson; Dick
15 Scruggs; Zach Scruggs; and Sid Backstrom.
16 Q. Okay. Do you recall anything of significance being
17 decided at that meeting?
18 A. Yes.
19 Q. What is that?
20 A. I was asked during that meeting to utilize my personal
21 relationship with Judge Lackey to attempt to corruptly
22 influence him to enter a favorable order in favor of the
23 Scruggs/Katrina litigation group and the Scruggs Law Firm in
24 the Jones lawsuit.
25 Q. Who was present at the table --

DAILY COPY   DIRECT - BALDUCCI        29

1  MR. KEKER: Excuse me, Your Honor. I object and move
2  to strike the answer as a conclusion. He was asked what was
3  said and what he gave was his legal conclusion. Sounds a lot
4  like the indictment.
5  THE COURT: He may explain his answer. The objection
6  to strike is overruled.
7  BY MR. NORMAN:
8  Q. Do you recall who was present at the table when the
9  decision was made to ask you to do that?
10 A. Yes.
11 MR. KEKER: Objection, Your Honor, leading.
12 THE COURT: Overruled.
13 BY MR. NORMAN:
14 Q. Who, please?
15 A. The five people that I just mentioned.
16 Q. All right. Mr. Balducci, have you ever done anything like
17 that with Judge Lackey before?
18 A. No, sir.
19 Q. And did you realize -- what did you believe to be the
20 consequences of approaching a judge under those circumstances?
21 A. Mr. Norman, I knew it to be completely unethical; and I
22 knew that by doing so that I was risking the loss of my law
23 license.
24 Q. All right. Now, in fairness to the other side, was any
25 money mentioned at that meeting?

DAILY COPY   DIRECT - BALDUCCI        30

1  A. No, sir.
2  Q. In fact, was there any discussion -- a discussion, overt
3  discussion, of the crime of bribery --
4  MR. KEKER: Excuse me, Your Honor. Objection to
5  leading the witness. Could he tell us what happened at the
6  meeting rather than be led through it?
7  THE COURT: He'll be able -- I assume you're going to
8  clear that up and explain with specificity what was said.
9  MR. NORMAN: Yes, sir.
10 THE COURT: All right.
11 BY MR. NORMAN:
12 Q. Mr. Balducci, while present at that meeting, can you tell
13 us whether or not money was mentioned?
14 A. There was no money mentioned in relation to giving Judge
15 Lackey money in exchange for a favorable order, no, sir.
16 Q. All right. In fairness, did you believe a crime was
17 contemplated at that time?
18 A. At that time, no, sir.
19 Q. Okay. Now, I'd like to fast forward; and we're skipping
20 many things here. But fast forward with me, please, to your
21 first meeting with Judge Lackey on that subject.
22 THE COURT: Now, Mr. Norman, you said you would
23 specify what was said at that meeting. You haven't done that.
24 MR. NORMAN: All right, sir.
25 BY MR. NORMAN:

DAILY COPY   DIRECT - BALDUCCI        31

1  Q. Mr. Balducci, give us, to the best of your ability, with
2  specificity, what was said on this subject and by whom.
3  A. During the course of the meeting, discussion turned to the
4  Jones v. Scruggs case, and my partner, my business partner,
5  Steve Patterson, and I were made aware by the three members of
6  the Scruggs Law Firm that Judge Lackey -- well, first of all,
7  that the suit had been filed.
8  They talked generally about the allegations with us that
9  had been made in the case, and then that Judge Lackey was the
10 judge of record on the case. He had, I think, just recently
11 signed an order maybe sealing the court file relative to the
12 case. And the initial discussion was about our firm possibly
13 representing the Scruggs firm in that lawsuit, in that dispute.
14 But that was quickly dismissed.
15 Then a discussion was had about maybe me serving as some
16 sort of go-between, mediator, not formally but just an
17 intermediary, because I knew Johnny Jones and Steve Funderburg
18 well, had worked with them previously in representing
19 Mr. Scruggs in another legal fee dispute in which we were all
20 co-counsel, and had a good relationship with them as well.
21 And, so, there was some discussion had about maybe me
22 acting as intermediary, going to Johnny and Steve, seeing if I
23 could resolve the case favorably. That discussion then ended,
24 and it was then that sort of the real reason for the meeting
25 was revealed and that was --

DAILY COPY   DIRECT - BALDUCCI        32

1  MR. KEKER: Objection, Your Honor. Move to strike
2  that last conclusion and ask that from now on he say who said
3  what rather than talk generally.
4  THE COURT: Well, the objection will be sustained.
5  Ask specific questions that call for specific answers in that
6  regard, Mr. Norman.
7  BY MR. NORMAN:
8  Q. Sir, do you recall who said what? Do you recall who
9  suggested this course of action?
10 A. Originally, it was suggested by Zach Scruggs. Zach said
11 that he was familiar and knew -- it was generally known to
12 those members of the firm my relationship with Judge Lackey.
13 MR. KEKER: Objection, Your Honor. Unresponsive. He
14 said what?
15 THE COURT: Overruled. He may complete his answer.
16 THE WITNESS: It was generally known about my
17 relationship with Judge Lackey, and Zach was the first one to
18 bring that up and asked if I thought it would be possible for
19 me to go and have an off-the-record conversation with Judge
20 Lackey about the case and see if I could persuade him to rule
21 in their favor.
22 BY MR. NORMAN:
23 Q. Did anyone veto the idea?
24 A. No, sir.
25 Q. How long did the discussion last, if you can approximate

DAILY COPY   DIRECT - BALDUCCI   33

1  an answer?
2  A. The entire discussion probably -- are you talking about me
3  going to see the Judge ultimately, that discussion, or the
4  entire discussion about the Jones case?
5  Q. The discussion regarding the Jones case at the Scruggs Law
6  Firm on that occasion.
7  A. Best of my recollection, Mr. Norman, the entire discussion
8  was probably 20 minutes.
9  Q. All right. With or without any dissent from any of these
10 three defendants?
11 A. I recall no dissent.
12 Q. Okay. Did you then act upon their request?
13 A. I did.
14 Q. Do you recall how you began your task of doing what you'd
15 been asked to do?
16 A. Yes, sir. I placed a phone call to Judge Lackey shortly
17 after the meeting and advised him -- I reached him on his phone
18 and advised him that I had a matter of interest that I wanted
19 to come and see him personally about and talk to him about.
20 Q. All right. What was his response?
21 A. Fine. Come on.
22 Q. And can you approximate the date of that telephone
23 conversation?
24 A. On or about March 28th of last year.
25 Q. All right. Did you in fact go see Judge Lackey?

DAILY COPY   DIRECT - BALDUCCI   34

1  A. I did.
2  Q. Do you recall the date?
3  A. March 28th.
4  Q. All right. Where did you meet with the Judge?
5  A. I met with Judge Lackey at his office, his personal office
6  in Calhoun City.
7  Q. Would you please tell us about the conversation?
8  A. Met Judge Lackey there at his office, he welcomed me,
9  brought me into the anteroom of his office there, which was a
10 conference room. You know, we exchanged pleasantries for a
11 while and discussed just general things, my new law firm, how I
12 was doing, talked to him about his health, how he was doing,
13 things that were going on politically. He asked me about my
14 family, just catching up type of stuff, two old friends sort of
15 visiting.
16     And then I told him the reason that I'd asked for the
17 meeting, and I explained to him that I was there to discuss a
18 case that was pending before him. And I told him it was the
19 Jones v. Scruggs case. And I told him that I was not an
20 attorney of record in the case, that I wasn't representing
21 either party, specifically not representing the Scruggs Law
22 Firm; and that I personally had no interest in the outcome of
23 the case; that they had asked me to come down there and to
24 basically explain their side of the story to him.
25     They knew that we were friends and wanted me to convey

DAILY COPY   DIRECT - BALDUCCI   35

1  their position to Judge Lackey. And, so, I did that. I told
2  him what they had told me, essentially, about the case. I knew
3  very little about it, frankly. What I knew, I had gotten from
4  them. And I told him what I knew and I told Judge Lackey that
5  they -- the members of the Scruggs Law Firm wanted the case
6  ultimately sent to arbitration, that there were some matters
7  that they had been sued now outside of just the legal fee issue
8  over the Katrina fees. It had now grown into a bigger lawsuit
9  than just what their joint venture agreement share of fees
10 would be.
11     And I discussed with Judge Lackey the propriety of him --
12 based on that conversation, of him maybe dismissing those
13 extraneous matters and sending simply the dispute over the fees
14 to arbitration.
15 Q. How did Judge Lackey react?
16 A. While we were together, he never gave me any indication
17 that he was offended by it or that he felt that what I was
18 doing was improper.
19 Q. Do you recall saying anything that would either lead Judge
20 Lackey to believe or lead Judge Lackey not to believe that --
21     MR. KEKER: Objection, Your Honor. That's leading.
22 Could we have him just relate what happened, rather than have
23 the prosecutor lead through it?
24     THE COURT: Overruled.
25     THE WITNESS: I know that when we were together --

DAILY COPY   DIRECT - BALDUCCI   36

1      THE COURT: Repeat the question. I didn't hear all
2  of the question.
3      MR. NORMAN: Your Honor, I asked Mr. Balducci if he
4  recalled saying anything that would one way or the other either
5  indicate to Judge Lackey that others were involved or indicate
6  to Judge Lackey that no one else was involved.
7      THE COURT: All right. You may answer the question.
8      THE WITNESS: Yes. I specifically told Judge Lackey,
9  as I said, that I was not an attorney in the case; I had no
10 interest in the outcome of the case; and that I was there on
11 behalf of members of Scruggs Law Firm who had asked me to come
12 down there and have that discussion with him.
13 BY MR. NORMAN:
14 Q. All right. Was there any mention of, of counsel?
15 A. Yes.
16 Q. How did that come up and what did you say?
17 A. During the course of the conversation with Judge Lackey,
18 as I said, we talked about a number of things; and toward the
19 end of our meeting and our discussion, I mentioned to him the
20 fact that my law firm -- I'd just started my new law firm in
21 January, and that we had been fortunate enough to secure
22 several former judges and other political figures to become of
23 counsel to our firm.
24     And I mentioned to Judge Lackey that he was a close friend
25 of mine, that we'd known each other and been colleagues for a

DAILY COPY   DIRECT - BALDUCCI        37
1  long, long time; and I knew that his days on the bench
2  ultimately were numbered. Generally, I knew that he had
3  wrestled time and time again about how long he was going to
4  stay on the bench.
5     And I told him during the course of that meeting that
6  there would come a time I knew that he would retire; that he
7  would hang up his robe, lay down his gavel. And when he
8  decided to do that, that I would be humbled if he would
9  consider coming to work in our firm in an of counsel capacity.
10 Q.  All right. Is that of counsel status anything of value?
11 A.  Yes, it is.
12 Q.  What's it worth?
13 A.  Well, not a lot. But the members of my firm who had
14 already joined me of counsel, the arrangement I had with them
15 was they got a small monthly stipend of about a $1,000 a month.
16 And they had the ability, if they wanted, to work on cases with
17 us. I was doing that with a couple of them. They were
18 actively practicing on a few cases with us, and I have just a
19 separate fee arrangement with them on those specific cases.
20    And then other members of the of counsel crew that were
21 part of the firm had lesser roles, and they were really more
22 for marketing and for relationships and business developments.
23 And they just received a monthly stipend.
24 Q.  Did you intend that as a quid pro quo?
25 A.  No, sir, I did not, Mr. Norman.

