105

1  Patterson affidavit, we said that the first call was placed by
2  Steve Patterson from the target telephone -- the last call was
3  placed by Patterson.  Telephone toll records from the phone
4  reflect -- wait a minute.  I'm sorry.
5       MR. TRAPP:  Excuse me.  Can you tell us where you are
6  while you do that, once you get there?
7       MR. SANDERS:  Yeah, I can.  If the Court could
8  indulge me just one second, Judge.  I found it.  It's in the
9  affidavit for the Patterson authorization.  It's on page 6 in
10  Paragraph 15.  We pointed out to the Court that on October the
11  10th Steve Patterson placed a call from the target phone to Tim
12  Balducci and requested Balducci to find out when the order
13  would be signed.
14       Balducci asked Patterson if there was a problem with the
15  deal; and Patterson responds, "P.L. wants to know."  That's
16  precisely why it wasn't mentioned.  We felt certainly there was
17  probable cause by October 16th to feel that P.L. Blake did know
18  something about why the 40,000 was being paid.
19       They also point to, in their motion, on October 27th a
20  couple of statements Balducci made when he was meeting with the
21  judge.  These are the statements they refer to as gutting the
22  Government's case.  These are the statements Balducci made to
23  the judge when he said something to the effect that only he and
24  the judge knew what was going on.
25       Again, this was an affidavit submitted on October the

106

1  16th.  We knew, however, that on September the 27th what he was
2  saying -- when Balducci said, "only he and Scruggs knew about
3  it," we knew when he said it that it wasn't true.  That wasn't
4  true.  We knew, and it's in the affidavit that on his way over
5  to meet with the judge he was talking to Patterson about it.
6       Also, by October the 10th, he has already mentioned,
7  again, that P.L. Blake has called and wanted to know about the
8  order.  We know that Patterson; we know that Blake, at least
9  from a probable cause perspective; we know Mr. Scruggs --
10  obviously, we performed surveillance, that's also in the
11  affidavit on September 27; that Balducci leaves the judge's
12  chambers and goes straight to the Scruggs Law Firm.  These are
13  the reasons that those type statements were left out.  We knew
14  he wasn't telling the truth when he said that.
15       Finally, they point to a statement made -- that Balducci
16  made to Judge Lackey on October 10th.  They are talking on the
17  phone, I believe; and Balducci says they talk about the order.
18  And then at the end of that conversation -- it's a short
19  conversation -- Tim says he is going to get back to him about
20  that other deal.
21       They cite this to suggest that Tim Balducci was unaware
22  that the $40,000 had anything to do with the order the judge
23  was going to enter in the Scruggs v. Jones case.  I said in my
24  motion, Judge, that based on the totality of the circumstances
25  before the Court at that time that that was nonsense; that

107

1  there were a number of occasions that we pointed to in both
2  affidavits where the judge specifically referred to the $40,000
3  and the order being entered in the Scruggs v. Jones case.
4       So in the end, Your Honor, under a totality of the
5  circumstances test, which would include these statements to
6  which they refer, all the statements that are in the affidavit
7  already up to and including September the 18th, when Judge
8  Lackey asks if they would help him if he helps them, also when
9  Judge Lackey asks for $40,000 and Tim agrees to it, all of
10  these are to be taken into consideration.
11       The fact that when he leaves the judge's chambers the day
12  that the judge requested the $40,000 he immediately, at 10:08,
13  which is the same time Judge Lackey is calling the FBI -- he
14  immediately calls the Scruggs Law Firm.  All of these taken
15  into consideration, in addition to the statements the
16  defendants refer to, certainly there would still be probable
17  cause in such an affidavit.  So for those reasons, Your Honor,
18  the Government believes there's no reason for an evidentiary
19  hearing pursuant to Franks v. Delaware.
20       MR. KEKER:  May I respond to some of those
21  statements --
22       THE COURT:  Would the Government be willing to
23  stipulate that the statements the defendants say were made and
24  the statements that the defendants say were left out could be
25  put into a hypothetical affidavit or added to this affidavit,

108

1  and that the Court could look at it and ascertain whether or
2  not probable cause existed without having to put testimony in
3  on it?
4       MR. SANDERS:  Absolutely, Your Honor.
5       THE COURT:  What do you say to that, Mr. Keker?
6       MR. KEKER:  I don't think that's sufficient for the
7  Franks standard, Your Honor, for the following reasons --
8       THE COURT:  Well, okay, but I'm just talking about --
9  it would be a Franks-type motion -- hearing, but it would just
10  be by stipulation of what -- that the testimony you hope to
11  elicit from the agent would be admitted to.
12       MR. KEKER:  I understand that, Your Honor.  And I
13  still think that it's important that the -- the hearing is
14  important to determine what we've now heard from the
15  Government, that a lot of this -- some of this -- I don't know
16  how much of it -- but was done intentionally, intentionally
17  left things out; and are now making arguments about why it is
18  okay to intentionally leave them out as opposed to meeting some
19  other negligence or reckless standard, that's one thing.
20       And second, I think to have Agent Delaney up there to
21  explain why, if you had gotten this application on
22  September 25, which is when the order was signed -- it was
23  before any bribe had been paid; it was after Judge Lackey had
24  talked about wanting $40,000.
25       And if somebody had told you then that what really

109

1  happened in the first meeting was that Scruggs said, "I don't
2  want anything illegal, just go talk to your friend, make sure
3  that he understands we want arbitration; that there was no
4  bribe paid; there was no quid pro quo; that there was no
5  discussion of any of that; that by the time the wire was up and
6  running, there were several times where Balducci made it plain
7  that he wasn't about that, about seeking a bribe or doing a
8  bribe or anything like that.
9      May 9th, May 21, I think the agent can explain why he left
10  out completely the recusal business where Judge Lackey just
11  walks away from the case; and maybe the agent can tell us
12  whether or not the agent told him to get back on the case. It
13  left out completely -- it goes from -- as I recall, from May 9,
14  it goes to September 18. It leaves out the summer when he's
15  doing all the business that you know he's doing.
16      And then they come up on September 25th with an
17  affidavit that makes it sound like this is all of the piece.
18  You read it and, basically, what that affidavit says is
19  Balducci came to him, made a corrupt overture; he went right to
20  the U.S. Attorney. False. The corrupt overtures continued.
21  False.
22      THE COURT: Or whether it could have been viewed as a
23  corrupt overture by the person to whom it was made.
24      MR. KEKER: That's another thing that I think Agent
25  Delaney could help us with if he got on the stand. There's

110

1  that affidavit, so we deal with that one separately with Agent
2  Delaney. And then you sort of think about whether or not that
3  meets the totality of the circumstances test for, if I -- if
4  all of this was in there, would there be a different -- and the
5  reviewing court would have the ability to do it, too. If all
6  this were in there, would things have looked different? But
7  then we go on to the one that's really bad.
8      On October 16, wouldn't it have been good and aren't we
9  entitled to an explanation of why this agent leaves out all
10  this business about P.L. Blake didn't know what this was about?
11  I understand they've got an argument that, oh, maybe he did
12  later; we changed our mind about that, and completely leaves
13  out exculpatory information.
14      But most important, all the pushing Judge Lackey did about
15  how Scruggs knows about this, doesn't he? Scruggs is on it.
16  Scruggs knows about what's going on. And he's told no. The
17  notion that they think that they can just -- I mean, that that
18  wouldn't affect that Patterson affidavit. And then it gets
19  repeated again. And then all of this kind of melds together
20  when they come back for the search warrant; and what he puts
21  in that search warrant really doesn't measure up based on what
22  Balducci's already telling them. We see that now that we've
23  seen these Balducci statements.
24      So we're asking for, again, a short examination of Agent

111

1  Delaney about why -- what's not in, what's in, and why he
2  didn't do it. And we think that that would make a suitable
3  record from which you could then rule on this motion and see
4  what affected what. Because the first wiretap affects the
5  second wiretap, affects the third wiretap, affects the search.
6      THE COURT: Well, since this -- I think this area of
7  the -- goes to the heart of the case. I'll allow your short
8  examination of Agent Delaney on that area, the wiretap
9  information is the gut of the case against these defendants.
10      And, so, the motion will be granted to examine Agent
11  Delaney. You say a short examination. I don't know what you
12  mean by short, but I would say an hour at the most.
13      MR. KEKER: What I mean by short is what you tell me
14  short is.
15      THE COURT: Well, I think an hour is reasonable.
16      MR. SANDERS: Your Honor, if the Government could, we
17  would do the same as we did earlier. If the Court wants us to
18  do it that way, we will call Delaney ourselves.
19      THE COURT: If that's what you prefer.
20      MR. KEKER: And under the same rules, it's clear that
21  a Government agent is a Government witness, no matter who calls
22  them. So if we could get the Jencks Act material now, it would
23  be helpful so that when the time comes --
24      THE COURT: It may shorten it up so --
25      MR. KEKER: Yes, sir.

DAILY COPY  DIRECT - DELANEY  112

1      THE COURT: The Government will be instructed to do
2  that. Again, I'm not ordering that the Government give him all
3  the prior information, just the statements that he's made
4  concerning this area of his testimony.
5      MR. SANDERS: Yes, sir, Your Honor. I've already
6  prepared Jencks with that in mind.
7      THE COURT: Okay. Good. All right. Call Agent
8  Delaney.
9      (THE WITNESS IS SWORN)
10      WILLIAM P. DELANEY, GOVERNMENT'S WITNESS, SWORN
11          DIRECT EXAMINATION
12      THE CLERK: State your name clearly for the record,
13  please.
14      THE WITNESS: It's William P. Delaney.
15      THE COURT: All right, sir, you may proceed.
16  BY MR. SANDERS:
17  Q. Agent Delaney, if you could, for the record, would you
18  tell us what you do for a living?
19  A. I'm a Special Agent with the Federal Bureau of
20  Investigation.
21  Q. And in your position as an agent with the FBI, you had the
22  opportunity to investigate a case involving the Scruggs Law
23  Firm, the defendants in this case?
24  A. Yes, I have.
25  Q. All right. And was it you who signed the affidavits

DAILY COPY   DIRECT - DELANEY          113

1  submitted in this case for authorization for wiretaps and for a
2  search warrant?
3  A.  Yes, I was.
4  Q.  When did you sign those affidavits?
5  A.  I signed the first affidavit September 25th, 2007; the
6  second one October 16th, 2007; and I believe the last one
7  November 26th, I believe, 2007.
8  Q.  When was the extension for the Balducci wiretap; do you
9  know?
10 A.  I think it was the same day.  I think it was October 16th.
11 Q.  Could it have been October 24th?
12 A.  Yes.
13 Q.  Okay.  I want to ask you -- you're familiar with this.
14 There's a motion been filed pursuant to Franks v. Delaware.
15 And the defendants have filed a motion pointing to specific
16 portions of conversations you left out of the affidavit.  What
17 I want to do is I want to walk through the sentences to which
18 they refer, and I'm going to ask you why you left these out.
19 Do you understand?
20 A.  Yes, sir.
21 Q.  All right.  Specifically, the defendants initially state
22 that you drafted in your affidavit that you brought the
23 Government at the conclusion of his first meeting with Tim
24 Balducci.  Was that accurate?  Was it after the meeting had
25 concluded?

DAILY COPY   DIRECT - DELANEY          114

1  A.  That was my understanding, yes.
2  Q.  Okay.  What do you mean by, that was my understanding?
3  A.  The way I was involved in this, my supervisor called me
4  that the U.S. Attorney's Office in Oxford had been notified of
5  this event and asked me to look into it.  He gave me the
6  impression that Judge Lackey had been approached by an attorney
7  inappropriately, and he asked me to look into it.  I then
8  contacted the U.S. Attorney's Office.  They basically gave me
9  the same information.
10 Shortly thereafter, I contacted Judge Lackey, interviewed
11 him in person; and he gave me the same impression; that
12 Mr. Balducci had approached him, called him, come down to visit
13 with him, made inappropriate overtures to him.  And shortly
14 thereafter, he contacted the U.S. Attorney's Office.
15 Q.  And do you know on now how long after it was that he
16 contacted the U.S. Attorney's Office?
17 A.  My understanding now is it'd been two weeks.
18 Q.  Okay.  They also point out on May the 4th -- and by the
19 way, you were familiar with the phone call that Judge Lackey
20 had with Mr. Balducci after this initial meeting with Judge
21 Lackey?
22 A.  Yes, sir.
23 Q.  Okay.  On May the 4th, was there a conversation between
24 Judge Lackey and Tim Balducci?
25 A.  Yes, there was.

DAILY COPY   DIRECT - DELANEY          115

1  Q.  All right.  And they point specifically to a sentence that
2  was not included in the affidavit, and I want to read that
3  sentence they're pointing to.  They said that Tim said, "Here's
4  just some thoughts, ideas, and suggestions I thought I'd put on
5  paper to see if His Honor might be interested in."  Do you
6  remember Balducci saying that?
7  A.  Yeah, I remember that from the recording, yes, sir.
8  Q.  All right.  Why was that not included in your affidavit?
9  A.  I didn't give much weight to that considering what had
10 happened earlier in the day when Mr. Balducci had, unsolicited,
11 faxed an order to the judge in his office; and the order had a
12 signature line at the bottom.  To me, it seemed more --
13 obviously, Mr. Balducci was more interested in having the judge
14 sign and enter that order than just trying to give him some
15 thoughts and ideas about the case.
16 Q.  All right.  I want to move now to May the 9th.  Did
17 Balducci and Lackey speak together on May the 9th?
18 A.  Yes, they did.
19 Q.  All right, sir.  I'm going to read to you, again, a
20 statement made during that conversation to which the defendants
21 refer.  They said that Balducci asked Judge Lackey whether he
22 thought the parties ought to arbitrate; and Judge Lackey said,
23 according to the defendants, "It does; it looks like that's
24 what they agreed to."  Is that -- do you remember that
25 statement being made?

DAILY COPY   DIRECT - DELANEY          116

1  A.  Yes, I do.
2  Q.  All right.  And tell the Court why you left that
3  particular statement out.
4  A.  Well, prior to the judge making that particular statement,
5  he had actually told Mr. Balducci how he thought the case would
6  go.  And in that instance, he thought the case would go to the
7  State Supreme Court.  Mr. Balducci said, "Well, let me give you
8  my thoughts and ideas about it."  He then went on a fairly long
9  explanation as to how he saw the case and how he thought it
10 should go.  At the end of which, he said, "I think it should go
11 to arbitration, don't you, Judge?"  And the judge said, "Well,
12 I agree"; but he never gave a definitive answer that that's how
13 he truly thought, and that's what he was going to do.
14 Q.  Okay.  All right.  And then one more statement he made
15 on -- or to which the defendants refer, on May the 9th, that
16 Judge Lackey told Balducci he was -- he wanted to make certain
17 he was, quote, "going to get credit for the order."  Do you
18 remember whether Judge Lackey said that?
19 A.  Yes, that was in the conversation.
20 Q.  All right.  And why did you not put that statement into
21 the affidavit?
22 A.  I didn't see where it was material.  You had earlier where
23 the -- Mr. Balducci had approached the judge, talked to him
24 about this case at some length; at the end of which, he offered
25 a position of, of counsel when the judge was ready for it.  The

DAILY COPY   DIRECT - DELANEY        117

1   judge clearly indicated to me that he felt that was a, you
2   know, at least, at the very least, improper overture to him, if
3   not rising to possibly criminal intent.  Based on that, I put
4   much more weight into that incident than what Mr. Balducci said
5   on May 9th.
6   Q.  Okay.  All right.  I want to move now to May 21st.  Did
7   Balducci and Lackey speak together on May 21st?
8   A.  Yes, they did.
9   Q.  Okay.  The defendants describe Judge Lackey's behavior as
10  aggressive, and they point to a particular statement Judge
11  Lackey made.  He said, "I just want to hear you say it again.
12  You and Scruggs are the only ones who know anything about
13  this?"  Do you remember that particular statement?
14  A.  Yes.
15  Q.  All right.  They say that this omission thus conceals
16  Lackey's aggressive efforts to target Balducci.  Was it your
17  opinion at that time that -- why did you leave that statement
18  out?
19  A.  Again, Judge Lackey, when called on the 21st of May, he
20  started that whole conversation out by telling Mr. Balducci,
21  "I've never been involved in anything like this before."  He
22  was looking for reassurances.  Judge Lackey was terribly
23  troubled by this whole incident.
24      He was really conflicted for two reasons:  A, he knew what
25  Mr. Balducci had done was wrong; but also, Mr. Balducci was a

DAILY COPY   DIRECT - DELANEY        118

1   friend of his for several years.  And the judge was conflicted.
2   He knew what he needed to do; but by the same token, he was
3   conflicted.  He didn't want to get his friend in trouble.
4       And I think that really kind of manifested itself on May
5   21st both with that phone call where he's clearly troubled, and
6   Mr. Balducci picks up on that pretty quickly, and then later
7   that day when he sends a recusal letter.
8   Q.  Okay.  I want to ask you about -- I'm still on May 21st.
9   Here's another statement I want to refer you to.  Do you
10  remember Tim Balducci saying, "I don't mean to make you
11  uncomfortable.  If it's not something you feel right about, you
12  do what your heart tells you.  I've got complete confidence
13  that it's completely fine.  I would never put you -- you nor
14  me -- in that position.  I have complete confidence that it's
15  fine."  Do you remember whether or not Balducci said that?
16  A.  Yes, sir, he did.
17  Q.  And why didn't you put that in the affidavit?
18  A.  Again, I didn't give a lot of weight to it.  Simply the
19  fact that my impression of that conversation, Mr. Balducci was
20  reacting to Judge Lackey's initial statement about him being
21  troubled; he'd never been involved in anything like this
22  before.  He was looking for some reassurance.  To me, it was
23  nothing more than Mr. Balducci trying to put the judge at ease,
24  trying to get him to, you know, deal with him in a position
25  that he would be more comfortable in.

