1  as a very blessed man, Judge.  My family, my church, my

2  community have stood by me through this ordeal.  I never set

3  out to corruptly bribe a judge.  I never set out in my

4  initial -- when this thing started, to do anything of that

5  nature.

6        My attorneys and the Government's attorneys have allowed

7  me and have instructed me that, in fact, at the point at which

8  I joined this alleged conspiracy, that I was in fact, then, at

9  that point, a conspirator.

10       But in -- I feel that it's important that I say that it's

11 very -- from the outset, there was no intent on my part to ever

12 corruptly influence anyone.  However, I do understand that once

13 I joined it and once the cat was out of the bag that I became a

14 coconspirator; and that's the reason I'm entering this plea.

15       **THE COURT:**  All right.  Well, my question on it to

16 you at this time is, Do you understand that the Government

17 would have to prove each of these elements that I just

18 described before you can be found guilty?

19       **THE DEFENDANT:**  I do understand.

20       **THE COURT:**  All right.  Now, we'll get into this

21 other matter later in this hearing.  You understand the maximum

22 possible penalty under this count is five years' imprisonment

23 plus a fine of $250,000 and, also, a certain period of time

24 under supervised release after imprisonment?  Are you aware of

25 that?

1     **THE DEFENDANT:** Yes, sir.

2     **THE COURT:** All right. Has anyone threatened you or

3 forced you to plead guilty to this charge?

4     **THE DEFENDANT:** No, sir.

5     **THE COURT:** All right. I understand there has been a

6 plea agreement entered into between the defendant and the

7 Government.

8     Mr. Norman, would you state, briefly as you can, the

9 substance of that plea agreement?

10     Mr. Patterson, you listen to him; and I want to ask you,

11 then, if you agree with it.

12     **THE DEFENDANT:** (Nodding head affirmatively.)

13     **MR. NORMAN:** Yes, Your Honor. By the terms of the

14 plea agreement, Mr. Patterson agreed to plead guilty to Count 1

15 of the indictment charging him with conspiring with others to

16 corruptly influence or bribe a state-elected official. He has

17 agreed to cooperate with the United States Attorney's Office

18 and with agents of the FBI.

19     We have agreed that in the event his cooperation rises to

20 the level of substantial assistance that we will ask the Court

21 to consider a downward departure from the applicable guidelines

22 in this case. Mr. Patterson must understand that the decision

23 of whether or not to move the Court for such a departure is

24 ours.

25     Ultimately, the decision of whether or not to depart is

```
 1  the Court's and the Court's alone.  And we have explained that
 2  to Mr. Patterson, but I feel it necessary to say that once
 3  again on the record.
 4      We have agreed to take the position that he is a minor
 5  participant as compared with other defendants in this case.
 6  That would, as the Court knows, under the guidelines, result in
 7  a two-point reduction from the applicable guideline range.
 8  Once again, Mr. Patterson must understand that that is our
 9  recommendation.  It's not an attempt to bind the Court in any
10  way; and ultimately, the Court has that discretion and the
11  Court alone.  I know the Court knows that; but with the Court's
12  indulgence, I'm saying that for Mr. Patterson's benefit.
13      He has agreed to take a polygraph.  He has agreed to
14  testify if we ask him to do so.  We have agreed not to pursue
15  any other or greater charges against him in connection with
16  this case.  There is no agreement as to sentence, the sentence
17  to be imposed.  And both sides understand that that remains
18  within the sound discretion of the Court.  He knows that he
19  must pay a $100 special assessment; and I must remind him that
20  this plea agreement binds no other authority, other than the
21  United States Attorney's Office for the Northern District of
22  Mississippi.  I will, however, say for the record that I do not
23  know of any other jurisdiction interested in prosecuting him.
24      Mr. Patterson agrees that he is pleading guilty because he
25  is in fact guilty.  And that is, Your Honor, in summary, the
```

Exhibit M

1  agreement between the parties, sir.

2        THE COURT:  All right.  Steven Patterson, you've

3  heard the prosecutor state his understanding of what the

4  agreement is between you and the Government.  Did he accurately

5  state it as you understand it to be?

6        THE DEFENDANT:  Yes, sir.

7        THE COURT:  Is there anything he said that you

8  disagree with?

9        THE DEFENDANT:  No, sir.

10        THE COURT:  Has anyone made any promise to you in

11  addition to this plea agreement to cause you to plead guilty?

12        THE DEFENDANT:  (Indicating.)

13        THE COURT:  Anyone made any promise to you in

14  addition to this plea agreement to cause you to plead guilty?

15        THE DEFENDANT:  No, sir.

16        THE COURT:  Has anyone made any prediction or promise

17  what your sentence would be?

18        THE DEFENDANT:  No, sir.

19        THE COURT:  Did you, as charged in Count 1 of this

20  indictment, enter into a conspiracy to bribe a state judge as

21  charged?

22        THE DEFENDANT:  Judge, as I stated earlier, I have

23  been explained by my lawyer and the Government's lawyers that I

24  did.  That was not my understanding at the time.

25        THE COURT:  Well, the charge says that you

1   "willfully."

2                **THE DEFENDANT:** Right.

3                **THE COURT:** That means that you knowingly and

4   intentionally went in to this -- to join this conspiracy.  Did

5   you or did you not?

6                **THE DEFENDANT:** Yes, sir.

7                **THE COURT:** All right.  Mr. Norman, what, in summary,

8   could the Government produce as far as evidence against

9   Mr. Patterson in a trial?

10              **MR. NORMAN:** May it please the Court, were this case

11   to go to trial, the Government would expect to prove by

12   judicial notice, the presentation of documentary evidence, and

13   tape recordings and the factual testimony of lay witnesses that

14   between March of 2007 and November 2007 in the Northern

15   District of Mississippi Timothy R. Balducci, Richard F.

16   "Dickie" Scruggs, David Zachary Scruggs, Sidney A. Backstrom,

17   and Steven A. Patterson conspired to bribe a state circuit

18   court judge.