DAILY COPY   DIRECT - BALDUCCI        38
1  Q.  Did you know -- are you able to say how Judge Lackey took
2  it?
3  A.  Well, I know, now, in retrospect, that that's how it was
4  taken. And I can see -- objectively looking back on it, the
5  course of events and having that discussion within the same
6  context of the discussion with asking him to improperly rule in
7  the Scruggs Law Firm favor in the Jones case -- I can see how,
8  now, in retrospect, Judge Lackey may have interpreted it that
9  way. It was not my intention, but I can understand how he did.
10 Q.  You can see how Judge Lackey might have interpreted it in
11 what way?
12 A.  That it was a quid pro quo, that I was asking him, "If you
13 rule in this manner, then I will give you this job later."
14 Q.  Okay. We've been permitted to ask about one other area,
15 and I'd like to move forward in the summer of 2007. Did there
16 come a time that you learned Judge Lackey had recused himself
17 from the case of Jones v. Scruggs?
18 A.  Yes.
19 Q.  How did you learn of that?
20 A.  I received a call from Sid Backstrom advising me of the
21 same.
22 Q.  What did he say; what was his mood?
23 A.  Frantic and angry. And he said -- when I answered the
24 phone, he said, you know: What's going on? We've just been
25 advised and just received an order -- I believe he said an

DAILY COPY   DIRECT - BALDUCCI        39
1  order, or just been notified that Judge Lackey has recused
2  himself in the case. He said, "What's that about?" You know,
3  "What's going on here?" And I said, "I have no idea. I
4  haven't spoken to Judge Lackey about it." I did not know that
5  Judge Lackey was contemplating recusing himself. I said, "I
6  don't know." He said, "Well, find out. Get ahold of the
7  situation and find out what's going on, and let us know."
8  Q.  All right. Did you do what you were told to do?
9  A.  I did.
10 Q.  How?
11 A.  I called Judge Lackey.
12 Q.  Who called whom?
13 A.  I called Judge Lackey, and then I don't believe I spoke
14 with him then. I think he called me back later.
15 Q.  Okay. Can you recall the gist of that conversation? Can
16 you tell us who said what?
17 A.  Yes. You know, I opened the conversation by saying, you
18 know, Judge, I understand -- I've been told that you recused
19 yourself in the Jones v. Scruggs case. And Judge Lackey said,
20 yeah, he said -- he told me a story of having seen one of the
21 lawyers from the law firm that was representing Mr. Jones at
22 some social function recently, and he said that that lawyer had
23 engaged him in a conversation, an ex parte conversation about
24 the case and essentially was promoting Mr. Jones' side of the
25 case. And that Judge Lackey felt at that point that he, you

DAILY COPY   DIRECT - BALDUCCI        40
1  know, had been influenced, I suppose, you know, improperly; and
2  that he felt like he needed to recuse himself.
3  Q.  Did you argue with him?
4  A.  No, sir.
5  Q.  Why?
6  A.  Well, my relationship with him, I thought, was such that
7  that's what he said he was doing; and I didn't feel like I was
8  in a position to do anything about it.
9  Q.  Did you have occasion to report back to anyone in the
10 Scruggs Law Firm?
11 A.  I did.
12 Q.  With whom did you speak?
13 A.  Well, before that, he had told me during the same course
14 of conversation -- he had said that he thought he had sort of
15 acted maybe precipitously and that he was considering -- you
16 know, I guess for lack of a better word, unrecusing himself and
17 getting back into the case. And basically, I said, "Look,
18 whatever. Do whatever you think you need to do." And, so,
19 that's what I reported after that.
20    I called Sid Backstrom back, and I -- I told him that I'd
21 had a conversation with the Judge, explained to him what the
22 Judge had told me, and also said that the Judge, after
23 reflecting on it, thought, Maybe -- well, it's not as big a
24 deal anymore as I thought it was originally. Maybe I acted,
25 you know, hastily. And that the Judge was considering getting

DAILY COPY   DIRECT - BALDUCCI        41
1  back in.
2  Q. All right. What was Mr. Backstrom's response, if you
3  recall?
4  A. Essentially the same thing, "Well, just stay after it, and
5  monitor it and keep this thing -- keep this thing on track."
6  Q. All right, sir. I'd like to summarize now, did Judge
7  Lackey hound you in the summer of 2007?
8       MR. KEKER: It's fine with me, Your Honor; but I
9  ought to be able to explore the answer. Okay?
10      MR. NORMAN: I feel sure he will, Your Honor.
11      THE COURT: All right.
12      THE WITNESS: I'm sorry, Mr. Norman. Did you say
13 hound me?
14 BY MR. NORMAN:
15 Q. Did Judge Lackey hound you over the summer of 2007 about
16 the Jones case?
17 A. No, sir.
18 Q. Did Judge Lackey initiate all the communication that
19 summer?
20 A. No, sir.
21 Q. Did you ever refuse to return a telephone call to Judge
22 Lackey?
23 A. Mr. Norman, if the Judge called me, I returned his call.
24 Q. Did you ever initiate the contact?
25 A. Yes, I'm certain I did.

DAILY COPY   CROSS - BALDUCCI        42
1  Q. Ever take your boys to see him?
2  A. On two separate occasions.
3  Q. Did he make you commit a crime you didn't want to commit?
4  A. No, sir.
5       MR. NORMAN: Would the Court indulge me briefly?
6  That's all we have, Your Honor.
7       THE COURT: All right.
8            CROSS-EXAMINATION
9  BY MR. KEKER:
10 Q. Good morning, Mr. Balducci. I'm John Keker, one of the
11 lawyers for Mr. Scruggs.
12      MR. KEKER: Your Honor, at this point, I would
13 request the -- Mr. Balducci's Jencks material on the subject
14 matter on which he's testified. This is a hearing; and under
15 Rule 26.2(a), we're entitled to the Jencks material. And I
16 would request an opportunity to look at it. But if you want me
17 to go ahead, I can go ahead and look at it afterwards.
18      THE COURT: You may have the Jencks material in
19 regard to this area of testimony.
20      MR. KEKER: Yes, sir.
21      THE COURT: Not the entire area that he's testified
22 to before any grand jury.
23      MR. KEKER: Fair enough. Yes, sir, I understand
24 that. Although, I must say those last couple of questions were
25 pretty broad. It's hard to imagine his statements -- I think

DAILY COPY   CROSS - BALDUCCI        43
1  it probably involves all of the Jencks material.
2       THE COURT: No, I don't think so. Only in regard to
3  what he's just testified about. Do you have that with you,
4  Mr. Norman?
5       MR. NORMAN: I do, Your Honor. What we have is
6  considerably broader than that, but I think the quickest thing
7  to do is provide him with all of it and then object to going
8  into other areas.
9       THE COURT: All right. If you want to do that,
10 that's your prerogative to give him everything at this point,
11 if that's what you want to do.
12      MR. NORMAN: Well, for example, Your Honor --
13      THE COURT: You're not required to.
14      MR. NORMAN: I would prefer not to disclose grand
15 jury transcripts at this point. I do have 302s of Mr. Balducci
16 speaking with the FBI that I'd be happy to produce.
17      THE COURT: All right. Go ahead. Give it to him.
18      MR. KEKER: Thank you, Your Honor. Would it be
19 inappropriate to ask for a ten-minute recess to look at this or
20 how --
21      THE COURT: No, it wouldn't be. We'll be in recess.
22 You may leave the stand, Mr. Balducci. We'll call you back.
23 We'll be in recess for ten minutes.
24      (AFTER A SHORT BREAK, THE PROCEEDING CONTINUED).
25      (CALL TO ORDER OF THE COURT)

DAILY COPY   CROSS - BALDUCCI        44
1       THE COURT: All right. Mr. Keker, you may resume.
2       MR. KEKER: Thank you, Your Honor. Your Honor, I
3  want to take up, later, when it's convenient, further
4  discussion about the Jencks material. I think we're entitled
5  to the grand jury minutes of this as well, but we can do that
6  later.
7  BY MR. KEKER:
8  Q. Mr. Balducci, what was the approximate date of your visit
9  to the Scruggs Law Firm that you were talking to Mr. Norman
10 about?
11 A. I'm not certain of the exact date, but it was between
12 March 15th and March 28th, '07.
13 Q. At the time, you went to the Scruggs Law Firm, did you
14 know about the case of Jones v. Scruggs?
15 A. Generally, yes, sir.
16 Q. When you went to the Scruggs Law Firm, what was your
17 purpose in going there?
18 A. We were having a meeting about some other business matters
19 that we were conducting with the Scruggs Law Firm.
20 Q. What other business?
21 A. I know that we had discussed a project we were working
22 together on in Kentucky, and it seems like there were others;
23 but I don't recall.
24 Q. Was Mr. Buse with you?
25 A. No, sir.

DAILY COPY   CROSS - BALDUCCI   45

1  Q.  How long did the meeting last in total?
2  A.  Probably about an hour, my best recollection.
3  Q.  And I think you told us that the discussion about the
4  Jones case took about 20 minutes?
5  A.  My best recollection, yes, sir.
6  Q.  Who raised the subject of the Jones case?
7  A.  I think Mr. Scruggs did, my best recollection. Zach --
8  excuse me, Dick Scruggs.
9  Q.  Who raised the subject of you going to see Judge Lackey?
10 A.  Zach Scruggs.
11 Q.  Are you sure of that?
12 A.  Yes, sir.
13 Q.  Wasn't Mr. Patterson?
14 A.  No, sir.
15 Q.  Did you know of any ex parte contact that had occurred
16 with Judge Lackey in the Jones v. Scruggs case before you went
17 to this meeting?
18 A.  No, sir.
19 Q.  Did you learn of any ex parte contact at the meeting?
20 A.  At the meeting?
21 Q.  Yes.
22 A.  At the meeting with Judge Lackey?
23 Q.  No. With Mr. Scruggs, Mr. Backstrom, Mr. Zach Scruggs,
24 Mr. Patterson.
25 A.  I'm sorry, Counselor; I don't understand your question.

DAILY COPY   CROSS - BALDUCCI   46

1  Q.  Was there any discussion of how Mr. Tollison had gotten --
2  on behalf of Jones, had gotten the case filed under seal?
3  A.  Yes.
4  Q.  Tell us what discussion there was and who said it.
5  A.  That was essentially the discussion I recall, and I don't
6  recall who said it; but that the case had been filed; it had
7  been placed under seal; that Judge Lackey was the judge who was
8  apparently assigned the case and had signed the order sealing
9  the case, is my best recollection.
10 Q.  And then he signed an order unsealing the case?
11 A.  I'm not certain if I knew that at that meeting or not.
12 Q.  Did you know that there was concern about ex parte
13 contacts between Jones' lawyer, Mr. Tollison, and Judge Lackey?
14 A.  I wouldn't phrase it that way.
15 Q.  How would you phrase it?
16 A.  I remember a discussion about a fear among the members of
17 the Scruggs Law Firm that Mr. Tollison was going to use that
18 case as a vehicle to draw media attention to the dispute that
19 had been filed here in Lafayette County; that it was an attempt
20 to embarrass Mr. Dick Scruggs and the members of his firm
21 locally; and that they were very concerned about that, that
22 issue.
23 Q.  Do you remember any conversation from anybody concerned
24 that Mr. Tollison had approached Judge Lackey ex parte to put
25 the case under seal and at a later date unseal it?