DAILY COPY   DIRECT - DELANEY        119

1   Q.  Okay.  And then, finally, on the 21st, I believe, do you
2   remember Balducci saying this, "Frankly, Judge, I think we're
3   right; and I think that the law is on our side.  And I think
4   probably had I never approached you, we'd probably had the
5   right result with us on this thing.  My goal was simply to tell
6   you where -- that I had an interest in this thing and if I
7   could help guide you to where I thought this thing legally
8   could come."  You remember that statement?
9   A.  Yes, sir.
10  Q.  And why was that not provided in your affidavit?
11  A.  Again, I go back to Judge Lackey's initial statement on
12  that May 21st conversation.  He was obviously troubled.  And
13  also, I didn't give a lot of credence to -- you know,
14  Mr. Balducci had already approached the judge again back in
15  March and subsequent contacts in early May.  He told him what
16  he wanted.  I just didn't give a lot of credibility to what was
17  said in that particular conversation.
18  Q.  And when was this affidavit signed, the initial Balducci
19  wire signed?
20  A.  September 25th.
21  Q.  And, so, you were aware, at that time, of events that took
22  place later?
23  A.  Yes, sir.
24  Q.  All right.  The next thing the defendants point to with
25  their motion is the fact that -- you remember when Judge Lackey

DAILY COPY   DIRECT - DELANEY        120

1   recused himself from the Jones v. Scruggs case?
2   A.  He sent a letter out May 21st after the phone call to
3   Mr. Balducci.
4   Q.  Did he tell you -- did you talk to him before he recused?
5   A.  No, I did not.
6   Q.  All right.  Why did you not include in the affidavit
7   anything about the recusal?
8   A.  I didn't think it was pertinent to the case, you know, to
9   what we were looking at.  Judge Lackey recused himself not
10  because what he was doing -- there was nothing criminal going
11  on or nothing wrong.  Judge Lackey recused himself, from my
12  perspective, because he was troubled by this.
13      Like a lot of things that people do when they're -- things
14  bother them, they want to get away from them.  He made that
15  decision to try and, you know, remove himself from this
16  problem; but he also realized after he did it that he really
17  wasn't solving anything and that, ultimately, this issue of
18  whether what Mr. Balducci did was merely improper or if there
19  was criminal intent needed to be resolved.  And he was -- he
20  needed to be involved in that process to finding that out.
21  Q.  When he did recuse, did he contact you?
22  A.  When he --
23  Q.  After he recused?
24  A.  When he sent in his subsequent letter saying he was coming
25  back in?

DAILY COPY   DIRECT - DELANEY        121

1  Q.  No.  I'm talking about after he recused.  Did he contact
2  you?
3  A.  The following day.
4  Q.  And did you meet with him?
5  A.  Yes, I did.
6  Q.  And what did you tell him to do?
7  A.  I discussed with him, basically, what the options were,
8  you know.  He told me -- he didn't really give me any concrete
9  explanations, from what I recall, as to why he did it.  I could
10  tell, again, this whole situation troubled him greatly.  We
11  discussed possible options.  He told me that, you know, the
12  door for him getting back in was not necessarily closed.
13      I don't remember specifically what he hadn't done to
14  finalize it.  I think it may have been notify the Supreme
15  Court, but I'm not sure.  But anyway, he indicated to me that
16  the door was not shut on him getting back into the case.  We
17  talked about it; and when I left him that day, he had not made
18  a decision one way or the other what he was going to do, other
19  than he was just going to think about it.
20  Q.  Were you demanding that he get back into the case?
21  A.  No.  No.
22  Q.  All right.  The next thing to which the defendants refer
23  is that your affidavit failed to disclose that Judge Lackey
24  repeatedly contacted Balducci from May until September.  As I
25  said, they're describing Judge Lackey's behavior as aggressive.

DAILY COPY   DIRECT - DELANEY        122

1  Do you know how many times during the summer of 2007 -- do you
2  know how many times Judge Lackey contacted Tim Balducci?
3  A.  I believe there was two or three contacts in June.  I
4  don't believe there was any contact in July that I'm aware of.
5  And I think there was two more contacts in August.
6  Q.  All right.  During the summer of 2007, how many FBI agents
7  were working on this case with you?
8  A.  Just myself.
9  Q.  All right.  Where were you during July?
10  A.  I was gone for three out of the four weeks out of the
11  state.
12  Q.  Okay.  Were you working on any other cases besides this
13  case during this time period?
14  A.  During the summer, yes, sir.  I had several other cases,
15  to include cattle gate (phonetic).
16  Q.  You were working on the case involving Mississippi Beef?
17  A.  Yes, sir.
18  Q.  How often would you meet or speak with Judge Lackey that
19  summer?
20  A.  It was pretty infrequently.  I believe I probably came
21  down -- if I was up here working on another case, I would come
22  down through Calhoun City and see him just to check on him.
23  Again, he was real troubled by this; and a lot of times, I just
24  came by to see how he's doing, see how he's holding up.
25  Q.  Okay.  I want to take you now to May 29th.  Did Balducci

DAILY COPY   DIRECT - DELANEY        123

1  and Judge Lackey speak together -- speak to each other on May
2  the 29th of last year?
3  A.  Yes, they did.
4  Q.  All right.  I want to read again the statement that the
5  defendants allege was made and ask if you remember this
6  statement.  They're saying that Balducci says this to Judge
7  Lackey, "I damn sure didn't want you to do anything to
8  jeopardize my relationship with you.  I didn't want to do
9  anything in the world to do that relationship any harm.  I want
10  to make sure you and I are okay and that it would break my
11  heart if I thought I put you in a bad position.  When you
12  called the other night, I could tell that you were troubled by
13  it."  Do you remember that statement being made?
14  A.  Yes, I do.
15  Q.  Why didn't you include that?
16  A.  Again, May 29th is shortly after the judge had recused
17  himself.  Mr. Balducci knew he had recused himself.  It is
18  clear to me, my impression, Mr. Balducci was concerned about
19  his actions; and he was trying to do anything he could or say
20  anything he could to the judge to try and remedy what he
21  thought was a misstep on his part.
22  Q.  All right.  Again, the defendants refer to Balducci
23  saying, with reference to the decision they were wanting Judge
24  Lackey to make, "If that's how you see it after you've taken a
25  look at it, if you see it that way, that would be terrific."

DAILY COPY   DIRECT - DELANEY        124

1  Do you remember that statement being made?
2  A.  Yes, I do.
3  Q.  And why did you not put that in the affidavit?
4  A.  Same reason.  Again, it's right after the recusal.  It's
5  right after the phone call on May 21 where Balducci
6  acknowledges he can tell the judge is troubled.  I think
7  Balducci is trying to placate the judge as much as possible,
8  trying to keep from a bad situation being worse.
9  Q.  Okay.  Just three more statements I've got with respect to
10  the September the 25th affidavit.  The defendants refer to a
11  September the 18th conversation between Judge Lackey and
12  Balducci.  And they point out that Judge Lackey told Balducci
13  that he -- quote, he wanted to -- quote, "help me get over a
14  little hump I've got."  This is when he's discussing payment.
15  A.  Uh-huh (yes).
16  Q.  Do you remember that phrase, Judge Lackey using that
17  phrase?
18  A.  I do.
19  Q.  And why did you not put that phrase in the affidavit?
20  A.  Because there were earlier conversation on September 18th
21  where Judge Lackey had talked about the Scruggs matter, and
22  that he wanted to help him; and basically asked him, said, "If
23  I'm willing to help them, would they help us?"  And
24  Mr. Balducci's response was, "No question."  And continued on
25  trying to figure out, you know, how he could do it.

Exhibit K

DAILY COPY   DIRECT - DELANEY        125
1   I put much more weight into those comments, that
2   conversation, than I did, you know, over the hump.
3   Subsequently, I believe, also later in that conversation, that
4   comment that the judge made about getting over a hump was in
5   response to a question from Mr. Balducci about how badly he
6   needs the help or when he needs the help.
7   Q.   So when Judge Lackey asked him to "help get me over a
8   little hump," you're saying that Balducci had already agreed to
9   pay the bribe by the time he said that?
10  A.   Yes, that's my recollection.
11  Q.   All right.  On the 21st, Judge Lackey is speaking with
12  Balducci again and he says, "I could delay my misery; I think I
13  can get them to put it off."  Do you remember whether Judge
14  Lackey said that to Tim?
15  A.   Yes, he did.
16  Q.   And why did you not put that phrase in the affidavit?
17  A.   Much the same reason.  Earlier in the conversation, they
18  had discussed the arrangement, the judge helping them out,
19  signing the order, sending it to arbitration in exchange for --
20  what they agreed on that day was $40,000.  They were so far as
21  trying to figure out how the arrangements could be made,
22  whether it was in cash, how quickly he needed it.  To me, they
23  had already agreed to the deal.  That line did not carry as
24  much weight as the earlier conversations as to the incident.
25  Q.   All right.  Okay.  And then, finally, on September the

DAILY COPY   DIRECT - DELANEY        126
1   24th, do you remember Judge Lackey speaking to Tim Balducci and
2   saying, "Can I commit to my folks that are pressuring me
3   something by the weekend?"  Do you remember that phrase?
4   A.   I do.
5   Q.   And why was that not included in the affidavit?
6   A.   Same reason.  Again, that was later in the conversation;
7   and actually, that comment from the judge was in response to a
8   question from Mr. Balducci and, again, I think asking how soon
9   he needed the money.  Again, they had already agreed to what
10  the deal was going to be.
11      In this particular instance on September 24th, if I recall
12  correctly, the judge was returning a call to Mr. Balducci.
13  Mr. Balducci immediately, in the conversation, was trying to
14  set up an arrangement with the judge.  He said, "I can come
15  down tomorrow.  I can come down the next day."  And the judge
16  is trying to set it up for later in the week.  And, so, to me,
17  that was nothing more than the judge just trying to set
18  parameters when this deal could take place.  The deal had
19  already been agreed to on a couple of different occasions.
20  Q.   So it was your impression who was putting pressure on
21  whom?
22  A.   In that particular phone call, it sounded like
23  Mr. Balducci was much more eager to get the deal done sooner
24  than the judge.
25  Q.   All right.  I now want to ask you about the affidavit from

DAILY COPY   CROSS - DELANEY        127
1   October 16th.
2      MR. KEKER:  Excuse me, Mr. Sanders.  Your Honor,
3   could I suggest that maybe if I could examine on this
4   affidavit -- and we have this affidavit -- kind of put it to
5   bed in one place before we move on?  I'm afraid they're all
6   going to get mushed up.
7      THE COURT:  That may be preferable.
8      MR. KEKER:  And I'll stop at --
9      THE COURT:  All right.
10            CROSS-EXAMINATION
11  BY MR. KEKER:
12  Q.   Good afternoon, Agent Delaney.
13  A.   Good afternoon.
14  Q.   Agent Delaney, you've said you're the case agent on this
15  case?
16  A.   Yes, sir.
17  Q.   And when were you assigned to it?
18  A.   I'm sorry?
19  Q.   When were you assigned to the case?
20  A.   Early April, I believe.  Early, mid-April.
21  Q.   And you said one of the first things you did is interview
22  Judge Lackey?
23  A.   Yes, sir.
24  Q.   Do you remember when that interview was?
25  A.   I believe it was around April 24th.

DAILY COPY   CROSS - DELANEY        128
1   Q.   Did Judge Lackey tell you then that he had waited two
2   weeks before reporting his conversation with Mr. Balducci?
3   A.   No, sir.  He didn't give me a frame as to when he had
4   reported it.  He just said he reported it to the U.S.
5   Attorney's Office.
6   Q.   Why did you put it in your declaration, that we're
7   referring to now as Exhibit 9 -- why did you put in your
8   declaration that it was at the conclusion of the meeting, then?
9   A.   That was my understanding talking to the U.S. Attorney's
10  Office and talking to the judge, that it was shortly after
11  Mr. Balducci came down and met with him.
12  Q.   Okay.  So did Judge Lackey give you the impression --
13  leave you to understand that at the conclusion of the meeting
14  he went to the U.S. Attorney and said, "There's a problem
15  here"?
16  A.   We didn't get into the time frame as to how quickly he
17  went and saw the U.S. Attorney's Office.  He just indicated to
18  me that that's what he had done.
19  Q.   Did you later learn that it was a two-week interval?
20  A.   Yes, sir.
21  Q.   Did you ask him about that?
22  A.   He explained it to me.
23  Q.   What did he explain?  Tell us about that.
24  A.   As what happened in that interim?
25  Q.   Yeah.

DAILY COPY   CROSS - DELANEY        129

1   A.   He had talked to several different people after
2   Mr. Balducci's visit.  Again, he was troubled.  He didn't know
3   what to do.  He talked to several different people soliciting
4   different people's advice.  Ultimately, he decided the best
5   course of action was to contact the U.S. Attorney's Office.
6   Q.   Did he tell you who he talked to?
7   A.   He did.  I don't know any of the individuals personally,
8   so I can't recall their names.
9   Q.   Did he tell you that during this two-week period he was
10  sort of trying to figure out whether or not anything improper
11  had happened?
12  A.   He just told me that he was discussing it with other
13  people and trying figure out what the best course of action
14  was.
15  Q.   Did he tell you that he had a real question about whether
16  or not anything improper had happened?
17  A.   No.  He made it clear to me that he certainly believed
18  something improper had happened.  It was just a question of
19  whether something criminal had happened.
20  Q.   What did he tell you about this of counsel position?
21  A.   He told me that he believed -- he took it, when
22  Mr. Balducci came down and talked about the civil case that he
23  was hearing -- that when Mr. Balducci, at the end of
24  conversation, offered him the position of, of counsel to him
25  Mr. Balducci was trying to say that if, you know, you help us

DAILY COPY   CROSS - DELANEY        130

1   out on this case; when you're ready, I'll have a position in my
2   law firm for you.
3   Q.   And that's the way Judge Lackey presented it, offer of
4   quid pro quo?
5   A.   Yes, sir.
6   Q.   So he had no question in his mind that he had been bribed?
7   A.   No, sir.  There was no -- see, there was no question that
8   he had been bribed.  That was the whole crux of this thing.  He
9   knew something improper had happened, but he didn't know for
10  sure if something illegal had happened.
11  Q.   So Judge Lackey didn't know whether or not someone had
12  offered to bribe him?
13  A.   Say that again, sir.
14  Q.   Judge Lackey, after this first meeting with Mr. Balducci,
15  spent two weeks trying to figure out what to do about it?
16  A.   Uh-huh (yes).
17  Q.   And he didn't know, during that two-week period, that he
18  had been bribed?
19  A.   He didn't know whether, you know, what had happened with
20  Mr. Balducci rose to the level of a criminal action, no.  That
21  was the whole point of contacting the U.S. Attorney's Office
22  and bringing our office in to determine if that in fact had
23  happened or would happen.
24  Q.   So what you did is set up recording equipment in his
25  office to get to the bottom of it?

DAILY COPY   CROSS - DELANEY        131

1   A.   Basically to make it -- to find out if that in fact had
2   happened, whether it was just an improper overture by
3   Mr. Balducci or was it more.
4   Q.   When did you set up recording equipment in Judge Lackey's
5   office?  And by you, I mean the Government.
6   A.   The first time we tried to made a recorded conversation
7   was May 3rd.
8   Q.   When did you set up the recording equipment?
9   A.   I'm not sure when -- what you mean by set up.  I gave him
10  a telephone recorder on May 3rd.
11  Q.   Was there a call with Mr. Balducci on May 3rd?
12  A.   Yes, there was.
13  Q.   And was that call recorded?
14  A.   It was -- the only thing that successfully recorded
15  was the preamble.
16  Q.   And what was the preamble?
17  A.   Just basically the judge identifying who he was, who he
18  was calling, the time, the date, the numbers he was calling
19  from and calling to, from what I recall.
20  Q.   And, so, he talks into this recording machine; and we've
21  been told that there's no recording of this.
22  A.   That's correct.
23  Q.   You're telling me there was a recording, but it
24  malfunctioned some point?
25  A.   The only thing that was captured on tape was preamble.