19      The evidence would show that Steven A. Patterson and

20   Timothy R. Balducci were shareholders in the law firm of

21   Patterson Balducci, PLLC.  The evidence would also show that in

22   March 2007 a lawsuit was filed in the circuit court of

23   Lafayette County, Mississippi, styled *Jones, et al. v. Scruggs,*

24   *et al.,* that being Civil Action No. L07-135.

25      Patterson and Balducci had previously performed legal work

1  for the Scruggs Law Firm, but they were not parties to the suit

2  nor did they represent any of the litigants in that case.  The

3  case was assigned to State Circuit Judge Henry Lackey.  And the

4  defendant, Richard F. "Dickie" Scruggs, and the Scruggs Law

5  Firm were named as defendants in that $26.5 million lawsuit.

6      In approximately March 2007, the named coconspirators

7  discussed ways and means of attempting to influence Circuit

8  Judge Henry Lackey.  Knowing that Timothy R. Balducci and Judge

9  Lackey had been friends for many years, Richard "Dickie"

10 Scruggs asked Balducci to explore the possibility of

11 influencing the judge.

12     Mr. Balducci thereafter met with Judge Lackey and

13 explained to the judge that he would consider it a personal

14 favor if the judge could resolve the lawsuit in favor of Dickie

15 Scruggs and the Scruggs Law Firm.  During the same

16 conversation, Balducci expressed the desire to have Judge

17 Lackey become "of counsel" with his and Steven A. Patterson's

18 law firm upon his retirement.  "Of counsel" being a position

19 which would result in Judge Lackey being paid by the firm

20 simply to allow the use of his name on the firm's letterhead.

21     On September 21st, 2007, Judge Lackey tested the

22 coconspirators' intent by asking for $40,000 in cash in

23 exchange for an order favorable to the Scruggs Law Firm.

24 Immediately after meeting with Judge Lackey and agreeing on the

25 $40,000 figure, Balducci placed a four-minute phone call to the

1  Scruggs Law Firm and asked Sidney Backstrom if the Scruggs Law

2  Firm would cover a $40,000 expenditure by Patterson Balducci,

3  PLLC.

4      On September 27th, 2007, Timothy Balducci delivered a

5  first installment, consisting of Patterson Balducci, PLLC's

6  $20,000 to Circuit Judge Henry Lackey.  On September 28th,

7  2007, Steven A. Patterson and Timothy R. Balducci spoke by

8  telephone; and unbeknownst to either, the call was being

9  recorded pursuant to Court order.

10     Patterson told Balducci that his wife had just gotten off

11 the phone with "P.L." -- that being known to the Government as

12 P.L. Blake -- who had just gotten out of the meeting that

13 Patterson had asked him to have.  Balducci asked Patterson to

14 call P.L. for details.  Patterson called back and related to

15 Balducci that P.L. had in fact met with Dick Scruggs, and "he"

16 knows it's going to be "40."  Patterson assured Balducci that

17 P.L. was confident that Scruggs would take care of Patterson

18 and Balducci.  "We got your horse sold" or words to that

19 effect.

20     On October 7th, 2007, Timothy Balducci called Steven A.

21 Patterson at approximately 5:48 p.m.  Patterson told Balducci

22 that he had just talked to P.L., and that he -- Steve

23 Patterson -- would be calling "the guy in Oxford tomorrow."

24 Patterson assured Balducci that "the guy in Oxford" was

25 expecting a call.  And on the following day, October 8th, at

1   approximately 8:17 a.m., Balducci called Patterson. Patterson

2   indicated that he was about to call Scruggs.

3      In a second telephone conversation that same date, Timothy

4   Balducci and Steven Patterson discussed the firm's financial

5   problems; and Patterson reassured Balducci that, "We've got 40

6   coming from Scruggs" or words to that effect.

7      On October 10th, 2007, at approximately 8:55 a.m., Steven

8   Patterson called Timothy Balducci and informed Balducci that he

9   needed to find out when "that order" was going to be signed.

10   Patterson stated that P.L. needed to know.

11      Timothy Balducci is expected to testify that on

12   approximately the 16th of October, 2007, Timothy Balducci and

13   Steven Patterson were in Oxford to meet with Richard "Dickie"

14   Scruggs on other matters. When they entered the office,

15   Richard "Dickie" Scruggs stated, "I know y'all have talked to

16   P.L., and I've talked to P.L. Everything's fine. Y'all are

17   going to be covered," or words to that effect. Patterson and

18   Balducci assured Scruggs that they were there for other

19   reasons.

20      Later that day, after leaving the Scruggs Law Firm,

21   Patterson and Balducci went their separate ways. However, at

22   approximately 7:30 p.m., Timothy Balducci called Steve

23   Patterson and told Patterson that he had just spoken with the

24   judge and that the order would be available the next day. It

25   was actually two days later, on October the 18th, when Timothy

1  Balducci met with Circuit Judge Henry Lackey, paid him an

2  additional $10,000; and picked up a proposed order from Judge

3  Lackey.

4      In the meantime, a Court-authorized intercept picked up a

5  phone call from Richard "Dickie" Scruggs to Steven Patterson at

6  Patterson's residence.  Scruggs was inquiring about the

7  whereabouts of Balducci and the order.  Patterson assured

8  Scruggs that Balducci had gone "south" -- meaning to Judge

9  Lackey's chambers in Calhoun County -- but would hand-carry the

10 order to Oxford.  Scruggs told Patterson to have Balducci put

11 it on his desk and pick up a package which was ready.