DAILY COPY   CROSS - BALDUCCI   47

1  A.  Only what I've said so far. Yes, I do remember a general
2  discussion about the fact that the case had been sealed, and
3  that Judge Lackey had signed the order sealing it.
4  Q.  Who was the first person to mention your relationship with
5  Judge Lackey?
6  A.  Zach Scruggs.
7  Q.  Did Steve Patterson talk about your relationship with
8  Judge Lackey?
9  A.  Yes.
10 Q.  What did he say?
11 A.  Essentially verifying that I had a long-standing
12 relationship with Judge Lackey.
13 Q.  What did you say about your relationship with Judge
14 Lackey?
15 A.  The same thing, that I did, in fact, as everyone at the
16 table knew, have a long-standing relationship with Judge
17 Lackey.
18 Q.  Did you volunteer to go talk to Judge Lackey about the
19 case?
20 A.  Volunteer? I don't know if I'd put it that way. I was
21 asked to and agreed to.
22 Q.  Do you remember being interviewed by Special Agent Delaney
23 and someone else named Gilbert Surles on November 2nd, 2007?
24 A.  Yes, sir.
25 Q.  And do you remember being asked to talk about what

DAILY COPY   CROSS - BALDUCCI   48

1  happened at this meeting?
2  A.  Yes, sir.
3  Q.  Did you tell the agents that during the meeting a
4  discussion came up regarding the recent developments in the
5  civil case involving the Scruggs Law Firm as the defendant and
6  Jones as the plaintiffs?
7  A.  I'm sorry. I didn't understand that last part of your
8  question.
9  Q.  Did you tell the agents on November 2nd that during the
10 meeting a discussion came up regarding the recent developments
11 in a civil case involving the Scruggs Law Firm and Jones?
12 A.  Yes, I did.
13 Q.  And did either Patterson or you ask what the situation was
14 and ask for an explanation about it?
15 A.  Possibly. I know -- as I said before, I know we discussed
16 the general status of the case at that time.
17 Q.  Okay. And did you tell the agents that either Patterson
18 or you asked about the status of the case?
19 A.  Well, as I said, the issue of the Jones case was
20 introduced by --
21 Q.  Can you answer that question yes or no? If you don't
22 remember, just tell us.
23 A.  Can you repeat the question, please?
24 Q.  Did you tell the agents that either Patterson or you asked
25 what the situation in the case was?

### DAILY COPY   CROSS - BALDUCCI   49

1  A.  Yes. May I explain?
2  Q.  And --
3  A.  May I explain my answer, Counselor?
4      MR. NORMAN: Your Honor, I believe the witness is
5  entitled to explain his answer.
6      THE COURT: He may.
7      THE WITNESS: Yes, I did tell them that; and, as I
8  said, the issue had been introduced to Patterson and I by
9  Mr. Scruggs and the other members of the Scruggs Law Firm. And
10 we did inquire at that point and say, "What's the status;
11 what's going on?"
12 BY MR. KEKER:
13 Q.  Okay. So did they tell you that the matter -- they wanted
14 the matter settled through the arbitration, that the plaintiffs
15 had refused and had now filed this suit?
16 A.  Yes.
17 Q.  And did -- was it Zach Scruggs that actually informed you
18 that Judge Lackey had been assigned the case?
19 A.  I don't recall.
20 Q.  And did you tell them -- tell the agents that you
21 acknowledged that you knew Judge Lackey, and Dick Scruggs asked
22 you if the case could be sent to arbitration?
23 A.  Did I tell the agents that?
24 Q.  Well, first, did it happen?
25 A.  Again --

### DAILY COPY   CROSS - BALDUCCI   50

1  Q.  Dick Scruggs said, Can this case be sent to arbitration?
2  A.  Can this case be sent to arbitration?
3  Q.  Yeah.
4  A.  Words that to that effect, yes, sir.
5  Q.  And then did you say you didn't know?
6  A.  We had a general discussion, yes, sir, about trying to
7  influence Judge Lackey to send the case to arbitration.
8  Q.  No. My -- did you tell the agents, then -- I guess let's
9  stick to that -- that you said -- when Dick Scruggs said, Could
10 this case be sent to arbitration, you said you didn't know?
11 A.  Yes, I think I did say that.
12 Q.  And then did Dick Scruggs say he was not asking you for
13 anything illegal, but would you see if the judge would move the
14 matter to arbitration?
15 A.  Yeah. No, that's not accurate.
16 Q.  Okay. Did you tell the agents that Dick Scruggs said he
17 was not asking for anything illegal, but could you see if the
18 judge will move the matter to arbitration?
19 A.  I understand that that's what's written in that 302. But
20 I was later interviewed; and in another 302, that statement was
21 clarified. What I said at the meeting -- excuse me. What I
22 said to the agents was that we didn't discuss paying any money
23 to the judge or bribing the judge at that meeting.  We
24 certainly discussed improperly influencing the judge at that
25 meeting. And I think that that was incorrectly written down by

### DAILY COPY   CROSS - BALDUCCI   51

1  the agent in that first debriefing, and I brought that to their
2  attention later.
3  Q.  So later they let you see the 302 that they wrote, and you
4  corrected it?
5  A.  No. We had a discussion about that. Mr. Keker, I've been
6  debriefed for hours and hours and hours about this case. And
7  in one of those subsequent conversations with the agents, that
8  was discussed, that issue was brought up; and I explained to
9  them, "If that's what I said, that's not what I meant. If
10 that's what they heard, that's not what I said." What I just
11 told you is what happened.
12 Q.  You said you'd been debriefed for hours. How many hours?
13 A.  I couldn't tell you, sir.
14 Q.  How many debriefings?
15     THE COURT: That's not an area we're going to get
16 into.
17     MR. KEKER: Yes, sir.
18     THE COURT: Just answer the question. You don't have
19 to --
20 BY MR. KEKER:
21 Q.  So you told them it was not accurate, that Dick Scruggs
22 said he was not asking you for anything illegal. And you then
23 met with them on December 14th, 2007; and they told you, Well,
24 that's what our notes say you said, right?
25 A.  Yes.

### DAILY COPY   CROSS - BALDUCCI   52

1  Q.  And they told you they weren't going to change the 302
2  because what you were now saying was not consistent with what
3  you'd said before, right?
4  A.  That's what they said.
5  Q.  And they didn't change the 302?
6  A.  My understanding, they did not.
7  Q.  And they wrote a 302 describing your effort to get them to
8  change the 302.
9  A.  It was not my effort to get them to change the 302,
10 Counselor. It was my recollecting with them and telling them
11 that I did not agree with what they had written previously
12 about what I had told them.
13 Q.  First, tell me if this happened: Dick Scruggs asked you
14 to go see Judge Lackey and see if Judge Lackey would be
15 amenable to moving the case to arbitration.
16 A.  Correct.
17 Q.  And then Dick Scruggs said Judge Lackey ought to move the
18 case to arbitration since it was the correct thing to do?
19 A.  Correct.
20 Q.  And that's what you told the agents and that's what
21 happened?
22 A.  Yes.
23 Q.  And at the time you had this conversation, you didn't
24 think Judge Lackey was the kind of judge that could be bribed,
25 did you?

### DAILY COPY   CROSS - BALDUCCI   53

1  A.  No, sir.
2  Q.  You didn't think you were talking about a bribe?
3  A.  No, sir.
4  Q.  You didn't think you were talking about anything criminal,
5  did you?
6  A.  Not at the time, no, sir.
7  Q.  Mr. Patterson has said that he didn't think anything that
8  happened at that meeting was a corrupt influence -- an effort
9  to corruptly influence the judge.  Do you know about
10  Mr. Patterson's plea?
11  A.  I am aware that he's pled guilty, yes, sir.
12  Q.  And you agree Mr. Patterson didn't have any intent to
13  corruptly influence the judge at that meeting?
14  A.  Mr. Patterson can speak for himself on his intent, sir.
15  Q.  Okay.  After the meeting at the Scruggs Law Firm, you
16  called Judge Lackey, asked to come and see him, and then went
17  down to Calhoun City to his office on May 28th; is that right?
18  A.  Yes, sir.
19  Q.  And you talked to him -- how long was that meeting?
20  A.  Best of my recollection, it was probably 30 to 45 minutes.
21  Q.  You talked to him about pleasantries, health, politics,
22  family, catching up, just like two old friends, I think you
23  told us?
24  A.  Yes, sir.
25  Q.  And then, finally, you told him that you were here to talk

### DAILY COPY   CROSS - BALDUCCI   54

1  to him about a case assigned to him that you didn't have any
2  interest in, Jones v. Scruggs?
3  A.  Yes, sir.
4  Q.  And did you tell him that you would consider it -- you
5  were there to ask for a personal favor?
6  A.  Yes, sir.
7  Q.  And was that true, you were there to ask for a personal
8  favor?
9  A.  Yes, sir.
10  Q.  You weren't there to bribe him?
11  A.  No, sir.
12  Q.  You weren't there to offer him any quid pro quo?
13  A.  No, sir.
14  Q.  Did you tell him that the allegations that the Jones --
15  Mr. Jones had filed in the complaint were vicious and
16  slanderous?
17  A.  I think I did.
18  Q.  And at that time, did you know that the defendants had
19  filed a motion as of March 19th, a week before, at least a week
20  before, to move the case to arbitration?
21  A.  I'm not certain that I knew the motion had been filed; but
22  clearly, we had talked about the strategy that the Scruggs Law
23  Firm wanted to employ was to have the case moved to
24  arbitration.
25  Q.  And did you believe that they had a right to do that under

### DAILY COPY   CROSS - BALDUCCI   55

1  the agreement?
2  A.  I didn't know what the agreement was, sir.  Again, all
3  that I knew about the facts or the substance of the case was
4  what I had been told by them.  Based on what they had told me,
5  yes, I thought so.
6  Q.  And you said that Judge Lackey, during this conversation,
7  didn't do anything to indicate to you that your behavior was
8  improper or that he was uncomfortable?
9  A.  That's correct.  Nothing I perceived.
10  Q.  Tell -- you talked to him about your new law firm?
11  A.  Yes, sir.
12  Q.  Called Balducci Patterson or Patterson Balducci?
13  A.  Yes, sir.
14  Q.  What is it, which one?
15  A.  It was Patterson Balducci.
16  Q.  And in that law firm, you were in the process of -- you
17  have three offices, an office in Washington and one in
18  Mississippi and one in Louisiana?
19  A.  No, sir.  Two in Mississippi, one in Oxford, one in New
20  Albany; and one in Washington.
21  Q.  And you were signing up dignitaries, including judges, to
22  be of counsel in your organization?
23  A.  I wouldn't classify it as signing up.  We had
24  relationships with some former judges and some former
25  politicians and others that had joined our firm in an of

### DAILY COPY   CROSS - BALDUCCI   56

1  counsel capacity.
2  Q.  The -- and at that -- you happened to mention -- tell us
3  why you mentioned to him this of counsel position.  How did it
4  come up?  Were you talking about your firm?
5  A.  Yes, sir.  And essentially, what I said on direct, that I
6  knew from having a relationship with Judge Lackey for a long
7  time that he was getting into the twilight of his career; and
8  he was someone that Steve Patterson and I had talked about
9  previously as someone that, as I said, we would be very humbled
10  if he would have considered to join us in our law firm.  And I
11  expressed that to him.
12  Q.  And you were reaching out to him as a mentor and friend?
13  A.  Excuse me?
14  Q.  You were reaching out to him as a mentor and a friend, not
15  to bribe?
16  A.  That's correct.
17  Q.  Now, there came a time later, after this March 28th
18  meeting, that you learned that Judge Lackey had recused himself
19  from hearing the Jones case?
20  A.  Yes, I did.
21  Q.  And at that point, were you upset?
22  A.  Was I upset?
23  Q.  Yeah.
24  A.  No, sir.
25  Q.  Your work was done?