DAILY COPY   CROSS - DELANEY        132

1   The actual content of the conversation between Judge Lackey and
2   Balducci was not captured.
3   Q.   Who had control over that recording device on May 3rd to
4   determine whether or not a call would be recorded or not?
5   A.   I gave the recording -- actually, Judge Lackey used his
6   own recording device on that instance.
7   Q.   Oh, so you didn't give --
8   A.   I gave him one; he elected to use his own in that
9   particular incident.
10  Q.   And he didn't record the call on May 3rd?
11  A.   It was not successfully recorded, no.
12  Q.   Did he report to you about that?
13  A.   Yes.  I was in the office with him.
14  Q.   During the call?
15  A.   Yes, sir.
16        THE COURT:  Mr. Keker, the area of inquiry that has
17  been established for this testimony is to examine what you have
18  alleged were misleading or false statements that were not put
19  in the affidavit.  Please stick to that area.
20        MR. KEKER:  And forgive me if I got afield.
21  BY MR. KEKER:
22  Q.   As I understand your testimony, every one of the omissions
23  that we have alluded to was done on purpose; you did it
24  intentionally?
25  A.   I won't say it was done intentionally.  I weighed what

DAILY COPY   CROSS - DELANEY   133

1  information I had in front of me, and I tried to make the best
2  decision I could based on what I believe was probable cause
3  that Mr. Balducci was using his phone to conduct a criminal
4  conspiracy.
5  Q.  And to the extent that the information before you didn't
6  fit into what you thought established probable cause, you chose
7  to leave it out?
8  A.  No.
9  Q.  Well, I think you said something about, you just didn't
10  see much credibility with what he said; and therefore, you left
11  it out.  Another time you said, you didn't think it carried
12  much weight; and you left it out.  All the exculpatory material
13  you left out?
14  A.  I explained myself why I left it out.  There was
15  obviously, in my view, reasons why Mr. Balducci said those
16  things.
17  Q.  Okay.  Then let's go through some of them.  May 4th, the
18  first call that's recorded, you left out deliberately that he
19  referred to this order that he'd sent down as "just some
20  thoughts, ideas, suggestions, I thought I'd put it on paper,
21  see if His Honor might be interested in it"?
22  A.  Uh-huh (yes).
23  Q.  And you left that out because you didn't think it
24  supported probable cause?
25  A.  Again, earlier in the day, he had sent a fax to the judge,

DAILY COPY   CROSS - DELANEY   134

1  unsolicited, with an order with a signature line on it.  I give
2  more weight to that action than what Mr. Balducci said.  To me,
3  it was clear that -- to me what Mr. Balducci wanted was the
4  judge to sign and enter that order rather than just trying to
5  give him some thoughts and ideas about the case.
6  Q.  There wasn't any mention in that phone conversation about
7  an of counsel position, was there?
8  A.  No, sir, there wasn't.
9  Q.  And what you said in your affidavit was that there had
10  been mention of an of counsel position in the May 3rd
11  unrecorded call?
12  A.  Correct.
13  Q.  And in your affidavit, you quoted what was said in the May
14  3rd call.  And would you agree that your affidavit gives the
15  impression there was a recording with that May 3rd call?
16  A.  That was taken from a statement provided to me by the
17  judge.  The judge wrote out a statement after the May 3rd
18  recording.
19  Q.  Okay.  And you were quoting from his statement?
20  A.  Yes, sir.
21  Q.  Okay.  And you didn't consider it misleading that you were
22  quoting and implying that it was recorded?
23  A.  I don't think it says in the affidavit that it is from a
24  recording.  It's quoted from a -- it's quoted from Judge
25  Lackey's statement that he gave to me.

DAILY COPY   CROSS - DELANEY   135

1  Q.  Let me jump ahead, then, to May 9.  We're still trying to
2  determine -- you and Judge Lackey are trying to determine if
3  Mr. Balducci is a criminal.  You left out that there was no
4  discussion of -- you didn't say anything, but there's no
5  discussion of money, no discussion of the of counsel position
6  in that call, right?
7  A.  Not that I recall.  Well, I take that back.  I believe
8  Mr. Balducci spoke about some of the people he did bring in --
9  had brought in recently as of counsel; and I'm not sure if he
10  specifically said, "Judge, again, we'd like to have you of
11  counsel"; but that was the -- my interpretation of the intent
12  of that, of that whole litany, was to say that we've got room
13  for you; we'd like to have you in there.
14  Q.  And at the end of the conversation, he says -- Judge
15  Lackey said, "It looks like they deserve to have the case go to
16  arbitration," or words to that effect; and you left that out
17  deliberately, right?
18  A.  I don't think he said that, sir.  I think what he said,
19  "Looks like they agreed to it."  But again, as I said earlier,
20  before Judge Lackey had said that, he had told Mr. Balducci
21  that he thought the case was going to the Supreme Court.  He
22  was reacting in that particular statement, which you reference
23  in your motion, he was reacting -- the judge was reacting to a
24  question that Mr. Balducci posed to him.  He answered it.  He
25  didn't answer it completely.  He just said, "Yeah, sort of

DAILY COPY   CROSS - DELANEY   136

1  looks like what they agreed to."  But he didn't say, "I agree
2  with it; that's how I'm going to act," or any other.
3  Q.  Agent Delaney, you are an FBI agent; and in substance,
4  you're being paid to look at the world through dirty windows;
5  isn't that true?
6  A.  I'm not sure what you mean by dirty windows.
7  Q.  Well, you cast a suspicious eye on human transactions to
8  see if there's anything illegal about it, right?
9  A.  If allegations are brought to me, my job is to try to
10  figure out whether they're true or not.
11  Q.  Did you understand that the job of the judge -- remember
12  the judicial branch -- in evaluating the affidavit from a law
13  enforcement officer is to try to look at it fair and square and
14  call the chips -- look at it fair and square, look at all the
15  information and make a decision?
16  A.  Yes, sir.
17  Q.  And did you understand that you were filtering out
18  exculpatory information so the judge wouldn't have that to look
19  at?
20  A.  Again, I put down in that affidavit what I thought was the
21  best probable cause regarding Mr. Balducci's use of his
22  cellular telephone in a criminal case.
23  Q.  Did you tell the judge that as of May 9 they -- the
24  judge -- Balducci had talked to Judge Lackey, and Judge Lackey
25  says, "It looks like that's what they agreed to"?  There was no

DAILY COPY   CROSS - DELANEY   137

1  discussion about doing anything further with respect to
2  anything.  Did you tell the judge that it was over on May 9th?
3  A.  No, I did not put that in my affidavit, if that's what
4  you're asking me.
5  Q.  And then on May 21, Judge Lackey started calling
6  Mr. Balducci again, right?
7  A.  He called him, yes, sir.
8  Q.  Did you tell him to call him?
9  A.  I was not present for that call.
10  Q.  Did you tell him to call?
11  A.  (No response.)
12  Q.  Or suggest?
13  A.  I'm sure we discussed having him call, yes.
14  Q.  And did he call him once -- he called him twice; and
15  finally, he got him the third time.  And Mr. Balducci assured
16  Judge Lackey that nobody other than Balducci and Scruggs knew
17  the arrangements suggested by Balducci.
18      You put that in; but then you omitted that it was Judge
19  Lackey that was bringing that up; that Balducci said a number
20  of times he didn't want the judge to do anything improper; that
21  Balducci said to Judge Lackey, "You do what you feel
22  comfortable with, and I don't mean to make you uncomfortable,
23  if it's not something you feel right about.  You do what your
24  heart tells you.  I've got complete confidence that this is
25  completely fine.  I would never put you or me in that position.

DAILY COPY   CROSS - DELANEY   138

1  I have complete confidence that it's fine."  You left that out
2  of your affidavit, right?
3  A.  Yes, sir.
4  Q.  And you did it on purpose?
5  A.  No, I did not do it on purpose.  I did it, again,
6  reflecting over the content of the call and the fact that the
7  judge calls up, he's troubled.  Mr. Balducci picks up that he's
8  troubled.  I believe the judge starts out the conversation
9  with, "I've never been involved in anything like this before.
10  I'm looking for reassurance."  My impression, that's what
11  Mr. Balducci was doing; he was reacting to that comment of the
12  judge and trying to reassure the judge.
13  Q.  You said earlier he was trying to put the judge at ease?
14  A.  Yes, sir.
15  Q.  And you didn't put that in your affidavit so that the
16  judge evaluating probable cause would know that?
17  A.  No, I didn't.
18  Q.  Why didn't you do that?
19  A.  Why didn't I put that the judge was not at ease?
20  Q.  Why didn't you put that Balducci's making all these
21  professions of innocence, trying to put the judge at ease and
22  make everything go away, basically?
23  A.  But he never did say, Look -- he said -- he was trying to
24  put the judge at ease; but he never said, "Look, Judge, you
25  misunderstood me.  I didn't mean to influence you in this way.

DAILY COPY   CROSS - DELANEY   139

1  And, you know, I don't want to -- you know, we don't need to
2  talk about this anymore; and I apologize."  It never went that
3  far.
4  Q.  But he said, "You do what you feel comfortable with.  I
5  don't mean to make you uncomfortable.  If it's something that
6  you feel right about, you do whatever your heart tells you."
7  What's the difference, Agent Delaney?
8  A.  The difference is he's telling him what to do; he's not
9  stopping -- you know, he's not saying, What happened in the
10  past was wrong.  He's not trying to stop what is happening then
11  or what may happen in the future.
12  Q.  You didn't put in the affidavit what he said on May 21st,
13  and this is all right before Judge Lackey gets out of the case
14  because he's being earwigged by the other side.  Balducci says,
15  "Frankly, I think we're right; and I think the law's on our
16  side.  And I think probably had I never approached you, we'd
17  have probably had the right result for us on this thing.  My
18  goal is simply to tell you where I had an interest in this
19  thing and help guide you to where I thought this thing legally
20  could come."  You left that out, too?
21  A.  Yes, sir.
22  Q.  And then you omitted, he recused himself that same night
23  or day?
24  A.  Yes, sir.
25  Q.  And you left that out of the affidavit?

DAILY COPY   CROSS - DELANEY   140

1  A.  Yes, I did.
2  Q.  But you also left out of the affidavit -- who called whom
3  the next day?  You got together with him the next day?
4  A.  Yes, I did.
5  Q.  And you told him to get back in there?
6  A.  No, sir, I didn't.
7  Q.  Why did you get together with him the next day?
8  A.  I believe he called me to tell me that he'd made that
9  phone call to Mr. Balducci and that he was recusing himself.
10  Q.  Well, he filed a form on the 21st, right?
11  A.  I'm sorry?
12  Q.  He filed a form recusing himself, a formal recusal?
13  A.  My understanding is he faxed the letter on the 21st.
14  Q.  And he called you and told you about it?
15  A.  On the 22nd.
16  Q.  And you talked him into getting back in the case?
17  A.  No, I did not.  He made that decision on his own.
18  Q.  Did you and Judge Lackey talk about the fact that up to
19  now, at least, you as a professional agent and he as a judge,
20  nothing criminal had happened; there's no case?
21  A.  No.  We -- in that particular instance, from what I
22  recall, we discussed his recusal, his possibility of getting
23  back in.  We talked about the different options.  And again,
24  from what I recall, at the end of meeting with him, he had not
25  made up his mind what he was going to do.  He said he would

DAILY COPY   CROSS - DELANEY      141

1  think about it.
2  Q.  So when did you learn that he was going to get back in the
3  case?
4  A.  Less than a week later, I believe.
5  Q.  Okay.  And the first thing you did when you learned he was
6  going to get back in the case, you came up and wired up this
7  judge in circuit court; and you sent him up to New Albany to
8  have lunch with Tim Balducci, right?
9  A.  No, that was not the next thing.
10     THE COURT:  Counselor, now --
11     MR. KEKER:  I'm sorry, Your Honor.
12     THE COURT:  Stick with what we've talked about.
13  BY MR. KEKER:
14  Q.  Did you say anything in the affidavit about the fact that
15  you wired him up and sent him to New Albany to have lunch with
16  Tim Balducci?
17  A.  No, I did not.
18  Q.  And did you say anything in the affidavit about the fact
19  that at that lunch nothing - Balducci, despite being alone in
20  the car with Judge Lackey not once but twice, said nothing
21  about the Jones case or about of counsel or any of this?
22  A.  No, I didn't.
23  Q.  And did you say anything in the affidavit about the fact
24  that you wired him up again on June 28 and directed him to go
25  to the Balducci office?

DAILY COPY   CROSS - DELANEY      142

1  A.  No, I did not.
2  Q.  But you did do that; you did wire him up and send him to
3  the Balducci office?
4  A.  I gave him a body recorder; and, yes, he did.
5  Q.  And again, nothing happened; you didn't say anything about
6  that in the affidavit?
7  A.  No, I did not.
8  Q.  At any point, did Judge Lackey say to you, you know, "I'm
9  getting nervous about this motion that's been pending since
10  March 19th"?
11  A.  No.  We discussed that.  Actually, I brought it up more
12  than he did; and he assured me it was fine; he'd be able to
13  take care of it.
14  Q.  Did you put into your affidavit that during your -- I
15  guess you were on some kind of military leave during --
16  A.  No, sir, I was not on military.
17  Q.  But you were out of state in July?
18  A.  Yes.
19  Q.  And Judge Lackey held a hearing in the Jones case to
20  decide the motion to arbitrate?  Did you know that?
21  A.  I believe I learned of that later.
22  Q.  And there's nothing in the affidavit about that or about
23  the fact that he still wouldn't issue an order one way or the
24  other?
25  A.  No, sir.

DAILY COPY   CROSS - DELANEY      143

1  Q.  And then there's nothing in the affidavit about -- well,
2  did you ask Judge Lackey when you got back in August to start
3  making calls to Balducci?
4  A.  I mean, I -- no.  Did I continually direct him to make
5  calls?  No.  It was understood from the beginning that if
6  Mr. Balducci contacted him, he was, you know, to try and record
7  the conversation or, if not, call him back and record the
8  conversation.  I wasn't directing him when to make the calls or
9  anything like that.  That was pretty much up to Judge Lackey.
10  Q.  And did you know that he tried to contact Mr. Balducci on
11  August 3rd, but Mr. Balducci didn't call him back?
12  A.  Yes, sir.
13  Q.  And did you put that in the affidavit?
14  A.  No.  I believe actually what happened is he called and he
15  wasn't there, and he didn't leave a message for him to call
16  back.
17  Q.  And Mr. Balducci didn't call him back?
18  A.  No, he didn't; but he didn't ask him to call him back
19  either.
20  Q.  And did you put in the affidavit that he called him, Judge
21  Lackey called Balducci on August 9?
22  A.  That's not in the affidavit, no.
23  Q.  And did you say that Judge Lackey was trying to implicate
24  Dick Scruggs in that conversation by asking, "You think Dickie
25  wants this thing to go to mediation and arbitration"?  He

DAILY COPY   CROSS - DELANEY      144

1  brings up Scruggs's name just gratuitously?
2  A.  No, it's not in the affidavit.
3  Q.  And did you put in the affidavit that on August 9 Balducci
4  told Lackey -- Judge Lackey's just had a hearing -- to decide
5  the motion how he sees it?  "If that's how you see it after
6  you've taken a look at it, if you see it that way, that'd be
7  terrific."
8  A.  That's not in the affidavit.
9  Q.  But it happened, didn't it?
10  A.  Yes, it did.
11  Q.  And then on August 27, Judge Lackey called Mr. Balducci
12  twice; and Balducci didn't call him back.  And you didn't
13  mention that in the affidavit, did you?
14  A.  No, sir.
15  Q.  And on September 11th, Judge Lackey same thing, called him
16  twice, leaving messages; and Balducci didn't call him back.
17  A.  I believe Mr. Balducci may have been out of town on that
18  particular instance.
19  Q.  But you didn't say in your affidavit --
20  A.  No, it's not in the affidavit.
21  Q.  Then you said you were stopping by to see Judge Lackey.
22  How many times do you think you stopped down at Calhoun City to
23  see Judge Lackey?
24  A.  I couldn't give you an accurate number, sir.
25  Q.  On September 18 -- you talked about September 18, said

Exhibit K

DAILY COPY   CROSS - DELANEY         145

1    something about they mentioned a hump and all that business.
2    That wasn't September 18.  That was September 21st, wasn't it?
3    I don't want to confuse you.
4    A.  Without looking at the transcript -- I think it was
5    September 18; but without looking at the transcript, I don't
6    know for sure.
7    Q.  On September 18, Mr. -- Judge Lackey said to
8    Mr. Balducci -- first of all, who called whom on September 18?
9    It was Judge Lackey calling Balducci, correct?
10   A.  I believe that's correct.
11   Q.  And let me give you the transcript if you want to use it
12   to refresh your recollection.
13   A.  Thank you.
14         MR. KEKER:  Would you like a copy, Your Honor?
15         THE COURT:  No.
16         MR. KEKER:  This is Exhibit 12 to the Dooley
17   declaration.
18   BY MR. KEKER:
19   Q.  September 18 is not the call where he says he's got to get
20   over the hump, is it?
21   A.  Okay.  Are you asking me?
22   Q.  Yeah.  I just want you --
23         THE COURT:  What are you asking him to look at?
24         MR. KEKER:  I'm asking him to look at the transcript
25   we've been provided.