12     Balducci was surveilled entering the Scruggs Law Firm and

13 leaving Judge Lackey's chambers.  Balducci left the order and

14 picked up a check for $40,000, together with documents designed

15 to conceal the true nature of the payment.  On November 1st,

16 2007, Timothy Balducci made the final payment of 10,000 to

17 Judge Henry Lackey.

18     And finally, the Government would show that the

19 above-described criminal activities took place in the Northern

20 Judicial District of Mississippi, and that the Lafayette County

21 Circuit Court is a state or local governmental agency which

22 received in the applicable one-year period benefits in excess

23 of $10,000 under a federal program.  Your Honor, in brief

24 summary, that is the evidence that would apply to this

25 defendant, Steven Patterson.

Exhibit M

1      THE COURT:  Very well.  Mr. Patterson, did you do

2   everything that Mr. Norman described you as having done?

3      THE DEFENDANT:  Some of what he read, I don't have

4   any way of knowing whether it happened or not, like the e-mails

5   between parties that didn't affect me.

6      THE COURT:  No.  My question is, Did you do what he

7   just described that you did?

8      THE DEFENDANT:  Yes, sir.

9      THE COURT:  You did do that?

10      THE DEFENDANT:  Yes, sir.

11      THE COURT:  The Court finds there is a factual basis

12   for this defendant to plead guilty to this charge.  Now,

13   Mr. Patterson, you understand that this plea agreement that you

14   entered into with the Government is not binding on the Court;

15   and, that is, that as far as your being determined -- when the

16   Court computes the sentencing guidelines, that you may or may

17   not be found to be a minor participant; that that would be up

18   to the probation officers who look at the evidence and decide

19   what the sentencing guidelines call for?  Are you aware of

20   that?

21      THE DEFENDANT:  Yes, sir.

22      THE COURT:  All right.  And you're also aware that

23   the sentencing guidelines are no longer binding on the Court,

24   they are advisory?

25      THE DEFENDANT:  Yes, sir.

Exhibit M

1          THE COURT:   Very well, with that understanding, do

2     you plead guilty or not guilty to Count 1 of this indictment?

3          THE DEFENDANT:   Guilty, Your Honor.

4          THE COURT:   All right.   Since you are telling me that

5     you are guilty; you know what your right is to a trial; you

6     know what the maximum possible punishment is; and the Court's

7     finding you're voluntarily pleading guilty; the Court will

8     accept your guilty plea and enter a judgment of guilty on your

9     plea.

10         All right, Mr. Patterson, are you under bond at this time?

11         THE DEFENDANT:   Yes, sir.

12         THE COURT:   All right.   If you're allowed to stay

13    under that same bond, do you agree to be back before the Court

14    at such times as the Court may direct?

15         THE DEFENDANT:   Yes, sir.

16         THE COURT:   All right.   Now, I'll allow you to remain

17    under that bond; and you will be excused until such time as

18    you're notified to be back for sentencing.   I will tell you

19    that your cooperation with the Government will certainly be a

20    factor that the Court will consider and the extent of your

21    cooperation will be a factor the Court will consider in

22    determining what sentence would be proper in your case, not

23    only in this particular case but any information you provide on

24    any other case, if you know any.   And the Court will take that

25    into consideration.   Is there anything else before we recess?

Exhibit M

1      **MR. NORMAN:**  Not from the Government, Your Honor.

2      **THE COURT:**  Anything from the defendants?

3      **MR. MICHAEL:**  No, sir, Your Honor.

4      **THE COURT:**  All right.  With that understanding,

5  you'll be allowed to remain on your same bond.  Be back before

6  the Court at such future time as the Court directs.

7      **THE DEFENDANT:**  Thank you, sir.

8      **MR. MICHAEL:**  Thank you, sir.

9      **MR. NORMAN:**  Thank you, sir.  May we be excused, Your

10  Honor?

11      **THE COURT:**  All right.  Court will be in recessed.

12          (THE PLEA ENDED AT 10:23 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        C E R T I F I C A T E

 2

 3        I, Rita Davis Sisk, RPR, BCR, CSR #1626, Official Court

 4   Reporter for the United States District Court, Northern

 5   District of Mississippi, was present in court during the

 6   foregoing matter and reported said proceedings

 7   stenographically.

 8        I further certify that thereafter, I, Rita Davis Sisk,

 9   RPR, BCR, CSR #1626, have caused said stenographic notes to be

10   transcribed via computer, and that the foregoing pages are a

11   true and accurate transcription to the best of my ability.

12        Witness my hand, this ____ day of _____, 2008.

13

14

15                         _____
16                         RITA DAVIS SISK, RPR, BCR, CSR #1626
                           Official Court Reporter
17