### DAILY COPY  CROSS - BALDUCCI    57

1  A.  That's right.
2  Q.  You had talked to him about the Scruggs firm's position;
3  they wanted the case to go to arbitration; you were finished,
4  right?
5  A.  I had done what they asked me to do, yes, sir.
6  Q.  There had been contacts with Judge Lackey during that
7  interim period between March 28th and the time that -- and the
8  time in May when you learned he'd recused himself, right?
9  A.  I think that's correct, yes, sir.
10  Q.  And during those contacts, you had gone out of your way to
11  make sure you didn't want him to do anything that he wasn't
12  comfortable with or that wasn't right, right?  You'd said that
13  to him?
14  A.  I think that we had some conversations where I did use
15  words to that effect, yes, sir.
16  Q.  And during these conversations, Judge Lackey had said to
17  you, "Well, it looks like they're entitled to arbitration; it
18  looks like both sides agreed to arbitration," right?
19  A.  He did tell me that.
20  Q.  So you and he both thought it was the right thing to do,
21  which was exactly what the Scruggs Firm happened to want,
22  right?
23  A.  Again, Mr. Keker, I don't know what Judge Lackey thought;
24  but based on what I had been told by members of the Scruggs Law
25  Firm, they believed that they had a good position relative to

### DAILY COPY  CROSS - BALDUCCI    58

1  having the case sent to arbitration.
2  Q.  And Judge Lackey seemed to agree with their position that
3  they were entitled to arbitration?
4  A.  He expressed that to me on one occasion I recall.
5  Q.  And up to this time he recused himself, there had been no
6  discussion about a bribe, a quid pro quo, or anything improper
7  with Judge Lackey, had there?
8  A.  As far as I thought at the time, I had not submitted
9  anything to Judge Lackey in the form of a quid pro quo.  As I
10  said on direct, I can see in retrospect what -- how he
11  misinterpreted what I said about the of counsel position in
12  that regard; but there was no discussion at that time about any
13  money changing hands, no, sir.
14  Q.  And on the day that he recused himself -- which, do you
15  recall that was May 21?
16  A.  I think that's correct, yes, sir.
17  Q.  May 21, 2007.  He had been -- we won't use the word hound,
18  but he had been calling you three times that day, hadn't he?
19  A.  I don't recall, Mr. Keker.  I do know --
20  Q.  Did he call you at 10:10 a.m.?  Can I see that transcript,
21  May 21?  He called you at 10:10 a.m.; he called you at 2:00,
22  you didn't call him back; finally, he gets you at 4:35 on the
23  phone, the day he recuses himself.
24  A.  I don't dispute what the phone records say.
25  Q.  And he tried to implicate Mr. Scruggs in those

### DAILY COPY  CROSS - BALDUCCI    59

1  conversations, didn't he?  He started talking about
2  Mr. Scruggs, "Mr. Scruggs knows about this," and so on?
3  A.  I believe that he did discuss Mr. Scruggs during those
4  calls, yes.
5  Q.  And you told him, "Listen, I don't want you to do anything
6  you aren't comfortable with.  I don't want you to do anything
7  you aren't comfortable with.  I respect you too much for that,
8  now.  But, now, listen, you do what you feel comfortable with,
9  now.  I don't -- I'm not -- I don't want you to do anything
10  that you don't feel comfortable with."  That's what you told
11  him on May 21, right?
12  A.  I think I did, yes, sir.
13  Q.  And then he recused himself.
14  A.  I think he had already recused himself at that point.  I
15  think he was letting me know that he had recused at that point.
16  Q.  Well, if I tell you there's nothing in those transcripts
17  that indicates he's recused himself, will you take my word for
18  it; or do you want me to show you the transcripts?
19  A.  No.  I believe the transcripts are accurate.  What I'm
20  telling you is I don't know in the context of the time frame --
21  I know he recused right at the same time as that call; and I
22  don't know, as I sit here today, if that call was before he
23  recused or after.  But my best recollection is I talked to him
24  after he recused because he was suggesting to me he might get
25  back in.

### DAILY COPY  CROSS - BALDUCCI    60

1       MR. KEKER:  Your Honor, what I was referring to on
2  May 21 is Exhibit 13, the Dooley declaration, declaration in
3  support of the motion.
4       THE COURT:  Well, that's purely hearsay.  Just ask
5  him about what he knows; ask this witness about what he knows.
6       MR. KEKER:  Should I show him the transcript and get
7  him to refresh his recollection?  I don't want to waste time
8  doing that.  Can we have a stipulation?
9       THE COURT:  Well, the question is whether Lackey had
10  recused himself before or after the telephone conversation.  He
11  says he thinks it was before.  Do you have anything to
12  contradict that?  You may show it to him.
13       THE WITNESS:  Let me answer it this way; let me tell
14  you what I know --
15       THE COURT:  You just wait until he asks you a
16  question.
17       MR. KEKER:  Your Honor, may I approach the witness --
18       THE COURT:  You may.
19       MR. KEKER:  -- and show him what the Government has
20  provided us as transcripts of the May 21st phone call?  Look
21  through that and see if that refreshes your recollection of
22  whether or not Judge Lackey, on May 21st, told you that he had
23  recused himself.
24       Your Honor, I have a copy for the Court, if you want one.
25  Exhibit 13 to Mr. Dooley's declaration.

DAILY COPY   CROSS - BALDUCCI                61

1   THE COURT: What page of this transcript do you
2   suggest --
3   MR. KEKER: I think all pages would indicate that he
4   didn't say anything about recusal in this conversation. That's
5   the point. And the further point is that the time he talked to
6   him about recusal and getting back in was actually eight days
7   later, on May 29th.
8   THE COURT: Well, let's don't -- I don't want to take
9   the time for this witness to read this whole transcript to see
10  if it mentions anything about recusal. He's already said he
11  doesn't know. You don't have to read that.
12  BY MR. KEKER:
13  Q.   Mr. Balducci, if I told you that the Judge's order
14  withdrawing his recusal, unrecusing himself, was June 4th,
15  2007, would that refresh your recollection that your
16  conversation with him was closer to that order, say around
17  May 29th, which I believe the record shows it is?
18  A.   Mr. Keker, I don't dispute the accuracies of the
19  transcripts; so they say what they say. I'm just trying to
20  tell you what my best recollection is. I know we had a
21  discussion about Judge Lackey considering unrecusing himself,
22  and I know it was in a short period of time around that time.
23  Q.   And did you tell him, during that conversation about
24  unrecusing himself, that it would break your heart if "I
25  thought I put you in a bad position, that's why I told you just

DAILY COPY   CROSS - BALDUCCI                62

1   do what your heart tells you"?
2   A.   Yes, I did.
3   Q.   All right. Now, the reason for the recusal, apparently,
4   was yet another ex parte contact with Judge Lackey by a member
5   of the -- Coker law firm, you said?
6   A.   No, sir.
7   Q.   Which law firm had chatted with Judge Lackey at a party
8   that he said led him to recuse himself?
9   A.   Judge Lackey told me that he had seen a member of the
10  Tollison Law Firm at a social event and that that member had
11  discussed the Jones case with him and essentially had promoted
12  Mr. Jones' side of the case to him ex parte.
13  Q.   And Tollison is representing Jones, and Tollison is the
14  firm that was representing Jones when they had whatever contact
15  they had with Judge Lackey about sealing the original
16  complaint, right?
17  A.   My understanding is that Mr. Tollison represented Mr.
18  Jones throughout.
19  Q.   And now there is further ex parte contact from the
20  Tollison firm?
21  A.   Judge Lackey told me that he'd seen a member of their firm
22  at a social event and discussed the case.
23  Q.   Had you had ex parte contact with Judge Lackey in the past
24  on your cases?
25  A.   None that I recall.

DAILY COPY   CROSS - BALDUCCI                63

1   Q.   The whole time you were public defender, thousands of
2   cases that you handled before him, you never had ex parte
3   contact; you sure about that?
4   A.   Well, I don't recall any, sir.
5   Q.   Did the DA have any ex parte contact?
6   A.   Excuse me?
7   Q.   Did the DA have any ex parte contact with Judge Lackey on
8   any of the thousands of cases that you handled?
9   A.   Certainly none to my knowledge.
10  Q.   Now, you were asked -- so on June 4, he unrecuses himself;
11  and as far as you're concerned, no crime has been committed at
12  that point, right?
13  A.   That's correct.
14  Q.   No crime is contemplated. Nobody's thinking about bribing
15  Judge Lackey?
16  A.   Well, we had not discussed at any point paying any money
17  for the order.
18  Q.   And then you were asked a question about, Did he hound you
19  in the summer of 2007. I'd like to ask some -- and you said
20  no. You remember that?
21  A.   I remember that.
22  Q.   After he tells you he's unrecusing himself, the next day
23  you drive up to New Albany to have lunch with him, on May 30th.
24  A.   I recall a lunch that I had with Judge Lackey. I can't,
25  as I sit here, recall the exact timing of the sequence.

DAILY COPY   CROSS - BALDUCCI                64

1   Q.   Do you remember if it was in approximately late May or
2   early June?
3   A.   I remember it was in the summer.
4   Q.   And you drove him to lunch, and you had lunch with
5   Mr. Patterson and Mr. Buse; is that right?
6   A.   Yes.
7   Q.   You drove him back to the office; you looked around the
8   office.
9   A.   Yes.
10  Q.   And was there any discussion of bribe or the Jones case in
11  any regard?
12  A.   No.
13  Q.   And you didn't know he was wearing a body wire during that
14  visit?
15  A.   Obviously, no, sir.
16  Q.   And then after he was sent -- well, when was the next
17  contact that you do remember? You said he didn't hound you?
18  A.   As I sit here, I don't remember the specific sequence of
19  events, Mr. Keker; but I know I had communications with the
20  judge over the summer. Either he called me or I would call
21  him.
22      I remember, as I said earlier, two specific instances when
23  he was holding court in New Albany; and both of my sons were
24  working for me that summer, and I took them to the courthouse
25  to see him on separate occasions.

DAILY COPY  CROSS - BALDUCCI        65

1  Q.  And did he make phone calls to you during the summer?
2  A.  I'm certain he did.
3  Q.  How many times did he come to visit you in New Albany?
4  A.  I remember the lunch, and I remember him coming to the
5  office another time.
6  Q.  You say that you made phone calls to him? We've got
7  records; we haven't seen any. Do you know where you called
8  him? Did you call him at his office?
9  A.  My understanding is that the Government's surveillance on
10 my phones didn't go up until after that time.
11 Q.  But Judge Lackey, your understanding is, had his whole
12 office wired up, right, and could record --
13 A.  No, I don't have an understanding of that. I know that
14 there are some instances where I met with him that are
15 recorded. But as far as his office being wired, I don't know
16 that to be true.
17     THE COURT: Well, let's just – the question was, Did
18 you call Judge Lackey during that period of time.
19     THE WITNESS: Yes.
20 BY MR. KEKER:
21 Q.  How many times?
22 A.  I'm not certain of the number, but more than once and
23 probably less than ten.
24 Q.  Did he call you where you didn't return the call?
25 A.  If Judge Lackey called me, I returned the call. I may not

DAILY COPY  CROSS - BALDUCCI        66

1  have done it promptly. I may not have done it immediately.
2  But if Judge Lackey called me, I would not have not returned
3  his call.
4  Q.  Did he call you on August 27, and you didn't return his
5  call? Call you twice and you didn't return his call?
6  A.  I think I did return his call. He may not have reached me
7  when he called me. Mr. Keker, I was practicing law and had
8  other commitments. I mean, it wasn't a situation where every
9  time the judge called I dropped everything to talk to him. But
10 I did communicate with him.
11 Q.  Did he call you twice on August 27 and twice again on
12 September 11, and you didn't return any of those calls?
13 A.  I don't have an independent recollection of that; but if
14 that's what the records that you have show, all I can say is if
15 I did return the call -- I'm certain I did, and it must not be
16 on the records that you have.
17 Q.  When you called him, what phone did you use to call him?
18 A.  I would use any number of phones, Mr. Keker. I'd use my
19 office phone, my cell phone, my home phone.
20 Q.  Where did you call?
21 A.  Where would I call?
22 Q.  Yeah.
23 A.  I would call him primarily at his office and sometimes on
24 his cell phone.
25 Q.  On his cell phone?