DAILY COPY   CROSS - DELANEY         146

1          THE COURT:  I know that, but what part.
2          MR. KEKER:  On September 18, to see if his testimony
3    on direct was mistaken, that this is not the call where he
4    talks about "I've got to get over a hump."  That happened three
5    days later, and I think Agent Delaney --
6          THE WITNESS:  I don't see it in here.
7    BY MR. KEKER:
8    Q.  So -- but that is the conversation where Judge Lackey says
9    Grady -- meaning Grady Tollison, the opponent in the Jones v.
10   Scruggs case -- is putting some pressure on him?
11   A.  September 18.
12   Q.  Did you talk to Judge Lackey to get an understanding what
13   that pressure was?
14   A.  I don't recall talking to Judge Lackey about that, no.
15   Q.  Where did the idea on September 18 to ask Balducci what
16   could be done -- what can you do for me or what can they do for
17   me, where did that idea come from?
18   A.  That idea came from -- that was sort of the idea from the
19   very beginning, again, to find out which way this thing was
20   going to go.  Is it just an improper overture or something
21   criminal in nature that occurred?  Again, I go back to the
22   judge was very, very troubled over this.  He didn't want to get
23   his friend in trouble.  Let me finish, please.
24         It took Judge Lackey virtually the entire summer -- from
25   my perspective, it took him the entire summer to realize he

DAILY COPY   CROSS - DELANEY         147

1    needed to get this thing resolved, we needed to get this thing
2    resolved.  And the only way to get it resolved was for him to
3    broach that question to Mr. Balducci in sort of the form that
4    he did.
5    Q.  Did you say in the affidavit that you filed in September
6    that for six months of calling and visiting and transcribed
7    calls Balducci had not even given a glimmer that he was talking
8    about a bribe?
9    A.  Again, the judge -- early on in that first meeting, back
10   in March, the judge believed that that overture where he talked
11   about the case and then later of counsel was a possibility that
12   a bribe did exist.
13   Q.  Did you say in the affidavit that from March to
14   September 17 there had never been a hint from Mr. Balducci or
15   anybody else that they were talking about money bribe to
16   Judge --
17   A.  No, that did not come up.  That does not eliminate the
18   fact of what happened on March 28.
19   Q.  So was it -- whose idea was it to raise the issue of a
20   money bribe in September after this six months of silence?
21   A.  Again, it was not the issue of -- the idea of whether it
22   was a money bribe was not the initial thing.  It was framing
23   the question in such a way, without putting any kind of
24   tangible value on it, to see what Mr. Balducci's reaction would
25   be; and that's what he did.

DAILY COPY   CROSS - DELANEY         148

1          The judge told me in early September, he said, "Look, we
2    need to find out one once and for all what is going on here";
3    and that's what we decided to do, to have him ask Mr. Balducci
4    in the manner that's recorded in this conversation on the 18th
5    of September.
6    Q.  The 18th -- and he asked him -- and Balducci's reaction
7    was --
8          MR. SANDERS:  Your Honor, we're now getting into -- I
9    think the affidavit was September 25th.  I thought we were
10   getting into what took place after the 25th.
11         MR. KEKER:  No, still September 18th
12   conversation.  I want to make sure this part is clear.  On
13   September 18 --
14         THE COURT:  Limit it to what you've alleged was
15   omitted from the affidavit or what you allege was in the
16   affidavit that was materially misleading and why he did that.
17   That's what this examination is about.
18   BY MR. KEKER:
19   Q.  Did you put in the affidavit that in response to a
20   suggestion by the judge that they do something for him?  Did
21   you put in the affidavit that Mr. Balducci did not offer to do
22   anything for him, did not come back with any concrete proposal?
23   A.  I put in the affidavit the contents of that conversation
24   from September 18.
25   Q.  Well, you didn't put in all the contents, did you?

DAILY COPY   CROSS - DELANEY           149

1    A.  No, I didn't.
2    Q.  And you didn't put in the fact that he did not come back
3    and say, yeah, we will do X, Y, Z.
4    A.  There was nothing definitive decided on October -- I'm
5    sorry -- September 18th, other than the fact that the judge
6    asked, "If I help them out, will they help me out" and
7    Mr. Balducci -- I believe his response was, "No question, I
8    think they will."
9    Q.  But he also said, "You go think on it, Balducci, and come
10   back and tell me what you've got to offer," words to that
11   effect?
12   A.  I don't know what the exact words are.  Can I look at the
13   transcript?
14   Q.  Sure.  But you know -- he did not -- he tried to leave it
15   with Balducci, and Balducci didn't respond with any kind of
16   specific quid pro quo.
17   A.  No.  There was no specific deal done on September 18th.
18   It was strictly, as I said, he asked if I would help them,
19   would they help me; and he was told he thought he would.
20   Q.  Did you point out in the affidavit, to the magistrate
21   deciding whether or not to issue the wiretap, that after three
22   days Judge Lackey was the one who had to come up with a
23   specific quid pro quo, namely $40,000?
24   A.  I believe on the 21st Mr. Balducci asked him what he was
25   referring to.

DAILY COPY   REDIRECT - DELANEY           150

1    Q.  And that's when the judge raises the issue of money?
2    A.  Yes.
3    Q.  And talks about the hump he has to get over and the
4    problems in his private life?
5    A.  He talks about the hump he has to get over after
6    Mr. Balducci agrees to the 40 in discussing how they're going
7    to do it and saying he's the one to do it.
8    Q.  The transcript will speak for itself.
9            MR. KEKER:  That's all I have on this, Your Honor.
10           THE COURT:  All right.  Any redirect?
11           MR. SANDERS:  Yes, Your Honor.
12               REDIRECT EXAMINATION
13   BY MR. SANDERS:
14   Q.  There was some conversation about the September 18th and
15   the September 21st when Judge Lackey said "to get him over a
16   hump."  Did Judge Lackey discuss getting over a hump both
17   times?  Do you recall?
18   A.  I think on the 18th.  I'm not sure if he used the exact
19   term getting over a hump, but I think he'd indicated he'd had
20   some problems.
21   Q.  All right.  If I hand you the transcript from
22   September 18th, would it refresh your recollection?  You may
23   still have it.
24   A.  I have it.
25   Q.  If you look at page 8, do you think that would refresh

DAILY COPY   REDIRECT - DELANEY           151

1    your recollection?
2            MR. KEKER:  Your Honor, I'm embarrassed to say what I
3    handed him were excerpts and not the full transcript.  I'm not
4    sure if --
5            THE WITNESS:  There is no page 8.
6            MR. SANDERS:  May I approach, Your Honor?
7            THE COURT:  All right.  You may hand him the
8    transcript.
9            MR. SANDERS:  Okay.
10           THE COURT:  Give Mr. Keker back his excerpts.
11           THE WITNESS:  Yes, he does.  He does say that it's my
12   make and my hump, can't blame anybody else.
13   BY MR. SANDERS:
14   Q.  Okay.  I just wanted to clear that up.  He asked you about
15   May the 4th.  Again, he asked you about the thoughts, ideas
16   that Balducci was referring to?
17   A.  Yes, sir.
18   Q.  What specific document was Balducci referring to when he
19   talked about the thoughts, ideas on paper?
20   A.  He was referring to that May 4th order that he'd faxed
21   down to Judge Lackey earlier in the morning.
22   Q.  All right.  And now he asked you, too, on May 4th whether
23   or not Balducci refers to of counsel.  Did he on May 4th?
24   A.  No, not that I recall.
25   Q.  Did he on May 3rd?

DAILY COPY   REDIRECT - DELANEY           152

1    A.  Yes, he did.
2    Q.  And did he on May 9th?
3    A.  I believe he did.
4    Q.  All right.  And again, the statements Balducci is making,
5    that I think everything is fine, this order is fine, I think
6    this is probably right, those statements he made, what was your
7    impression of those statements; and why did you not put those
8    statements in the affidavit?
9    A.  Again, to me -- which date are we talking about, May --
10   Q.  The 21st of May.
11   A.  Oh, the 21st.  Again, those statements, to me, were
12   clearly made in response to the judge's first comment during
13   the conversation that, "Look, I've never been involved in
14   something like this."  He's clearly troubled.  Mr. Balducci
15   picks up on the judge is clearly troubled.  And Mr. Balducci
16   clearly is trying to put the judge at ease and trying to assure
17   him that everything will be okay.
18   Q.  Everything will be okay meaning what?
19   A.  That nobody else is going to find out, that they'll be
20   able to do -- you know, if the judge does what they're asking
21   him to do, that there won't be any problems as a result of it.
22   Q.  Okay.  Also, you said that Tim never said anything like,
23   "No, you misunderstood this, Judge" something to that effect.
24   What would you have done if he'd said something like that?
25   A.  If Mr. Balducci had made it clear that the judge was

DAILY COPY   REDIRECT - DELANEY   153

1  mistaken in his overtures in March or early May and relay that
2  to me, if it was on tape, then I probably would have approached
3  Mr. Balducci, interviewed him, tried to find out exactly what
4  his intentions were.  Based on that, I may have gone and
5  interviewed Mr. Scruggs; but certainly, I would have talked to
6  Mr. Balducci.
7      Q.  And finally, you mentioned once -- you said that Judge
8  Lackey had -- Mr. Keker did -- he said that Judge Lackey
9  recused because he was being earwigged by the other side.  You
10  said you met with Judge Lackey after he recused.  Was that why?
11  A.  No.  He recused himself because he was terribly troubled
12  by this.
13      MR. SANDERS:  Your Honor, I don't have any more
14  questions for this agent on the September 25th wiretap.
15      THE COURT:  All right.  You may step down.
16      MR. KEKER:  Your Honor, may I ask him one question
17  about the September 25?
18      THE COURT:  Was it anything that came out on cross?
19      MR. KEKER:  Well, it's the date.
20      THE COURT:  You may ask him about any question that
21  came out on cross-examination.
22      MR. KEKER:  This is something that -- I wouldn't say
23  it came -- this has to do with the affidavit and the date.
24      THE COURT:  One question.
25      MR. KEKER:  One question.

DAILY COPY   RECROSS - DELANEY   154

1              RECROSS EXAMINATION
2  BY MR. KEKER:
3      Q.  What date was your affidavit signed?  I'm showing you
4  Exhibit 9.
5      A.  September 25th.
6      Q.  Okay.  And whose dating is that?
7      A.  That's mine.
8      Q.  And that says 25?
9      A.  Yes, sir.
10      Q.  Okay.  Thank you.
11      MR. SANDERS:  Your Honor, no further questions as far
12  as the September 25th affidavit.
13      THE COURT:  Okay.  You may step down.  We'll call you
14  back out in a couple of minutes.
15      THE WITNESS:  Thank you, sir.
16      THE COURT:  All right.  We'll be in recess ten
17  minutes.
18      (AFTER A SHORT BREAK, THE PROCEEDING CONTINUED)
19      (CALL TO ORDER OF THE COURT)
20      THE COURT:  All right.  There's also an affidavit for
21  a wiretap on -- I believe it was October 16th on Patterson's
22  phone; is that correct?
23      MR. KEKER:  Yes, Your Honor.
24      THE COURT:  Is that your next one?
25      MR. SANDERS:  Yes, sir, Your Honor.

155

1      THE COURT:  Now, there's a question we haven't taken
2  up yet.  There hasn't been any question raised about standing
3  for the defendants in this case to complain about a wiretap on
4  somebody else's phone.  Of course, there was no wiretap ever on
5  Mr. Scruggs elder, Mr. Zach Scruggs, or Mr. Backstrom's phone.
6  So their phones were never tapped.
7      So I understand there's no law that's clear that an
8  aggrieved party can complain about if evidence on a wiretap of
9  somebody else's phone is used against a third person -- or a
10  second person from the phone, owner of the phone, then that
11  aggrieved person has a standing to complain about it.  But the
12  question that I'd like to hear from counsel on is if there was
13  no information gained from the wiretap on Mr. Balducci's phone
14  from September 25th, I believe is when it was issued, until the
15  renewal of that wiretap -- which was, what, 30 days later?
16      MR. SANDERS:  Yes, sir.
17      THE COURT:  Thirty days later.  Was there any
18  information during that thirty-day period that any of these
19  three defendants can claim they are aggrieved by, Mr. Keker?
20      MR. KEKER:  I believe so, Your Honor.  October 18,
21  Mr. Backstrom is on one of the calls.  And it's also our
22  position that calls on a wiretap into a premises, owners of the
23  premise have standing.  We've briefed this piece.
24      THE COURT:  If they're aggrieved by the results.
25      MR. KEKER:  Yes, sir.  And then it's also our

156

1  position that this is cumulative, that the first one leads to
2  the second one, leads to the third one, sort of the taint runs
3  all the way through.  The search warrant eventually is based on
4  the fruits of these wiretaps.  So for all these reasons, they
5  have standing.
6      And then just to an anticipate, Mr. Patterson's phone --
7  Mr. Dick Scruggs and I, think, Mr. Patterson -- but I'm not
8  sure about that.  But I know Dick Scruggs is on the Patterson
9  tap that we'll get to later on.
10      THE COURT:  All right.  You may proceed.  Evidently,
11  the Government's not concerned with that issue then, are you?
12  You haven't brought it up.
13      MR. SANDERS:  That's right.  Your Honor, first, we're
14  aware that the Government doesn't waive standing.  The
15  Government cannot waive standing.  In this instance, frankly,
16  Your Honor, we looked at the information; we looked at the law
17  out there.  We knew if a party was aggrieved they had standing,
18  and it's certainly our position that the defendants are
19  aggrieved by the information elicited from the wiretaps.
20      THE COURT:  Well, the question I brought up was
21  whether they were aggrieved by this 30-day period from which
22  the first wiretap was issued till 30 days later when it was
23  renewed.
24      MR. SANDERS:  Yes, sir.
25      THE COURT:  And probable cause or information had to

157

1  be presented at that renewal that would point toward the --
2  that would justify the renewal of it.  So evidently, you're not
3  concerned with any standing of these three defendants to object
4  to information that was gained from this first 30-day period
5  where Mr. Balducci's phone was wiretapped?
6      MR. SANDERS:  Your Honor, as I said, we don't believe
7  we waived it; and we may well address it at a later time.  At
8  this point, however, we see the case law saying that if a
9  person is aggrieved -- and we believe that, for instance, on
10  October 18th, all three defendants were greatly aggrieved by
11  information elicited from the wiretap.
12      THE COURT:  Okay.  That would be within the thirty
13  days.
14      MR. SANDERS:  Yes, sir.
15      THE COURT:  All right.  Good.  All right, Mr. Keker.
16      MR. KEKER:  Your Honor, if we're going to go back to
17  Mr. Sanders to elicit information and I cross, that's all
18  right.  Otherwise, I'll do it.
19      THE COURT:  It's up to you gentlemen.
20      MR. KEKER:  I'll do it either way, Mr. Sanders.
21      MR. SANDERS:  Your Honor, do you want argument now on
22  the September 25th?
23      THE COURT:  No.  Do you want to go forward with the
24  second affidavit?
25      MR. SANDERS:  Yes, sir.

---

DAILY COPY   DIRECT - DELANEY        159

1  A.  Yes, sir.
2      MR. KEKER:  Well, I object because he didn't say he
3  knows the amount of the bribe.  Does P.L. know the amount is
4  all he said, nothing said about the bribe.
5      MR. SANDERS:  I'm sorry.  I'll rephrase, Your Honor.
6      THE COURT:  Okay.
7  BY MR. SANDERS:
8  Q.  Did Patterson tell P.L. the amount?
9  A.  Yes.
10  Q.  Did Patterson also tell Balducci that P.L. doesn't know
11  what it's about or anything?
12  A.  Yes, he did.  I believe that's on the transcript of the
13  call.
14  Q.  All right.  Why did you not put that in the October 16th
15  affidavit?
16  A.  Again, I'm trying to establish probable cause that
17  Mr. Patterson is aware of the conspiracy and using his phone in
18  connection with the conspiracy.  We used the elements of that
19  call where he said he knew the amount.  In a subsequent call, I
20  believe on October 10th, where, again, it's Mr. Patterson
21  speaking with Mr. Balducci.  Mr. Patterson's asking
22  Mr. Balducci when the order's going to be sign, and he says
23  P.L. wants to know.  I took those two phone calls to establish
24  the probable cause that Mr. Patterson and Mr. Blake had reason
25  to believe that they were involved in this conspiracy.