18

19

20

21

22

23

24

25
```

Exhibit M

1

1

2

3

4

5   IN THE CIRCUIT COURT OF LAFAYETTE COUNTY, MISSISSIPPI

6

7

8

9

10

11

12

13   JONES, FUNDERBURG,

14   SESSUMS, PETERSON & LEE, PLLC          PLAINTIFFS

15   VERSUS                          NO.   L2007-135

16   RICHARD SCRUGGS, INDIVIDUALLY

17   DON BARRETT, INDIVIDUALLY;

18   SCRUGGS LAW FIRM; BARRETT

19   LAW OFFICE; NUTT & MCALISTER

20   & LOVELACE LAW FIRM                    DEFENDANTS

21

22

23

24

25

26        TRANSCRIPT OF CHRISTY M. LITTLEJOHN, CSR

27             OFFICIAL COURT REPORTER

Exhibit N

28

29

2

1   IN THE CIRCUIT COURT OF LAFAYETTE COUNTY, MISSISSIPPI

2               APRIL TERM, 2008

3

4   JONES, FUNDERBURG,

5   SESSUMS, PETERSON, & LEE, PLLC        PLAINTIFFS

6   VERSUS                      NO.  L2007-135

7   RICHARD SCRUGGS, INDIVIDUALLY;

8   DON BARRETT, INDIVIDUALLY;

9   SCRUGGS LAW FIRM; BARRETT

10  LAW OFFICE; NUTT & MCALISTER

11  & LOVELACE LAW FIRM              DEFENDANTS

12

13  * * * * * * * * * * * * * * * * * * * * * * * *

14  TRANSCRIPT OF THE PROCEEDINGS HAD AND DONE IN THE

15  SANCTIONS HEARING OF THE ABOVE STYLED AND NUMBERED

16  CAUSE, BEFORE THE HONORABLE WILLIAM F. COLEMAN, SPECIAL

17  CIRCUIT JUDGE, IN LAFAYETTE COUNTY ON THE 15TH AND 16TH

18  DAYS OF APRIL, 2008.

19  * * * * * * * * * * * * * * * * * * * * * * * *

20

21  APPEARANCES:

22

Exhibit N

23      Present and Representing the Plaintiffs:

24
            Honorable Grady Tollison
25          Honorable Roy Percy
            Honorable Cameron Able
26          Honorable Bill Duke
            Tollison Law Firm
27          Post Office Box 1216
            Oxford, Mississippi   38655
28

29


3

1       Present and Representing the Defendant,
            Richard Scruggs and Scruggs Law Firm:
2
            Honorable J. Cal Mayo, Jr.
3           Honorable Pope Mallette
            Mayo Mallette, PLLC
4           Post Office Box 1456
            Oxford, Mississippi   38655
5
            Honorable Brook Dooley
6           Keker & Van Nest
            710 Sansome Street
7           San Francisco, California   94111-1704

8

9


10      Present and Representing the Defendants,
            Barrett Law Firm, Nutt & McAlister,
11          and Dewitt Lovelace:

12
            Honorable Larry Moffett
13          Honorable Wilton V. Byars, III
            Daniel, Coker, Horton & Bell
14          Post Office Box 1396
            Oxford, Mississippi   38655
15
            Honorable Ken Rutherford
16          Attorney at Law
            Post Office Box 1381
17          Oxford, Mississippi   38655

18

Exhibit N

19  mentioned that -- I don't believe he mentioned any of

20  the judges that were coming on of counsel at that time.

21      Q.   At the first meeting?

22      A.   At the first meeting.

23      Q.   You later learned that there were some

24  judges?

25      A.   Later on he did.

26      Q.   Did you receive a copy of an announcement

27  that he sent out?

28      A.   I did.

29      Q.   And it had, I believe, Judge Gillespie listed


Cross-Examination - Henry L. Lackey          61

1  on there?

2      A.   Judge Gillespie.  Mr. Peters, I believe, was

3  on there.  Maybe Bill Allain.  I know he discussed the

4  former Governor Allain, and Former Chancellor Shands,

5  Rodney Shands.

6      Q.   Okay.  So you at some point became aware

7  having people of counsel with his firm was something

8  that his firm was doing?

9      A.   He had them of counsel, yeah.

10     Q.   In that first meeting, did Mr. Balducci tell

11  you that it would be a personal favor to him if you

12  would send the matter to arbitration?  Is that what he

13  told you?

14      A.   He did.

15      Q.   And that it would benefit him if you would do

16   this?

17      A.   He would count it a personal favor if the

18   court would consider that; that he felt that they had

19   been treated wrong and he would consider it a personal

20   favor if I would do that.

21      Q.   And at that time when you had that first

22   meeting, there was no summary judgment motion pending

23   or a motion to strike pending or anything of that sort,

24   was there?

25      A.   No, no.

26      Q.   Not that you know of?

27      A.   No, there wasn't.  I didn't know anything

28   about the lawsuit other than what he told me and that

29   it was the one that I had sealed apparently.


    Cross-Examination - Henry L. Lackey        62

1       Q.   In the course of talking to you about the

2    lawsuit, did there come a time, Judge Lackey, when you

3    told him to stop?  Wait a minute.  This is a case I'm

4    involved in?

5       A.   No, I didn't tell him that.  I was shocked.

6    He knew that I was involved in it.  There wasn't any

7    need of me telling him what he already knew.  I was

8    shocked that he would make that overture to me.  I was

9    incensed.  I actually became physically ill because of

10   it.

11      Q.   Judge Lackey, in the practice in this

12   district among circuit judges, is it a fair statement

13   that the judges will at times handle -- different

14   judges will handle the same cases?

15      A.   Different judges will handle the same cases,

16   yes, sir, it is.

17      Q.   Okay.

18      A.   We travel seven counties and we assign terms;

19   and if a case is set for trial in Tippah County and I

20   have a ruled on a motion on it but I'm in Lafayette

21   County and Judge Howorth is in Tippah County, rather

22   than delaying the trial, we go ahead and hear it.

23      Q.   Yes, sir, your Honor.  You said earlier at

24   some point I think towards the end of this conversation

25   Mr. Balducci mentioned to you that when you stepped

26   down from the bench and laid your gavel down you could

27   come and be of counsel with his firm.  Mr. Balducci did

28   not say to you, Judge Lackey, that I will give you this

29   position of counsel if you will do this for me?


Cross-Examination - Henry L. Lackey          63

1      A.   He didn't tell me that.  That was my

2   perception though.

3      Q.   And he didn't say anything about paying any

4   money during that first meeting?

Exhibit N

5      A.    Not at that time, no, he didn't.