DAILY COPY  CROSS - BALDUCCI        67

1  A.  Sometimes.
2  Q.  You had his cell phone number?
3  A.  Yes.
4  Q.  What did you use his cell phone number for, the judge's
5  cell phone number?
6  A.  To call him.
7  Q.  Why would you call him -- lawyers don't call judges on
8  their cell phone numbers. Why would you call him on his cell
9  phone?
10 A.  The times that I called him on his cell phone were related
11 to this case, to ask him to send this case to arbitration in
12 favor of the Scruggs Law Firm.
13 Q.  When did you call him on his cell phone about that?
14 A.  Several times.
15 Q.  Can you tell us when? We've got all these recordings, but
16 we don't have those.
17 A.  Mr. Keker --
18 Q.  Can you give me a month?
19 A.  -- there were times where we talked on a cell phone.
20 That's the best I can tell you.
21 Q.  And he was on his cell phone?
22 A.  Yes.
23 Q.  Do you remember his number?
24 A.  It was a 680 number.
25 Q.  And when did he give you that number?

DAILY COPY  CROSS - BALDUCCI        68

1  A.  At one of the times that I met with him in Calhoun,
2  because we were having a hard time communicating; and he had
3  called me a couple of times, and I wasn't in the office. I had
4  called him a couple of times, and he wasn't in the office.
5      And I asked him at one point to give me his cell phone
6  number, and he did. And I remember one time I called him, and
7  I think he told me he was at his shop working. And he called
8  me back, I think. I think I left him a voice mail, and he
9  called me back later on his cell phone after that.
10 Q.  So there were -- you believe there were calls with Judge
11 Lackey during this period that somehow were not recorded by
12 Judge Lackey?
13 A.  I don't know what calls Judge Lackey recorded, sir.
14 Q.  Okay. Before September 18, do you recall Judge Lackey
15 raising the subject of money?
16 A.  No.
17     MR. KEKER: Your Honor, I would request to be able to
18 go into the September period to show Judge Lackey's initiation
19 of criminal activity. It's clearly outside what you said I
20 could go into, so I'm requesting you to consider broadening
21 your tolerance. I won't spend much time on it.
22     THE COURT: Well, what is it specifically you want to
23 go into?
24     MR. KEKER: I want to establish that Judge Lackey
25 first raised the issue of money, first presented it to

DAILY COPY   CROSS - BALDUCCI        69
1  Mr. Balducci; and I wanted to show the circumstances that at
2  that point this order had been long overdue. Six months had
3  gone by without Judge Lackey doing what everybody recognized
4  was the right thing, and it was Judge Lackey who --
5       THE COURT: You want to question him about the
6  meeting in September, whenever it was when the money question
7  first came up?
8       MR. KEKER: Yes, sir. When it first came up and --
9  first it came up about, What can you do for me; and then it
10 came up, I want $40,000, those meetings.
11      THE COURT: How many meetings are you talking about?
12      MR. KEKER: I'm talking about there's the
13 September 18 meeting where it's first raised by Judge Lackey,
14 Will they do something for me? And then September 21 is where
15 Judge Lackey, we believe --
16      THE COURT: All right. You may question him about
17 those two meetings in that regard only.
18      MR. KEKER: Thank you.
19 BY MR. KEKER:
20 Q.  Do you recall a call from Judge Lackey to you on
21 September 18, 2007?
22 A.  I do.
23 Q.  This is about six months after your meeting in the Scruggs
24 Law Firm?
25 A.  Correct.

DAILY COPY   CROSS - BALDUCCI        70
1  Q.  And it's two months after the hearing on the motion to
2  arbitrate has been argued before Judge Lackey, right?
3  A.  That's my understanding.
4  Q.  And it's five months after Judge Lackey has told you that
5  he thinks they're entitled to arbitration?
6  A.  That sounds about right.
7  Q.  And in that call, did Judge Lackey say words to the
8  effect, If I help the Scruggs firm, will they help me?
9  A.  Yes, he did.
10 Q.  And what -- were you surprised?
11 A.  Yes.
12 Q.  Did that seem unlike Judge Lackey to you?
13 A.  Yes.
14 Q.  Did you feel a little awkward being told by a judge who
15 had been sitting on a motion that he ought to have granted that
16 he wanted something for it?
17 A.  Well, the whole thing was a little bit awkward, sir; so
18 the answer, I guess, is yes.
19 Q.  And did he tell you during that call that Grady Tollison
20 was putting pressure on him?
21 A.  Yes.
22 Q.  And what did you understand that to mean? Grady Tollison
23 was whispering in his ear?
24 A.  Essentially; that seemed logical.
25 Q.  And how -- was he doing that ex parte, chatting with him

DAILY COPY   CROSS - BALDUCCI        71
1  and putting pressure on him?
2  A.  I presume.
3       THE COURT: Well, let's don't presume. Just testify
4  what you know, no presumptions.
5       THE WITNESS: Okay. The judge did tell me that, yes.
6  BY MR. KEKER:
7  Q.  Did he tell you that he had a personal problem?
8  A.  I'm not certain if he did in that conversation.
9  Q.  Did he tell you in a conversation -- after he said, "If I
10 help them, would they help me," did he tell you to think about
11 it and get back to him with what you could do for him?
12 A.  Yes.
13 Q.  And did you think about it?
14 A.  Yes.
15 Q.  Did you talk to Steve Patterson about it?
16 A.  Yes.
17 Q.  And tell us about that conversation; what did you and
18 Mr. Patterson talk about?
19 A.  We discussed the fact that the judge was clearly telling
20 us that he wanted some money in exchange for entering the order
21 for arbitration, and what should we do. The judge had not said
22 a specific amount. And Steve and I discussed the fact that I
23 needed to go meet with the judge personally to try to find out
24 specifically what he was talking about. And, so, that's what
25 we decided to do, and that's what I did.

DAILY COPY   CROSS - BALDUCCI        72
1  Q.  You didn't tell anybody at the Scruggs Law Firm about this
2  approach before you went to see him?
3  A.  No.
4  Q.  As far as you know, they knew nothing about it?
5  A.  That's correct.
6  Q.  And, so, you went to see him on September 21st?
7  A.  I think that's correct, yes, sir.
8  Q.  And how long was that meeting with Judge Lackey?
9  A.  I don't know exactly. I'm going to say approximately 20
10 or 30 minutes.
11 Q.  What did you talk about?
12 A.  We talked about the case. We talked about the fact that
13 he said he was in a position that he'd gotten himself into,
14 that he needed some money; he needed to get over a hump. And
15 it was something that he had created for himself, and that he
16 needed $40,000. And did I think that Mr. Scruggs would give
17 him $40,000 if he entered an order that they wanted done.
18 Q.  And what did you understand him to mean? You're good
19 friends with him, what did he mean, over a hump and gotten
20 himself into a fix? How did you understand him?
21 A.  You know, I didn't know specifically. And I -- I just
22 knew it was something personal. You know, I believed the judge
23 when he told me that, and I believed it was certain. And what
24 I thought at the time was that Judge Lackey had gotten himself
25 into some bad position and that he needed some money to get out

## DAILY COPY   CROSS - BALDUCCI    73

1  of it; and that he was looking at this issue that I had placed
2  before him about signing this order as some avenue to get that
3  money; that's what I thought at the time.
4     And I didn't ask him a lot of questions, sir. I didn't
5  pry about why he needed the money. I just felt like, you know,
6  he was pouring his heart out to me at the time; and I thought
7  he was sincere. And I thought he had really gotten himself in
8  trouble and needed the money, and he was just trying to use
9  this case as an avenue to get it.
10 Q. And you were listening to him and thought he was talking
11 to you as a mentor, as a friend, as a man in trouble?
12 A. Certainly in part. Now, I understand -- I understood
13 clearly what he meant. I understood clearly that he was
14 saying, I need the money; and if you get me the money from
15 Mr. Scruggs, I'll enter this order for it. As I said, I
16 thought he had gotten himself into some trouble or some
17 position; and he was viewing this case as an opportunity that
18 had arisen to get himself out of the trouble he was in.
19 Q. Okay. Up to that point, you didn't think that you'd done
20 anything that was illegal or committed a crime, did you?
21 A. I didn't think I had done anything that was a crime up to
22 that point, no, sir.
23 Q. And now your mentor and your friend is asking you for
24 $40,000 because he's in a personal jam, right?
25 A. Yes. And that he --

## DAILY COPY   CROSS - BALDUCCI    74

1  Q. And what was your response?
2  A. Told him I'd find out if I could get him the money.
3  Q. You told him you'd do it, didn't you?
4  A. Well, I told him that I felt sure that I could help him,
5  yeah; and that I'd let him know.
6  Q. And you responded to him as a friend and as a mentor?
7  A. Well, both. As I said, I believed what he told me. I
8  believed he was in trouble. But at the same time, I clearly
9  understood and I clearly knew that what he was saying was, I
10 need $40,000 to enter this order.
11 Q. And this is --
12    MR. KEKER: There's one more meeting, Your Honor, the
13 27th. Maybe I'll just quit because we've talked about that a
14 lot. The next meeting, the 27th, is when Judge Lackey tries to
15 draw him out about Scruggs being involved; and he said,
16 "Scruggs doesn't know about this."
17    THE COURT: You've got a tape of that.
18    MR. KEKER: Yes, sir.
19    THE COURT: You want to ask him about it?
20    MR. KEKER: I'd like to.
21    THE COURT: All right. Briefly.
22 BY MR. KEKER:
23 Q. You went back on September 27 with $20,000 of Patterson
24 Balducci money to give to Judge Lackey, right?
25 A. Yes.

## DAILY COPY   CROSS - BALDUCCI    75

1  Q. Where'd you get that money? Did you get it out of the
2  bank?
3  A. Yes.
4  Q. And Judge Lackey, during that conversation, kept asking
5  you whether or not it was Mr. Scruggs' money, didn't he?
6  A. Yes. It came up during the conversation, yes.
7  Q. And you told him it wasn't, right?
8  A. I don't think I said it wasn't his money.
9  Q. Well, you told him that this was money that you had
10 stashed away for a rainy day, didn't you?
11 A. I think so.
12 Q. And you told him that this was just between you and him,
13 your friend?
14 A. I think I told him that, yes, sir.
15 Q. And he kept trying to bring Mr. Scruggs into it and say,
16 "Well, Scruggs knows about it, doesn't he?"
17 A. Right.
18 Q. Kept saying, "I don't want this to be your money; I want
19 it to be Scruggs' money," words to that effect?
20 A. Words to that effect.
21 Q. And you finally had to tell him that, "Mr. Scruggs doesn't
22 know anything about it"?
23 A. Whatever the transcript says, I don't disagree with it,
24 sir.
25 Q. And Mr. Scruggs, as far as you were concerned, didn't know

## DAILY COPY   CROSS - BALDUCCI    76

1  anything about it, did he?
2  A. At that point in time, I'm not sure if Mr. Scruggs had
3  gotten the word yet or not. I know that I had had a
4  conversation with Mr. Backstrom before then about paying the
5  judge the $40,000. And I understood in the response from
6  Mr. Backstrom that all three of the defendants had talked about
7  it and agreed to it, and that I was to go forward and give the
8  judge the money. But I had not had a personal discussion with
9  Dick Scruggs at that time, no.
10 Q. Or Zach Scruggs?
11 A. Or Zach, no.
12 Q. You say you had a conversation with Sid Backstrom?
13 A. Yes.
14 Q. When was that conversation?
15 A. Immediately after I left the judge's office when he first
16 proposed the $40,000 to me.
17 Q. So that'd be on September 21st?
18 A. I think that's correct.
19 Q. And what did you say to Mr. Backstrom?
20 A. I told him I'd just met with the judge; and that the judge
21 was getting pressured and influenced, it appeared, from some
22 other places; and that he told me that he was amenable and
23 wanted to enter the order; but that he needed $40,000 to do it.
24 And I asked Mr. Backstrom, "Is that something that y'all want
25 me to go forward with; and if so, how do you want me to handle