---

DAILY COPY   DIRECT - DELANEY        158

1      THE COURT:  All right.  You may proceed.
2          DIRECT EXAMINATION
3  BY MR. SANDERS:
4  Q.  Okay.  Mr. Delaney, I am going to talk to you now about
5  the Patterson wiretap.  The affidavit was signed -- when did
6  you sign the affidavit for the Patterson --
7  A.  I believe it was October 16th.
8  Q.  All right.  They refer in their motion to three different
9  statements made, and I'm going to read those statements to you
10  and have you explain to us why they weren't contained in the
11  Patterson wiretap.  The first one they talk about is that you
12  put in the affidavit that Patterson's talking to Balducci, and
13  you point out that P.L. Blake -- that Patterson has spoken to
14  P.L. Blake.  And you said that he's already talked to P.L. and
15  that P.L. knows the amount.
16  A.  Uh-huh (yes).
17  Q.  Did P.L. Blake -- did Patterson also tell P.L. Blake on
18  the telephone call that P.L. doesn't know what it's about or
19  anything?
20      MR. KEKER:  I think it was misspoken.  It was a phone
21  call not with P.L. Blake but with Patterson Balducci.
22  BY MR. SANDERS:
23  Q.  That's right.  It's Patterson and Balducci.  And does
24  Patterson tell Balducci that P.L. knows the amount of the
25  bribe?  Do you remember that?

---

DAILY COPY   DIRECT - DELANEY        160

1  Q.  Based on the September 27th and the October 10th call?
2  A.  Yes, sir.
3  Q.  All right.  They also refer to a September 27th call
4  between -- or I think it's a conversation between Balducci and
5  Judge Lackey.  All right?  And this is -- I'll try to
6  paraphrase this, but it's essentially there's a statement
7  Balducci makes -- he says to Judge Lackey, "There ain't another
8  soul in the world that knows about this, okay?  And this is --
9  this is -- this is taken care of."
10      And then later, Balducci says -- Lackey asks, "When you
11  tell him Mr. Scruggs or Dickie or whatever I ought to call him --
12  you tell him that this is a first-time venture with me."  And
13  then Balducci says, "He's not even involved at that level,
14  Judge."  Balducci goes on to say, "The way this will work is
15  I'll just go to him at some point in time and say that I cured
16  a problem that you had, and you need to recognize the problem
17  that I have cured.  That's how it works."  Do you remember
18  those statements, Balducci speaking to Judge Lackey?
19  A.  I do.
20  Q.  And why were those statements not included in the
21  October 16th affidavit?
22  A.  Again, I didn't give those statements as much weight as I
23  gave previous statements.  Earlier on the 27th, we intercepted,
24  I believe, two calls on Mr. Balducci's phone.  I believe one
25  with Mr. Patterson, and I believe the other one was Mr. Biden

DAILY COPY   DIRECT - DELANEY      161

1  (phonetic); I'm not sure.  Mr. Balducci says in those two
2  separate phone calls he's on his way to Oxford.  I believe he
3  says he's going to go see either the Scruggs Law Firm or
4  Mr. Scruggs or words to that effect.
5      One of the phone calls he tells, I believe Mr. Patterson,
6  he's on his way to go see Sid to pick up that thing.  We know
7  from phone calls during that morning that he's on his way to
8  head south, which is Calhoun City, south of Oxford.  So based
9  on those earlier phone calls, on the 27th, I gave much more
10 weight to the veracity of those phone calls than I did to that
11 conversation that Mr. Balducci had with the judge while
12 conducting elicit --
13 Q.  Okay.  Was one of the conversations to which you just
14 referred with Steve Patterson when he's talking about this
15 order with Balducci?  Did that conversation take place before
16 Balducci meets with Judge Lackey?
17 A.  Yes, it does.
18 Q.  Okay.  So did you believe that Balducci wasn't telling the
19 truth here?
20 A.  I had reason to doubt what he was saying.
21 Q.  Okay.  And then based on subsequent conversations, who
22 else did you think knew or at least you believed had probable
23 cause to know that there was a crime taking place?
24 A.  Subsequent conversations we believe that Mr. Scruggs,
25 based on -- on Mr. Balducci saying he's going to the law firm

DAILY COPY   DIRECT - DELANEY      162

1  before that day, we had surveillance locate Mr. Balducci
2  returning to the Scruggs Law Firm after the first bribe payment
3  on September 27th.  We had the four-minute phone call September
4  27th immediately after Mr. Balducci had agreed to the bribe
5  payment with the judge in Calhoun City.
6      We had, I believe, a surveillance later in October showing
7  Mr. Patterson and Mr. Balducci visiting the Scruggs Law Firm
8  while these payments were going on -- in the midst of these
9  bribe payments.
10 Q.  Let me ask you this:  You mentioned just a minute ago --
11 you said something about Sid.  What did you say about Sid?
12 A.  One of the intercepted phone calls on the morning of the
13 27th was, I believe, Mr. Balducci told Mr. Patterson that he
14 was going to see Sid to pick that thing up.
15 Q.  Okay.
16 A.  And, you know, later in the day after Mr. Balducci had
17 dropped off the money and an order -- we did in fact recover an
18 order from the judge's office.
19 Q.  Okay.  And then one final point they make about this.
20 They say that on October the 10th that Balducci called Judge
21 Lackey and asked when he could pick up the sweet potatoes.
22 A.  Uh-huh (yes).
23 Q.  Did you think Tim Balducci was going to pick up sweet
24 potatoes from Judge Lackey?
25 A.  No, sir.

DAILY COPY   CROSS- DELANEY      163

1  Q.  What did you think that was?
2  A.  Sweet potatoes was their code word for the order.
3  Q.  Okay.  At the end of that conversation, Balducci talks
4  about he was going to get back to Judge Lackey about, quote,
5  that other deal.
6  A.  Yes, sir.
7  Q.  The defendants say that this is strong evidence that
8  Balducci did not understand Lackey's request for the payment to
9  be connected with the order being entered in the Scruggs case.
10 Is that how you saw?
11 A.  No.  I think it's pretty clear what Mr. Balducci meant by
12 the other deal was the second half of the money on
13 September 27th even though he'd originally agreed on 40,000.
14 He delivered 20,000; and during the conversation, he said he
15 would get the rest of them later.  And that's what I took that
16 October 10th conversation to mean was the other deal was the
17 remaining 20,000 of the 40,000.
18     MR. SANDERS:  Tender the witness, Your Honor.
19     THE COURT:  Very well.
20         CROSS-EXAMINATION
21 BY MR. KEKER:
22 Q.  Agent Delaney, the October 16 affidavit in support of the
23 Patterson wiretap repeats, in essence, all the allegations with
24 all the omissions that were in the one we just talked about,
25 right?

DAILY COPY   CROSS- DELANEY      164

1  A.  Yes, sir.
2  Q.  Okay.  So we won't go over that again.  But all of that
3  applies to this, too --
4  A.  Yes, sir.
5  Q.  -- what we talked about.  And then what's new here --
6  let's start with the big one.  You had a tape that you knew
7  amounted to Mr. Balducci telling Judge Lackey that Scruggs did
8  not know about the bribe that was being paid on September 27th;
9  is that a fair characterization?
10 A.  That's what he told him, yes, sir.
11 Q.  And you didn't think it was true?
12 A.  I had reason to doubt it, yes, sir.
13 Q.  Okay.  Now, in your FBI training, do they tell you that
14 when you're preparing an affidavit for probable cause you are
15 to present a fair picture of all the evidence to the judge to
16 let him decide?
17 A.  I believe we're suppose to present evidence that I think
18 gives probable cause that would lead to the approval of the
19 warrant.
20 Q.  Okay.  So your job -- the FBI training tells you your job
21 is to present the information to the judge that will allow you
22 to get a warrant whether or not it is a fair picture of what's
23 going on?
24 A.  No, I don't think that's accurate.
25 Q.  Does the FBI care about whether or not they present to a

DAILY COPY   CROSS- DELANEY        165

1  judicial officer --
2  A.  Yes, they do.
3  Q.  -- a search warrant affidavit -- whether or not it's a
4  fair picture of what's going on?
5  A.  Yes, they do.
6  Q.  And how does the judge weigh whether or not it's a fair
7  picture if you leave out all the favorable information or all
8  the information that doesn't fit your view of the events?
9  A.  I think the fact that you have those calls from
10  September 27th in the morning -- I think that's -- there's
11  enough weight given to know that -- that establishes the
12  probable cause that Mr. Patterson was involved in the
13  conspiracy and using his phone to do so.
14  Q.  Okay.  You think you had enough on Mr. Patterson.  And the
15  allegation, though, was that the conspiracy included Dick
16  Scruggs.
17  A.  Yes, sir.
18  Q.  And you were making quite a point in this affidavit that
19  Dick Scruggs was an important member of this conspiracy.
20  A.  I think there was enough probable cause to establish that,
21  yes.
22  Q.  And did you leave out of your affidavit that Judge Lackey
23  made a real yeoman's effort, a tremendous effort, in
24  September 27th to get some evidence on Dick Scruggs; and he
25  failed?

DAILY COPY   CROSS- DELANEY        166

1  A.  That conversation was not in the affidavit, no.
2  Q.  Okay.  Balducci said to him, "This is just between you and
3  me."  You didn't tell them that in the affidavit, did you?
4  A.  No, sir.
5  Q.  And he repeated it, "This is just between you and me."
6  And Lackey said, "All right."  That's not in the affidavit,
7  right?
8  A.  No, sir.
9      THE COURT:  Counsel, just a moment.  There's nobody
10  rising from the prosecutor's table; but in my interest of
11  judicial economy, this is an affidavit from a wiretap on
12  Patterson's phone, not Mr. Scruggs' phone.  You're not trying
13  to introduce probable cause that Mr. Scruggs had committed a
14  crime by this affidavit.  They're trying to introduce probable
15  cause to tap Mr. Patterson's phone.
16      MR. KEKER:  I hear Your Honor, but that's -- the
17  affidavit that was presented is that there is probable cause to
18  believe that Tim Balducci, Dickie Scruggs, Steven Patterson,
19  and so on, P.L. Blake -- they are alleging -- this agent is
20  asserting here there's probable cause to believe there was a
21  conspiracy, and that's what we say -- I mean, if Balducci and
22      And in order to evaluate that affidavit, it's our position
23  that leaving out not just significant but totally exculpatory
24  information about Blake, who said he didn't know anything about
25  it, and leaving out totally exculpatory information about

DAILY COPY   CROSS- DELANEY        167

1  Scruggs, who Balducci said didn't know anything about it, is
2  improper, unfair, and undercuts probable cause for the
3  conspiracy that they're alleging exists.  If they'd just said,
4  Patterson and Balducci are doing something, I suppose --
5      THE COURT:  Well, if he just said Patterson was doing
6  something, that's sufficient to tap his phone, which is the one
7  they tapped.  I'll reserve ruling on that.  Go ahead.
8      MR. KEKER:  And then I go back to the point this
9  Patterson tap picked up --
10      THE COURT:  Picked them up later.  But that's a
11  question of whether or not probable cause was presented to tap
12  the phone that was tapped, which is Patterson.  But whether --
13  okay.  But you may proceed.  You know, I agree that by that
14  Patterson phone tap that information came in as a result that
15  pointed to any one of these three defendants.  Then these three
16  defendants would have cause to complain of the probable cause
17  that was presented for that wiretap.
18      But still, the probable cause that the Court was dealing
19  with was really about Patterson, not about these three
20  defendants.  But I'll -- you may proceed.  I'll reserve ruling on
21  that and certainly going to have to hear more information.
22      MR. KEKER:  I think though since -- we are stuck
23  with -- I know one of my colleagues has made a James motion,
24  that the Government is going to take advantage of the fact that
25  they've charged a conspiracy to say that everybody is liable

DAILY COPY   CROSS- DELANEY        168

1  for everything; and that's what they're alleging here.  And if
2  they'd just thought they were investigating Steve Patterson, I
3  agree we'd have a different situation.  But that's not what --
4  that's not what the special agent --
5      THE COURT:  Suppose they had only put in Patterson in
6  the affidavit, we want to tap Patterson's phone.
7      MR. KEKER:  Then they'd have to show that he was
8  committing -- there's probable cause to believe that Patterson
9  was committing a crime, and they'd have to say what that was.
10      THE COURT:  Right.  And they could have said, We
11  believe he's involved in a conspiracy with Balducci to bribe
12  Judge Lackey.  And they would have had that, assumed they could
13  have had that probable cause.
14      MR. KEKER:  I think that's true.  And if they'd said
15  that, the magistrate might have looked at it and said, Well,
16  what in the world -- this doesn't make any sense.  This
17  whole -- the whole thrust of why they're trying to get a
18  probable cause determination is the Scruggs firm was involved
19  in it.
20      That's what they're -- that's what they say the case is
21  about, and that's what we say -- I mean, if Balducci and
22  Patterson -- we say that Balducci and Patterson were doing
23  whatever they were doing all by themselves without the
24  knowledge of these folks, at least through this period that
25  we're talking about --

DAILY COPY   CROSS- DELANEY          169

1    THE COURT: Well, all right. But -- we'll go
2    forward.
3    MR. KEKER: And I think, Your Honor, we've briefed
4    this. We can go on to the next one. The big headline here is
5    there's exculpatory information about P.L. Blake that -- I
6    mean, let me ask a couple of questions about that because I
7    didn't get that.
8    BY MR. KEKER:
9    Q.   On September 27, you have a phone call that says P.L.
10   Blake doesn't know what this money is for, doesn't know
11   anything about it, right?
12   A.   That's what Patterson tells Balducci, yes.
13   Q.   Okay. And you decide to leave that out of an affidavit
14   that says there's a conspiracy involving Blake?
15   A.   Uh-huh (yes).
16   Q.   And the reason you do that is you found out by October 10
17   P.L. Blake knows something about an order?
18   A.   Yes.
19   Q.   And so, therefore, you connected in your mind the order
20   with the money; and you concluded that P.L. Blake knew about
21   the -- some connection between the two?
22   A.   I didn't know definitely; I thought there's probable cause
23   to believe that.
24   Q.   And based on that belief, you chose to leave out a full
25   and complete statement from -- in a conversation between

DAILY COPY   CROSS- DELANEY          170

1    Patterson & Balducci that P.L. Blake didn't know anything about
2    this?
3    A.   Yes.
4    Q.   And you chose to not -- I'm not going to let the judge
5    know about that?
6    A.   Yes.
7    MR. KEKER: That's enough for this one, Your Honor.
8    We will rely on our briefing. We've got other points.
9    THE COURT: Very well. Do you have any redirect?
10   MR. SANDERS: No, Your Honor, no redirect on that.
11   THE COURT: All right. All right. The Balducci cell
12   phone extension, that was the 30-day extension that came up
13   earlier in our discussion, was signed on October 29th. Are you
14   ready to proceed on that, Mr. Keker?
15   MR. KEKER: Yes, sir.
16   THE COURT: Or you, Mr. Sanders?
17   MR. SANDERS: Yes, sir, Your Honor. And as I noted
18   in our response to their motion, I think in their motion they
19   just -- they don't point to any specific omissions or what they
20   call misleading statements with respect to the extension
21   affidavit. They just rely on what they've argued beforehand,
22   so we would stand on what we've done thus far in here.
23   THE COURT: All right. In other words, there are no
24   new omissions or misleading statements listed in the motion
25   concerning the cell phone extension.