6      Q.    Did you have any thoughts about who it was

7   that might have sent Mr. Balducci to see you?

8      A.    Well, the only thoughts I have is from the

9   matter that was pending in the -- that has been pending

10  in the United States District Court and the evidence

11  that was introduced over there.

12     Q.    Contemporaneous from when this happened, did

13  you have any thoughts that maybe somebody else was

14  involved and sent him to see you?

15     A.    I didn't know who was involved.  He said

16  they.  He mentioned Mr. Scruggs and Mr. Barrett.  I

17  don't know whether he mentioned Mr. Sparky or what his

18  last name is I can't remember.  I remember he was

19  talking about Mr. Nutt and Mr. Nutt's position was that

20  he was going to fund this by putting up $1,000,000 a

21  year for the group and that other lawyers would do the

22  lawyering and that Mr. Nutt was to put up the

23  $1,000,000 a year is the only thing I remember about

24  that.

25     Q.    After this meeting, Judge Lackey, I believe

26  you said that you spoke with Judge Howorth?

27     A.    Pardon?

28     Q.    Judge Howorth?

29     A.    I did.  I did.  I spoke with Judge Howorth

Exhibit N

16      Q.    And it was in this call, Judge Lackey, that

17  you told Mr. Balducci, as I understand what you said

18  earlier, you told Mr. Balducci that there was a hearing

19  that was set on the Motion to Compel Arbitration and

20  that you had not seen a summary judgment motion?

21      A.    That's right.

22      Q.    And Mr. Balducci in response to your phone

23  call faxed you a proposed order; is that right?

24      A.    He did.  He said that they had changed their

25  tactics, I believe.

26      Q.    And then he called you later that same day

27  that he sent you the order?  Do you recall that?

28      A.    He probably did.

29      Q.    And I believe his words to you were something


                Cross-Examination - Henry L. Lackey        68

1   to the effect of that the order was just an idea, just

2   some thoughts he had put on paper just for you to

3   consider?  Do you recall him telling you that?

4       A.    I think so.  He said that I could change it

5   any way I felt comfortable with.

6       Q.    And during that phone conversation on the 4th

7   or on the 3rd, there is no mention about the payment of

8   any money to you?

9       A.    No.

10      Q.    And there was no mention about a quid pro

Exhibit N

11  quo, if you will do this, we will do that?

12     A.    No.

13          BY MR. TOLLISON:  Excuse me.  If I may, your

14     Honor, I would like to object.  I don't know

15     whether we are trying to present a defense to

16     something where there are five guilty pleas

17     already in evidence.  All this has no relevance to

18     about whether they bribed a judge or not, and I

19     object to it.  I don't know what they're trying to

20     do to present a defense to something where there

21     are already five guilty pleas on record.

22          BY THE COURT:  Overruled.  Move along.

23  BY MR. MAYO:   (Continuing)

24     Q.    Judge Lackey, at the end of that phone

25  conversation on May 4th, did you say something to Mr.

26  Balducci inviting him to have a meeting with you, words

27  to the effect of, Can you be here Wednesday?  Can we

28  hunker down about three or four o'clock?

29     A.    We need to hunker I think is what I told


Cross-Examination - Henry L. Lackey          69

1   him.

2      Q.    You need to hunker?

3      A.    That sounds like my language.

4      Q.    So you invited him to come meet with you?

5      A.    Surely.

6      Q.    And whose idea was it for him to come and

7   meet with you?  Is that the FBI's idea?

8       A.   Well, I think it was a joint idea with me and

9   Tim.  He certainly didn't have to come.

10      Q.   Right.  So you met with him on the 9th.   In

11  the meeting on the 9th, did Mr. Balducci mention

12  anything to you about money at that meeting?

13      A.   No.  There wasn't any mention about money

14  until I mentioned it finally I believe it was in

15  September.  I said, This show has got to stop.  I have

16  lived with this thing since March and I want to bring

17  it to a head one way or the other.  I just hoped

18  against hope that when I mentioned money to him that he

19  would say, Wait a minute, Judge.  You got me all

20  wrong.  I really thought that's what would happen.  You

21  got me all wrong.  Please excuse what I said and I

22  didn't intend that in any way.  That would have been

23  the greatest gift that he could have given me.

24      Q.   So just to be clear, Judge Lackey, there's no

25  mention of money and there's no mention of a quid pro

26  quo until September of 2007 when you brought it up?

27      A.   I asked him, I said, If I take care of Mr.

28  Scruggs, will he take care of me?  He said, That is no

29  problem.


Cross-Examination - Henry L. Lackey            70

1       Q.   Do you recall in this May 9 meeting telling

2   Mr. Balducci that you thought the matter should go to

3   arbitration; that the agreement was pretty clear?

4      A.  I probably did.  I probably did.

5      Q.  Judge Lackey, I believe the next contact with

6   Mr. Balducci was on May 21 towards the end of the month

7   when you tried to call him several times.  In a

8   conversation with him on the 21st, you said to him, "I

9   just want to hear you say it again.  You and Scruggs

10   are the only ones that know anything about this?"  Do

11   you recall telling him that?

12      A.  I did.

13      Q.  And in that same conversation Mr. Balducci

14   said to you, "You should just do what you think is

15   right.  I don't mean to make you uncomfortable.  If

16   it's not something you feel right about, you do what

17   your heart tells you."

18      A.  Yeah.

19      Q.  "I've got complete confidence that this is

20   completely fine."  Do you remember him telling you all

21   that?

22      A.  Right.

23      Q.  "I don't want you to do anything you're not

24   comfortable with.  I don't want you to do anything that