DAILY COPY   CROSS - BALDUCCI         77
1  it? Are y'all going to cover it if I do?"
2  Q. Now, you said to Mr. Backstrom that the judge was getting
3  pressure from other places. What had the judge told you about
4  that pressure from other places?
5  A. Just what we discussed earlier, that he was in a bind, and
6  he needed to get over a hump; and it was, you know, essentially
7  a problem of his own creation and --
8  Q. This wasn't pressure from the Jones side of the case, from
9  Mr. Tollison's firm?
10 A. Well, I think that he had mentioned once prior to that,
11 words to the effect, as you asked me earlier, about Grady had
12 said something, or Grady was putting some pressure on him as
13 well.
14 Q. And, so, you told Mr. Backstrom that the judge wanted
15 $40,000 for this order?
16 A. Yes.
17 Q. Did Mr. Backstrom say that Judge Lackey sounded crazy?
18 A. No.
19 Q. You never remember him saying the situation with Judge
20 Lackey and Judge Lackey seems crazy?
21 A. No.
22 Q. Did Mr. Backstrom respond to you?
23 A. He did.
24 Q. Okay. And when did he respond to you?
25 A. Called me back later within -- either that day or within a

DAILY COPY   CROSS - BALDUCCI         78
1  day or so after that.
2  Q. And said what?
3  A. Yes, we want you to go forward. You're covered. Go get
4  it done.
5  Q. Okay. Now, so you believed the Scruggs Law Firm at that
6  point knew what Judge Lackey was asking for?
7  A. Yes.
8  Q. So there would be no need for you to involve anybody else
9  in trying to communicate with the Scruggs Law Firm to get this
10 Balducci Patterson money?
11 A. Well, the circumstances were such that when Patterson and
12 I talked about it, we wanted really -- Steve, more than
13 anything, wanted some direct confirmation from Dick about it.
14 He wasn't satisfied necessarily with my conversation with Sid.
15 So Steve said that he was going to contact P.L. Blake and make
16 certain that he, Steve, got a direct word from Dick that Dick
17 wanted us to go forward.
18 Q. And when Mr. Patterson contacted P.L. Blake, he never told
19 P.L. Blake what you and he needed $40,000 for, did he?
20 A. I wasn't privy to their conversation, sir.
21 Q. Did he tell you that he had not told P.L. Blake what you
22 needed the $40,000 for?
23 A. Patterson told me that he told P.L. Blake that we were
24 working on a problem to solve for Dick, that he wanted us to
25 solve; and that it was going to cost $40,000; and that we

DAILY COPY   CROSS - BALDUCCI         79
1  needed to know if he wanted us to solve the problem.
2  Q. Did Patterson tell you that he had never told P.L. Blake
3  what the problem was?
4  A. Yes.
5  Q. So you'd had this very direct conversation with
6  Mr. Backstrom, but Mr. Patterson didn't trust it?
7  A. I don't know what he felt. He wanted some direct
8  confirmation because, frankly, the $40,000 was a big deal to us
9  at the time; and he wanted to make certain that we were going
10 to get our money back, that we weren't going to do this and get
11 hung out to dry and not get our money back.
12 Q. But before -- all right. And just to sum up, before
13 September 21, 2007 -- from March through September 21, 2007,
14 you hadn't committed a crime; you weren't interested in
15 committing a crime; you hadn't discussed with the Scruggs Law
16 Firm committing a crime; is that right?
17 A. Well, in my mind, up until that point, I had not committed
18 a crime, no, sir.
19       MR. KEKER: That's all I have, Your Honor. Thank
20 you.
21       MR. TRAPP: Your Honor --
22       (AFTER OFF-THE-RECORD COMMENTS, THE PROCEEDING CONTINUED
23       MR. KEKER: Well, Your Honor, I can ask him some
24 questions about what he reviewed to prepare for today, but it
25 seems to me crystal clear that any grand jury materials or any

DAILY COPY   CROSS - BALDUCCI         80
1  other materials, beside the 302s, that constitutes Jencks
2  material for the subject matter of this testimony should be
3  given to us at this point.
4        THE COURT: Why?
5        MR. KEKER: Because the rules require it.
6        THE COURT: What rule?
7        MR. KEKER: In discussion in a hearing on a motion to
8  suppress or a motion like this one, 26.2(a) of the Federal
9  Rules of Criminal Procedure say that at a suppression hearing
10 -- and that's been interpreted by the -- I believe the Fifth
11 Circuit and at least some circuits -- we've got a brief on it
12 if you'd like to see it, to cover this kind of hearing -- and
13 when the Government calls a witness and/or when a law
14 enforcement officer testifies, you get the Jencks material
15 that's relevant to the subject matter. I don't think we have a
16 dispute about this with the Government. Would you like to see
17 a brief on it?
18       THE COURT: I've got the Section 3500 before me.
19       MR. KEKER: This is in the Federal Rules of Criminal
20 Procedure, Your Honor. 26.2 provides that after a witness,
21 other than the defendant, has testified on direct examination
22 according to motion of the party who did not call the witness,
23 must order the attorney for the Government and so on. And then
24 the 26.2(a) says Rule 26.2 applies to a suppression hearing.
25       Also 26.2(g) says this rule applies at a suppression

DAILY COPY   CROSS - BALDUCCI        81

1  hearing. And that the mutual impact of the two rules is once a
2  Government witness has testified on direct examination at trial
3  or at a suppression hearing, the Government, on motion of
4  defendant, must produce any statement in possession made by a
5  witness related to the subject matter of the witness's
6  testimony.
7        THE COURT: All right. That's -- but the grand jury
8  material relates to other matters that he hasn't testified
9  about. As I mentioned earlier, to the Government, that they
10 would give you the Jencks material about this area of
11 testimony.
12       MR. KEKER: That's all we're asking for. I had the
13 impression that grand jury -- maybe I'm wrong -- that the grand
14 jury -- if there's anything in grand jury materials that is
15 relevant to this -- is covered by this subject matter, we're
16 entitled to it, is our position.
17       THE COURT: They've agreed to give you that.
18       MR. KEKER: Yes, sir. Okay.
19       THE COURT: But not now. We'll wait and do it after
20 the hearing today. I don't think there's anything in there
21 that will warrant you to get up and cross-examine him again.
22 You can take a look at it again.
23       MR. KEKER: Your Honor, maybe we could get it at
24 lunch or something.
25       THE COURT: Yes.

DAILY COPY   REDIRECT - BALDUCCI      82

1            REDIRECT EXAMINATION
2  BY MR. NORMAN:
3  Q. Mr. Balducci, I want to cover a few specific things
4  brought up by counsel opposite. Beginning with earlier in your
5  testimony, there was mention of a motion being filed in the
6  Jones case on May 19th. Do you recall that line of
7  questioning?
8  A. Yes.
9  Q. That brings up this question I'd like to ask: Do you
10 know, from your personal knowledge, whether or not the Scruggs
11 Law Firm was represented by competent counsel in that case?
12 A. They were.
13 Q. Do you know who represented them?
14 A. The law firm of Daniel Coker here in Oxford.
15 Q. Did anybody from the law firm of Daniel Coker participate
16 in your ex parte meetings with the judge?
17 A. No, sir.
18 Q. The lunch you had in New Albany with Judge Lackey, did
19 Judge Lackey attempt to bring you into a conversation about
20 Jones v. Scruggs?
21 A. No, sir.
22 Q. Now I want to go to the last line of questioning by the
23 defense, I did not ask you about on direct examination, that
24 being your meeting with the judge, with Judge Lackey on
25 September 21st of 2007. Do you recall that line of

DAILY COPY   REDIRECT - BALDUCCI      83

1  questioning?
2  A. I do, yes, sir.
3  Q. Sir, when Judge Lackey mentioned the figure, 40,000, to
4  the best of your recollection, what was your response?
5  A. Best of my recollection was, yes, that I would help him;
6  I'd get it together and would help him.
7  Q. Okay. Was there any mention of whether or not that would
8  be a problem?
9  A. I think I said it would not be a problem.
10 Q. Okay. Was there something that let you believe that would
11 not be a problem?
12 A. Yes, sir.
13 Q. What is that, in very brief terms?
14 A. I had been privy previously to another matter in which
15 Mr. Scruggs bribed another judge for a favorable outcome in a
16 case and I was aware of that.
17       MR. NORMAN: Your Honor, that is the subject of our
18 404(b) motion and countermotion; and I will leave that at this
19 point.
20 BY MR. NORMAN:
21 Q. Did you at any time say, Judge, you misunderstood us?
22 A. No.
23 Q. Did you at any time say, Judge, that's a crime?
24 A. No.
25 Q. Did you at any time protest that the Scruggs firm wasn't

DAILY COPY   REDIRECT - BALDUCCI      84

1  going to be involved in that?
2  A. No.
3  Q. What did you do the moment you left his chambers?
4  A. I called Sid Backstrom.
5  Q. Counsel opposite asked you if you spoke personally with
6  Mr. Scruggs about that. Did there come a time, at the Scruggs
7  Law Firm, when you and Steve Patterson did have occasion to
8  speak with Mr. Richard Scruggs about whether or not you would
9  be covered for your $40,000?
10 A. Yes, sir.
11 Q. And what did he say?
12 A. He said that he knew that we had talked to P.L. Blake, and
13 that he had talked to P.L. Blake. And he knew that we needed
14 the 40, and that we would be covered and not to worry about it.
15 Q. Did you get your 40,000 from the Scruggs Law Firm?
16 A. Yes, sir.
17       MR. NORMAN: Will the Court indulge me?
18       THE COURT: Very well.
19       MR. NORMAN: One final couple of questions, if the
20 Court would permit.
21       THE COURT: Very well.
22 BY MR. NORMAN:
23 Q. You said you called Sid Backstrom when you left the
24 judge's chambers; and to work into that, would you please tell
25 me again what you asked him?