DAILY COPY   CROSS - DELANEY          171

1    MR. SANDERS: That's right.
2    THE COURT: Is that right, Mr. Keker?
3    MR. KEKER: If I could just have a moment, Your
4    Honor.
5    THE COURT: Okay.
6    MR. KEKER: Well, actually, could I ask a couple of
7    questions to show that there's a --
8    THE COURT: Ask him a couple?
9    MR. KEKER: Yes, sir.
10   THE COURT: All right. You may.
11        CROSS-EXAMINATION
12   BY MR. KEKER:
13   Q.   Now, by the October 24 affidavit, which is Exhibit 31 to
14   Mr. Dooley's declaration, you just dropped P.L. Blake out of
15   this conspiracy, didn't you?
16   A.   Yes, I did.
17   Q.   And that's because you determined that you were wrong in
18   what you'd said on October 16 about P.L. Blake?
19   A.   I don't believe we came up with any further evidence to
20   show that he was involved, no.
21   Q.   And did you tell the judge, when you came for the
22   October 24 extension, that what you'd told them before about
23   P.L. Blake hadn't panned out; and you just were dropping P.L.
24   Blake, including exculpatory information, everything about P.L.
25   Blake, out of this affidavit? You want me to show you the

DAILY COPY   CROSS - DELANEY          172

1    affidavit?
2    A.   If you'd like.
3    Q.   Show you Exhibit 31. The question is, P.L. Blake is gone.
4    He's not a member of the conspiracy. There's no information
5    about him. There's nothing about calls to him. And you didn't
6    tell the judge that what you'd said before turned out not to be
7    true.
8    A.   He's not listed on the affidavit, on the extension, no.
9    Q.   Okay. And you didn't tell the judge --
10   A.   Well, I mean, the fact that he's omitted from the
11   affidavit, I think, is pretty clear that we no longer consider
12   him or, at that time, didn't consider him a subject.
13   Q.   That's all I have. And the rest that's in here is an
14   accumulation of what we've talked about so far?
15   A.   Yes, sir.
16   Q.   Okay. With the same omissions and the same issues that
17   we've talked about?
18   A.   Yes, sir.
19   MR. KEKER: That's all I have on that one, Your
20   Honor.
21   THE COURT: Very well. Anything else?
22   MR. SANDERS: No, Your Honor.
23   THE COURT: Very well.
24   MR. KEKER: We've got the search warrant affidavit,
25   Your Honor. Should we go with that one?

DAILY COPY  CROSS - DELANEY      173

1    THE COURT:  Yes, we can go forward.
2        MR. SANDERS:  Your Honor, I believe with the search
3    warrant, as with the extension on the wiretap -- I don't think
4    they refer to any more specific omissions or misleading
5    statements; and I think we simply refer back to what we've done
6    so far.
7        THE COURT:  Very well.  Do you agree with that,
8    Mr. Keker?
9        MR. KEKER:  No, I don't, Your Honor.
10       THE COURT:  With what do you disagree?
11       MR. KEKER:  Well, there's a lot in the search warrant
12   affidavit that has even more omissions.  I mean, for example,
13   by now the March 2007 meeting is reduced to this, that
14   Balducci, Patterson, Scruggs, Backstrom, and Zach Scruggs met
15   in the offices of Scruggs Law Firm in Oxford for purposes of
16   discussing ways and means of corruptly influencing the outcome
17   of Jones, et al v. Scruggs, et al.  Now we've heard a lot more
18   about that.  There's a lot more about that meeting than that.
19       But in addition, by this time, they have Mr. Balducci; and
20   Mr. Balducci sat down and talked to them.  And Mr. Balducci has
21   said things I'd like to ask Agent Delaney about that are left
22   out of this affidavit and so on.  I mean, there's a number of
23   things in this affidavit.
24       THE COURT:  All right.  Since there is an
25   affidavit -- since there is a search warrant, there was an

DAILY COPY  CROSS - DELANEY      174

1    affidavit, then the Court has determined there was probable
2    cause to look on the face of the affidavit.  So, therefore, the
3    burden comes to the defendant to attack the affidavit.
4        MR. KEKER:  Okay.  Let me get my --
5        MR. SANDERS:  Your Honor, under Franks, even to have
6    a hearing, they've got to make a substantial preliminary
7    showing.  And in their motion, they didn't mention any of this
8    that Mr. Keker is talking about; so I don't think they've made
9    the showing that would entitle them to the hearing at this
10   stage.
11       MR. KEKER:  I don't think that's true.
12       THE COURT:  The question is the suppression of a
13   search warrant affidavit, they can -- the Court will allow them
14   to attack the affidavit, but the burden switches from the
15   Government to justify the search to the defendant to show why
16   there was no probable cause in the affidavit.
17       MR. KEKER:  Then, beginning with --
18       THE COURT:  It may not be in the motion, but I'm
19   going to let the -- try to establish something anyway.
20            CROSS-EXAMINATION
21   BY MR. KEKER:
22   Q.  Agent Delaney, do you have your 302?
23   A.  (Shaking head negatively.)
24   Q.  The 302 of your interview with Mr. Balducci on November 2,
25   2007?

DAILY COPY  CROSS - DELANEY      175

1    A.  I don't have it with me.
2    Q.  Could we get a copy to put up in front of him in case he
3    needs to refer to it?
4        MR. SANDERS:  And I've got a copy for him, Your
5    Honor, if I can --
6        THE COURT:  All right.
7    BY MR. KEKER:
8    Q.  I'm going to give you two, one is dated -- well, you tell
9    me what they are dated.  I think they are --
10   A.  11/2 and 11/7, sir.
11   Q.  And those are the dates of the interviews?
12   A.  Yes, sir.
13   Q.  And these are interviews with Mr. Balducci?
14   A.  Yes, sir.
15   Q.  And you and another agent conducted them?
16   A.  Yes, sir.
17       THE COURT:  Are you claiming in this, even though you
18   didn't put anything in your motion about omissions or
19   misleading statements -- is that what you're claiming about the
20   defects in this affidavit?
21       MR. KEKER:  Yes, sir.
22       THE COURT:  All right.
23   BY MR. KEKER:
24   Q.  In the search warrant affidavit, which is dated
25   November 26 and which was written after you interviewed

DAILY COPY  CROSS - DELANEY      176

1    Mr. Balducci on 11 -- on November 2 and November 7, correct?
2    A.  Yes.
3    Q.  You stated -- and all you stated about March 2007 in the
4    Scruggs office is what I just read, that five people met in the
5    offices of the Scruggs Law Firm in Oxford for the purposes of
6    discussing ways and means for the purpose of corruptly
7    influencing the outcome of Jones et al. V. Scruggs, right?
8    A.  Yes.
9    Q.  And at that point, you knew Mr. Balducci, who you arrested
10   and was cooperating, had said that at that meeting Dick Scruggs
11   said he was not asking Balducci for anything illegal but would
12   Balducci see if the judge would move the matter to arbitration.
13   You knew that you were -- that he'd said that to you, and you
14   omitted it from the search warrant affidavit.
15   A.  There was some disagreement -- I'm not going to say
16   disagreement -- misunderstanding about that statement.  That
17   was my understanding the way he said it at the time.  We later
18   talked to him about it.  He said that was not his recollection
19   of that meeting.
20       That information went in the affidavit subsequently after
21   that where we discussed it again.  And we talked about it; and
22   we determined that it, you know -- that it is what myself and
23   the other agent heard.  And at that time, Mr. Balducci was not
24   going to dispute it.  He said, "If that's what you heard,
25   that's what I said."

DAILY COPY  CROSS - DELANEY      177

1   Q.  You had notes of your interviews on the 2nd and 7th of
2   November with Mr. Balducci, didn't you?
3   A.  Yes.
4   Q.  And when you checked your notes and what your notes told
5   you, you were right in what you put in the report?
6   A.  Yes, sir.
7   Q.  Dick Scruggs said he was not asking Balducci for anything
8   illegal?
9   A.  Yes.
10   Q.  And you didn't -- just tell us why you didn't put that
11   into the search warrant affidavit.  Why didn't you say --
12   instead of saying they met her for purposes to figure out
13   corrupt -- how to corruptly influence the outcome of the case,
14   why didn't you say, two weeks ago the persons there -- I wasn't
15   there, the person that was there told me that Dick Scruggs said
16   he didn't want to do anything illegal; but will you please talk
17   to your friend, the judge, about getting this case to
18   arbitration?  Why didn't you put that in the affidavit?
19   A.  Again, that issue -- when the affidavit was written, I was
20   under the -- I was under the belief, based on the subsequent
21   interview with Mr. Balducci, that there was elicit conversation
22   in that March 20th interview.  I did not check my notes when I
23   talked to Mr. Balducci the second time.  I was going off my
24   memory.  He assured me that there was.
25       When I subsequently later went back -- and this was after

DAILY COPY  CROSS - DELANEY      179

1   Mr. Balducci was not.
2   Q.  Did you come back to the judge --
3   A.  No, I did not.  No, I did not.
4   Q.  Let me finish the question.  Did you come back to the
5   judge who signed the search warrant affidavit and say, Judge, I
6   had mistaken memory; and I said some things in my affidavit
7   that I now know are wrong.  I'm sorry.  I just wanted you to
8   know that?
9   A.  No, I did not.
10   Q.  Did you put in the search warrant affidavit that Balducci
11   told Dick Scruggs that Balducci would see Judge Lackey and ask
12   him as a favor to rule for arbitration in the case, as a favor?
13   A.  No.
14   Q.  Did you tell -- in the affidavit, you talk about, very
15   briefly, the March 28 meeting where Balducci went down to see
16   Judge Lackey, right?
17   A.  Yes, sir.
18   Q.  And you said about it -- well, the judge can read it.  He
19   requested a private meeting; he was not a party.  During the
20   course of the conversation, Mr. Balducci made corrupt overtures
21   to Judge Lackey who reported the same to federal officials.
22   A.  Uh-huh (yes).
23   Q.  At that time, did you know it took him two weeks?
24   A.  No.
25   Q.  Did you tell him that Mr. Balducci had told you that he'd

DAILY COPY  CROSS - DELANEY      178

1   the affidavit was signed -- I checked my notes and saw that in
2   fact that's what my notes reflected, that he said there was
3   nothing illegal -- Mr. Scruggs was not asking him to do
4   anything illegal.
5   Q.  You also said that Dick Scruggs stated that Judge Lackey
6   ought to move the case to arbitration since it was the correct
7   thing to do.  Why didn't you put that in the affidavit?
8   A.  Because, again, that was back in March.  Subsequently, as
9   the investigation rolled on, it showed that that was not the
10   case.  That may have been at that time; but subsequently, it
11   was -- it appeared that there was more to it than that, just
12   asking the judge to do -- to move the case to arbitration, but
13   to actually, you know, bribe the judge to have it done.
14   Q.  But -- okay.  You're telling the judge who you're
15   submitting the search warrant affidavit to that the meeting in
16   March was for the purpose of discussing ways and means of
17   corruptly influencing the outcome of the case; and you don't
18   put in that Scruggs said he didn't want to do anything illegal,
19   the right thing to do was to move it to arbitration?
20   A.  Again, the first interview, that's what I had in my notes.
21   The subsequent interview with Mr. Balducci, I did not have my
22   notes in front of me when I spoke to him.  He assured me that's
23   not what happened; I misunderstood him.  When I later -- after
24   the affidavit was signed -- checked my notes, confirmed with my
25   partner, I felt that I was correct in the first instance; and

DAILY COPY  CROSS - DELANEY      180

1   told Judge Lackey that this was for his personal benefit?  He
2   asked him for a favor and said it was for his personal benefit?
3   A.  No, I didn't put that in there.
4   Q.  Okay.  Why didn't you put that in?
5   A.  Because, again, I think -- as the investigation moved
6   along, I think it showed that it wasn't just for a personal
7   favor; it was more than that.
8   Q.  But you're telling the judge about these meetings.  You're
9   taking the trouble to tell him about the meetings, but you're
10   not telling him what actually happened at the meetings.  That's
11   okay?
12   A.  I didn't put it in.
13   Q.  You said that -- we just read it -- that at the meeting,
14   you said to the judge, who decided the search warrant issue,
15   that at the meeting he made corrupt overtures; but you didn't
16   put in the affidavit that Balducci said he would benefit if
17   Judge Lackey ruled in favor of the Scruggs Law Firm, ruled for
18   arbitration.
19       And that he further stated it would be considered a
20   personal favor if Judge Lackey ruled for arbitration, and
21   arbitration was the correct legal way to settle the matter.
22   And that Balducci also mentioned that he had mentioned the
23   position of, of counsel when the judge was ready to retire; but
24   that the offer of, of counsel was not related to or offered as
25   an incentive to rule as the -- as Balducci asked.  That's what

DAILY COPY  CROSS - DELANEY       181

1   he told you, right?
2   A.  That's what he told me.
3   Q.  So did you tell the judge in the November 26th search
4   warrant affidavit when you said corrupt overtures had been made
5   that Balducci told you the two things were not tied together
6   and no corrupt overtures had been made?
7   A.  That's correct.
8   Q.  Did you tell him that?
9   A.  No.  We relied on, basically, that information came from
10  what the judge -- the judge was still under the impression that
11  the two were tied.  Mr. Balducci's version was they were not
12  tied.
13  Q.  Did you tell him it took the judge two weeks to figure out
14  that maybe there was a problem?
15  A.  Again, at the time -- I did not know at the time it took
16  the judge two weeks.
17  Q.  I'm sorry?
18  A.  I did not know at the time there was a two-week lag time
19  between Mr. Balducci's visit and the judge reporting it to the
20  United States Attorney's Office.
21  Q.  Why didn't you tell him at least that one side, Balducci
22  said there wasn't any corrupt overture; it wasn't meant that
23  way?
24  A.  I don't know.  I just left it out.
25  Q.  You did it on purpose?

DAILY COPY  CROSS - DELANEY       182

1   A.  No, I did not do it on purpose.
2       THE COURT:  Excuse me, gentlemen.  May I have a copy
3   of this affidavit for the search warrant?
4       MR. KEKER:  Yes, sir.  Here's the affidavit.  You
5   want a copy of the 302, Your Honor?
6       THE COURT:  No, just the affidavit.  Thank you.
7   BY MR. KEKER:
8   Q.  Did -- were you aware of Balducci having contacts with
9   people at the Scruggs firm after he was arrested that were not
10  recorded?
11  A.  I'm sorry.  Say that again, sir.
12  Q.  Did you send Balducci to the Scruggs Law Firm to try to
13  gather evidence without wiring him up?
14  A.  No, not to gather evidence.  It was simply to try and see
15  if he could get Mr. Backstrom to come to his office so he could
16  talk to him in private.
17  Q.  Did you send him to the Scruggs office on November 19?
18  A.  I asked him to go over there and see if Mr. Backstrom
19  would come back to his office with him.
20  Q.  And he was not wired?
21  A.  No, sir, he was not.
22  Q.  Did he tell you about the conversation he had with people
23  at the Scruggs firm while he was there?
24  A.  He told me he went in, spoke with one of the secretaries;
25  I think he didn't know who it was.  They told him that

DAILY COPY  CROSS - DELANEY       183

1   Mr. Backstrom was not in the office and would not be there, and
2   he came back.
3   Q.  Did he tell you any conversations he had with anybody at
4   the Scruggs firm about the work that he was doing on the voir
5   dire or the jury instructions?
6   A.  No, I don't recall him telling me that.
7       MR. KEKER:  Your Honor, I believe the rest --
8       THE WITNESS:  You talking about on that particular
9   day, sir, on November --
10  BY MR. KEKER:
11  Q.  Well, I mean, did he ever go back and have a conversation
12  that wasn't recorded where he talked about work on the jury
13  instructions and voir dire?
14      THE COURT:  Are you saying that relates to --
15      MR. KEKER:  No, it's omitted.  I'm trying to
16  establish it, and I want to point out that it's not in the
17  affidavit.
18      THE WITNESS:  I'm not sure.  The only two occasions I
19  recall him going over to the Scruggs Law Firm was on the
20  November 19th incident we just discussed and then on
21  November 5th when he picked up a package at the financial
22  office, not the main office.
23      MR. KEKER:  Your Honor, I think the rest of the
24  omissions and misstatements are -- in this affidavit are things
25  that we have talked about that have accumulated from the other

DAILY COPY  CROSS - DELANEY       184

1   ones; so I think that's the only thing I have.  May I check
2   with my colleagues?
3       THE COURT:  Check and see.  While you're doing that,
4   is there anything in this affidavit, anything else, that you
5   want to call attention to that you haven't -- I don't recall
6   you've said anything about this affidavit about false
7   statements or mis --
8       MR. KEKER:  Well, I can go back over them.  We
9   believe that the -- almost all of this is false.  The
10  description of the March meeting at the Scruggs Law Firm, we've
11  talked about.  The meeting with Judge Lackey, which is referred
12  to in here, we've talked about.  We think those are false.
13      THE COURT:  Wait just a minute.  What meeting with
14  Judge Lackey that was false?
15      MR. KEKER:  The description of the meeting with Judge
16  Lackey on May 28th -- excuse me -- March 28th, the initial
17  meeting where he went down there.  And that's on page 1 of the
18  affidavit.  And he said he requested a private meeting.  At the
19  bottom of the page, it says, "Balducci, during the course of
20  the conversation -- next to the last line.  "Balducci made
21  corrupt overtures to Judge Lackey, who reported the same to
22  federal officials."
23      And we believe that that, given context, is false.  It's
24  false in various ways.  First of all, he knew and omitted the
25  very important fact that Judge Lackey didn't know whether or