25   you aren't comfortable with.  I respect you too much

26   for that."  Do you recall him telling you that on the

27   21st?

28      A.  He did.

29      Q.  So at this point at the end of May, Mr.

Exhibit N

Cross-Examination - Henry L. Lackey        71

1  Balducci has made no quid pro quo offer and he has

2  offered no money?

3       A.    He was lying to me and I was lying to him.

4  That's what had happened.

5       Q.    And this had been going on now for about a

6  month after you first met with the FBI back at the end

7  of April?

8       A.    Pardon?

9       Q.    You had met with the FBI about a month before

10 this back at the end of April?

11      A.    I had met with them several times, yes, sir.

12      Q.    That's fair, but the initial meeting you had

13 with them was back towards the end of April?

14      A.    Right.

15      Q.    And I believe the next thing that happened,

16 Judge Lackey, was your recusal.  I believe Mr. Tollison

17 asked you some questions.  I will hand you both of

18 these at the same time, if that's all right.

19      A.    These appear to be the same.  No, they

20 don't.  One is my fax transmission to them on May the

21 21st where I tell them that I'm going to recuse myself,

22 and then June the 4th I decide I'm going to get back in

23 the case.

24           BY MR. MAYO:  I will have these marked as the

25           next numbered exhibit.

Exhibit N

26          BY MR. TOLLISON:  To be consistent, your

27     Honor, I will object on relevancy.

28          BY THE COURT:  Overruled.  Admitted.

29          (EXHIBIT D-17, MAY 21, 2007 FAX, WAS MARKED


Cross-Examination - Henry L. Lackey          72

1     AND RECEIVED INTO EVIDENCE)

2          (EXHIBIT D-18, JUNE 4, 2007 FAX, WAS MARKED

3     AND RECEIVED INTO EVIDENCE)

4   BY MR. MAYO:  (Continuing)

5          Q.   Judge Lackey, do you have a recording device

6   in your office?

7          A.   Have a what?

8          Q.   A recording device in your office?

9          A.   I do.

10          Q.   Did you use that recording device for any of

11   the tape recordings that were made?

12          A.   Oh, yeah, yeah.  It was a little tape

13   recorder that I got from Office Max or some of them

14   that I gave -- I would give the tapes to the FBI when

15   they came in.  They furnished me one, but it seems like

16   I'm electronically challenged and I couldn't get it

17   turned on properly.

18          Q.   Judge Lackey, did you have any discussions

19   with the U.S. Attorney's Office or anyone from the FBI

20   about your decision to recuse yourself before you sent

21   out the May 21 letter to counsel?

Exhibit N

22    A.   I don't remember whether I did or I didn't.

23  I know I didn't have any discussions with them about

24  recusing myself -- I mean, when I sent the letter

25  saying that I was going to recuse myself.  That was my

26  decision.  I didn't feel like I was getting anywhere.

27  I was getting frustrated with the situation.

28    Q.   How did you let the U.S. Attorney's Office or

29  the FBI know that you had, in fact, recused yourself or

Cross-Examination - Henry L. Lackey          73

1  you were in the process of doing it?

2    A.   Called John Hailman -- well, wait a minute.

3  I reported it to Bill Delaney, the FBI agent.  John

4  wasn't in that day, I don't believe.

5    Q.   Okay.  I believe your letter, the notice

6  letter is dated May 21.  How long after that was it

7  before you had a meeting with somebody from the federal

8  government about your recusal or your plan to recuse

9  yourself?

10    A.   I don't know.  You have it in there in that

11  transcript.

12    Q.   Well, I don't have the transcript.  I've got

13  your notes here.

14    A.   What do my notes say there?

15    Q.   On May 22nd that William Delaney was in my

16  office when I returned from lunch.

17    A.    Okay.

18    Q.    Do you recall him being there?

19    A.    Oh, yeah.

20    Q.    Did you know he was going to come see you?

21    A.    Surely.

22    Q.    Okay.  And what did Agent Delaney, what was

23  that conversation about?

24    A.    It was about the investigation and whether or

25  not I should get back in the case or not.  That's what

26  it was about.

27    After talking with him and after realizing what a

28  monster that we were probably dealing with and the

29  lives that he had probably destroyed and the young

Cross-Examination - Henry L. Lackey        74

1  lawyers whose lives and their families that he had

2  destroyed, I agreed to get back in it.

3    Q.    And who is the he that you're referring to,

4  Judge Lackey?

5    A.    Pardon?

6    Q.    Who is the he you're referring to?

7    A.    Talking about Dickie Scruggs.

8    Q.    Okay.  And who was it that told you that Mr.

9  Scruggs had destroyed those lives?

10    A.    Pardon?

11    Q.    Who was it that told you Mr. Scruggs had

12  destroyed all those lives?

13    A.   It's evident what he's done.   It's evident.

14  You don't think he's destroyed them?

15    Q.   Judge Lackey, I'm just asking was that part

16  of the discussion you had with Agent Delaney and Mr.

17  Hailman?

18    A.   I didn't know for sure at that point, didn't

19  know what type of monster we were dealing with, but I

20  realize now.   I think he's done more to destroy this

21  profession than anything that's happened in my life

22  time.

23    Q.   Yes, sir, Judge Lackey.   My question is about

24  your discussion with Agent Delaney though.   Is that

25  something that y'all discussed or did you discuss that

26  with Mr. Hailman?

27    A.   Well, Tim had assured me that he and Dickie

28  Scruggs were the only ones that knew about this and so

29  I assumed that he knew what he was talking about.


Cross-Examination - Henry L. Lackey          75

1    Q.   Judge Lackey, my question is did you have a

2  discussion with either Agent Delaney or Mr. Hailman

3  about the lives that Dickie Scruggs had destroyed?   Was

4  that part of the discussion that you had with them?

5    A.   No, no, not at that time.   Not at that time.

6    Q.   So did Agent Delaney or Mr. Hailman encourage

7  you to get back in the case?

Exhibit N