DAILY COPY   REDIRECT - BALDUCCI           85
1   A.  I advised him that I'd just left a meeting with the judge;
2   that the judge wanted $40,000 to enter the order compelling the
3   Jones case to arbitration. And I asked him, is that what they
4   wanted done; did they want to pay the money? And if so, how
5   did they physically want to do it? Did they want me to pay it?
6   And, if so, were they going to cover me?
7   Q.  You said they several times. Did you use that plural
8   pronoun?
9   A.  Yes, sir.
10  Q.  Who were you referring to?
11  A.  The three defendants.
12  Q.  To the best of your ability, tell us what he said in
13  response.
14  A.  During that conversation, he said, "I'll get back to you.
15  Let me find out, and I'll call you back."
16  Q.  All right. Did he?
17  A.  He did.
18        MR. NORMAN:  Thank you, Your Honor.
19        THE COURT:  All right. You may step down.
20        MR. KEKER:  Your Honor, he opened a couple of new
21  matters. Could I just ask him briefly about them? He went in
22  and bribed another judge. That's -- I don't think that's true.
23  Can I just ask him what he's -- let me make sure we know what
24  he's talking about because it's -- and then this conversation
25  about Dick Scruggs saying he was covered --

DAILY COPY   RECROSS - BALDUCCI           86
1         THE COURT:  Well, normally, I don't have redirect,
2   Mr. Keker; but I'll give you five minutes to talk to him about
3   that. That was only in response to matters that were brought
4   out on cross; but if it wasn't on cross, you could have
5   objected to it. If it wasn't about a matter brought out on
6   cross, you could have objected to it. But since you didn't,
7   they're allowed to get it in. I'll allow you five minutes to
8   redirect on those points.
9                RECROSS EXAMINATION
10  BY MR. KEKER:
11  Q.  You said you were privy to another matter where Dick
12  Scruggs bribed a judge. What matter are you referring to?
13  A.  A case involving an attorney named Bob Wilson who had sued
14  Mr. Scruggs for asbestos and possibly tobacco fees.
15  Q.  Was that case pending in Hinds County before Judge Bobby
16  DeLaughter?
17  A.  It was.
18  Q.  Was Judge Bobby DeLaughter bribed in that case?
19  A.  He was.
20  Q.  By whom?
21  A.  By Dick Scruggs.
22  Q.  And was the bribe a money bribe?
23  A.  No, sir.
24  Q.  What was the bribe that you're referring to?
25  A.  He was offered a federal judgeship or he was offered the

DAILY COPY   RECROSS - BALDUCCI           87
1   influence of Mr. Scruggs' brother-in-law, who was Senator Trent
2   Lott, to put him on the list for consideration of an open
3   federal district judgeship.
4   Q.  So we can get it, what do you understand -- Mr. Scruggs
5   called Mr. DeLaughter and said something?
6   A.  No, sir. Mr. Lott called Mr. DeLaughter.
7   Q.  What are you saying?
8   A.  I'm saying that Mr. Lott called Judge DeLaughter, at Mr.
9   Scruggs' request, and told him that he was being considered to
10  be put under -- or put on the list for consideration for an
11  open judgeship in that district; and that that was during the
12  pendency of the case involving Mr. Wilson that was before Judge
13  DeLaughter.
14  Q.  And how do you know that that happened? You talked to
15  Senator Lott about that?
16  A.  No, sir.
17  Q.  How do you know that that happened?
18  A.  Because I was directly involved in the conversation
19  between Mr. Scruggs and Mr. Langston where they were discussing
20  it, where they discussed that the call would be made; and then
21  I was privy to conversations after the call was made.
22  Q.  When was that discussion, the one before?
23  A.  When?
24  Q.  Yeah.
25  A.  It was during the pendency of the Wilson case.

DAILY COPY   RECROSS - BALDUCCI           88
1   Q.  Do you remember more specifically than that?
2   A.  It would have been around the summer of '06.
3   Q.  2006. So June, July, or August 2006?
4   A.  I think the Wilson case -- my best recollection is the
5   Wilson case was tried in August of '06. So it was shortly
6   before that.
7   Q.  Like within a month or two?
8   A.  Yes.
9   Q.  Okay. You're sure about that?
10  A.  It's my best recollection, yes, sir.
11  Q.  Because you were there. So if these conversations didn't
12  happen in June or July, then you're just completely wrong about
13  this, right?
14  A.  No. No. The conversation -- I think that the call was
15  made -- maybe I misunderstood what you were asking. I think
16  that Senator Lott made the call to Judge DeLaughter sometime in
17  the first quarter or so of '06.
18  Q.  And what was Judge DeLaughter supposed to do? What was he
19  going to do? You said it was a bribe; what was he going to do?
20  A.  Rule favorably for Mr. Scruggs.
21  Q.  On what, some particular motion or just anything that came
22  along?
23  A.  There were several, yes, sir; and it was for a favorable
24  outcome.
25  Q.  And you know that because you heard Mr. Langston and

### DAILY COPY  RECROSS - BALDUCCI    89

1  Mr. Scruggs talking about it?
2  A. I know it for a lot more reasons than just that, but, yes.
3  Q. What are the rest of the reasons?
4  A. I was privy to several meetings with Ed Peters where we
5  discussed strategies about the case, where we previewed filings
6  in the case, where we were provided with draft copies of orders
7  that Judge DeLaughter was going to enter in the case. There
8  was a lot of stuff.
9  Q. What did that have to do with this call from Senator Lott?
10 A. I'm not sure I understand your question.
11 Q. I'm not sure I understand your answer. What did it have
12 to do with what you just said; these meetings, what did that
13 have to do --
14 A. That was part of implementing the favorable outcome in the
15 Wilson case.
16 Q. Are you aware, sir, that the judgeship Judge DeLaughter
17 was interested in was given to somebody else; by, say, April of
18 2006, it was gone?
19 A. My understanding is that there were about three different
20 judgeships that were pending during the Wilson case before it
21 was tried, and that the last federal judgeship was filled
22 within just a couple of weeks after the trial; that there
23 was -- during the pendency of the Wilson trial, in other words,
24 there was always an open judgeship on the federal bench.
25 Q. Did the Wilson trial end in a settlement whereby

### DAILY COPY  RECROSS - BALDUCCI    90

1  Mr. Scruggs paid Mr. Wilson some money?
2  A. He did.
3  Q. How much money did he pay him?
4  A. My best recollection is that he paid him $3.9 million.
5      THE COURT: Mr. Keker, your time is up. I'll give
6  you two or three minutes to wrap it up.
7  BY MR KEKER:
8  Q. I want to ask you about this Patterson. You said you and
9  Mr. Patterson went and talked to Mr. Scruggs. And he said he
10 talked to P.L. Blake, and he knew you needed 40. When was that
11 conversation?
12 A. October 16th.
13 Q. And where was the conversation?
14 A. In Dick Scruggs' personal office in Oxford.
15 Q. And tell us exactly what was said by him and by you.
16 A. That's essentially it. Steve and I were there to meet
17 with Dick on an unrelated matter. He brought us into his
18 office; and before we even sat down, he brought it up. I think
19 that he must have thought that's what we were there to talk
20 about, because he initiated it. And he said, "I know you've
21 talked to P.L.; and I've talked to P.L. as well. Don't worry.
22 I know you need the 40; you're covered. It'll be fine."
23 Q. And what did he say the 40 related to?
24 A. He didn't.
25 Q. Well, were you going to do some work for the 40?

### DAILY COPY  RECROSS - BALDUCCI    91

1  A. Not -- no. Well, yeah, bribe Judge Lackey.
2  Q. Excuse me?
3  A. Yeah, bribe Judge Lackey.
4  Q. Other than that, were you going to do any work for
5  Mr. Scruggs for the $40,000?
6  A. At that time, Mr. Scruggs had not created this cover story
7  for me doing this voir dire for him, if that's what you're
8  asking.
9  Q. This cover story for voir dire, at some point, did you
10 agree to do work on voir dire for a case that was coming up for
11 trial; and did Mr. Scruggs pay you $40,000 to do that?
12 A. I did not agree to do work on the case. We agreed that we
13 would cover the $40,000 payment to me in that fashion, yes.
14 Q. Did Mr. Scruggs tell you what P.L. Blake had said you
15 needed the $40,000 for?
16 A. No.
17 Q. Had you told Mr. Scruggs in these various meetings about
18 other matters that your firm was a little desperate to get some
19 money?
20 A. Had I told Mr. Scruggs --
21 Q. Yeah. You were desperate for money.
22     MR. NORMAN: Excuse me, sir. I object. We're
23 bringing up a lot of areas that I would now have to ask for
24 permission to go into to clear up.
25     THE COURT: I realize that, and this has gotten much

### 92

1  further than the area of cross-examination; so wrap your -- are
2  you through?
3      MR. KEKER: Yes, sir.
4      THE COURT: All right. Fine.
5      THE WITNESS: Your Honor, am I finally excused?
6      THE COURT: We'll let you know.
7      THE WITNESS: Thank you, sir.
8      MR. KEKER: Your Honor, at this point, we'd request
9  that Judge Lackey be called, either as the Government witness
10 or as our witness, either way; but Judge Lackey can fill in how
11 this crime was created.
12     MR. NORMAN: Your Honor, we believe that this motion
13 can be decided now. We felt it could be decided on the briefs
14 and on the law. I think it can more than be decided now. We
15 can go on and call witnesses for two or three weeks, but I
16 don't think the Court has time for that; and I think this is a
17 good time to cut it off.
18     MR. KEKER: We're not asking for two or three weeks.
19 We're asking for a similar sort of examination of Judge Lackey,
20 which will take an hour, an hour and a half; and we are asking
21 for an examination of Agent Delaney about why his affidavits
22 read like they did. Because you read the affidavits and you
23 listen to what happened, they sound like two different worlds.
24     But we think -- that's three hours' worth of testimony,
25 and we're certainly not asking for two or three weeks. And

## Page 93

1  we'll abide by whatever time limits the Court deems
2  appropriate.
3      THE COURT: All right. What is it, specifically,
4  that you would want to ask Judge Lackey about?
5      MR. KEKER: I want to ask Judge Lackey about pursuing
6  Mr. Balducci after May 9th. We've got the early part from him.
7  But after May 9th, when this was over, and especially after the
8  recusal -- I mean, what happened to him to chase Balducci
9  through the summer and get this man, whom he considered to be
10 his friend and mentee (sic), into this kind of trouble that --
11 I mean, it -- to establish the Government overinvolvement in
12 the creation of this crime.
13     MR. NORMAN: May I respond briefly?
14     THE COURT: You may.
15     MR. NORMAN: Your Honor, first of all, we have the
16 man who he says was chased throughout the summer, who has now
17 testified; and he's testified he wasn't chased. The man who
18 pled guilty to that crime and said he did not feel he was
19 hounded by the judge or chased or caused to commit a crime he
20 did not want to commit.
21     We can go on and call more witnesses as long as the Court
22 would like; but we're not going to change the facts that are
23 before the Court and the defense has yet to cite one case that
24 makes their allegations sufficient to constitute a due process
25 violation under the Fifth Amendment.

## Page 94

1      MR. KEKER: Well, I won't rise to the bait about
2  cases, but the cases talk about the totality of the
3  circumstances. This witness has said some things about calling
4  Judge Lackey that either aren't true or aren't verified by all
5  the voluminous records that they have, and he's the one -- if
6  he was talking to Balducci, while he's under control of the
7  Government in choosing which conversations to tape and which
8  conversations to recognize on his tape machine, that's
9  something that I think this Court should take into
10 consideration and find out why he's doing that. I suspect
11 that's not what he was going to say. I suspect he's going to
12 say he was a faithful taper, and what we've got is what there
13 is.
14     But until we -- all that we have shows him pursuing
15 Balducci, not the other way around. Balducci doesn't want to
16 do anything to hurt the Government's case at this point; given
17 his guilty plea, I think it's understandable, especially his
18 answer, his first answer, which read like he was reciting the
19 indictment. He attended a meeting in order to corruptly
20 influence the judge. So we'd ask for an hour with Judge
21 Lackey, hour, hour and a half.
22     THE COURT: Well, the Court's concerned about -- at
23 this point, it seems that the motion of the defendants is
24 basically whether Judge Lackey, acting as a Government agent
25 asking for money from Mr. Balducci, created the crime that the

## Page 95

1  defendants are now charged with and whether the defendants
2  themselves did anything to promote that crime and formed any
3  elements that constitute that crime. That's what it -- that's
4  the gist of the motion, that it is involved outrageous
5  Government conduct.
6      And the law requires that in order for such a motion to be
7  successful the defendants must not have participated in any
8  active way in the carrying out of the crime. All the evidence
9  to this point is that they did. So it would seem to the Court
10 it would be futile to bring in these other witnesses to testify
11 about what they did and what the defendants did because the
12 defendants are unable, will be unable, to show that they were
13 merely passive participants in this crime.
14     It's clear to the Court that they were active participants
15 in it; and for the defendants to be successful in this kind of
16 a motion, the defendants must only be passive actors. And so,
17 therefore, at this point, I do not see any --
18     MR. GRAVES: Can I be heard?
19     THE COURT: Well, Mr. Keker is the one arguing about
20 this.
21     MR. GRAVES: Well, this is a right specifically about
22 my client, Your Honor. I'll defer to Mr. Keker.
23     MR. KEKER: May I be heard on the statement of law?
24     THE COURT: You may.
25     MR. KEKER: We don't agree with it, and we don't