DAILY COPY  CROSS - DELANEY     185

1  not corrupt -- that's what he's been saying here, took him six
2  months to figure out if anything was corrupt; and that's only
3  because he raised $40,000.
4      The second thing is that -- what Balducci had told him by
5  this point is that at that meeting Balducci said he would
6  benefit if Judge Lackey ruled in favor; I'm here for a personal
7  favor. I would benefit if you ruled for arbitration. And he
8  also said arbitration was the correct legal way to settle the
9  matter. Balducci also offered Lackey a position of counsel
10 when the judge was ready to retire; but he said, the offer of,
11 of counsel was not related to or offered as an incentive to
12 rule as the -- as Balducci had asked.
13     And so, the person doing it has said, I was not making
14 your quid pro quo corrupt overture. The person receiving it
15 took two-weeks to report it to the federal government and
16 apparently a lot of phone calls and --
17     THE COURT:  Well, is that false?  What's in here
18 that's false?
19     MR. KEKER:  Well, during the course of the
20 conversation, Mr. Balducci made corrupt overtures to Judge
21 Lackey who reported the same to federal officials.
22     THE COURT:  Well, that would not be subject to
23 interpretation what you meant by --
24     MR. KEKER:  I think that's fair; but if I were a --
25     THE COURT:  You're arguing that corrupt is equal to

DAILY COPY  CROSS - DELANEY     186

1  illegal here, criminal.
2      MR. KEKER:  Yes, sir.
3      THE COURT:  Okay. I get your point now.
4      MR. KEKER:  The affidavit is submitted for a search
5  warrant they say that they're investigating bribery, public
6  corruption. The whole emphasis is on a criminal act. Probable
7  cause to show that a violation of 666 is happening.
8      THE COURT:  All right. What else? The other
9  statement that you say is false?
10     MR. KEKER:  The May 3rd meeting, first of all,
11 implied -- which is on page 2 -- implies that it was recorded
12 because there -- it's being quoted. We now know that it wasn't
13 recorded. And there's this statement about Judge Lackey that
14 they had changed their strategy. I don't think there's any
15 evidence of that. The May 4 call is omitted completely.
16     THE COURT:  Wait a minute. Wait a minute. There's
17 no evidence of that perhaps, but you're saying it's false. Do
18 you have evidence that it's false?
19     MR. KEKER:  I think I do. I mean, what Balducci had
20 told him by the time of this affidavit was that in March they
21 were talking about, Would you go see your friend, Judge Lackey,
22 and explain to him that we'd like this case to go - don't want
23 anything illegal but love to have it go to arbitration, the
24 legally correct thing.
25     Now he's saying they've changed their strategy and would

DAILY COPY  CROSS - DELANEY     187

1  like to rely on an order to compel binding arbitration. That's
2  nonsense. On March 19th, they filed a motion to compel
3  arbitration. According to Balducci, they said in March that
4  that's what they wanted; and now somebody is saying in this
5  unrecorded call they've changed their strategy and want --
6      THE COURT:  I know. But what we're dealing with here
7  is not ultimately whether it was true or false but whether this
8  agent knew it was true or false. And do you have any evidence
9  of that?
10     MR. KEKER:  I do, Your Honor. The agent, the one who
11 sat with Mr. Balducci a month before he signed this, less than
12 a month before he signed this, and took down and wrote this
13 302, took his notes, wrote it.
14     THE COURT:  Well, this agent says that Balducci told
15 him that. Now, what evidence do you have that that's not true?
16     MR. KEKER:  That's not what he said -- I mean, they
17 couldn't have changed their strategy -- it doesn't make any
18 sense that they changed their strategy, if their strategy in
19 March was to go to arbitration.
20     THE COURT:  Well, whether or not they used good sense
21 in changing their strategy is not in issue. The issue is did
22 this agent have a knowledge that your interpretation -- that
23 this statement is false. That's what I'm interested in.
24     MR. KEKER:  Then the May 4 call we've talked about
25 before. There's exculpatory information that was omitted from

DAILY COPY  CROSS - DELANEY     188

1  the May 4 call, one sentence. May 9, tremendous amount of
2  exculpatory information we've gone over. I can go over it
3  again if you'd like.
4      But they completely left out that there was no discussion
5  of money, no discussion of, of counsel position. He omitted
6  that Lackey viewed an arbitration request as a favor on which
7  to get credit. He omitted that Balducci said that this fax
8  order that he sent over was just something to look at.
9      And most importantly, he omitted that by May 9th, Lackey
10 had indicated that Balducci had agreed with him, the case
11 should go to arbitration. And they didn't make any plans to
12 meet again. And then the next thing -- so he leaves all that
13 out.
14     The next thing he puts in is May 21. And out of May 21,
15 he says, Mr. Balducci assured Judge Lackey that nobody other
16 than Balducci and Scruggs knew of the arrangement suggestion by
17 Balducci to Judge Lackey. That's not what he said. He said
18 nobody knows about this but you and me.
19     There wasn't any arrangement. And indeed, in the May 21
20 discussion -- we've been over this, but I'll just mention it
21 again -- he omitted that Lackey had been pursuing Balducci
22 during the day, two earlier calls. He omitted that he assured
23 Judge Lackey --
24     THE COURT:  I know. We've gotten over that omission
25 stuff. Let's just talk about what you claim is false. That's

DAILY COPY  CROSS - DELANEY      189

1  what my question was.
2      MR. KEKER:  Okay.  Well, I believe those things
3  render the statements that's in here false, things I've said
4  already.  And especially Mr. Balducci assured Judge Lackey that
5  nobody other than Balducci and Scruggs knew of the arrangements
6  suggested by Balducci to Judge Lackey.  That suggests there was
7  an arrangement, suggested by Balducci to Judge Lackey.
8      And what actually -- what Balducci said is, "Frankly, I
9  think we're right; and I think the law's on our side.  And I
10  think probably had I never even approached you, you'd probably
11  had the right result for us in this thing.  My goal is simply
12  to tell you where I am interested in this thing and help guide
13  you to where I thought this thing legally could come."
14      What arrangement?  That's not an arrangement.  And yet he
15  says there is an arrangement.  And then it jumps.  And we
16  believe this is a significant omission.  And I am not going to
17  go over it again.  It jumps to September 18.  It goes from
18  nothing to September 18.  And then in September 18, we talk
19  about what's wrong with it from then on.
20      THE COURT:  Okay.  Thank you.
21      MR. KEKER:  Your Honor, before I sit down, we're
22  working out this Jencks Act material with the Government, but I
23  just wanted to put on the record that the Government has agreed
24  to give us the 302s of Agent Delaney's interviews that he had
25  referred to during his testimony and the interviews with Lackey

DAILY COPY  CROSS - DELANEY      190

1  on April 24, May 3rd, and September 18.  And we'd like to get
2  it before he's excused while this motion hearing is still going
3  on in case there's something in there that we need to ask him
4  if we can reopen based on what we have.  And I think we're
5  getting it as soon as possible.
6      THE COURT:  They've agreed to give it to you now?
7      MR. KEKER:  Yes, sir.
8      THE COURT:  Well, that's very generous of them.
9      MR. KEKER:  Following the law is never generous, Your
10  Honor.  It's just the law.
11      THE COURT:  Well, it says after direct examination,
12  before cross-examination, they're required to give it to you.
13  Now they're giving it to you about a month before the trial
14  date.  So I think that is generous.  Do you have anything else
15  you want to add to this search warrant --
16      MR. KEKER:  Your Honor, if I can just get this
17  straight.  It was May 3rd, April 24, and May 22.
18      THE COURT:  Very well.
19      MR. SANDERS:  Your Honor, I can.  I can clear up a
20  couple of things that Agent Delaney talked about.  But frankly,
21  Your Honor, I think everything the Court needs to find probable
22  cause is in the search warrant itself.
23      THE COURT:  Well, I'm sure you feel that way.
24      MR. SANDERS:  I can clear up those points, Your
25  Honor.

DAILY COPY  REDIRECT - DELANEY      191

1      THE COURT:  If you want to, for the record, you may.
2      MR. SANDERS:  Yes, sir.
3      THE COURT:  The affidavit, however, speaks for itself
4  based on the record so far.  But you may proceed.
5      MR. SANDERS:  Okay.
6          REDIRECT EXAMINATION
7  BY MR. SANDERS:
8  Q.  Agent Delaney, you talked about -- and I want to clarify
9  this language in your 302 with respect to what you believe
10  Balducci told you in the first meeting and what Balducci told
11  you about in the second meeting.  All right?  You know what I'm
12  talking about?
13  A.  Yes, sir.
14  Q.  All right.  Explain what you thought Balducci said the
15  first time you met with Balducci with respect to what
16  Mr. Scruggs said to him at that first meeting.
17  A.  In the first meeting, I -- he told me -- or what I
18  believed he told me was, in that meeting on March 28 when it
19  was him and Mr. Patterson and Mr. Scruggs and I believe
20  Mr. Backstrom and the other Mr. Scruggs, Mr. Scruggs said he
21  wanted him to go see Judge Lackey but would not ask him to do
22  anything illegal.
23      I wrote a draft of that report.  I subsequently showed
24  that to Mr. Balducci to have him read it.  And he advised me
25  and said, I don't -- that was not the content of that meeting

DAILY COPY  REDIRECT - DELANEY      192

1  in March, that he was asking me to do something illegal.
2  Q.  Okay.  So what -- let me -- I'm trying to clarify this.
3  Let me see if I'm correct.  Is Tim saying that Mr. Scruggs told
4  him, don't do anything illegal?
5  A.  That was my interpretation of what he said on the first
6  meeting on November 2nd.  When he looked at the draft of my
7  report, he saw that and said, "No, that's not accurate.  That's
8  not what happened at that March meeting.  He didn't tell me not
9  to do anything illegal."
10  Q.  And that's what you came to believe when you signed the
11  affidavit?
12  A.  Yes.
13  Q.  All right.  Now, a couple of things that he mentioned in
14  passing.  He said that it took Judge Lackey six months to
15  figure out if anything corrupt was taking place.  Did it take
16  Judge Lackey six months to determine whether anything corrupt
17  was taking place?
18  A.  No.  By corrupt, I mean, are we talking about illicit or
19  are we talking about criminal?
20  Q.  He said corrupt.  I don't know what he meant.
21  A.  I mean, corrupt -- certainly illicit in those first
22  meetings from Judge Lackey's perspective.
23  Q.  And also, they've referred to a couple of different times
24  on the May 3rd statements made that you put it in quotes in the
25  affidavit, statements made by, I believe, Balducci on May 3rd.

DAILY COPY  REDIRECT - DELANEY        193

1  Did you put them in quotes to mislead the Court as if it were a
2  recording?
3  A.  No.
4  Q.  Why did you put it in quotes?
5  A.  That was taken from a statement from Judge Lackey.
6  Q.  And finally, what date did you sign this search warrant
7  affidavit?
8  A.  I believe it was November 26th.
9  Q.  All right.  It was after November 1st?
10 A.  Yes.
11 Q.  And did Balducci wear a wire into the Scruggs Law Firm on
12 November 1st?
13 A.  Yes, he did.
14 Q.  And did he talk to each of the defendants?
15 A.  Yes, he did.
16 Q.  Did he talk to each of the defendants about the bribe he
17 was paying to Judge Lackey?
18 A.  He discussed the order that he'd picked up from Judge
19 Lackey earlier the morning of November 1st after he delivered
20 $10,000.
21 Q.  Did he discuss the bribe they were paying to Judge Lackey
22 to Zach Scruggs?
23 A.  Yes.
24 Q.  What did he say exactly?
25 A.  He showed him the order; and sounds like from the

---

DAILY COPY  REDIRECT - DELANEY        194

1  recording of the conversation, that they read the new paragraph
2  that Judge Lackey had inserted into that order that he picked
3  up November 1st and discussed the language in that order.
4  Q.  Did he talk about paying for it?
5  A.  Well, Mr. Balducci made the comment that -- saying, you
6  know, let's get this right; you're paying for it; let's get it
7  the way you want it.
8  Q.  Who was standing with him when he said that?
9  A.  I believe it was Mr. Backstrom and Mr. Zach Scruggs.
10 Q.  All right.  And then did he talk to Mr. Dick Scruggs?
11 A.  Afterwards, yes, in private.
12 Q.  And did he talk about a bribe they were paying to Judge
13 Lackey with Mr. Scruggs?
14 A.  Yes.
15 Q.  What did he say about the bribe in that instance?
16 A.  Basically, to paraphrase the conversation --
17         THE COURT:  Counsel, the affidavit speaks for itself.
18         MR. SANDERS:  Yes, sir, Your Honor.  No further
19 questions.
20         THE COURT:  We've already gone over that.  You may
21 step down.
22         MR. KEKER:  May I question, Your Honor, just about
23 that redirect?
24         THE COURT:  What part of the redirect?
25         MR. KEKER:  Just looking at the draft report.

---

DAILY COPY  RECROSS - DELANEY        195

1          THE COURT:  Okay.
2          MR. KEKER:  That he just talked about.
3                  RECROSS-EXAMINATION
4  BY MR. KEKER:
5  Q.  Agent Delaney, when did you write the draft report that
6  later Mr. Balducci had trouble with?  I don't think we have
7  that one for you.
8  A.  I've got it.  It's dated November 12th.
9  Q.  So on November 12, you wrote your -- what became your 302;
10 and then you say you had Balducci read it?
11 A.  Yes.
12 Q.  He said this morning that he never saw it.  He said that
13 you read it to him.  Do you remember which is the truth?
14 A.  No.  I specifically -- I gave those reports to him and had
15 him read it.
16 Q.  And there was some disagreement on his part about this
17 part of the report where Dick Scruggs said he didn't want him
18 to do anything illegal?
19 A.  Yes.
20 Q.  And you then went back to your original notes from the
21 interview, as well as consulted the other FBI person there,
22 Agent Surles?
23 A.  Yes.
24 Q.  And you decided you were right and Balducci was wrong?
25 A.  I felt more comfortable that that was the accurate

---

DAILY COPY  RECROSS - DELANEY        196

1  reflection of what he said that evening, yes.
2  Q.  Do you still have those notes?
3  A.  Yes.
4  Q.  Do you have the draft 302 that you showed to Mr. Balducci
5  and had him read?
6  A.  No, I don't have the draft.
7  Q.  But you have the notes?
8  A.  Yes.
9          MR. KEKER:  Your Honor, we'd ask for an order
10 reserving all notes in the case, specifically those.
11         THE COURT:  I'll take that under advisement.
12         MR. KEKER:  Nothing further.  Thank you.
13         THE COURT:  All right.  You may step down.  Give that
14 to Mr. Keker.  That's your affidavit, Mr. Keker.
15         MR. KEKER:  Yes, sir.
16         THE COURT:  As to these motions concerning the
17 adequacy of the probable cause in the affidavits for these
18 wiretaps and for the search warrant, the defendants attacked
19 the adequacy of the probable cause by bringing out alleged
20 omissions and alleged false statements.
21         The law, of course, is to the effect that, when deciding
22 that the Court should look at whether the affidavits establish
23 probable cause with those statements included, if they had been
24 included.  And, so, what I would like to see -- have from
25 counsel on both sides is -- I've taken notes, and I know

197

1   basically from those notes basically what the defendants claim
2   were the omitted statements that should have been put in and
3   what the statements are that the defendants claim were false.
4   But I would like -- I'd like a memorandum from the defendants
5   listing those alleged false and omitted statements that you
6   claim make the probable cause defective.
7           MR. KEKER:  Would it be helpful if we -- rather than
8   just argue about this, if we just wrote the affidavit with
9   highlighting this was -- this part is omitted, should have been
10  there.  And then this part is false.  I mean, just sort of
11  rewrote the affidavit?  Or do you want just a legal memorandum?
12          THE COURT:  Well, I just want a listing of what you
13  claim.  And the Government, also, if you want to do that also.
14  You seem to have already listed them from your argument here.
15          Also, there's still this question in the Court's mind
16  about what established probable cause, for example, the
17  Patterson wiretap and the Balducci wiretap.  It's not contested
18  by either party that if someone is aggrieved over a wiretap
19  they have a standing to complain about it.
20          But the question in the Court's mind at this time is, What
21  do they complain about?  Do they complain about the probable
22  cause to establish the wiretap of the person who owned the
23  phone or against whom the wiretap was sought, or can they
24  complain about whether any probable cause existed against the
25  person who was complaining about it, the aggrieved party whose

199

1   it's four o'clock.  I think we've gotten through the longest
2   motions that will be involved.  We have left the motion to
3   dismiss Counts 2, 3, and 4 because of alleged lack of
4   jurisdiction.  And the motion to exclude the 404(b) evidence,
5   that is, the prior bad acts evidence, prior similar bad acts.
6           And then we also have the motion of Zachary Scruggs and
7   Sid Backstrom to sever their trial from that of Richard Scruggs
8   and the motion for change of venue.  I think we'll recess
9   today.  We've been in Court a pretty good while today.  And
10  take those up at nine-thirty tomorrow morning.  We'll start
11  with the motion to dismiss Counts 2, 3, and 4 for lack of
12  jurisdiction and then go from that to the 404(b) motion.
13          All right, gentlemen, thank you very much.  We'll be in
14  recess until nine-thirty.
15          (THE HEARING RECESSED AT 3:54 p.m.)
16
17
18
19
20
21
22
23
24
25

198

1   phone was not tapped?
2           In other words, there's no question that the three
3   defendants in this case have standing to complain about the
4   legality of the Patterson wiretap.  Now, what can they complain
5   about?  Can they complain about whether probable cause existed
6   against these three defendants when that wiretap was sought?
7   Or can they only complain about whether probable cause existed
8   to tap Patterson's phone?
9           Now, that's a question I'd like to hear some law about.
10  As I mentioned earlier, the three defendants in this case never
11  had any of their phones tapped.  And if the Patterson wiretap,
12  for example, were illegal, then they have the right to attack
13  it.  But to prove it was -- but was it illegal if it did not
14  have probable cause against these three defendants in the
15  affidavit, since it was only the Patterson phone that was
16  wiretapped?
17          I think there's an arguable basis to conclude that -- to
18  justify that wiretap, the Government has to show there was
19  probable cause to tap Patterson's phone and did not have to
20  show probable cause that there was a crime being committed by
21  these three defendants.  So I'd like to hear your memorandum on
22  that.  All right.  And I'd like to get that -- I'd like to get
23  that by Monday.
24          MR. KEKER:  End of the day Monday or --
25          THE COURT:  End of the day.  All right.  Let's see.