8     A.   Pardon?

9     Q.   Did Agent Delaney from the FBI or Mr. Hailman

10   encourage you to get back in the case; in other words,

11   to undo your recusal?

12   A.   They did.   They did ask me to get back in the

13   case.   They did.   I related to you the conversation

14   that I had with the District Attorney, Assistant

15   District Attorney, and what had happened with Mr. Hood,

16   Jim Hood.   I knew about that from several months before

17   when Mr. Hood was -- even before the qualifying date to

18   run for Attorney General, I knew that he had reported

19   that to his good friend Lon Stallings and Lon told me,

20   and I took it as truth.

21         BY MR. MAYO:   Your Honor, I move to strike.

22         BY THE COURT:   Sustained.   Move on.   How much

23      longer do you anticipate?

24         BY MR. MAYO:   About another 20 minutes.

25         BY THE COURT:   Okay.   Go ahead.

26   BY MR. MAYO:   (Continuing)

27   Q.   After your May 21 notice about the recusal

28   and before the June 4 unrecusal, did you have a

29   discussion with Mr. Balducci?   Do you recall?


Cross-Examination - Henry L. Lackey          76

1     A.   Say that again now.

2     Q.   Between May 21 when you sent out the notice

3   of recusal and June 4 when you sent out the notice of

Exhibit N

4     unrecusal, did you have a conversation of some type

5     with Mr. Tim Balducci?

6         A.   I don't know whether it was between there or

7     not, but I have discussion with him explaining to him,

8     which was a fabrication, as to why I got out and why I

9     got back in.

10        Q.   That's when that conversation took place?

11        A.   That's correct.

12        Q.   Okay.  And in that conversation with you in

13    that time period, and I believe it was on the 29th, but

14    whenever it was between the 21st of May and the 4th of

15    June, did Mr. Balducci tell you words to this effect, I

16    didn't want to do anything to jeopardize my

17    relationship with you?

18        A.   He did.

19        Q.   I didn't want to do anything in the world

20    ever to harm you.  Do you recall him telling you that?

21        A.   Uh-huh.

22        Q.   And it would break my heart if I thought I

23    had put you in a bad position?

24        A.   Yeah.

25        Q.   At some point you went up to New Albany and

26    had lunch with Mr. Balducci during this time frame,

27    didn't you?

28        A.   I believe it was before then.  I went up to

29    New Albany and we went out to the auction barn to have

Cross-Examination - Henry L. Lackey        77

1  lunch with he and Steve Patterson, a black man that was

2  a runner or investigator for them, and then a Mr. Buse,

3  I believe is his name.

4      Q.   I'm looking at your notes on Wednesday, May

5  30th that says, "I was at the courthouse in New

6  Albany.  Tim was waiting for me.  He had invited me to

7  lunch."  Is that the meeting you're talking about?

8      A.   That's right.

9      Q.   Now, at that time, Judge Lackey, were you

10  wearing some kind of a recording device on you?

11      A.   I was.

12      Q.   Did Mr. Balducci mention anything at that

13  lunch meeting that you had about the Jones' case?

14      A.   No.

15      Q.   Did he mention anything with you about trying

16  to pressure you to get back into the case?

17      A.   Oh, no.

18      Q.   And you were in the vehicle alone with him at

19  different times; were you not?

20      A.   Pardon?

21      Q.   Were you in the vehicle alone with Mr.

22  Balducci at some point?

23      A.   I was.

24      Q.   So you had lunch with some other people, but

25  you were alone with him in the vehicle?

26      A.   After lunch, Tim and I drove down to look at

27  their new building that they were going to -- that they

Exhibit N

28  had purchased and were going to remodel.

29      Q.   And he throughout that time never mentioned

Cross-Examination - Henry L. Lackey          78

1   the Jones' case, never mentioned being of counsel, or

2   anything to you like that?

3       A.   Oh, no.

4       Q.   I think the next thing was your decision to

5   unrecuse yourself, and we've talked about that decision

6   that you weren't forced to get back in?

7       A.   Right.

8       Q.   You made that choice to get back in?

9       A.   I did.

10      Q.   On June 28th, did you go by Mr. Balducci's

11  office again?  Do you recall going by his office a

12  second time?

13      A.   I don't know.  Are you referring to notes of

14  mine?

15      Q.   I've just got some notes here, Judge Lackey.

16  I don't know if it's in your notes or not, but do you

17  recall going to his office another time, besides the

18  time you had lunch with him, when you were wearing a

19  recording device of some type?

20      A.   I don't recall that.  What are you reading

21  from?

22      Q.   These are just some of my notes that I've

23  got.

24      A.   Your notes?

25      Q.   Yes, sir.

26      A.   I don't recall.  I may have to tell you the

27  truth.

28      Q.   You then had a hearing on July 17th.  We

29  talked about that hearing that took place over in

Cross-Examination - Henry L. Lackey          79

1  Okolona?

2      A.   Okolona, yeah.

3      Q.   Okay.  Then we get into August.  I believe

4  that some of the transcripts that I got from Mr.

5  Tollison's firm show that there were attempts to call

6  Mr. Balducci on August 3rd.  You then spoke with him on

7  August 9.  You said to him, Are you where we can talk

8  just a minute?  Then you asked him, you asked Mr.

9  Balducci, Dickie wants this thing to go to mediation --

10  I mean, arbitration.  Do you remember bringing that up

11  to Mr. Balducci in that conversation in August?

12      A.   I'm sure.

13      Q.   And he tells you to decide the motion however

14  you see it.  He said, Yes, sir.  That would be

15  terrific, if that's how you see it after you've taken a

16  look at it.  If you see it that way, that's terrific.

17  Yes, sir.  Do you remember him telling you that?

18      A.   Yeah.

Exhibit N

19      Q.   And then you called him again at the end of

20   August.  You left some messages for him.  Then in early