## Page 96

1  think that you agree with it based on the opinions you've made.
2  Yes, you have to balance; and you've said, "Government
3  involvement in the crime is extensive particularly when
4  compared to the involvement of the defendant."
5      In all of the cases that deal with Government misconduct,
6  that go up on appeal, the defendant has been convicted of some
7  crime; and the issue is not was the defendant -- did the
8  defendant do nothing, but was the defendant's involvement in
9  this crime something because of the Government's conduct that
10 violated the due process clause?
11     And the whole point of this hearing is to focus on the
12 Government's conduct to determine if the creation of this crime
13 by the Government was so extensive. And then I agree with you,
14 the cases certainly support how active the defendants were. To
15 hear that the activity was at the end, it's the fruit of the
16 poisonous tree argument a little bit.
17     The defendants never had a chance to act if the Government
18 misconduct hadn't occurred, because they created and
19 exclusively made up this crime under what I said before was
20 sort of extortion circumstances. The judge just sits and sits
21 and sits, and then all of a sudden begins to complain about
22 personal problems to a friend and so on and so on. So it's a
23 balance, I agree with that.
24     In Slatterly, what you were looking at was, yes, the
25 Government involvement there was great; but what you decided

### Page 97

    1    was, because Slatterly already was off committing the crime
    2    separately and independently before the Government ever got
    3    involved, that, therefore, he wasn't going to be able to win.
    4         But all of these cases involve people who have been
    5    convicted of a crime; and the focus is on the Government's
    6    conduct, not the defendant's conduct. So that's why we think
    7    that a little bit more airing out of what the Government did
    8    here, what Judge Lackey did, and what Agent Delaney asked him
    9    to do or told him to do is important for you to give full
    10   consideration to these motions.
    11        THE COURT: Well, I appreciate your argument, but the
    12   Fifth Circuit has said very clearly at 192, 203 that -- and I
    13   quote -- "The requirement – this is on a motion for outrageous
    14   Government conduct. It says, "Such dismissal of an indictment
    15   for outrageous Government conduct is proper only in the, quote,
    16   rarest of circumstances."
    17        "Accordingly, a defendant claiming outrageous conduct
    18   bears an extremely high burden of proof and must demonstrate in
    19   light of the totality of the circumstances both substantial
    20   Government involvement in the events and a passive role by the
    21   defendants. The requirement that the defendants play only a
    22   passive role means that a defendant who actively participates
    23   in the crime may not avail himself of this defense."
    24        And the Court's of the opinion that to go further with
    25   these other witnesses would not wipe out the clear evidence

### Page 98

    1    that's before the Court now that there was an active
    2    participation of the other defendants in the carrying out of
    3    this crime. I'm not judging whether there's proof beyond a
    4    reasonable doubt at this time; I'm talking about preponderance
    5    of the evidence; that there was active participation in this
    6    crime by these defendants.
    7         And, therefore, they are not -- they cannot avail
    8    themselves of a motion to dismiss the indictment because of
    9    outrageous Government conduct. So for that reason, the motion
    10   to call any other witnesses is denied, and also the motion to
    11   dismiss the indictment for that very reason.
    12        All right, gentlemen, I think this will be a very good
    13   time to take a noon recess; and we'll be in recess until 1:15.
    14        (AFTER A LUNCH BREAK, THE PROCEEDING CONTINUED).
    15        (CALL TO ORDER OF THE COURT)
    16        THE COURT: Mr. Keker, you have another motion?
    17        MR. KEKER: I do, Your Honor.
    18        THE COURT: Second on the list, motion to suppress
    19   the wiretap info, correct?
    20        MR. KEKER: Correct, Your Honor. Wiretap and search
    21   warrant affidavit.
    22        THE COURT: Okay.
    23        MR. KEKER: And this is based on the Fourth Amendment
    24   principles enunciated in Franks v. Delaware, which -- where
    25   willful misstatements and/or statements that showed reckless

### Page 99

    1    disregard for the truth are enough to throw out a search
    2    warrant affidavit if they are material to the affidavit. The
    3    Tomblin case in the Fifth Circuit says that omissions -- just
    4    like under a 1001 jurisprudence, omissions are the same as
    5    falsehoods if they make what is said misleading or untrue.
    6         We need to make a substantial preliminary showing, and I
    7    believe we have, that there have been allegations and/or
    8    material omissions that are the result of either deliberate
    9    falsehood or reckless disregard for the truth.
    10        And then the second thing we have to show is that the
    11   remaining portion of what's in the affidavit is not sufficient
    12   to support probable cause. Where, as here, we're dealing with
    13   both falsehoods and omissions, I think you really need to have
    14   a hearing to carefully evaluate what's left after you hear from
    15   the agent what he put in and didn't put in his affidavit and
    16   why he did it.
    17        If, at the end, a full picture hadn't been provided to the
    18   independent magistrate exercising his judicial judgment would
    19   have led to a different picture, we really can't say. I don't
    20   think anybody can say what that judgment would have been.
    21   Here, the picture that would have been shown, had Agent Delaney
    22   filed an affidavit that was thorough and complete and didn't
    23   contain misleading statements, we believe, would have led to a
    24   lack of finding and probable cause from the first affidavit on.
    25        We're dealing with four affidavits. The first one was

### Page 100

    1    used to get the wiretap on Mr. Balducci's phone on September
    2    25, I think is when the order was signed. That is Exhibit 9 to
    3    Mr. Dooley's declaration. The second one is October 24 --
    4    excuse me. Not the October -- the October 16 application.
    5    That's Exhibit 19 to Mr. Dooley's declaration.
    6         The October 16 application and affidavit in support of the
    7    wiretap on Mr. Patterson's home phone. Then there was another
    8    Delaney affidavit. And all of these -- some of these are
    9    fairly repetitive. On October 24, to get an extension on the
    10   Balducci cell phone wiretap, that's Exhibit 31 to the Dooley
    11   declaration.
    12        And then, finally, they got all rolled up into the
    13   affidavit in support of the search warrant which happened on
    14   November 26, 2007, which is Exhibit 25 to the Dooley
    15   declaration.
    16        So our view is that we should get Agent Delaney on the
    17   stand, the person who signed these four affidavits, allow for
    18   questioning about why he put in some things that we believe
    19   could be argued very, very misleading and/or downright false;
    20   and why he omitted other things which we think was important to
    21   the determination of probable cause, to let the judge who
    22   decided these things have a fair picture.
    23        THE COURT: What's the Government's attitude on that?
    24        MR. SANDERS: Your Honor, he pointed out -- Mr. Keker
    25   pointed out that there's got to be a substantial preliminary

### Page 101

1  showing that Agent Delaney, in drafting his affidavit, was
2  intentionally dishonest or acted with reckless disregard to the
3  truth. He's not -- his motion -- I don't see anything that
4  suggests Agent Delaney was acting with intentional dishonesty.
5  I don't think there's anything in there to suggest he was being
6  dishonest. Even assuming the Court thought that was a
7  possibility, they've got to show --
8      THE COURT: Well, I don't think it's got to be
9  intentionally dishonest. It could be a material
10 misrepresentation by negligence or oversight or something else
11 or leaving something out.
12     MR. SANDERS: I think he has to show that it was an
13 intentional dishonest act or that he acted with reckless
14 disregard for the truth and then, also, that that is a material
15 misrepresentation.
16     THE COURT: All right.
17     MR. SANDERS: The omissions or the alleged
18 misrepresentations, I don't think they've shown under the
19 totality of the circumstances, which is what Franks v. Delaware
20 requires, that any of it is material.
21     Under the totality of the circumstances, what Franks
22 requires is if you took everything they refer to in their
23 motion, everything they refer to as the omissions and what
24 they've referred to as the misleading statements, if you put
25 every bit of that back into a hypothetical affidavit of what we

### Page 102

1  put in the affidavit -- frankly, it's the Government's position
2  that if we'd attached every transcript of every phone call
3  made, there would have been probable cause.
4      Certainly with what they've got here, they've not made any
5  showing that the Court would -- understanding the statements
6  they refer to, most of which are the ones between Balducci and
7  Lackey, if the Court had been aware of those statements in the
8  affidavit under the totality of the circumstances, of course
9  the Court would still have found probable cause.
10     The totality of the circumstances they've referred to --
11 and I can go through a few of these point by point if the Court
12 wants me to. They refer to a number of statements where
13 Balducci -- and we heard him this morning talking about it --
14 is telling the judge, "I don't want to make you uncomfortable,"
15 those statements that he's referring to.
16     Obviously, what Balducci was saying to the Court is, as I
17 said in my response, he is attempting to put the Court at ease.
18 He's been asked by the defendants to go to his mentor and do
19 something highly inappropriate. He's aware of that. He
20 admitted that it was extremely awkward. He's doing that, and
21 it's obvious that Balducci is trying to straddle the fence, as
22 it were.
23     He wants to offer or say something to Judge Lackey that's
24 extremely inappropriate, but he also wants to maintain at least
25 his relationship with Judge Lackey. It's not surprising that

### Page 103

1  he's going to continue to try to put the judge at ease, more so
2  after Judge Lackey has recused. Obviously, Judge Lackey is
3  nervous about this and Balducci wants to put him at ease.
4  That's essentially the statements they're referring to with
5  Judge Lackey and Balducci.
6      They refer, also, to one where Balducci says, for
7  instance, Judge, those are just some ideas that I put down on
8  paper for Your Honor to think about. Those weren't just, you
9  know, bullet points, just some ideas for the judge to consider.
10 As we pointed out in the affidavit, that was actually the order
11 compelling arbitration with Judge Lackey's signature line at
12 the bottom of it. That was Balducci trying to influence the
13 judge, very much trying to influence the judge.
14     In addition to that, Your Honor, the fact that Balducci
15 goes to Judge Lackey and is saying, We think it's right,
16 doesn't take away from -- if you're speaking to a judge and
17 trying to influence him in a corrupt manner and eventually
18 bribe him, it doesn't matter whether you believe the decision
19 is legally correct or not. That doesn't really have an effect
20 on it. Balducci is obviously -- all he's trying to do is put
21 Judge Lackey at ease; and that's what's very, very clear from
22 the statements the defendants refer to.
23     They refer, also, to the Patterson wire. They point out
24 three different instances that they describe as omissions or
25 materially misleading statements. The first one was a

### Page 104

1  September 27th statement that Patterson -- that Patterson's
2  making to Balducci with respect to P.L. Blake. On September
3  the 27th, Patterson was talking to Balducci; and as the
4  defendants point out, he tells him that P.L. Blake and
5  Patterson discuss this $40,000 problem that they're having.
6      In the middle of that statement, Patterson did say to
7  Balducci, P.L. doesn't know what it's about. That statement
8  was taken out of the affidavit specifically because on October
9  the 16th, when we eventually submitted that affidavit to the
10 Court, P.L. had already called Patterson back. Patterson had
11 already called Balducci again and said, "P.L. wants to know now
12 when the judge is going to sign the order."
13     The reason that statement was omitted from the affidavit
14 was because there was probable cause to believe by that time
15 that P.L. knew precisely what it was about. He'd asked about
16 40,000 back in September. Now on October 10th, he's already
17 saying: When is the order going to be signed?"
18     THE COURT: Was that put in the affidavit, that P.L.
19 had called him and back and said, When's the judge going to
20 sign the order?
21     MR. SANDERS: I'm sorry, Judge, was --
22     THE COURT: You didn't put in that P.L. doesn't know
23 what it's about. Did you put in that P.L. now knows what it's
24 about?
25     MR. SANDERS: Yes, sir. As a matter of fact, in the