200

1                   C E R T I F I C A T E
2
3           I, Rita Davis Sisk, RPR, BCR, CSR #1626, Official Court
4   Reporter for the United States District Court, Northern
5   District of Mississippi, was present in court during the
6   foregoing matter and reported said proceedings
7   stenographically.
8           I further certify that thereafter, I, Rita Davis Sisk,
9   RPR, BCR, CSR #1626, have caused said stenographic notes to be
10  transcribed via computer, and that the foregoing pages are a
11  true and accurate transcription to the best of my ability.
12          Witness my hand, this 20th day of February, 2008.
13
14
15
16
17
                    RITA DAVIS SISK, RPR, BCR, CSR #1626
18                  Official Court Reporter
19
20
21
22
23
24
25

1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF MISSISSIPPI
2

3    UNITED STATES OF AMERICA        .        Cause No. 3:07CR192

4            Plaintiff               .        Oxford, Mississippi
                                     .        March 14, 2008
5            v.                      .        10:04 a.m.

6    RICHARD F. "DICKIE" SCRUGGS     .
                                     .
7            Defendants              .

8    . . . . . . . . . . . . . . . . .

9

                CHANGE OF PLEA AS TO COUNT 1 OF THE INDICTMENT
10                BEFORE THE HONORABLE NEAL B. BIGGERS
                    U.S. SENIOR DISTRICT JUDGE
11

12   APPEARANCES:

13

     For the Government:        United States Attorney's Office
14                              Northern District of Mississippi
                                BY:  THOMAS W. DAWSON, ESQ.
15                              BY:  ROBERT H. NORMAN, ESQ.
                                BY:  DAVID A. SANDERS, ESQ.
16                              900 Jefferson Avenue
                                Oxford, Mississippi  38655-3608
17

     For the Defendant
18       Richard F. "Dickie" Scruggs:
                                JOHN W. KEKER, ESQ.
19                              Keker & Van Nest, LLP
                                710 Sansome Street
20                              San Francisco, California 94111-1704

21

     Court Reporter:            Rita Davis Sisk
22                              911 Jackson Avenue, Room 369
                                Oxford, Mississippi  38865
23                              (662) 281-3027

24

     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.

Exhibit L

DAILY COPY

```
1        (CALL TO ORDER OF THE COURT)

2            THE COURT:  All right.  There are two matters that

3   the Court has been advised are going to be taken up this

4   morning.  And we'll take those first, and then we'll get to the

5   motions later.  I have been presented with two plea agreements

6   advising that in the case of U.S. v. Richard Dickie Scruggs and

7   the case of U.S v. Sidney A. Backstrom the defendants wish to

8   change their plea of not guilty and enter a plea of guilty.

9        Mr. Keker, representing Dickie Scruggs, is that your

10  desire at this time?

11           MR. KEKER:  Yes, Your Honor, to plead guilty to

12  Count 1.

13           THE COURT:  All right.  Let your client come up.

14  And, Mr. Dawson, if you'll represent the Government.

15       (Parties complying.)

16           THE COURT:  All right.  Do you need that podium,

17  Mr. Keker?  Have you got everything there you can -- might

18  be --

19           MR. KEKER:  I don't know that I need it, Your Honor;

20  but if you want me to use it, I will.

21           THE COURT:  Well, it's up to you.  All right.

22  Mr. Scruggs, is your full name Richard F. Scruggs?

23           THE DEFENDANT:  Yes, sir.

24           THE COURT:  All right.  The Court is advised that you

25  wish to change the plea that you have previously entered to a
```

Exhibit L

1  plea of guilty; is that correct?

2        THE DEFENDANT:  On Count 1, that's correct.

3        THE COURT:  On Count 1.  Before accepting your guilty

4  plea, there a number of questions I will ask you to assure that

5  it's a valid plea.  If you do not understand any of the

6  questions or at any time you wish to consult with your

7  attorney, you may let me know, because it is essential to a

8  valid plea that you understand each question before you answer.

9  Do you understand that?

10        THE DEFENDANT:  Yes, sir, I do.

11        THE COURT:  All right.  Will the clerk please swear

12  the defendant.

13        THE CLERK:  (Oath administered.)

14        THE DEFENDANT:  Yes, I do.

15        THE COURT:  Do you understand now, Mr. Scruggs, that

16  you're under oath; and your answers to these questions will be

17  subject to the penalty of perjury if you do not answer them

18  truthfully?

19        THE DEFENDANT:  I do, Your Honor.

20        THE COURT:  What is your age?

21        THE DEFENDANT:  Sixty-one.

22        THE COURT:  And you have a law degree?

23        THE DEFENDANT:  Yes, sir.

24        THE COURT:  And are you presently under the influence

25  of any drugs, medicines, or alcohol that would cloud your

Exhibit L

1   thinking?

2            **THE DEFENDANT:**  That impairs my thinking?  No, sir.

3            **THE COURT:**  All right.  Do you think you fully

4   understand what is happening here today?

5            **THE DEFENDANT:**  Yes, I do.

6            **THE COURT:**  Mr. Dawson, Mr. Keker, do either of you

7   have any doubt about the defendant's competence to enter a plea

8   at this time, Mr. Dawson?

9            **MR. DAWSON:**  I do not, Your Honor.

10            **THE COURT:**  Mr. Keker?

11            **MR. KEKER:**  No, Your Honor.

12            **THE COURT:**  The Court makes a finding that this

13   defendant is competent to enter a plea.  Have you had an ample

14   opportunity, Mr. Scruggs, to discuss this case with your

15   attorney?

16            **THE DEFENDANT:**  My attorney and my wife and my

17   family, yes, I have.

18            **THE COURT:**  Are you satisfied with your attorney's

19   representation of you; that is, do you believe that he has

20   represented you competently and fairly in this case?

21            **THE DEFENDANT:**  Yes.  I'm very proud to have had an

22   attorney of this caliber, and he is every bit a professional.

23            **THE COURT:**  All right.  Do you understand that under

24   the Constitution and laws of the United States that you are

25   entitled to a trial by a jury on this charge, Count 1?

Exhibit L

1          THE DEFENDANT:  I do, Your Honor.

2          THE COURT:  Do you understand that at a trial you

3   would be presumed to be innocent of this charge, and the

4   Government would be required to prove you guilty by competent

5   evidence and beyond a reasonable doubt before you could be

6   found guilty?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  Do you understand, that is, that you

9   would not have to prove that you were innocent; rather, the

10  burden is on the Government to prove you guilty beyond a

11  reasonable doubt?

12         THE DEFENDANT:  I understand, sir.

13         THE COURT:  And do you understand that during the

14  course of a trial the witnesses for the Government would have

15  to come into court, if you chose to go to trial, and testify in

16  your presence; that your attorney could cross-examine the

17  witnesses for the Government; he could object to evidence

18  offered by the Government; and he could also offer evidence in

19  your behalf?  Are you aware of that?

20         THE DEFENDANT:  I am, Your Honor.

21         THE COURT:  Do you also understand that if you wish

22  to testify in your own defense, you would have that right to do

23  so; but, also, you have the right not to testify and no

24  inference or suggestion of guilt would be drawn if you chose

25  not to testify?  Are you aware of that?

Exhibit L

1      **THE DEFENDANT:**  I am, sir.

2      **THE COURT:**  If you plead guilty here today and I

3   accept your plea, do you understand that you're going to waive

4   your right to a trial; you're going to waive the other rights

5   that I've just discussed with you; there will be no trial; and

6   I will enter a judgment of guilty and sentence you on the basis

7   of your guilty plea after considering a presentence report?

8      **THE DEFENDANT:**  Yes, sir, I do.

9      **THE COURT:**  Also, if you plead guilty, do you

10  understand that you will also have to waive your right not to

11  incriminate yourself since I may ask you questions about what

12  you did in order to satisfy myself that you are guilty as

13  charged; and you'll have to acknowledge your guilt?  Are you

14  aware of that?

15     **THE DEFENDANT:**  Yes, sir.

16     **THE COURT:**  All right.  Now, Mr. Scruggs, having

17  discussed these rights with you, your understanding of what

18  you're waiving by entering a plea of guilty, do you still wish

19  go forward with this guilty plea?

20     **THE DEFENDANT:**  I do, Your Honor.

21     **THE COURT:**  All right.  Have you received a copy of

22  the indictment in this charge?

23     **THE DEFENDANT:**  Yes, I have.

24     **THE COURT:**  And you've discussed with your attorneys

25  this charge, Count 1, and any possible defenses that you might

Exhibit L

1   have in this case?

2           **THE DEFENDANT:**   Yes, sir.

3           **THE COURT:**   All right.  In Count 1, you're charged

4   with the crime of conspiracy to attempt to bribe a state judge.

5   In order for you to be found guilty of this charge, the

6   Government would have to prove several elements.  I'm going to

7   read those to you at this time.  Let me see.  I've got a lot of

8   motions and papers up here.

9       All right.  In this particular charge of Count 1, there

10  are three elements that the Government must prove beyond a

11  reasonable doubt.  I'm going to enumerate them and then ask you

12  a few questions about them.

13      They would have to prove, first, that you and at least one

14  other person came to an agreement to commit the crimes of, one,

15  corruptly offering a thing of value to a person with the intent

16  to influence or reward an agent or state or local government in

17  connection with the business of that governmental agency and

18  that said corrupt offer involved something of value of more

19  than $5,000 at a time when the local government or agency

20  received benefits in excess of $10,000 under a federal program;

21  and devising a scheme and artifice to defraud and to deprive

22  the state of Mississippi of its intangible right to honest

23  services, and for the purpose of executing that scheme and

24  artifice, to knowingly cause to be transmitted by means of

25  wire, writings, and sounds in interstate commerce in violation

Exhibit L

1    of Title 18, Section 666 of the U.S. Code.

2         The second element that would have to be proven beyond a

3    reasonable doubt is that you knew of the unlawful purpose of

4    the agreement and joined in it willfully, that is, with the

5    intent to further its unlawful purpose.  And third, that during

6    the existence of the conspiracy, that you and at least one of

7    the conspirators committed at least one of the overt acts

8    described in the indictment in order to accomplish the

9    conspiracy.

10        Now, the Government, as I said, would have to prove all

11   three of those elements beyond a reasonable doubt.  Do you

12   think you understand this charge?

13             **THE DEFENDANT:**  I do, Your Honor.

14             **THE COURT:**  Do you have any questions about it?

15             **THE DEFENDANT:**  No, sir.

16             **THE COURT:**  All right.  Do you understand what the

17   maximum possible penalty is under Count 1 of this indictment?

18             **THE DEFENDANT:**  My understanding, it's five years.

19             **THE COURT:**  All right.  And a fine?

20             **THE DEFENDANT:**  Yes, sir.  I think I understand all

21   the penalties.

22             **THE COURT:**  All right.  There's five years'

23   incarceration, up to three years' supervised release after

24   incarceration, up to a $250,000 fine.

25        Has anyone threatened you in any way or forced you to

Exhibit L

1  plead guilty to this charge?

2        THE DEFENDANT:  No, sir.

3        THE COURT:  All right, Mr. Dawson, there has been a

4  plea agreement entered into that I have here.  Would you state

5  the substance of this plea agreement into the record?

6        MR. DAWSON:  May it please the Court, the United

7  States Attorney hereby proposes a plea agreement for the Court

8  that has the following provisions:  The defendant agrees to

9  plead guilty under oath to Count 1 of the indictment, which

10  charges a conspiracy to corruptly influence a state circuit

11  judge and which carries the maximum possible penalties of five

12  years' imprisonment and $250,000 fine; three years' supervised

13  release; and a mandatory special assessment of $100; all in

14  violation of Title 18, United States Code, Section 371.

15        The United States agrees to move the Court to dismiss the

16  remaining counts, 2 through 6 of the indictment, as to this

17  defendant at sentencing.  There is no agreement as to the

18  sentence imposed, which shall be in the sole discretion of the

19  Court subject to the Federal Sentencing Guidelines.  Both

20  parties reserve their right to speak at sentencing.

21        The defendant agrees, pursuant to 18 U.S.C. Section 3013,

22  to pay the clerk of the court of the United States District

23  Court, prior to sentencing, the mandatory $100 special

24  assessment fee for pleading guilty to Count 1.

25        There is -- this agreement does not bind any prosecuting

Exhibit L

1  authority of any state or other federal district, nor does it

2  bind the Attorney General of the United States with respect to

3  any matter, criminal or civil, involving federal criminal tax

4  laws -- or civil tax laws, for that matter.  The defendant and

5  the Government also acknowledge that there are no other

6  agreements, other than this agreement, filed with the Court.

7       I would add one thing with respect to the Paragraph 5

8  concerning the other authorities.  I want to make it painfully

9  clear that the investigation with respect to the *Wilson* matter

10  that is currently under investigation -- that this plea

11  agreement and this plea has no affect with respect to any

12  charging decision or subsequent prosecution with respect to

13  that case.

14       **THE COURT:**  All right.  Mr. Scruggs, you've heard the

15  U.S. Attorney state his understanding of the plea agreement

16  that you entered into with the Government.  Did he accurately

17  state it as you understand it to be?

18       **THE DEFENDANT:**  Yes, sir, he did.

19       **THE COURT:**  Mr. Keker, was it accurately stated as

20  you understand it to be?

21       **MR. KEKER:**  Yes, Your Honor.

22       **THE COURT:**  All right.  Has anyone offered you or

23  made any promise to you in addition to this plea agreement to

24  cause you to plead guilty?

25       **THE DEFENDANT:**  No, sir.

Exhibit L

DAILY COPY

1          THE COURT:   Has anyone made any prophesy or promise

2    what sentence you would receive in this case?

3          THE DEFENDANT:   No.

4          THE COURT:   Did you, as charged in Count 1 of this

5    indictment, enter into a conspiracy to bribe a state court

6    judge?

7          THE DEFENDANT:   I did.

8          THE COURT:   All right.  Mr. Dawson, would you state,

9    summarily, what the evidence is that the Government could

10   present in support of this charge if it were to go to trial?

11         MR. DAWSON:   Thank you, Your Honor.  May it please

12   the Court, were this case to go to trial, the Government would

13   prove through judicial notice, presentation of documentary

14   evidence, tape recordings, and factual testimony of lay

15   witnesses that between March of 2007 and November of 2007, in

16   the Northern District of Mississippi, Timothy R. Balducci,

17   Richard F. "Dickie" Scruggs, and others conspired to bribe a

18   state circuit court judge.

19      The evidence would show that in March of 2007 a lawsuit

20   was filed in the circuit court of Lafayette County,

21   Mississippi, styled *Jones et al. v. Scruggs et al.,* being Civil

22   Action No. L07-135.  The case was assigned to State Circuit

23   Judge Henry Lackey, and defendant Richard F. "Dickie" Scruggs

24   and the Scruggs Law Firm were named as defendants in that

25   $26.5 million lawsuit.

Exhibit L