21   September, around September the 11th I believe there

22   was a call to him and you left a message for him.  You

23   say, I need to talk to you about this matter that we

24   are both concerned about and interested.  I've got

25   something to run by you and see what you think.  Do you

26   recall making that call to him?

27      A.   I don't.

28      Q.   You don't recall that one and leaving a

29   message for him?


          Cross-Examination - Henry L. Lackey         80

1       A.   I don't recall.

2       Q.   Again, here we are over in September and at

3    that point Mr. Balducci has not made any offers of

4    money, any quid pro quo, or anything of that sort?

5       A.    Not other than what he told me a couple of

6    times during the summer about the of counsel, Mr.

7    Peters and former Governor Allain; and he told me about

8    Governor Allain cutting a tape for them on the Coast

9    for the Katrina Group and that Mr. Allain was

10   encouraging people to come sign up with them to sue the

11   insurance companies.

12      Q.   And then I believe you testified earlier,

13   Judge Lackey, that the decision was made to ask for the

Exhibit N

14  money?

15      A.   It was.

16      Q.   The decision was made after you had had some

17  discussions with the folks at the FBI or the U.S.

18  Attorney's Office?

19      A.   They had encouraged me to do it and I had

20  reservations about it because if Tim had done what I

21  really wanted him to do and say, No, Judge.  You

22  misunderstood me, then I would really be out.  There I

23  am asking for a bribe.

24      Q.   Right.

25      A.   I was ambivalent about it.  I tell you the

26  truth.

27      Q.   When you called him on the 18th and first

28  mentioned this, I believe that was the day, September

29  18th, when you called Mr. Balducci, you brought up the


        Cross-Examination - Henry L. Lackey        81

1   subject of the Jones' lawsuit.  You earlier testified

2   you made a statement or words to the effect of, If I

3   help him, will he help me?  Is that what you said,

4   words to that effect?

5       A.   I don't have a transcript of that.  If you're

6   reading from a transcript, I'd like to see it, but it

7   sounds like probably what I said.  Now, I'm not

8   questioning you.  I'm questioning my recollection.

9       Q.   Well, one reason I'm asking you, Judge

Exhibit N

20  transcript, and I'm sure it's correct.

21     Q.   I believe it came up again later on, Judge

22  Lackey, in the conversation you asked him some

23  questions.  When you tell Mr. Scruggs or Dickie or

24  whatever you call him, and he told you, He's not

25  involved at that level, Judge.  He doesn't even -- like

26  I said, the way this will work, the way this will work

27  is I will go him at some point in time and say I cured

28  a problem that you've had and you need to recognize the

29  problem I've cured for you.  He's not involved in a


Cross-Examination - Henry L. Lackey            86

1   direct manner and doesn't want to be and doesn't need

2   to be.  Did he tell you that?

3      A.   That's what he told me, but apparently, he

4   was telling me a tale because he plead guilty to doing

5   it.  As I say, I misled Mr. Balducci from time to time

6   and I didn't tell him the truth, and I don't know that

7   he ever told me the truth.

8      Q.   Judge Lackey, I want to back up just a minute

9   to your decision.  You recused yourself from the case

10  in your meeting, I believe, with Agent Delaney?

11     A.   I didn't officially recuse myself.  I

12  indicated that I was going to and the order was never

13  entered, and I changed my mind.

14     Q.   You met with Agent Delaney and talked about

15  it?

Exhibit N

16     A.   I did.

17     Q.   And did you at some point between the time

18  that you sent out that notice and the time that you

19  sent out your second notice on June the 4th getting

20  back in, did you speak with anyone other than Agent

21  Delaney about your decision to get back in the case?

22     A.   Not that I can recall.

23     Q.   No one from the U.S. Attorney's Office?

24     A.   Not that I recall.

25     Q.   Okay.

26     A.   I called Mr. Hailman to tell him.  Mr.

27  Hailman was out of his office.  He called my home about

28  10:30 that night and I was asleep.  My wife didn't know

29  who John Hailman was, so she didn't wake me.  I believe

Cross-Examination - Henry L. Lackey     87

1  I talked to Mr. Delaney the next day, I believe.  I

2  think I'm right, Cal.  I may be wrong.

3     Q.   And tell me, Judge Lackey.  What was it that

4  Agent Delaney told you about Mr. Scruggs?  What did he

5  tell?

6     BY MR. TOLLISON:  Excuse me, your Honor.

7     I've been letting the hearsay in, but I'm going to

8     have to object now.

9     BY THE COURT:  Sustained.  This has been

10     asked and answered.

11          BY MR. MAYO:  I would like to proffer it.  I

12     don't think I got it in.

13          BY THE COURT:  Go ahead.

14  BY MR. MAYO:  (Continuing)

15     Q.   What was it that Agent Delaney told you about

16  Mr. Scruggs?

17     A.   Well, he indicated that there might be some

18  problem there; that there might be some problem with

19  other cases.  Now, he didn't mention what other cases

20  there were.  I knew from my information and if it was

21  true that Jim Hood had told Lon Stallings that Mr.

22  Scruggs through Mike Moore had promised him if he

23  didn't go along with the settlement of these State Farm

24  cases and allow them to collect this $26.5 million in

25  attorney's fees that they would find a candidate that

26  would run against him; they would fund him just like

27  they were going to do the commissioner of insurance.

28  Now, that's what I knew.

29          BY MR. MAYO:  Same objection as before, your


Cross-Examination - Henry L. Lackey          88

1     Honor, and move to strike.

2          BY THE COURT:  I think it is in response to

3     your question.  Move along.

4          BY MR. MAYO:  All right.

5  BY MR. MAYO:  (Continuing)

6     Q.   Just to be clear, Judge Lackey, that's the

Exhibit N