1   showing that Agent Delaney, in drafting his affidavit, was

 2   intentionally dishonest or acted with reckless disregard to the

 3   truth.  He's not -- his motion -- I don't see anything that

 4   suggests Agent Delaney was acting with intentional dishonesty.

 5   I don't think there's anything in there to suggest he was being

 6   dishonest.  Even assuming the Court thought that was a

 7   possibility, they've got to show --

 8           **THE COURT:**  Well, I don't think it's got to be

 9   intentionally dishonest.  It could be a material

10   misrepresentation by negligence or oversight or something else

11   or leaving something out.

12           **MR. SANDERS:**  I think he has to show that it was an

13   intentional dishonest act or that he acted with reckless

14   disregard for the truth and then, also, that that is a material

15   misrepresentation.

16           **THE COURT:**  All right.

17           **MR. SANDERS:**  The omissions or the alleged

18   misrepresentations, I don't think they've shown under the

19   totality of the circumstances, which is what *Franks v. Delaware*

20   requires, that any of it is material.

21       Under the totality of the circumstances, what *Franks*

22   requires is if you took everything they refer to in their

23   motion, everything they refer to as the omissions and what

24   they've referred to as the misleading statements, if you put

25   every bit of that back into a hypothetical affidavit of what we

1  put in the affidavit -- frankly, it's the Government's position

2  that if we'd attached every transcript of every phone call

3  made, there would have been probable cause.

4      Certainly with what they've got here, they've not made any

5  showing that the Court would -- understanding the statements

6  they refer to, most of which are the ones between Balducci and

7  Lackey, if the Court had been aware of those statements in the

8  affidavit under the totality of the circumstances, of course

9  the Court would still have found probable cause.

10     The totality of the circumstances they've referred to --

11 and I can go through a few of these point by point if the Court

12 wants me to.  They refer to a number of statements where

13 Balducci -- and we heard him this morning talking about it --

14 is telling the judge, "I don't want to make you uncomfortable,"

15 those statements that he's referring to.

16     Obviously, what Balducci was saying to the Court is, as I

17 said in my response, he is attempting to put the Court at ease.

18 He's been asked by the defendants to go to his mentor and do

19 something highly inappropriate.  He's aware of that.  He

20 admitted that it was extremely awkward.  He's doing that, and

21 it's obvious that Balducci is trying to straddle the fence, as

22 it were.

23     He wants to offer or say something to Judge Lackey that's

24 extremely inappropriate, but he also wants to maintain at least

25 his relationship with Judge Lackey.  It's not surprising that

1  he's going to continue to try to put the judge at ease, more so

2  after Judge Lackey has recused.  Obviously, Judge Lackey is

3  nervous about this and Balducci wants to put him at ease.

4  That's essentially the statements they're referring to with

5  Judge Lackey and Balducci.

6      They refer, also, to one where Balducci says, for

7  instance, Judge, those are just some ideas that I put down on

8  paper for Your Honor to think about.  Those weren't just, you

9  know, bullet points, just some ideas for the judge to consider.

10  As we pointed out in the affidavit, that was actually the order

11  compelling arbitration with Judge Lackey's signature line at

12  the bottom of it.  That was Balducci trying to influence the

13  judge, very much trying to influence the judge.

14      In addition to that, Your Honor, the fact that Balducci

15  goes to Judge Lackey and is saying, We think it's right,

16  doesn't take away from -- if you're speaking to a judge and

17  trying to influence him in a corrupt manner and eventually

18  bribe him, it doesn't matter whether you believe the decision

19  is legally correct or not.  That doesn't really have an effect

20  on it.  Balducci is obviously -- all he's trying to do is put

21  Judge Lackey at ease; and that's what's very, very clear from

22  the statements the defendants refer to.

23      They refer, also, to the Patterson wire.  They point out

24  three different instances that they describe as omissions or

25  materially misleading statements.  The first one was a

 1   September 27th statement that Patterson -- that Patterson's

 2   making to Balducci with respect to P.L. Blake.  On September

 3   the 27th, Patterson was talking to Balducci; and as the

 4   defendants point out, he tells him that P.L. Blake and

 5   Patterson discuss this $40,000 problem that they're having.

 6       In the middle of that statement, Patterson did say to

 7   Balducci, P.L. doesn't know what it's about.  That statement

 8   was taken out of the affidavit specifically because on October

 9   the 16th, when we eventually submitted that affidavit to the

10   Court, P.L. had already called Patterson back.  Patterson had

11   already called Balducci again and said, "P.L. wants to know now

12   when the judge is going to sign the order."

13       The reason that statement was omitted from the affidavit

14   was because there was probable cause to believe by that time

15   that P.L. knew precisely what it was about.  He'd asked about

16   40,000 back in September.  Now on October 10th, he's already

17   saying:  When is the order going to be signed?"

18           THE COURT:  Was that put in the affidavit, that P.L.

19   had called him and back and said, When's the judge going to

20   sign the order?

21           MR. SANDERS:  I'm sorry, Judge, was --

22           THE COURT:  You didn't put in that P.L. doesn't know

23   what it's about.  Did you put in that P.L. now knows what it's

24   about?

25           MR. SANDERS:  Yes, sir.  As a matter of fact, in the

1   Patterson affidavit, we said that the first call was placed by

2   Steve Patterson from the target telephone -- the last call was

3   placed by Patterson.  Telephone toll records from the phone

4   reflect -- wait a minute.  I'm sorry.

5           MR. TRAPP:  Excuse me.  Can you tell us where you are

6   while you do that, once you get there?

7           MR. SANDERS:  Yeah, I can.  If the Court could

8   indulge me just one second, Judge.  I found it.  It's in the

9   affidavit for the Patterson authorization.  It's on page 6 in

10  Paragraph 15.  We pointed out to the Court that on October the

11  10th Steve Patterson placed a call from the target phone to Tim

12  Balducci and requested Balducci to find out when the order

13  would be signed.

14      Balducci asked Patterson if there was a problem with the

15  deal; and Patterson responds, "P.L. wants to know."  That's

16  precisely why it wasn't mentioned.  We felt certainly there was

17  probable cause by October 16th to feel that P.L. Blake did know

18  something about why the 40,000 was being paid.

19      They also point to, in their motion, on October 27th a

20  couple of statements Balducci made when he was meeting with the

21  judge.  These are the statements they refer to as *gutting* the

22  Government's case.  These are the statements Balducci made to

23  the judge when he said something to the effect that only he and

24  the judge knew what was going on.

25      Again, this was an affidavit submitted on October the

1   16th.  We knew, however, that on September the 27th what he was

2   saying -- when Balducci said, "only he and Scruggs knew about

3   it," we knew when he said it that it wasn't true.  That wasn't

4   true.  We knew, and it's in the affidavit that on his way over

5   to meet with the judge he was talking to Patterson about it.

6        Also, by October the 10th, he has already mentioned,

7   again, that P.L. Blake has called and wanted to know about the

8   order.  We know that Patterson; we know that Blake, at least

9   from a probable cause perspective; we know Mr. Scruggs --

10  obviously, we performed surveillance, that's also in the

11  affidavit on September 27; that Balducci leaves the judge's

12  chambers and goes straight to the Scruggs Law Firm.  These are

13  the reasons that those type statements were left out.  We knew

14  he wasn't telling the truth when he said that.

15       Finally, they point to a statement made -- that Balducci

16  made to Judge Lackey on October 10th.  They are talking on the

17  phone, I believe; and Balducci says they talk about the order.

18  And then at the end of that conversation -- it's a short

19  conversation -- Tim says he is going to get back to him about

20  that other deal.

21       They cite this to suggest that Tim Balducci was unaware

22  that the $40,000 had anything to do with the order the judge

23  was going to enter in the *Scruggs v. Jones* case.  I said in my

24  motion, Judge, that based on the totality of the circumstances

25  before the Court at that time that that was nonsense; that

 1   there were a number of occasions that we pointed to in both

 2   affidavits where the judge specifically referred to the $40,000

 3   and the order being entered in the *Scruggs v. Jones* case.

 4        So in the end, Your Honor, under a totality of the

 5   circumstances test, which would include these statements to

 6   which they refer, all the statements that are in the affidavit

 7   already up to and including September the 18th, when Judge

 8   Lackey asks if they would help him if he helps them, also when

 9   Judge Lackey asks for $40,000 and Tim agrees to it, all of

10   these are to be taken into consideration.

11        The fact that when he leaves the judge's chambers the day

12   that the judge requested the $40,000 he immediately, at 10:08,

13   which is the same time Judge Lackey is calling the FBI -- he

14   immediately calls the Scruggs Law Firm.  All of these taken

15   into consideration, in addition to the statements the

16   defendants refer to, certainly there would still be probable

17   cause in such an affidavit.  So for those reasons, Your Honor,

18   the Government believes there's no reason for an evidentiary

19   hearing pursuant to *Franks v. Delaware*.

20        **MR. KEKER:**  May I respond to some of those

21   statements --

22        **THE COURT:**  Would the Government be willing to

23   stipulate that the statements the defendants say were made and

24   the statements that the defendants say were left out could be

25   put into a hypothetical affidavit or added to this affidavit,

1   and that the Court could look at it and ascertain whether or

2   not probable cause existed without having to put testimony in

3   on it?

4           MR. SANDERS:  Absolutely, Your Honor.

5           THE COURT:  What do you say to that, Mr. Keker?

6           MR. KEKER:  I don't think that's sufficient for the

7   *Franks* standard, Your Honor, for the following reasons --

8           THE COURT:  Well, okay, but I'm just talking about --

9   it would be a *Franks*-type motion -- hearing, but it would just

10  be by stipulation of what -- that the testimony you hope to

11  elicit from the agent would be admitted to.

12          MR. KEKER:  I understand that, Your Honor.  And I

13  still think that it's important that the -- the hearing is

14  important to determine what we've now heard from the

15  Government, that a lot of this -- some of this -- I don't know

16  how much of it -- but was done intentionally, intentionally

17  left things out; and are now making arguments about why it is

18  okay to intentionally leave them out as opposed to meeting some

19  other negligence or reckless standard, that's one thing.

20          And second, I think to have Agent Delaney up there to

21  explain why, if you had gotten this application on

22  September 25, which is when the order was signed -- it was

23  before any bribe had been paid; it was after Judge Lackey had

24  talked about wanting $40,000.

25          And if somebody had told you then that what really

1   happened in the first meeting was that Scruggs said, "I don't

2   want anything illegal, just go talk to your friend, make sure

3   that he understands we want arbitration; that there was no

4   bribe paid; there was no quid pro quo; that there was no

5   discussion of any of that; that by the time the wire was up and

6   running, there were several times where Balducci made it plain

7   that he wasn't about that, about seeking a bribe or doing a

8   bribe or anything like that.

9       May 9th, May 21, I think the agent can explain why he left

10  out completely the recusal business where Judge Lackey just

11  walks away from the case; and maybe the agent can tell us

12  whether or not the agent told him to get back on the case.  It

13  left out completely -- it goes from -- as I recall, from May 9,

14  it goes to September 18.  It leaves out the summer when he's

15  doing all the business that you know he's doing.

16      And then they come to you on September 25th with an

17  affidavit that makes it sound like this is all of the piece.

18  You read it and, basically, what that affidavit says is

19  Balducci came to him, made a corrupt overture; he went right to

20  the U.S. Attorney.  False.  The corrupt overtures continued.

21  False.

22          THE COURT:  Or whether it could have been viewed as a

23  corrupt overture by the person to whom it was made.

24          MR. KEKER:  That's another thing that I think Agent

25  Delaney could help us with if he got on the stand.  There's

1    that affidavit, so we deal with that one separately with Agent

2    Delaney.  And then you sort of think about whether or not that

3    meets the totality of the circumstances test for, if I -- if

4    all of this was in there, would there be a different -- and the

5    reviewing court would have the ability to do it, too.  If all

6    this were in there, would things have looked different?  But

7    then we go on to the one that's really bad.

8         On October 16, wouldn't it have been good and aren't we

9    entitled to an explanation of why this agent leaves out all

10   this business about P.L. Blake didn't know what this was about?

11   I understand they've got an argument that, oh, maybe he did

12   later; we changed our mind about that, and completely leaves

13   out exculpatory information.

14        But most important, all the pushing Judge Lackey did about

15   how Scruggs knows about this, doesn't he?  Scruggs is on it.

16   Scruggs knows about what's going on.  And he's told no.  The

17   notion that they think that they can just -- I mean, that that

18   wouldn't affect that Patterson affidavit.  And then it gets

19   repeated again.  And then all of this kind of melds together

20   when they come back for the search warrant.

21        By that time, they've talked to Balducci; and what he puts

22   in that search warrant really doesn't measure up based on what

23   Balducci's already telling them.  We see that now that we've

24   seen these Balducci statements.

25        So we're asking for, again, a short examination of Agent

1  Delaney about why -- what's not in, what's in, and why he

2  didn't do it.  And we think that that would make a suitable

3  record from which you could then rule on this motion and see

4  what affected what.  Because the first wiretap affects the

5  second wiretap, affects the third wiretap, affects the search.

6          THE COURT:  Well, since this -- I think this area of

7  the -- goes to the heart of the case.  I'll allow your short

8  examination of Agent Delaney on that area, the wiretap

9  information is the gut of the case against these defendants.

10     And, so, the motion will be granted to examine Agent

11  Delaney.  You say a *short examination*.  I don't know what you

12  mean by short, but I would say an hour at the most.

13          MR. KEKER:  What I mean by short is what you tell me

14  short is.

15          THE COURT:  Well, I think an hour is reasonable.

16          MR. SANDERS:  Your Honor, if the Government could, we

17  would do the same as we did earlier.  If the Court wants us to

18  do it that way, we will call Delaney ourselves.

19          THE COURT:  If that's what you prefer.

20          MR. KEKER:  And under the same rules, it's clear that

21  a Government agent is a Government witness, no matter who calls

22  them.  So if we could get the Jencks Act material now, it would

23  be helpful so that when the time comes --

24          THE COURT:  It may shorten it up so --

25          MR. KEKER:  Yes, sir.

1          THE COURT:   The Government will be instructed to do

2    that.  Again, I'm not ordering that the Government give him all

3    the prior information, just the statements that he's made

4    concerning this area of his testimony.

5          MR. SANDERS:   Yes, sir, Your Honor.  I've already

6    prepared Jencks with that in mind.

7          THE COURT:   Okay.  Good.  All right.  Call Agent

8    Delaney.

9        (THE WITNESS IS SWORN)

10          WILLIAM P. DELANEY, GOVERNMENT'S WITNESS, SWORN

11                       DIRECT EXAMINATION

12          THE CLERK:   State your name clearly for the record,

13   please.

14          THE WITNESS:   It's William P. Delaney.

15          THE COURT:   All right, sir, you may proceed.

16   BY MR. SANDERS:

17   Q.   Agent Delaney, if you could, for the record, would you

18   tell us what you do for a living?

19   A.   I'm a Special Agent with the Federal Bureau of

20   Investigation.

21   Q.   And in your position as an agent with the FBI, you had the

22   opportunity to investigate a case involving the Scruggs Law

23   Firm, the defendants in this case?

24   A.   Yes, I have.

25   Q.   All right.  And was it you who signed the affidavits

1   submitted in this case for authorization for wiretaps and for a

2   search warrant?

3   A.    Yes, I was.

4   Q.    When did you sign those affidavits?

5   A.    I signed the first affidavit September 25th, 2007; the

6   second one October 16th, 2007; and I believe the last one

7   November 26th, I believe, 2007.

8   Q.    When was the extension for the Balducci wiretap; do you

9   know?

10  A.    I think it was the same day.  I think it was October 16th.

11  Q.    Could it have been October 24th?

12  A.    Yes.

13  Q.    Okay.  I want to ask you -- you're familiar with this.

14  There's a motion been filed pursuant to *Franks v. Delaware*.

15  And the defendants have filed a motion pointing to specific

16  portions of conversations you left out of the affidavit.  What

17  I want to do is I want to walk through the sentences to which

18  they refer, and I'm going to ask you why you left these out.

19  Do you understand?

20  A.    Yes, sir.

21  Q.    All right.  Specifically, the defendants initially state

22  that you drafted in your affidavit that Judge Lackey called the

23  Government at the conclusion of his first meeting with Tim

24  Balducci.  Was that accurate?  Was it after the meeting had

25  concluded?

1   A.    That was my understanding, yes.

2   Q.    Okay.  What do you mean by, *that was my understanding*?

3   A.    The way I was involved in this, my supervisor called me

4   that the U.S. Attorney's Office in Oxford had been notified of

5   this event and asked me to contact him.  He gave me the

6   impression that Judge Lackey had been approached by an attorney

7   inappropriately, and he asked me to look into it.  I then

8   contacted the U.S. Attorney's Office.  They basically gave me

9   the same information.

10      Shortly thereafter, I contacted Judge Lackey, interviewed

11  him in person; and he gave me the same impression; that

12  Mr. Balducci had approached him, called him, come down to visit

13  with him, made inappropriate overtures to him.  And shortly

14  thereafter, he contacted the U.S. Attorney's Office.

15  Q.    And do you know ow now how long after it was that he

16  contacted the U.S. Attorney's Office?

17  A.    My understanding now is it'd been two weeks.

18  Q.    Okay.  They also point out on May the 4th -- and by the

19  way, you were familiar with the phone call that Judge Lackey

20  had with Mr. Balducci after this initial meeting with Judge

21  Lackey?

22  A.    Yes, sir.

23  Q.    Okay.  On May the 4th, was there a conversation between

24  Judge Lackey and Tim Balducci?

25  A.    Yes, there was.

```
 1  Q.    All right.  And they point specifically to a sentence that
 2  was not included in the affidavit, and I want to read that
 3  sentence they're pointing to.  They said that Tim said, "Here's
 4  just some thoughts, ideas, and suggestions I thought I'd put on
 5  paper to see if His Honor might be interested in."  Do you
 6  remember Balducci saying that?
 7  A.    Yeah, I remember that from the recording, yes, sir.
 8  Q.    All right.  Why was that not included in your affidavit?
 9  A.    I didn't give much weight to that considering what had
10  happened earlier in the day when Mr. Balducci had, unsolicited,
11  faxed an order to the judge in his office; and the order had a
12  signature line at the bottom.  To me, it seemed more --
13  obviously, Mr. Balducci was more interested in having the judge
14  sign and enter that order than just trying to give him some
15  thoughts and ideas about the case.
16  Q.    All right.  I want to move now to May the 9th.  Did
17  Balducci and Lackey speak together on May the 9th?
18  A.    Yes, they did.
19  Q.    All right, sir.  I'm going to read to you, again, a
20  statement made during that conversation to which the defendants
21  refer.  They said that Balducci asked Judge Lackey whether he
22  thought the parties ought to arbitrate; and Judge Lackey said,
23  according to the defendants, "It does; it looks like that's
24  what they agreed to."  Is that -- do you remember that
25  statement being made?
```

1  A.    Yes, I do.

2  Q.    All right.  And tell the Court why you left that

3  particular statement out.

4  A.    Well, prior to the judge making that particular statement,

5  he had actually told Mr. Balducci how he thought the case would

6  go.  And in that instance, he thought the case would go to the

7  State Supreme Court.  Mr. Balducci said, "Well, let me give you

8  my thoughts and ideas about it."  He then went on a fairly long

9  explanation as to how he saw the case and how he thought it

10  should go.  At the end of which, he said, "I think it should go

11  to arbitration, don't you, Judge?"  And the judge said, "Well,

12  I agree"; but he never gave a definitive answer that that's how

13  he truly thought, and that's what he was going to do.

14  Q.    Okay.  All right.  And then one more statement he made

15  on -- or to which the defendants refer, on May the 9th, that

16  Judge Lackey told Balducci he was -- he wanted to make certain

17  he was, quote, "going to get credit for the order."  Do you

18  remember whether Judge Lackey said that?

19  A.    Yes, that was in the conversation.

20  Q.    All right.  And why did you not put that statement into

21  the affidavit?

22  A.    I didn't see where it was material.  You had earlier where

23  the -- Mr. Balducci had approached the judge, talked to him

24  about this case at some length; at the end of which, he offered

25  a position of, *of counsel* when the judge was ready for it.  The

1  judge clearly indicated to me that he felt that was a, you

2  know, at least, at the very least, improper overture to him, if

3  not rising to possibly criminal intent.  Based on that, I put

4  much more weight into that incident than what Mr. Balducci said

5  on May 9th.

6  Q.   Okay.  All right.  I want to move now to May 21st.  Did

7  Balducci and Lackey speak together on May 21st?

8  A.   Yes, they did.

9  Q.   Okay.  The defendants describe Judge Lackey's behavior as

10 aggressive, and they point to a particular statement Judge

11 Lackey made.  He said, "I just want to hear you say it again.

12 You and Scruggs are the only ones who know anything about

13 this?"  Do you remember that particular statement?

14 A.   Yes.

15 Q.   All right.  They say that this omission thus conceals

16 Lackey's aggressive efforts to target Balducci.  Was it your

17 opinion at that time that -- why did you leave that statement

18 out?

19 A.   Again, Judge Lackey, when called on the 21st of May, he

20 started that whole conversation out by telling Mr. Balducci,

21 "I've never been involved in anything like this before."  He

22 was looking for reassurances.  Judge Lackey was terribly

23 troubled by this whole incident.

24      He was really conflicted for two reasons:  A, he knew what

25 Mr. Balducci had done was wrong; but also, Mr. Balducci was a

 1  friend of his for several years.  And the judge was conflicted.

 2  He knew what he needed to do; but by the same token, he was

 3  conflicted.  He didn't want to get his friend in trouble.

 4      And I think that really kind of manifested itself on May

 5  21st both with that phone call where he's clearly troubled, and

 6  Mr. Balducci picks up on that pretty quickly, and then later

 7  that day when he sends a recusal letter.

 8  Q.   Okay.  I want to ask you about -- I'm still on May 21st.

 9  Here's another statement I want to refer you to.  Do you

10  remember Tim Balducci saying, "I don't mean to make you

11  uncomfortable.  If it's not something you feel right about, you

12  do what your heart tells you.  I've got complete confidence

13  that it's completely fine.  I would never put you -- you nor

14  me -- in that position.  I have complete confidence that it's

15  fine."  Do you remember whether or not Balducci said that?

16  A.   Yes, sir, he did.

17  Q.   And why didn't you put that in the affidavit?

18  A.   Again, I didn't give a lot of weight to it.  Simply the

19  fact that my impression of that conversation, Mr. Balducci was

20  reacting to Judge Lackey's initial statement about him being

21  troubled; he'd never been involved in anything like this

22  before.  He was looking for some reassurance.  To me, it was

23  nothing more than Mr. Balducci trying to put the judge at ease,

24  trying to get him to, you know, deal with him in a position

25  that he would be more comfortable in.

1  Q.   Okay.  And then, finally, on the 21st, I believe, do you

2  remember Balducci saying this, "Frankly, Judge, I think we're

3  right; and I think that the law is on our side.  And I think

4  probably had I never approached you, we'd probably had the

5  right result with us on this thing.  My goal was simply to tell

6  you where -- that I had an interest in this thing and if I

7  could help guide you to where I thought this thing legally

8  could come."  You remember that statement?

9  A.   Yes, sir.

10  Q.   And why was that not provided in your affidavit?

11  A.   Again, I go back to Judge Lackey's initial statement on

12  that May 21st conversation.  He was obviously troubled.  And

13  also, I didn't give a lot of credence to -- you know,

14  Mr. Balducci had already approached the judge again back in

15  March and subsequent contacts in early May.  He told him what

16  he wanted.  I just didn't give a lot of credibility to what was

17  said in that particular conversation.

18  Q.   And when was this affidavit signed, the initial Balducci

19  wire signed?

20  A.   September 25th.

21  Q.   And, so, you were aware, at that time, of events that took

22  place later?

23  A.   Yes, sir.

24  Q.   All right.  The next thing the defendants point to with

25  their motion is the fact that -- you remember when Judge Lackey

1  recused himself from the *Jones v. Scruggs* case?

2  A.   He sent a letter out May 21st after the phone call to

3  Mr. Balducci.

4  Q.   Did he tell you -- did you talk to him before he recused?

5  A.   No, I did not.

6  Q.   All right.  Why did you not include in the affidavit

7  anything about the recusal?

8  A.   I didn't think it was pertinent to the case, you know, to

9  what we were looking at.  Judge Lackey recused himself not

10 because what he was doing -- there was nothing criminal going

11 on or nothing wrong.  Judge Lackey recused himself, from my

12 perspective, because he was troubled by this.

13     Like a lot of things that people do when they're -- things

14 bother them, they want to get away from them.  He made that

15 decision to try and, you know, remove himself from this

16 problem; but he also realized after he did it that he really

17 wasn't solving anything; and that, ultimately, this issue of

18 whether what Mr. Balducci did was merely improper or if there

19 was criminal intent needed to be resolved.  And he was -- he

20 needed to be involved in that process to finding that out.

21 Q.   When he did recuse, did he contact you?

22 A.   When he --

23 Q.   After he recused?

24 A.   When he sent in his subsequent letter saying he was coming

25 back in?

1  Q.    No.   I'm talking about after he recused.   Did he contact

2  you?

3  A.    The following day.

4  Q.    And did you meet with him?

5  A.    Yes, I did.

6  Q.    And what did you tell him to do?

7  A.    I discussed with him, basically, what the options were,

8  you know.   He told me -- he didn't really give me any concrete

9  explanations, from what I recall, as to why he did it.   I could

10  tell, again, this whole situation troubled him greatly.   We

11  discussed possible options.   He told me that, you know, the

12  door for him getting back in was not necessarily closed.

13      I don't remember specifically what he hadn't done to

14  finalize it.   I think it may have been notify the Supreme

15  Court, but I'm not sure.   But anyway, he indicated to me that

16  the door was not shut on him getting back into the case.   We

17  talked about it; and when I left him that day, he had not made

18  a decision one way or the other what he was going to do, other

19  than he was just going to think about it.

20  Q.    Were you demanding that he get back into the case?

21  A.    No.   No.

22  Q.    All right.   The next thing to which the defendants refer

23  is that your affidavit failed to disclose that Judge Lackey

24  repeatedly contacted Balducci from May until September.   As I

25  said, they're describing Judge Lackey's behavior as aggressive.

1    Do you know how many times during the summer of 2007 -- do you

2    know how many times Judge Lackey contacted Tim Balducci?

3    A.   I believe there was two or three contacts in June.   I

4    don't believe there was any contact in July that I'm aware of.

5    And I think there was two more contacts in August.

6    Q.   All right.  During the summer of 2007, how many FBI agents

7    were working on this case with you?

8    A.   Just myself.

9    Q.   All right.  Where were you during July?

10   A.   I was gone for three out of the four weeks out of the

11   state.

12   Q.   Okay.  Were you working on any other cases besides this

13   case during this time period?

14   A.   During the summer, yes, sir.  I had several other cases,

15   to include cattle gate (phonetic).

16   Q.   You were working on the case involving Mississippi Beef?

17   A.   Yes, sir.

18   Q.   How often would you meet or speak with Judge Lackey that

19   summer?

20   A.   It was pretty infrequently.  I believe I probably came

21   down -- if I was up here working on another case, I would come

22   down through Calhoun City and see him just to check on him.

23   Again, he was real troubled by this; and a lot of times, I just

24   came by to see how he's doing, see how he's holding up.

25   Q.   Okay.  I want to take you now to May 29th.  Did Balducci

1  and Judge Lackey speak together -- speak to each other on May

2  the 29th of last year?

3  A.   Yes, they did.

4  Q.   All right.  I want to read again the statement that the

5  defendants allege was made and ask if you remember this

6  statement.  They're saying that Balducci says this to Judge

7  Lackey, "I damn sure didn't want you to do anything to

8  jeopardize my relationship with you.  I didn't want to do

9  anything in the world to do that relationship any harm.  I want

10 to make sure you and I are okay and that it would break my

11 heart if I thought I put you in a bad position.  When you

12 called the other night, I could tell that you were troubled by

13 it."  Do you remember that statement being made?

14 A.   Yes, I do.

15 Q.   Why didn't you include that?

16 A.   Again, May 29th is shortly after the judge had recused

17 himself.  Mr. Balducci knew he had recused himself.  It is

18 clear to me, my impression, Mr. Balducci was concerned about

19 his actions; and he was trying to do anything he could or say

20 anything he could to the judge to try and remedy what he

21 thought was a misstep on his part.

22 Q.   All right.  Again, the defendants refer to Balducci

23 saying, with reference to the decision they were wanting Judge

24 Lackey to make, "If that's how you see it after you've taken a

25 look at it, if you see it that way, that would be terrific."

1  Do you remember that statement being made?

2  A.    Yes, I do.

3  Q.    And why did you not put that in the affidavit?

4  A.    Same reason.  Again, it's right after the recusal.  It's

5  right after the phone call on May 21 where Balducci

6  acknowledges he can tell the judge is troubled.  I think

7  Balducci is trying to placate the judge as much as possible,

8  trying to keep from a bad situation being worse.

9  Q.    Okay.  Just three more statements I've got with respect to

10 the September the 25th affidavit.  The defendants refer to a

11 September the 18th conversation between Judge Lackey and

12 Balducci.  And they point out that Judge Lackey told Balducci

13 that he -- quote, he wanted to -- quote, "help me get over a

14 little hump I've got."  This is when he's discussing payment.

15 A.    Uh-huh (yes).

16 Q.    Do you remember that phrase, Judge Lackey using that

17 phrase?

18 A.    I do.

19 Q.    And why did you not put that phrase in the affidavit?

20 A.    Because there were earlier conversation on September 18th

21 where Judge Lackey had talked about the Scruggs matter, and

22 that he wanted to help him; and basically asked him, said, "If

23 I'm willing to help them, would they help us?"  And

24 Mr. Balducci's response was, "No question."  And continued on

25 trying to figure out, you know, how he could do it.

1      I put much more weight into those comments, that

2   conversation, than I did, you know, *over the hump*.

3   Subsequently, I believe, also later in that conversation, that

4   comment that the judge made about getting over a hump was in

5   response to a question from Mr. Balducci about how badly he

6   needs the help or when he needs the help.

7   Q.    So when Judge Lackey asked him to "help get me over a

8   little hump," you're saying that Balducci had already agreed to

9   pay the bribe by the time he said that?

10  A.    Yes, that's my recollection.

11  Q.    All right.  On the 21st, Judge Lackey is speaking with

12  Balducci again and he says, "I could delay my misery; I think I

13  can get them to put it off."  Do you remember whether Judge

14  Lackey said that to Tim?

15  A.    Yes, he did.

16  Q.    And why did you not put that phrase in the affidavit?

17  A.    Much the same reason.  Earlier in the conversation, they

18  had discussed the arrangement, the judge helping them out,

19  signing the order, sending it to arbitration in exchange for --

20  what they agreed on that day was $40,000.  They went so far as

21  trying to figure out how the arrangements could be made,

22  whether it was in cash, how quickly he needed it.  To me, they

23  had already agreed to the deal.  That line did not carry as

24  much weight as the earlier conversations as to the incident.

25  Q.    All right.  Okay.  And then, finally, on September the

1   24th, do you remember Judge Lackey speaking to Tim Balducci and

2   saying, "Can I commit to my folks that are pressuring me

3   something by the weekend?"  Do you remember that phrase?

4   A.   I do.

5   Q.   And why was that not included in the affidavit?

6   A.   Same reason.  Again, that was later in the conversation;

7   and actually, that comment from the judge was in response to a

8   question from Mr. Balducci and, again, I think asking how soon

9   he needed the money.  Again, they had already agreed to what

10  the deal was going to be.

11      In this particular instance on September 24th, if I recall

12  correctly, the judge was returning a call to Mr. Balducci.

13  Mr. Balducci immediately, in the conversation, was trying to

14  set up an arrangement with the judge.  He said, "I can come

15  down tomorrow.  I can come down the next day."  And the judge

16  is trying to set it up for later in the week.  And, so, to me,

17  that was nothing more than the judge just trying to set

18  parameters when this deal could take place.  The deal had

19  already been agreed to on a couple of different occasions.

20  Q.   So it was your impression who was putting pressure on

21  whom?

22  A.   In that particular phone call, it sounded like

23  Mr. Balducci was much more eager to get the deal done sooner

24  than the judge.

25  Q.   All right.  I now want to ask you about the affidavit from

 1  October 16th.

 2            **MR. KEKER:**  Excuse me, Mr. Sanders.  Your Honor,

 3  could I suggest that maybe if I could examine on this

 4  affidavit -- and we have this affidavit -- kind of put it to

 5  bed in one place before we move on?  I'm afraid they're all

 6  going to get mushed up.

 7            **THE COURT:**  That may be preferable.

 8            **MR. KEKER:**  And I'll stop at --

 9            **THE COURT:**  All right.

10                      CROSS-EXAMINATION

11  **BY MR. KEKER:**

12  Q.   Good afternoon, Agent Delaney.

13  A.   Good afternoon.

14  Q.   Agent Delaney, you've said you're the case agent on this

15  case?

16  A.   Yes, sir.

17  Q.   And when were you assigned to it?

18  A.   I'm sorry?

19  Q.   When were you assigned to the case?

20  A.   Early April, I believe.  Early, mid-April.

21  Q.   And you said one of the first things you did is interview

22  Judge Lackey?

23  A.   Yes, sir.

24  Q.   Do you remember when that interview was?

25  A.   I believe it was around April 24th.

1   Q.    Did Judge Lackey tell you then that he had waited two

2   weeks before reporting his conversation with Mr. Balducci?

3   A.    No, sir.  He didn't give me a frame as to when he had

4   reported it.  He just said he reported it to the U.S.

5   Attorney's Office.

6   Q.    Why did you put it in your declaration, that we're

7   referring to now as Exhibit 9 -- why did you put in your

8   declaration that it was at the conclusion of the meeting, then?

9   A.    That was my understanding talking to the U.S. Attorney's

10  Office and talking to the judge, that it was shortly after

11  Mr. Balducci came down and met with him.

12  Q.    Okay.  So did Judge Lackey give you the impression --

13  leave you to understand that at the conclusion of the meeting

14  he went to the U.S. Attorney and said, "There's a problem

15  here"?

16  A.    We didn't get into the time frame as to how quickly he

17  went and saw the U.S. Attorney's Office.  He just indicated to

18  me that that's what he had done.

19  Q.    Did you later learn that it was a two-week interval?

20  A.    Yes, sir.

21  Q.    Did you ask him about it?

22  A.    He explained it to me.

23  Q.    What did he explain?  Tell us about that.

24  A.    As what happened in that interim?

25  Q.    Yeah.

1  A.    He had talked to several different people after

2  Mr. Balducci's visit.  Again, he was troubled.  He didn't know

3  what to do.  He talked to several different people soliciting

4  different people's advice.  Ultimately, he decided the best

5  course of action was to contact the U.S. Attorney's Office.

6  Q.    Did he tell you who he talked to?

7  A.    He did.  I don't know any of the individuals personally,

8  so I can't recall their names.

9  Q.    Did he tell you that during this two-week period he was

10  sort of trying to figure out whether or not anything improper

11  had happened?

12  A.    He just told me that he was discussing it with other

13  people and trying figure out what the best course of action

14  was.

15  Q.    Did he tell you that he had a real question about whether

16  or not anything improper had happened?

17  A.    No.  He made it clear to me that he certainly believed

18  something improper had happened.  It was just a question of

19  whether something criminal had happened.

20  Q.    What did he tell you about this *of counsel* position?

21  A.    He told me that he believed -- he took it, when

22  Mr. Balducci came down and talked about the civil case that he

23  was hearing -- that when Mr. Balducci, at the end of

24  conversation, offered him the position of, *of counsel* to him

25  Mr. Balducci was trying to say that if, you know, you help us

1  out on this case; when you're ready, I'll have a position in my

2  law firm for you.

3  Q.    And that's the way Judge Lackey presented it, offer of

4  quid pro quo?

5  A.    Yes, sir.

6  Q.    So he had no question in his mind that he had been bribed?

7  A.    No, sir.   There was no -- see, there was no question that

8  he had been bribed.   That was the whole crux of this thing.   He

9  knew something improper had happened, but he didn't know for

10  sure if something illegal had happened.

11  Q.    So Judge Lackey didn't know whether or not someone had

12  offered to bribe him?

13  A.    Say that again, sir.

14  Q.    Judge Lackey, after this first meeting with Mr. Balducci,

15  spent two weeks trying to figure out what to do about it?

16  A.    Uh-huh (yes).

17  Q.    And he didn't know, during that two-week period, that he

18  had been bribed?

19  A.    He didn't know whether, you know, what had happened with

20  Mr. Balducci rose to the level of a criminal action, no.   That

21  was the whole point of contacting the U.S. Attorney's Office

22  and bringing our office in to determine if that in fact had

23  happened or would happen.

24  Q.    So what you did is set up recording equipment in his

25  office to get to the bottom of it?

1   A.    Basically to make it -- to find out if that in fact had

2   happened, whether it was just an improper overture by

3   Mr. Balducci or was it more.

4   Q.    When did you set up recording equipment in Judge Lackey's

5   office?  And by you, I mean the Government.

6   A.    The first time we tried to made a recorded conversation

7   was May 3rd.

8   Q.    When did you set up the recording equipment?

9   A.    I'm not sure when -- what you mean by *set up*.  I gave him

10  a telephone recorder on May 3rd.

11  Q.    Was there a call with Mr. Balducci on May 3rd?

12  A.    Yes, there was.

13  Q.    And was that call recorded?

14  A.    It was -- the only thing that was successfully recorded

15  was the preamble.

16  Q.    And what was the preamble?

17  A.    Just basically the judge identifying who he was, who he

18  was calling, the time, the date, the numbers he was calling

19  from and calling to, from what I recall.

20  Q.    And, so, he talks into this recording machine; and we've

21  been told that there's no recording of this.

22  A.    That's correct.

23  Q.    You're telling me there was a recording, but it

24  malfunctioned some point?

25  A.    The only thing that was captured on tape was preamble.

1   The actual content of the conversation between Judge Lackey and

2   Balducci was not captured.

3   Q.    Who had control over that recording device on May 3rd to

4   determine whether or not a call would be recorded or not?

5   A.    I gave the recording -- actually, Judge Lackey used his

6   own recording device on that instance.

7   Q.    Oh, so you didn't give --

8   A.    I gave him one; he elected to use his own in that

9   particular incident.

10  Q.    And he didn't record the call on May 3rd?

11  A.    It was not successfully recorded, no.

12  Q.    Did he report to you about that?

13  A.    Yes.  I was in the office with him.

14  Q.    During the call?

15  A.    Yes, sir.

16         THE COURT:  Mr. Keker, the area of inquiry that has

17  been established for this testimony is to examine what you have

18  alleged were misleading or false statements that were not put

19  in the affidavit.  Please stick to that area.

20         MR. KEKER:  And forgive me if I got afield.

21  BY MR. KEKER:

22  Q.    As I understand your testimony, every one of the omissions

23  that we have alluded to was done on purpose; you did it

24  intentionally?

25  A.    I won't say it was done intentionally.  I weighed what

1  information I had in front of me, and I tried to make the best

2  decision I could based on what I believe was probable cause

3  that Mr. Balducci was using his phone to conduct a criminal

4  conspiracy.

5  Q.     And to the extent that the information before you didn't

6  fit into what you thought established probable cause, you chose

7  to leave it out?

8  A.     No.

9  Q.     Well, I think you said something about, you just didn't

10 see much credibility with what he said; and therefore, you left

11 it out.  Another time you said, you didn't think it carried

12 much weight; and you left it out.  All the exculpatory material

13 you left out?

14 A.     I explained myself why I left it out.  There was

15 obviously, in my view, reasons why Mr. Balducci said those

16 things.

17 Q.     Okay.  Then let's go through some of them.  May 4th, the

18 first call that's recorded, you left out deliberately that he

19 referred to this order that he'd sent down as "just some

20 thoughts, ideas, suggestions, I thought I'd put it on paper,

21 see if His Honor might be interested in it"?

22 A.     Uh-huh (yes).

23 Q.     And you left that out because you didn't think it

24 supported probable cause?

25 A.     Again, earlier in the day, he had sent a fax to the judge,

1  unsolicited, with an order with a signature line on it.  I give

2  more weight to that action than what Mr. Balducci said.  To me,

3  it was clear that -- to me what Mr. Balducci wanted was the

4  judge to sign and enter that order rather than just trying to

5  give him some thoughts and ideas about the case.

6  Q.    There wasn't any mention in that phone conversation about

7  an *of counsel* position, was there?

8  A.    No, sir, there wasn't.

9  Q.    And what you said in your affidavit was that there had

10 been mention of an *of counsel* position in the May 3rd

11 unrecorded call?

12 A.    Correct.

13 Q.    And in your affidavit, you quoted what was said in the May

14 3rd call.  And would you agree that your affidavit gives the

15 impression there was a recording with that May 3rd call?

16 A.    That was taken from a statement provided to me by the

17 judge.  The judge wrote out a statement after the May 3rd

18 recording.

19 Q.    Okay.  And you were quoting from his statement?

20 A.    Yes, sir.

21 Q.    Okay.  And you didn't consider it misleading that you were

22 quoting and implying that it was recorded?

23 A.    I don't think it says in the affidavit that it is from a

24 recording.  It's quoted from a -- it's quoted from Judge

25 Lackey's statement that he gave to me.

1   Q.    Let me jump ahead, then, to May 9.   We're still trying to

2   determine -- you and Judge Lackey are trying to determine if

3   Mr. Balducci is a criminal.   You left out that there was no

4   discussion of -- you didn't say anything, but there's no

5   discussion of money, no discussion of the *of counsel* position

6   in that call, right?

7   A.    Not that I recall.   Well, I take that back.   I believe

8   Mr. Balducci spoke about some of the people he did bring in --

9   had brought in recently as *of counsel*; and I'm not sure if he

10  specifically said, "Judge, again, we'd like to have you *of*

11  *counsel*"; but that was the -- my interpretation of the intent

12  of that, of that whole litany, was to say that we've got room

13  for you; we'd like to have you in there.

14  Q.    And at the end of the conversation, he says -- Judge

15  Lackey said, "It looks like they deserve to have the case go to

16  arbitration," or words to that effect; and you left that out

17  deliberately, right?

18  A.    I don't think he said that, sir.   I think what he said,

19  "Looks like they agreed to it."   But again, as I said earlier,

20  before Judge Lackey had said that, he had told Mr. Balducci

21  that he thought the case was going to the Supreme Court.   He

22  was reacting in that particular statement, which you reference

23  in your motion, he was reacting -- the judge was reacting to a

24  question that Mr. Balducci posed to him.   He answered it.   He

25  didn't answer it completely.   He just said, "Yeah, sort of

1  looks like what they agreed to."  But he didn't say, "I agree

2  with it; that's how I'm going to act," or any other.

3  Q.    Agent Delaney, you are an FBI agent; and in substance,

4  you're being paid to look at the world through dirty windows;

5  isn't that true?

6  A.    I'm not sure what you mean by *dirty windows*.

7  Q.    Well, you cast a suspicious eye on human transactions to

8  see if there's anything illegal about it, right?

9  A.    If allegations are brought to me, my job is to try to

10 figure out whether they're true or not.

11 Q.    Did you understand that the job of the judge -- remember

12 the judicial branch -- in evaluating the affidavit from a law

13 enforcement officer is to try to look at it fair and square and

14 call the chips -- look at it fair and square, look at all the

15 information and make a decision?

16 A.    Yes, sir.

17 Q.    And did you understand that you were filtering out

18 exculpatory information so the judge wouldn't have that to look

19 at?

20 A.    Again, I put down in that affidavit what I thought was the

21 best probable cause regarding Mr. Balducci's use of his

22 cellular telephone in a criminal case.

23 Q.    Did you tell the judge that as of May 9 they -- the

24 judge -- Balducci had talked to Judge Lackey, and Judge Lackey

25 says, "It looks like that's what they agreed to"?  There was no

1  discussion about doing anything further with respect to

2  anything.  Did you tell the judge that it was over on May 9th?

3  A.    No, I did not put that in my affidavit, if that's what

4  you're asking me.

5  Q.    And then on May 21, Judge Lackey started calling

6  Mr. Balducci again, right?

7  A.    He called him, yes, sir.

8  Q.    Did you tell him to call him?

9  A.    I was not present for that call.

10  Q.    Did you tell him to call?

11  A.    (No response.)

12  Q.    Or suggest?

13  A.    I'm sure we discussed having him call, yes.

14  Q.    And did he call him once -- he called him twice; and

15  finally, he got him the third time.  And Mr. Balducci assured

16  Judge Lackey that nobody other than Balducci and Scruggs knew

17  the arrangements suggested by Balducci.

18      You put that in; but then you omitted that it was Judge

19  Lackey that was bringing that up; that Balducci said a number

20  of times he didn't want the judge to do anything improper; that

21  Balducci said to Judge Lackey, "You do what you feel

22  comfortable with, and I don't mean to make you uncomfortable,

23  if it's not something you feel right about.  You do what your

24  heart tells you.  I've got complete confidence that this is

25  completely fine.  I would never put you or me in that position.

1  I have complete confidence that it's fine."  You left that out

2  of your affidavit, right?

3  A.   Yes, sir.

4  Q.   And you did it on purpose?

5  A.   No, I did not do it on purpose.  I did it, again,

6  reflecting over the content of the call and the fact that the

7  judge calls up, he's troubled.  Mr. Balducci picks up that he's

8  troubled.  I believe the judge starts out the conversation

9  with, "I've never been involved in anything like this before.

10 I'm looking for reassurance."  My impression, that's what

11 Mr. Balducci was doing; he was reacting to that comment of the

12 judge and trying to reassure the judge.

13 Q.   You said earlier he was trying to put the judge at ease?

14 A.   Yes, sir.

15 Q.   And you didn't put that in your affidavit so that the

16 judge evaluating probable cause would know that?

17 A.   No, I didn't.

18 Q.   Why didn't you do that?

19 A.   Why didn't I put that the judge was not at ease?

20 Q.   Why didn't you put that Balducci's making all these

21 professions of innocence, trying to put the judge at ease and

22 make everything go away, basically?

23 A.   But he never did say, Look -- he said -- he was trying to

24 put the judge at ease; but he never said, "Look, Judge, you

25 misunderstood me.  I didn't mean to influence you in this way.

1   And, you know, I don't want to -- you know, we don't need to

2   talk about this anymore; and I apologize."  It never went that

3   far.

4   Q.   But he said, "You do what you feel comfortable with.  I

5   don't mean to make you uncomfortable.  If it's something that

6   you feel right about, you do what your heart tells you."

7   What's the difference, Agent Delaney?

8   A.   The difference is he's telling him what to do; he's not

9   stopping -- you know, he's not saying, What happened in the

10  past was wrong.  He's not trying to stop what is happening then

11  or what may happen in the future.

12  Q.   You didn't put in the affidavit what he said on May 21st,

13  and this is all right before Judge Lackey gets out of the case

14  because he's being earwigged by the other side.  Balducci says,

15  "Frankly, I think we're right; and I think the law's on our

16  side.  And I think probably had I never approached you, we'd

17  have probably had the right result for us on this thing.  My

18  goal is simply to tell you where I had an interest in this

19  thing and help guide you to where I thought this thing legally

20  could come."  You left that out, too?

21  A.   Yes, sir.

22  Q.   And then you omitted, he recused himself that same night

23  or day?

24  A.   Yes, sir.

25  Q.   And you left that out of the affidavit?

1   A.    Yes, I did.

2   Q.    But you also left out of the affidavit -- who called whom

3   the next day?  You got together with him the next day?

4   A.    Yes, I did.

5   Q.    And you told him to get back in there?

6   A.    No, sir, I didn't.

7   Q.    Why did you get together with him the next day?

8   A.    I believe he called me to tell me that he'd made that

9   phone call to Mr. Balducci and that he was recusing himself.

10  Q.    Well, he filed a form on the 21st, right?

11  A.    I'm sorry?

12  Q.    He filed a form recusing himself, a formal recusal?

13  A.    My understanding is he faxed the letter on the 21st.

14  Q.    And he called you and told you about it?

15  A.    On the 22nd.

16  Q.    And you talked him into getting back in the case?

17  A.    No, I did not.  He made that decision on his own.

18  Q.    Did you and Judge Lackey talk about the fact that up to

19  now, at least, you as a professional agent and he as a judge,

20  nothing criminal had happened; there's no case?

21  A.    No.  We -- in that particular instance, from what I

22  recall, we discussed his recusal, his possibility of getting

23  back in.  We talked about the different options.  And again,

24  from what I recall, at the end of meeting with him, he had not

25  made up his mind what he was going to do.  He said he would

1   think about it.

2   Q.   So when did you learn that he was going to get back in the

3   case?

4   A.   Less than a week later, I believe.

5   Q.   Okay.  And the first thing you did when you learned he was

6   going to get back in the case, you came up and wired up this

7   judge in circuit court; and you sent him up to New Albany to

8   have lunch with Tim Balducci, right?

9   A.   No, that was not the next thing.

10          THE COURT:   Counselor, now --

11          MR. KEKER:   I'm sorry, Your Honor.

12          THE COURT:   Stick with what we've talked about.

13  BY MR. KEKER:

14  Q.   Did you say anything in the affidavit about the fact that

15  you wired him up and sent him to New Albany to have lunch with

16  Tim Balducci?

17  A.   No, I did not.

18  Q.   And did you say anything in the affidavit about the fact

19  that at that lunch nothing -- Balducci, despite being alone in

20  the car with Judge Lackey not once but twice, said nothing

21  about the *Jones* case or about *of counsel* or any of this?

22  A.   No, I didn't.

23  Q.   And did you say anything in the affidavit about the fact

24  that you wired him up again on June 28 and directed him to go

25  to the Balducci office?

1  A.    No, I did not.

2  Q.    But you did do that; you did wire him up and send him to

3  the Balducci office?

4  A.    I gave him a body recorder; and, yes, he did.

5  Q.    And again, nothing happened; you didn't say anything about

6  that in the affidavit?

7  A.    No, I did not.

8  Q.    At any point, did Judge Lackey say to you, you know, "I'm

9  getting nervous about this motion that's been pending since

10 March 19th"?

11 A.    No.   We discussed that.   Actually, I brought it up more

12 than he did; and he assured me it was fine; he'd be able to

13 take care of it.

14 Q.    Did you put into your affidavit that during your -- I

15 guess you were on some kind of military leave during --

16 A.    No, sir, I was not on military.

17 Q.    But you were out of state in July?

18 A.    Yes.

19 Q.    And Judge Lackey held a hearing in the *Jones* case to

20 decide the motion to arbitrate?   Did you know that?

21 A.    I believe I learned of that later.

22 Q.    And there's nothing in the affidavit about that or about

23 the fact that he still wouldn't issue an order one way or the

24 other?

25 A.    No, sir.

1  Q.   And then there's nothing in the affidavit about -- well,

2  did you ask Judge Lackey when you got back in August to start

3  making calls to Balducci?

4  A.   I mean, I -- no.  Did I continually direct him to make

5  calls?  No.  It was understood from the beginning that if

6  Mr. Balducci contacted him, he was, you know, to try and record

7  the conversation or, if not, call him back and record the

8  conversation.  I wasn't directing him when to make the calls or

9  anything like that.  That was pretty much up to Judge Lackey.

10 Q.   And did you know that he tried to contact Mr. Balducci on

11 August 3rd, but Mr. Balducci didn't call him back?

12 A.   Yes, sir.

13 Q.   And did you put that in the affidavit?

14 A.   No.  I believe actually what happened is he called and he

15 wasn't there, and he didn't leave a message for him to call

16 back.

17 Q.   And Mr. Balducci didn't call him back?

18 A.   No, he didn't; but he didn't ask him to call him back

19 either.

20 Q.   And did you put in the affidavit that he called him, Judge

21 Lackey called Balducci on August 9?

22 A.   That's not in the affidavit, no.

23 Q.   And did you say that Judge Lackey was trying to implicate

24 Dick Scruggs in that conversation by asking, "You think Dickie

25 wants this thing to go to mediation and arbitration"?  He

1  brings up Scruggs's name just gratuitously?

2  A.    No, it's not in the affidavit.

3  Q.    And did you put in the affidavit that on August 9 Balducci

4  told Lackey -- Judge Lackey's just had a hearing -- to decide

5  the motion how he sees it?  "If that's how you see it after

6  you've taken a look at it, if you see it that way, that'd be

7  terrific."

8  A.    That's not in the affidavit.

9  Q.    But it happened, didn't it?

10  A.    Yes, it did.

11  Q.    And then on August 27, Judge Lackey called Mr. Balducci

12  twice; and Balducci didn't call him back.  And you didn't

13  mention that in the affidavit, did you?

14  A.    No, sir.

15  Q.    And on September 11th, Judge Lackey same thing, called him

16  twice, leaving messages; and Balducci didn't call him back.

17  A.    I believe Mr. Balducci may have been out of town on that

18  particular instance.

19  Q.    But you didn't say in your affidavit --

20  A.    No, it's not in the affidavit.

21  Q.    Then you said you were stopping by to see Judge Lackey.

22  How many times do you think you stopped down at Calhoun City to

23  see Judge Lackey?

24  A.    I couldn't give you an accurate number, sir.

25  Q.    On September 18 -- you talked about September 18, said

1   something about they mentioned a hump and all that business.

2   That wasn't September 18.   That was September 21st, wasn't it?

3   I don't want to confuse you.

4   A.    Without looking at the transcript -- I think it was

5   September 18; but without looking at the transcript, I don't

6   know for sure.

7   Q.    On September 18, Mr. -- Judge Lackey said to

8   Mr. Balducci -- first of all, who called whom on September 18?

9   It was Judge Lackey calling Balducci, correct?

10  A.    I believe that's correct.

11  Q.    And let me give you the transcript if you want to use it

12  to refresh your recollection.

13  A.    Thank you.

14          MR. KEKER:   Would you like a copy, Your Honor?

15          THE COURT:   No.

16          MR. KEKER:   This is Exhibit 12 to the Dooley

17  declaration.

18  BY MR. KEKER:

19  Q.    September 18 is not the call where he says he's got to get

20  over the hump, is it?

21  A.    Okay.   Are you asking me?

22  Q.    Yeah.   I just want you --

23          THE COURT:   What are you asking him to look at?

24          MR. KEKER:   I'm asking him to look at the transcript

25  we've been provided.

1              THE COURT:  I know that, but what part.

2              MR. KEKER:  On September 18, to see if his testimony

3  on direct was mistaken, that this is not the call where he

4  talks about "I've got to get over a hump."  That happened three

5  days later, and I think Agent Delaney --

6              THE WITNESS:  I don't see it in here.

7  BY MR. KEKER:

8  Q.    So -- but that is the conversation where Judge Lackey says

9  Grady -- meaning Grady Tollison, the opponent in the *Jones v.*

10 *Scruggs* case -- is putting some pressure on him?

11 A.    September 18.

12 Q.    Did you talk to Judge Lackey to get an understanding what

13 that pressure was?

14 A.    I don't recall talking to Judge Lackey about that, no.

15 Q.    Where did the idea on September 18 to ask Balducci what

16 could be done -- what can you do for me or what can they do for

17 me, where did that idea come from?

18 A.    That idea came from -- that was sort of the idea from the

19 very beginning, again, to find out which way this thing was

20 going to go.  Is it just an improper overture or something

21 criminal in nature that occurred?  Again, I go back to the

22 judge was very, very troubled over this.  He didn't want to get

23 his friend in trouble.  Let me finish, please.

24      It took Judge Lackey virtually the entire summer -- from

25 my perspective, it took him the entire summer to realize he

1   needed to get this thing resolved; we needed to get this thing

2   resolved.   And the only way to get it resolved was for him to

3   broach that question to Mr. Balducci in sort of the form that

4   he did.

5   Q.   Did you say in the affidavit that you filed in September

6   that for six months of calling and visiting and transcribed

7   calls Balducci had not even given a glimmer that he was talking

8   about a bribe?

9   A.   Again, the judge -- early on in that first meeting, back

10  in March, the judge believed that that overture where he talked

11  about the case and then later *of counsel* was a possibility that

12  a bribe did exist.

13  Q.   Did you say in the affidavit that from March to

14  September 17 there had never been a hint from Mr. Balducci or

15  anybody else that they were talking about money bribe to

16  Judge --

17  A.   No, that did not come up.   That does not eliminate the

18  fact of what happened on March 28.

19  Q.   So was it -- whose idea was it to raise the issue of a

20  money bribe in September after this six months of silence?

21  A.   Again, it was not the issue of -- the idea of whether it

22  was a money bribe was not the initial thing.   It was framing

23  the question in such a way, without putting any kind of

24  tangible value on it, to see what Mr. Balducci's reaction would

25  be; and that's what he did.

1      The judge told me in early September, he said, "Look, we

2  need to find out one once and for all what is going on here";

3  and that's what we decided to do, to have him ask Mr. Balducci

4  in the manner that's recorded in this conversation on the 18th

5  of September.

6  Q.   The 18th -- and he asked him -- and Balducci's reaction

7  was --

8          MR. SANDERS:   Your Honor, we're now getting into -- I

9  think the affidavit was September 25th.   I thought we were

10 getting into what took place after the 25th.

11         MR. KEKER:   No.   No, still September 18th

12 conversation.   I want to make sure this part is clear.   On

13 September 18 --

14         THE COURT:   Limit it to what you've alleged was

15 omitted from the affidavit or what you allege was in the

16 affidavit that was materially misleading and why he did that.

17 That's what this examination is about.

18 BY MR. KEKER:

19 Q.   Did you put in the affidavit that in response to a

20 suggestion by the judge that they do something for him?   Did

21 you put in the affidavit that Mr. Balducci did not offer to do

22 anything for him, did not come back with any concrete proposal?

23 A.   I put in the affidavit the contents of that conversation

24 from September 18.

25 Q.   Well, you didn't put in all the contents, did you?

1  A.   No, I didn't.

2  Q.   And you didn't put in the fact that he did not come back

3  and say, yeah, we will do X, Y, Z.

4  A.   There was nothing definitive decided on October -- I'm

5  sorry -- September 18th, other than the fact that the judge

6  asked, "If I help them out, will they help me out" and

7  Mr. Balducci -- I believe his response was, "No question, I

8  think they will."

9  Q.   But he also said, "You go think on it, Balducci, and come

10 back and tell me what you've got to offer," words to that

11 effect?

12 A.   I don't know what the exact words are.  Can I look at the

13 transcript?

14 Q.   Sure.  But you know -- he did not -- he tried to leave it

15 with Balducci, and Balducci didn't respond with any kind of

16 specific quid pro quo.

17 A.   No.   There was no specific deal done on September 18th.

18 It was strictly, as I said, he asked if I would help them,

19 would they help me; and he was told he thought he would.

20 Q.   Did you point out in the affidavit, to the magistrate

21 deciding whether or not to issue the wiretap, that after three

22 days Judge Lackey was the one who had to come up with a

23 specific quid pro quo, namely $40,000?

24 A.   I believe on the 21st Mr. Balducci asked him what he was

25 referring to.

1  Q.    And that's when the judge raises the issue of money?

2  A.    Yes.

3  Q.    And talks about the hump he has to get over and the

4  problems in his private life?

5  A.    He talks about the hump he has to get over after

6  Mr. Balducci agrees to the 40 in discussing how they're going

7  to do it and saying he's the one to do it.

8  Q.    The transcript will speak for itself.

9           MR. KEKER:   That's all I have on this, Your Honor.

10          THE COURT:   All right.  Any redirect?

11          MR. SANDERS:   Yes, Your Honor.

12                     REDIRECT EXAMINATION

13  BY MR. SANDERS:

14  Q.    There was some conversation about the September 18th and

15  the September 21st when Judge Lackey said "to get him over a

16  hump."  Did Judge Lackey discuss getting over a hump both

17  times?  Do you recall?

18  A.    I think on the 18th.  I'm not sure if he used the exact

19  term *getting over a hump*, but I think he'd indicated he'd had

20  some problems.

21  Q.    All right.  If I hand you the transcript from

22  September 18th, would it refresh your recollection?  You may

23  still have it.

24  A.    I have it.

25  Q.    If you look at page 8, do you think that would refresh

1  your recollection?

2          **MR. KEKER:**  Your Honor, I'm embarrassed to say what I

3  handed him were excerpts and not the full transcript.  I'm not

4  sure if --

5          **THE WITNESS:**  There is no page 8.

6          **MR. SANDERS:**  May I approach, Your Honor?

7          **THE COURT:**  All right.  You may hand him the

8  transcript.

9          **MR. SANDERS:**  Okay.

10          **THE COURT:**  Give Mr. Keker back his excerpts.

11          **THE WITNESS:**  Yes, he does.  He does say that it's my

12  make and my hump, can't blame anybody else.

13  **BY MR. SANDERS:**

14  Q.   Okay.  I just wanted to clear that up.  He asked you about

15  May the 4th.  Again, he asked you about the thoughts, ideas

16  that Balducci was referring to?

17  A.   Yes, sir.

18  Q.   What specific document was Balducci referring to when he

19  talked about the thoughts, ideas on paper?

20  A.   He was referring to that May 4th order that he'd faxed

21  down to Judge Lackey earlier in the morning.

22  Q.   All right.  And now he asked you, too, on May 4th whether

23  or not Balducci refers to *of counsel*.  Did he on May 4th?

24  A.   No, not that I recall.

25  Q.   Did he on May 3rd?

1   A.   Yes, he did.

2   Q.   And did he on May 9th?

3   A.   I believe he did.

4   Q.   All right.  And again, the statements Balducci is making,

5   that I think everything is fine, this order is fine, I think

6   this is probably right, those statements he made, what was your

7   impression of those statements; and why did you not put those

8   statements in the affidavit?

9   A.   Again, to me -- which date are we talking about, May --

10  Q.   The 21st of May.

11  A.   Oh, the 21st.  Again, those statements, to me, were

12  clearly made in response to the judge's first comment during

13  the conversation that, "Look, I've never been involved in

14  something like this."  He's clearly troubled.  Mr. Balducci

15  picks up on the judge is clearly troubled.  And Mr. Balducci

16  clearly is trying to put the judge at ease and trying to assure

17  him that everything will be okay.

18  Q.   Everything will be okay meaning what?

19  A.   That nobody else is going to find out, that they'll be

20  able to do -- you know, if the judge does what they're asking

21  him to do, that there won't be any problems as a result of it.

22  Q.   Okay.  Also, you said that Tim never said anything like,

23  "No, you misunderstood this, Judge" something to that effect.

24  What would you have done if he'd said something like that?

25  A.   If Mr. Balducci had made it clear that the judge was

1   mistaken in his overtures in March or early May and relay that

2   to me, if it was on tape, then I probably would have approached

3   Mr. Balducci, interviewed him, tried to find out exactly what

4   his intentions were.  Based on that, I may have gone and

5   interviewed Mr. Scruggs; but certainly, I would have talked to

6   Mr. Balducci.

7   Q.   And finally, you mentioned once -- you said that Judge

8   Lackey had -- Mr. Keker did -- he said that Judge Lackey

9   recused because he was being earwigged by the other side.  You

10  said you met with Judge Lackey after he recused.  Was that why?

11  A.   No.  He recused himself because he was terribly troubled

12  by this.

13          **MR. SANDERS:**  Your Honor, I don't have any more

14  questions for this agent on the September 25th wiretap.

15          **THE COURT:**  All right.  You may step down.

16          **MR. KEKER:**  Your Honor, may I ask him one question

17  about the September 25?

18          **THE COURT:**  Was it anything that came out on cross?

19          **MR. KEKER:**  Well, it's the date.

20          **THE COURT:**  You may ask him about any question that

21  came out on cross-examination.

22          **MR. KEKER:**  This is something that -- I wouldn't say

23  it came -- this has to do with the affidavit and the date.

24          **THE COURT:**  One question.

25          **MR. KEKER:**  One question.

1                        RECROSS EXAMINATION

2  BY MR. KEKER:

3  Q.    What date was your affidavit signed?  I'm showing you

4  Exhibit 9.

5  A.    September 25th.

6  Q.    Okay.  And whose dating is that?

7  A.    That's mine.

8  Q.    And that says 25?

9  A.    Yes, sir.

10 Q.    Okay.  Thank you.

11         MR. SANDERS:  Your Honor, no further questions as far

12 as the September 25th affidavit.

13         THE COURT:  Okay.  You may step down.  We'll call you

14 back out in a couple of minutes.

15         THE WITNESS:  Thank you, sir.

16         THE COURT:  All right.  We'll be in recess ten

17 minutes.

18     (AFTER A SHORT BREAK, THE PROCEEDING CONTINUED)

19     (CALL TO ORDER OF THE COURT)

20         THE COURT:  All right.  There's also an affidavit for

21 a wiretap on -- I believe it was October 16th on Patterson's

22 phone; is that correct?

23         MR. KEKER:  Yes, Your Honor.

24         THE COURT:  Is that your next one?

25         MR. SANDERS:  Yes, sir, Your Honor.

1           THE COURT:  Now, there's a question we haven't taken

2    up yet.  There hasn't been any question raised about standing

3    for the defendants in this case to complain about a wiretap on

4    somebody else's phone.  Of course, there was no wiretap ever on

5    Mr. Scruggs elder, Mr. Zach Scruggs, or Mr. Backstrom's phone.

6    So their phones were never tapped.

7        So I understand there's no law that's clear that an

8    aggrieved party can complain about if evidence on a wiretap of

9    somebody else's phone is used against a third person -- or a

10   second person from the phone, owner of the phone, then that

11   aggrieved person has a standing to complain about it.  But the

12   question that I'd like to hear from counsel on is if there was

13   no information gained from the wiretap on Mr. Balducci's phone

14   from September 25th, I believe is when it was issued, until the

15   renewal of that wiretap -- which was, what, 30 days later?

16           MR. SANDERS:  Yes, sir.

17           THE COURT:  Thirty days later.  Was there any

18   information during that thirty-day period that any of these

19   three defendants can claim they are aggrieved by, Mr. Keker?

20           MR. KEKER:  I believe so, Your Honor.  October 18,

21   Mr. Backstrom is on one of the calls.  And it's also our

22   position that calls on a wiretap into a premises, owners of the

23   premise have standing.  We've briefed that piece.

24           THE COURT:  If they're aggrieved by the results.

25           MR. KEKER:  Yes, sir.  And then it's also our

```
 1  position that this is cumulative, that the first one leads to
 2  the second one, leads to the third one, sort of the taint runs
 3  all the way through.  The search warrant eventually is based on
 4  the fruits of these wiretaps.  So for all these reasons, they
 5  have standing.
 6       And then just to an anticipate, Mr. Patterson's phone --
 7  Mr. Dick Scruggs and, I think, Mr. Patterson -- but I'm not
 8  sure about that.  But I know Dick Scruggs is on the Patterson
 9  tap that we'll get to later on.
10       THE COURT:  All right.  You may proceed.  Evidently,
11  the Government's not concerned with that issue then, are you?
12  You haven't brought it up.
13       MR. SANDERS:  That's right.  Your Honor, first, we're
14  aware that the Government doesn't waive standing.  The
15  Government cannot waive standing.  In this instance, frankly,
16  Your Honor, we looked at the information; we looked at the law
17  out there.  We knew if a party was aggrieved they had standing,
18  and it's certainly our position that the defendants are
19  aggrieved by the information elicited from the wiretaps.
20       THE COURT:  Well, the question I brought up was
21  whether they were aggrieved by this 30-day period from which
22  the first wiretap was issued till 30 days later when it was
23  renewed.
24       MR. SANDERS:  Yes, sir.
25       THE COURT:  And probable cause or information had to
```

DAILY COPY

1  be presented at that renewal that would point toward the --

2  that would justify the renewal of it.  So evidently, you're not

3  concerned with any standing of these three defendants to object

4  to information that was gained from this first 30-day period

5  where Mr. Balducci's phone was wiretapped?

6         **MR. SANDERS:**  Your Honor, as I said, we don't believe

7  we waived it; and we may well address it at a later time.  At

8  this point, however, we see the case law saying that if a

9  person is aggrieved -- and we believe that, for instance, on

10  October 18th, all three defendants were greatly aggrieved by

11  information elicited from the wiretap.

12         **THE COURT:**  Okay.  That would be within the thirty

13  days.

14         **MR. SANDERS:**  Yes, sir.

15         **THE COURT:**  All right.  Good.  All right, Mr. Keker.

16         **MR. KEKER:**  Your Honor, if we're going to go back to

17  Mr. Sanders to elicit information and I cross, that's all

18  right.  Otherwise, I'll do it.

19         **THE COURT:**  It's up to you gentlemen.

20         **MR. KEKER:**  I'll do it either way, Mr. Sanders.

21         **MR. SANDERS:**  Your Honor, do you want argument now on

22  the September 25th?

23         **THE COURT:**  No.  Do you want to go forward with the

24  second affidavit?

25         **MR. SANDERS:**  Yes, sir.

1          THE COURT:  All right.  You may proceed.

2                       DIRECT EXAMINATION

3  BY MR. SANDERS:

4  Q.    Okay.  Mr. Delaney, I am going to talk to you now about

5  the Patterson wiretap.  The affidavit was signed -- when did

6  you sign the affidavit for the Patterson --

7  A.    I believe it was October 16th.

8  Q.    All right.  They refer in their motion to three different

9  statements made, and I'm going to read those statements to you

10 and have you explain to us why they weren't contained in the

11 Patterson wiretap.  The first one they talk about is that you

12 put in the affidavit that Patterson's talking to Balducci, and

13 you point out that P.L. Blake -- that Patterson has spoken to

14 P.L. Blake.  And you said that he's already talked to P.L. and

15 that P.L. knows the amount.

16 A.    Uh-huh (yes).

17 Q.    Did P.L. Blake -- did Patterson also tell P.L. Blake on

18 the telephone call that P.L. doesn't know what it's about or

19 anything?

20          MR. KEKER:  I think it was misspoken.  It was a phone

21 call not with P.L. Blake but with Patterson Balducci.

22 BY MR. SANDERS:

23 Q.    That's right.  It's Patterson and Balducci.  And does

24 Patterson tell Balducci that P.L. knows the amount of the

25 bribe?  Do you remember that?

1  A.   Yes, sir.

2            MR. KEKER:   Well, I object because he didn't say he

3  knows the amount of the bribe.   Does P.L. know the amount is

4  all he said, nothing said about the bribe.

5            MR. SANDERS:   I'm sorry.   I'll rephrase, Your Honor.

6            THE COURT:   Okay.

7  BY MR. SANDERS:

8  Q.   Did Patterson tell P.L. the amount?

9  A.   Yes.

10 Q.   Did Patterson also tell Balducci that P.L. doesn't know

11 what it's about or anything?

12 A.   Yes, he did.   I believe that's on the transcript of the

13 call.

14 Q.   All right.   Why did you not put that in the October 16th

15 affidavit?

16 A.   Again, I'm trying to establish probable cause that

17 Mr. Patterson is aware of the conspiracy and using his phone in

18 connection with the conspiracy.   We used the elements of that

19 call where he said he knew the amount.   In a subsequent call, I

20 believe on October 10th, where, again, it's Mr. Patterson

21 speaking with Mr. Balducci.   Mr. Patterson's asking

22 Mr. Balducci when the order's going to be sign, and he says

23 P.L. wants to know.   I took those two phone calls to establish

24 the probable cause that Mr. Patterson and Mr. Blake had reason

25 to believe that they were involved in this conspiracy.

1  Q.    Based on the September 27th and the October 10th call?

2  A.    Yes, sir.

3  Q.    All right.  They also refer to a September 27th call

4  between -- or I think it's a conversation between Balducci and

5  Judge Lackey.  All right?  And this is -- I'll try to

6  paraphrase this, but it's essentially there's a statement

7  Balducci makes -- he says to Judge Lackey, "There ain't another

8  soul in the world that knows about this, okay?  And this is --

9  this is -- this is taken care of."

10       And then later, Balducci says -- Lackey asks, "When you

11  tell Mr. Scruggs or Dickie or whatever I ought to call him --

12  you tell him that this is a first-time venture with me."  And

13  then Balducci says, "He's not even involved at that level,

14  Judge."  Balducci goes on to say, "The way this will work is

15  I'll just go to him at some point in time and say that I cured

16  a problem that you had, and you need to recognize the problem

17  that I have cured.  That's how it works."  Do you remember

18  those statements, Balducci speaking to Judge Lackey?

19  A.    I do.

20  Q.    And why were those statements not included in the

21  October 16th affidavit?

22  A.    Again, I didn't give those statements as much weight as I

23  gave previous statements.  Earlier on the 27th, we intercepted,

24  I believe, two calls on Mr. Balducci's phone.  I believe one

25  with Mr. Patterson, and I believe the other one was Mr. Biden

1  (phonetic); I'm not sure.  Mr. Balducci says in those two

2  separate phone calls he's on his way to Oxford.  I believe he

3  says he's going to go see either the Scruggs Law Firm or

4  Mr. Scruggs or words to that effect.

5       One of the phone calls he tells, I believe Mr. Patterson,

6  he's on his way to go see Sid to pick up that thing.  We know

7  from phone calls during that morning that he's on his way to

8  head south, which is Calhoun City, south of Oxford.  So based

9  on those earlier phone calls, on the 27th, I gave much more

10 weight to the veracity of those phone calls than I did to that

11 conversation that Mr. Balducci had with the judge while

12 conducting elicit --

13 Q.    Okay.  Was one of the conversations to which you just

14 referred with Steve Patterson when he's talking about this

15 order with Balducci?  Did that conversation take place before

16 Balducci meets with Judge Lackey?

17 A.    Yes, it does.

18 Q.    Okay.  So did you believe that Balducci wasn't telling the

19 truth here?

20 A.    I had reason to doubt what he was saying.

21 Q.    Okay.  And then based on subsequent conversations, who

22 else did you think knew or at least you believed had probable

23 cause to know that there was a crime taking place?

24 A.    Subsequent conversations we believe that Mr. Scruggs,

25 based on -- on Mr. Balducci saying he's going to the law firm

1  before that day, we had surveillance locate Mr. Balducci

2  returning to the Scruggs Law Firm after the first bribe payment

3  on September 27th.  We had the four-minute phone call September

4  27th immediately after Mr. Balducci had agreed to the bribe

5  payment with the judge in Calhoun City.

6      We had, I believe, a surveillance later in October showing

7  Mr. Patterson and Mr. Balducci visiting the Scruggs Law Firm

8  while these payments were going on -- in the midst of these

9  bribe payments.

10 Q.    Let me ask you this:  You mentioned just a minute ago --

11 you said something about Sid.  What did you say about Sid?

12 A.    One of the intercepted phone calls on the morning of the

13 27th was, I believe, Mr. Balducci told Mr. Patterson that he

14 was going to see Sid to pick that thing up.

15 Q.    Okay.

16 A.    And, you know, later in the day after Mr. Balducci had

17 dropped off the money and an order -- we did in fact recover an

18 order from the judge's office.

19 Q.    Okay.  And then one final point they make about this.

20 They say that on October the 10th that Balducci called Judge

21 Lackey and asked when he could pick up the sweet potatoes.

22 A.    Uh-huh (yes).

23 Q.    Did you think Tim Balducci was going to pick up sweet

24 potatoes from Judge Lackey?

25 A.    No, sir.

1   Q.    What did you think that was?

2   A.    Sweet potatoes was their code word for the order.

3   Q.    Okay.  At the end of that conversation, Balducci talks

4   about he was going to get back to Judge Lackey about, quote,

5   that other deal.

6   A.    Yes, sir.

7   Q.    The defendants say that this is strong evidence that

8   Balducci did not understand Lackey's request for the payment to

9   be connected with the order being entered in the Scruggs case.

10  Is that how you saw?

11  A.    No.  I think it's pretty clear what Mr. Balducci meant by

12  the other deal was the second half of the money on

13  September 27th even though he'd originally agreed on 40,000.

14  He delivered 20,000; and during that conversation, he said he

15  would get the rest of them later.  And that's what I took that

16  October 10th conversation to mean was the other deal was the

17  remaining 20,000 of the 40,000.

18           MR. SANDERS:  Tender the witness, Your Honor.

19           THE COURT:  Very well.

20                   CROSS-EXAMINATION

21  BY MR. KEKER:

22  Q.    Agent Delaney, the October 16 affidavit in support of the

23  Patterson wiretap repeats, in essence, all the allegations with

24  all the omissions that were in the one we just talked about,

25  right?

1  A.    Yes, sir.

2  Q.    Okay.  So we won't go over that again.  But all of that

3  applies to this, too --

4  A.    Yes, sir.

5  Q.    -- what we talked about.  And then what's new here --

6  let's start with the big one.  You had a tape that you knew

7  amounted to Mr. Balducci telling Judge Lackey that Scruggs did

8  not know about the bribe that was being paid on September 27th;

9  is that a fair characterization?

10  A.    That's what he told him, yes, sir.

11  Q.    And you didn't think it was true?

12  A.    I had reason to doubt it, yes, sir.

13  Q.    Okay.  Now, in your FBI training, do they tell you that

14  when you're preparing an affidavit for probable cause you are

15  to present a fair picture of all the evidence to the judge to

16  let him decide?

17  A.    I believe we're suppose to present evidence that I think

18  gives probable cause that would lead to the approval of the

19  warrant.

20  Q.    Okay.  So your job -- the FBI training tells you your job

21  is to present the information to the judge that will allow you

22  to get a warrant whether or not it is a fair picture of what's

23  going on?

24  A.    No, I don't think that's accurate.

25  Q.    Does the FBI care about whether or not they present to a

1  judicial officer --

2  A.    Yes, they do.

3  Q.    -- a search warrant affidavit -- whether or not it's a

4  fair picture of what's going on?

5  A.    Yes, they do.

6  Q.    And how does the judge weigh whether or not it's a fair

7  picture if you leave out all the favorable information or all

8  the information that doesn't fit your view of the events?

9  A.    I think the fact that you have those calls from

10  September 27th in the morning -- I think that's -- there's

11  enough weight given to know that -- that establishes the

12  probable cause that Mr. Patterson was involved in the

13  conspiracy and using his phone to do so.

14  Q.    Okay.  You think you had enough on Mr. Patterson.  And the

15  allegation, though, was that the conspiracy included Dick

16  Scruggs.

17  A.    Yes, sir.

18  Q.    And you were making quite a point in this affidavit that

19  Dick Scruggs was an important member of this conspiracy.

20  A.    I think there was enough probable cause to establish that,

21  yes.

22  Q.    And did you leave out of your affidavit that Judge Lackey

23  made a real yeoman's effort, a tremendous effort, in

24  September 27th to get some evidence on Dick Scruggs; and he

25  failed?

DAILY COPY     CROSS- DELANEY                    166

```
 1  A.     That conversation was not in the affidavit, no.

 2  Q.     Okay.  Balducci said to him, "This is just between you and

 3  me."  You didn't tell them that in the affidavit, did you?

 4  A.     No, sir.

 5  Q.     And he repeated it, "This is just between you and me."

 6  And Lackey said, "All right."  That's not in the affidavit,

 7  right?

 8  A.     No, sir.

 9         THE COURT:  Counsel, just a moment.  There's nobody

10  rising from the prosecutor's table; but in my interest of

11  judicial economy, this is an affidavit from a wiretap on

12  Patterson's phone, not Mr. Scruggs' phone.  You're not trying

13  to introduce probable cause that Mr. Scruggs had committed a

14  crime by this affidavit.  They're trying to introduce probable

15  cause to tap Mr. Patterson's phone.

16         MR. KEKER:  I hear Your Honor, but that's -- the

17  affidavit that was presented is that there is probable cause to

18  believe that Tim Balducci, Dickie Scruggs, Steven Patterson,

19  and so on, P.L. Blake -- they are alleging -- this agent is

20  asserting here there's probable cause to believe there was a

21  conspiracy, and these people were members of it.

22      And in order to evaluate that affidavit, it's our position

23  that leaving out not just significant but totally exculpatory

24  information about Blake, who said he didn't know anything about

25  it, and leaving out totally exculpatory information about
```

1  Scruggs, who Balducci said didn't know anything about it, is

2  improper, unfair, and undercuts probable cause for the

3  conspiracy that they're alleging exists.  If they'd just said,

4  Patterson and Balducci are doing something, I suppose --

5        THE COURT:  Well, if he just said Patterson was doing

6  something, that's sufficient to tap his phone, which is who

7  they tapped.  I'll reserve ruling on that.  Go ahead.

8        MR. KEKER:  And then I go back to the point this

9  Patterson tap picked up --

10        THE COURT:  Picked them up later.  But that's a

11 question of whether or not probable cause was presented to tap

12 the phone that was tapped, which is Patterson.  But whether --

13 okay.  But you may proceed.  You know, I agree that by that

14 Patterson phone tap that information came in as a result that

15 pointed to any one of these three defendants.  Then these three

16 defendants would have cause to complain of the probable cause

17 that was presented for that wiretap.

18     But still, the probable cause that the Court was dealing

19 with was really about Patterson, not about these three

20 defendants.  But I'll -- you go ahead.  I'll reserve ruling on

21 that and certainly going to have to hear more information.

22        MR. KEKER:  I think though since -- we are stuck

23 with -- I know one of my colleagues has made a James motion,

24 that the Government is going to take advantage of the fact that

25 they've charged a conspiracy to say that everybody is liable

1    for everything; and that's what they're alleging here.  And if

2    they'd just thought they were investigating Steve Patterson, I

3    agree we'd have a different situation.  But that's not what --

4    that's not what the special agent --

5          THE COURT:  Suppose they had only put in Patterson in

6    the affidavit; we want to tap Patterson's phone.

7          MR. KEKER:  Then they'd have to show that he was

8    committing -- there's probable cause to believe that Patterson

9    was committing a crime, and they'd have to say what that was.

10         THE COURT:  Right.  And they could have said, We

11   believe he's involved in a conspiracy with Balducci to bribe

12   Judge Lackey.  And they would have had that, assumed they could

13   have had that probable cause.

14         MR. KEKER:  I think that's true.  And if they'd said

15   that, the magistrate might have looked at it and said, Well,

16   what in the world -- I mean, this doesn't make any sense.  This

17   whole -- the whole thrust of why they're trying to get a

18   probable cause determination is the Scruggs firm was involved

19   in it.

20       That's what they're -- that's what they say the case is

21   about, and that's what we say -- I mean, if Balducci and

22   Patterson -- we say that Balducci and Patterson were doing

23   whatever they were doing all by themselves without the

24   knowledge of these folks, at least through this period that

25   we're talking about --

1          THE COURT:  Well, all right.  But -- we'll go

2   forward.

3          MR. KEKER:  And I think, Your Honor, we've briefed

4   this.  We can go on to the next one.  The big headline here is

5   there's exculpatory information about P.L. Blake that -- I

6   mean, let me ask a couple of questions about that because I

7   didn't get that.

8   BY MR. KEKER:

9   Q.    On September 27, you have a phone call that says P.L.

10  Blake doesn't know what this money is for, doesn't know

11  anything about it, right?

12  A.    That's what Patterson tells Balducci, yes.

13  Q.    Okay.  And you decide to leave that out of an affidavit

14  that says there's a conspiracy involving Blake?

15  A.    Uh-huh (yes).

16  Q.    And the reason you do that is you found out by October 10

17  P.L. Blake knows something about an order?

18  A.    Yes.

19  Q.    And so, therefore, you connected in your mind the order

20  with the money; and you concluded that P.L. Blake knew about

21  the -- some connection between the two?

22  A.    I didn't know definitely; I thought there's probable cause

23  to believe that.

24  Q.    And based on that belief, you chose to leave out a full

25  and complete statement from -- in a conversation between

1   Patterson & Balducci that P.L. Blake didn't know anything about

2   this?

3   A.    Yes.

4   Q.    And you chose to not -- I'm not going to let the judge

5   know about that?

6   A.    Yes.

7            MR. KEKER:   That's enough for this one, Your Honor.

8   We will rely on our briefing.  We've got other points.

9            THE COURT:   Very well.  Do you have any redirect?

10           MR. SANDERS:   No, Your Honor, no redirect on that.

11           THE COURT:   All right.  All right.  The Balducci cell

12  phone extension, that was the 30-day extension that came up

13  earlier in our discussion, was signed on October 29th.  Are you

14  ready to proceed on that, Mr. Keker?

15           MR. KEKER:   Yes, sir.

16           THE COURT:   Or you, Mr. Sanders?

17           MR. SANDERS:   Yes, sir, Your Honor.  And as I noted

18  in our response to their motion, I think in their motion they

19  just -- they don't point to any specific omissions or what they

20  call misleading statements with respect to the extension

21  affidavit.  They just rely on what they've argued beforehand,

22  so we would stand on what we've done thus far in here.

23           THE COURT:   All right.  In other words, there are no

24  new omissions or misleading statements listed in the motion

25  concerning the cell phone extension.

1              MR. SANDERS:  That's right.

2              THE COURT:  Is that right, Mr. Keker?

3              MR. KEKER:  If I could just have a moment, Your

4    Honor.

5              THE COURT:  Okay.

6              MR. KEKER:  Well, actually, could I ask a couple of

7    questions to show that there's a --

8              THE COURT:  Ask him a couple?

9              MR. KEKER:  Yes, sir.

10             THE COURT:  All right.  You may.

11                        CROSS-EXAMINATION

12   BY MR. KEKER:

13   Q.   Now, by the October 24 affidavit, which is Exhibit 31 to

14   Mr. Dooley's declaration, you just dropped P.L. Blake out of

15   this conspiracy, didn't you?

16   A.   Yes, I did.

17   Q.   And that's because you determined that you were wrong in

18   what you'd said on October 16 about P.L. Blake?

19   A.   I don't believe we came up with any further evidence to

20   show that he was involved, no.

21   Q.   And did you tell the judge, when you came for the

22   October 24 extension, that what you'd told them before about

23   P.L. Blake hadn't panned out; and you just were dropping P.L.

24   Blake, including exculpatory information, everything about P.L.

25   Blake, out of this affidavit?  You want me to show you the

1  affidavit?

2  A.    If you'd like.

3  Q.    Show you Exhibit 31.   The question is, P.L. Blake is gone.

4  He's not a member of the conspiracy.   There's no information

5  about him.   There's nothing about calls to him.   And you didn't

6  tell the judge that what you'd said before turned out not to be

7  true.

8  A.    He's not listed on the affidavit, on the extension, no.

9  Q.    Okay.   And you didn't tell the judge --

10  A.    Well, I mean, the fact that he's omitted from the

11  affidavit, I think, is pretty clear that we no longer consider

12  him or, at that time, didn't consider him a subject.

13  Q.    That's all I have.   And the rest that's in here is an

14  accumulation of what we've talked about so far?

15  A.    Yes, sir.

16  Q.    Okay.   With the same omissions and the same issues that

17  we've talked about?

18  A.    Yes, sir.

19       MR. KEKER:   That's all I have on that one, Your

20  Honor.

21       THE COURT:   Very well.   Anything else?

22       MR. SANDERS:   No, Your Honor.

23       THE COURT:   Very well.

24       MR. KEKER:   We've got the search warrant affidavit,

25  Your Honor.   Should we go with that one?

1              THE COURT:  Yes, we can go forward.

2              MR. SANDERS:  Your Honor, I believe with the search

3    warrant, as with the extension on the wiretap -- I don't think

4    they refer to any more specific omissions or misleading

5    statements; and I think we simply refer back to what we've done

6    so far.

7              THE COURT:  Very well.  Do you agree with that,

8    Mr. Keker?

9              MR. KEKER:  No, I don't, Your Honor.

10             THE COURT:  With what do you disagree?

11             MR. KEKER:  Well, there's a lot in the search warrant

12   affidavit that has even more omissions.  I mean, for example,

13   by now the March 2007 meeting is reduced to this, that

14   Balducci, Patterson, Scruggs, Backstrom, and Zach Scruggs met

15   in the offices of Scruggs Law Firm in Oxford for purposes of

16   discussing ways and means of corruptly influencing the outcome

17   of *Jones, et al v. Scruggs, et al*.  Now we've heard a lot more

18   about that.  There's a lot more about that meeting than that.

19        But in addition, by this time, they have Mr. Balducci; and

20   Mr. Balducci sat down and talked to them.  And Mr. Balducci has

21   said things I'd like to ask Agent Delaney about that are left

22   out of this affidavit and so on.  I mean, there's a number of

23   things in this affidavit.

24             THE COURT:  All right.  Since there is an

25   affidavit -- since there is a search warrant, there was an

1   affidavit, then the Court has determined there was probable

2   cause to look on the face of the affidavit.  So, therefore, the

3   burden comes to the defendant to attack the affidavit.

4           **MR. KEKER:**  Okay.  Let me get my --

5           **MR. SANDERS:**  Your Honor, under *Franks*, even to have

6   a hearing, they've got to make a substantial preliminary

7   showing.  And in their motion, they didn't mention any of this

8   that Mr. Keker is talking about; so I don't think they've made

9   the showing that would entitle them to the hearing at this

10  stage.

11          **MR. KEKER:**  I don't think that's true.

12          **THE COURT:**  The question is the suppression of a

13  search warrant affidavit, they can -- the Court will allow them

14  to attack the affidavit, but the burden switches from the

15  Government to justify the search to the defendant to show why

16  there was no probable cause in the affidavit.

17          **MR. KEKER:**  Then, beginning with --

18          **THE COURT:**  It may not be in the motion, but I'm

19  going to let the -- try to establish something anyway.

20                      **CROSS-EXAMINATION**

21  BY MR. KEKER:

22  Q.   Agent Delaney, do you have your 302?

23  A.   (Shaking head negatively.)

24  Q.   The 302 of your interview with Mr. Balducci on November 2,

25  2007?

1  A.    I don't have it with me.

2  Q.    Could we get a copy to put up in front of him in case he

3  needs to refer to it?

4          MR. SANDERS:  And I've got a copy for him, Your

5  Honor, if I can --

6          THE COURT:  All right.

7  BY MR. KEKER:

8  Q.    I'm going to give you two, one is dated -- well, you tell

9  me what they are dated.  I think they are --

10 A.    11/2 and 11/7, sir.

11 Q.    And those are the dates of the interviews?

12 A.    Yes, sir.

13 Q.    And these are interviews with Mr. Balducci?

14 A.    Yes, sir.

15 Q.    And you and another agent conducted them?

16 A.    Yes, sir.

17         THE COURT:  Are you claiming in this, even though you

18 didn't put anything in your motion about omissions or

19 misleading statements -- is that what you're claiming about the

20 defects in this affidavit?

21         MR. KEKER:  Yes, sir.

22         THE COURT:  All right.

23 BY MR. KEKER:

24 Q.    In the search warrant affidavit, which is dated

25 November 26 and which was written after you interviewed

1  Mr. Balducci on 11 -- on November 2 and November 7, correct?

2  A.    Yes.

3  Q.    You stated -- and all you stated about March 2007 in the

4  Scruggs office is what I just read, that five people met in the

5  offices of the Scruggs Law Firm in Oxford for the purposes of

6  discussing ways and means for the purpose of corruptly

7  influencing the outcome of *Jones et al. V. Scruggs*, right?

8  A.    Yes.

9  Q.    And at that point, you knew Mr. Balducci, who you arrested

10 and was cooperating, had said that at that meeting Dick Scruggs

11 said he was not asking Balducci for anything illegal but would

12 Balducci see if the judge would move the matter to arbitration.

13 You knew that you were -- that he'd said that to you, and you

14 omitted it from the search warrant affidavit.

15 A.    There was some disagreement -- I'm not going to say

16 disagreement -- misunderstanding about that statement.  That

17 was my understanding the way he said it at the time.  We later

18 talked to him about it.  He said that was not his recollection

19 of that meeting.

20      That information went in the affidavit subsequently after

21 that where we discussed it again.  And we talked about it; and

22 we determined that it, you know -- that it is what myself and

23 the other agent heard.  And at that time, Mr. Balducci was not

24 going to dispute it.  He said, "If that's what you heard,

25 that's what I said."

1  Q.    You had notes of your interviews on the 2nd and 7th of

2  November with Mr. Balducci, didn't you?

3  A.    Yes.

4  Q.    And when you checked your notes and what your notes told

5  you, you were right in what you put in the report?

6  A.    Yes, sir.

7  Q.    Dick Scruggs said he was not asking Balducci for anything

8  illegal?

9  A.    Yes.

10  Q.    And you didn't -- just tell us why you didn't put that

11  into the search warrant affidavit.  Why didn't you say --

12  instead of saying they met for purposes to figure out

13  corrupt -- how to corruptly influence the outcome of the case,

14  why didn't you say, two weeks ago the persons there -- I wasn't

15  there, the person that was there told me that Dick Scruggs said

16  he didn't want to do anything illegal; but will you please talk

17  to your friend, the judge, about getting this case to

18  arbitration?  Why didn't you put that in the affidavit?

19  A.    Again, that issue -- when the affidavit was written, I was

20  under the -- I was under the belief, based on the subsequent

21  interview with Mr. Balducci, that there was elicit conversation

22  in that March 20th interview.  I did not check my notes when I

23  talked to Mr. Balducci the second time.  I was going off my

24  memory.  He assured me that there was.

25       When I subsequently later went back -- and this was after

1   the affidavit was signed -- I checked my notes and saw that in

2   fact that's what my notes reflected, that he said there was

3   nothing illegal -- Mr. Scruggs was not asking him to do

4   anything illegal.

5   Q.    You also said that Dick Scruggs stated that Judge Lackey

6   ought to move the case to arbitration since it was the correct

7   thing to do.  Why didn't you put that in the affidavit?

8   A.    Because, again, that was back in March.  Subsequently, as

9   the investigation rolled on, it showed that that was not the

10  case.  That may have been at that time; but subsequently, it

11  was -- it appeared that there was more to it than that, just

12  asking the judge to do -- to move the case to arbitration, but

13  to actually, you know, bribe the judge to have it done.

14  Q.    But -- okay.  You're telling the judge who you're

15  submitting the search warrant affidavit to that the meeting in

16  March was for the purpose of discussing ways and means of

17  corruptly influencing the outcome of the case; and you don't

18  put in that Scruggs said he didn't want to do anything illegal,

19  the right thing to do was to move it to arbitration?

20  A.    Again, the first interview, that's what I had in my notes.

21  The subsequent interview with Mr. Balducci, I did not have my

22  notes in front of me when I spoke to him.  He assured me that's

23  not what happened; I misunderstood him.  When I later -- after

24  the affidavit was signed -- checked my notes, confirmed with my

25  partner, I felt that I was correct in the first instance; and

1  Mr. Balducci was not.

2  Q.    Did you come back to the judge --

3  A.    No, I did not.  No, I did not.

4  Q.    Let me finish the question.  Did you come back to the

5  judge who signed the search warrant affidavit and say, Judge, I

6  had mistaken memory; and I said some things in my affidavit

7  that I now know are wrong.  I'm sorry.  I just wanted you to

8  know that?

9  A.    No, I did not.

10 Q.    Did you put in the search warrant affidavit that Balducci

11 told Dick Scruggs that Balducci would see Judge Lackey and ask

12 him as a favor to rule for arbitration in the case, as a favor?

13 A.    No.

14 Q.    Did you tell -- in the affidavit, you talk about, very

15 briefly, the March 28 meeting where Balducci went down to see

16 Judge Lackey, right?

17 A.    Yes, sir.

18 Q.    And you said about it -- well, the judge can read it.  He

19 requested a private meeting; he was not a party.  During the

20 course of the conversation, Mr. Balducci made corrupt overtures

21 to Judge Lackey who reported the same to federal officials.

22 A.    Uh-huh (yes).

23 Q.    At that time, did you know it took him two weeks?

24 A.    No.

25 Q.    Did you tell him that Mr. Balducci had told you that he'd

1  told Judge Lackey that this was for his personal benefit?  He

2  asked him for a favor and said it was for his personal benefit?

3  A.   No, I didn't put that in there.

4  Q.   Okay.  Why didn't you put that in?

5  A.   Because, again, I think -- as the investigation moved

6  along, I think it showed that it wasn't just for a personal

7  favor; it was more than that.

8  Q.   But you're telling the judge about these meetings.  You're

9  taking the trouble to tell him about the meetings, but you're

10 not telling him what actually happened at the meetings.  That's

11 okay?

12 A.   I didn't put it in.

13 Q.   You said that -- we just read it -- that at the meeting,

14 you said to the judge, who decided the search warrant issue,

15 that at the meeting he made corrupt overtures; but you didn't

16 put in the affidavit that Balducci said he would benefit if

17 Judge Lackey ruled in favor of the Scruggs Law Firm, ruled for

18 arbitration.

19      And that he further stated it would be considered a

20 personal favor if Judge Lackey ruled for arbitration, and

21 arbitration was the correct legal way to settle the matter.

22 And that Balducci also mentioned that he had mentioned the

23 position of, *of counsel* when the judge was ready to retire; but

24 that the offer of, *of counsel* was not related to or offered as

25 an incentive to rule as the -- as Balducci asked.  That's what

1  he told you, right?

2  A.    That's what he told me.

3  Q.    So did you tell the judge in the November 26th search

4  warrant affidavit when you said corrupt overtures had been made

5  that Balducci told you the two things were not tied together

6  and no corrupt overtures had been made?

7  A.    That's correct.

8  Q.    Did you tell him that?

9  A.    No.   We relied on, basically, that information came from

10 what the judge -- the judge was still under the impression that

11 the two were tied.   Mr. Balducci's version was they were not

12 tied.

13 Q.    Did you tell him it took the judge two weeks to figure out

14 that maybe there was a problem?

15 A.    Again, at the time -- I did not know at the time it took

16 the judge two weeks.

17 Q.    I'm sorry?

18 A.    I did not know at the time there was a two-week lag time

19 between Mr. Balducci's visit and the judge reporting it to the

20 United States Attorney's Office.

21 Q.    Why didn't you tell him at least that one side, Balducci

22 said there wasn't any corrupt overture; it wasn't meant that

23 way?

24 A.    I don't know.   I just left it out.

25 Q.    You did it on purpose?

 1 A.    No, I did not do it on purpose.

 2            THE COURT:  Excuse me, gentlemen.  May I have a copy

 3 of this affidavit for the search warrant?

 4            MR. KEKER:  Yes, sir.  Here's the affidavit.  You

 5 want a copy of the 302, Your Honor?

 6            THE COURT:  No, just the affidavit.  Thank you.

 7 BY MR. KEKER:

 8 Q.    Did -- were you aware of Balducci having contacts with

 9 people at the Scruggs firm after he was arrested that were not

10 recorded?

11 A.    I'm sorry.  Say that again, sir.

12 Q.    Did you send Balducci to the Scruggs Law Firm to try to

13 gather evidence without wiring him up?

14 A.    No, not to gather evidence.  It was simply to try and see

15 if he could get Mr. Backstrom to come to his office so he could

16 talk to him in private.

17 Q.    Did you send him to the Scruggs office on November 19?

18 A.    I asked him to go over there and see if Mr. Backstrom

19 would come back to his office with him.

20 Q.    And he was not wired?

21 A.    No, sir, he was not.

22 Q.    Did he tell you about the conversation he had with people

23 at the Scruggs firm while he was there?

24 A.    He told me he went in, spoke with one of the secretaries;

25 I think he didn't know who it was.  They told him that

 1 | Mr. Backstrom was not in the office and would not be there, and

 2 | he came back.

 3 | Q.   Did he tell you any conversations he had with anybody at

 4 | the Scruggs firm about the work that he was doing on the voir

 5 | dire or the jury instructions?

 6 | A.   No, I don't recall him telling me that.

 7 |          **MR. KEKER:**  Your Honor, I believe the rest --

 8 |          **THE WITNESS:**  You talking about on that particular

 9 | day, sir, on November --

10 | **BY MR. KEKER:**

11 | Q.   Well, I mean, did he ever go back and have a conversation

12 | that wasn't recorded where he talked about work on the jury

13 | instructions and voir dire?

14 |          **THE COURT:**  Are you saying that relates to --

15 |          **MR. KEKER:**  No, it's omitted.  I'm trying to

16 | establish it, and I want to point out that it's not in the

17 | affidavit.

18 |          **THE WITNESS:**  I'm not sure.  The only two occasions I

19 | recall him going over to the Scruggs Law Firm was on the

20 | November 19th incident we just discussed and then on

21 | November 5th when he picked up a package at the financial

22 | office, not the main office.

23 |          **MR. KEKER:**  Your Honor, I think the rest of the

24 | omissions and misstatements are -- in this affidavit are things

25 | that we have talked about that have accumulated from the other

1   ones; so I think that's the only thing I have.  May I check

2   with my colleagues?

3         THE COURT:  Check and see.  While you're doing that,

4   is there anything in this affidavit, anything else, that you

5   want to call attention to that you haven't -- I don't recall

6   you've said anything about this affidavit about false

7   statements or mis --

8         MR. KEKER:  Well, I can go back over them.  We

9   believe that the -- almost all of this is false.  The

10  description of the March meeting at the Scruggs Law Firm, we've

11  talked about.  The meeting with Judge Lackey, which is referred

12  to in here, we've talked about.  We think those are false.

13        THE COURT:  Wait just a minute.  What meeting with

14  Judge Lackey that was false?

15        MR. KEKER:  The description of the meeting with Judge

16  Lackey on May 28th -- excuse me -- March 28th, the initial

17  meeting where he went down there.  And that's on page 1 of the

18  affidavit.  And he said he requested a private meeting.  At the

19  bottom of the page, it says, "Balducci, during the course of

20  the conversation -- next to the last line.  "Balducci made

21  corrupt overtures to Judge Lackey, who reported the same to

22  federal officials."

23        And we believe that that, given context, is false.  It's

24  false in various ways.  First of all, he knew and omitted the

25  very important fact that Judge Lackey didn't know whether or

 1  not corrupt -- that's what he's been saying here, took him six

 2  months to figure out if anything was corrupt; and that's only

 3  because he raised $40,000.

 4      The second thing is that -- what Balducci had told him by

 5  this point is that at that meeting Balducci said he would

 6  benefit if Judge Lackey ruled in favor; I'm here for a personal

 7  favor.  I would benefit if you ruled for arbitration.  And he

 8  also said arbitration was the correct legal way to settle the

 9  matter.  Balducci also offered Lackey a position *of counsel*

10  when the judge was ready to retire; but he said, the offer of,

11  *of counsel* was not related to or offered as an incentive to

12  rule as the -- as Balducci had asked.

13      And so, the person doing it has said, I was not making

14  your quid pro quo corrupt overture.  The person receiving it

15  took two-weeks to report it to the federal government and

16  apparently a lot of phone calls and --

17          THE COURT:  Well, is that false?  What's in here

18  that's false?

19          MR. KEKER:  Well, during the course of the

20  conversation, Mr. Balducci made corrupt overtures to Judge

21  Lackey who reported the same to federal officials.

22          THE COURT:  Well, would that not be subject to

23  interpretation what you meant by --

24          MR. KEKER:  I think that's fair; but if I were a --

25          THE COURT:  You're arguing that corrupt is equal to

1    illegal here, criminal.

2            MR. KEKER:   Yes, sir.

3            THE COURT:   Okay.   I get your point now.

4            MR. KEKER:   The affidavit is submitted for a search

5    warrant they say that they're investigating bribery, public

6    corruption.   The whole emphasis is on a criminal act.   Probable

7    cause to show that a violation of 666 is happening.

8            THE COURT:   All right.   What else?   The other

9    statement that you say is false?

10           MR. KEKER:   The May 3rd meeting, first of all,

11   implied -- which is on page 2 -- implies that it was recorded

12   because there -- it's being quoted.   We now know that it wasn't

13   recorded.   And there's this statement about Judge Lackey that

14   they had changed their strategy.   I don't think there's any

15   evidence of that.   The May 4 call is omitted completely.

16           THE COURT:   Wait a minute.   Wait a minute.   There's

17   no evidence of that perhaps, but you're saying it's false.   Do

18   you have evidence that it's false?

19           MR. KEKER:   I think I do.   I mean, what Balducci had

20   told him by the time of this affidavit was that in March they

21   were talking about, Would you go see your friend, Judge Lackey,

22   and explain to him that we'd like this case to go -- don't want

23   anything illegal but love to have it go to arbitration, the

24   legally correct thing.

25        Now he's saying they've changed their strategy and would

1   like to rely on an order to compel binding arbitration.  That's

2   nonsense.  On March 19th, they filed a motion to compel

3   arbitration.  According to Balducci, they said in March that

4   that's what they wanted; and now somebody is saying in this

5   unrecorded call they've changed their strategy and want --

6          **THE COURT:**  I know.  But what we're dealing with here

7   is not ultimately whether it was true or false but whether this

8   agent knew it was true or false.  And do you have any evidence

9   of that?

10          **MR. KEKER:**  I do, Your Honor.  The agent, the one who

11  sat with Mr. Balducci a month before he signed this, less than

12  a month before he signed this, and took down and wrote this

13  302, took his notes, wrote it.

14          **THE COURT:**  Well, this agent says that Balducci told

15  him that.  Now, what evidence do you have that that's not true?

16          **MR. KEKER:**  That's not what he said -- I mean, they

17  couldn't have changed their strategy -- it doesn't make any

18  sense that they changed their strategy, if their strategy in

19  March was to go to arbitration.

20          **THE COURT:**  Well, whether or not they used good sense

21  in changing their strategy is not in issue.  The issue is did

22  this agent have a knowledge that your interpretation -- that

23  this statement is false.  That's what I'm interested in.

24          **MR. KEKER:**  Then the May 4 call we've talked about

25  before.  There's exculpatory information that was omitted from

 1  the May 4 call, one sentence.  May 9, tremendous amount of

 2  exculpatory information we've gone over.  I can go over it

 3  again if you'd like.

 4       But they completely left out that there was no discussion

 5  of money, no discussion of, *of counsel* position.  He omitted

 6  that Lackey viewed an arbitration request as a favor on which

 7  to get credit.  He omitted that Balducci said that this fax

 8  order that he sent over was just something to look at.

 9       And most importantly, he omitted that by May 9th, Lackey

10  had indicated that Balducci had agreed with him, the case

11  should go to arbitration.  And they didn't make any plans to

12  meet again.  And then the next thing -- so he leaves all that

13  out.

14       The next thing he puts in is May 21.  And out of May 21,

15  he says, Mr. Balducci assured Judge Lackey that nobody other

16  than Balducci and Scruggs knew of the arrangement suggestion by

17  Balducci to Judge Lackey.  That's not what he said.  He said

18  nobody knows about this but you and me.

19       There wasn't any arrangement.  And indeed, in the May 21

20  discussion -- we've been over this, but I'll just mention it

21  again -- he omitted that Lackey had been pursuing Balducci

22  during the day, two earlier calls.  He omitted that he assured

23  Judge Lackey --

24            **THE COURT:**  I know.  We've gotten over that omission

25  stuff.  Let's just talk about what you claim is false.  That's

1   what my question was.

2           **MR. KEKER:**   Okay.   Well, I believe those things

3   render the statements that's in here false, things I've said

4   already.   And especially Mr. Balducci assured Judge Lackey that

5   nobody other than Balducci and Scruggs knew of the arrangements

6   suggested by Balducci to Judge Lackey.   That suggests there was

7   an arrangement, suggested by Balducci to Judge Lackey.

8       And what actually -- what Balducci said is, "Frankly, I

9   think we're right; and I think the law's on our side.   And I

10  think probably had I never even approached you, you'd probably

11  had the right result for us in this thing.   My goal is simply

12  to tell you where I am interested in this thing and help guide

13  you to where I thought this thing legally could come."

14      What arrangement?   That's not an arrangement.   And yet he

15  says there is an arrangement.   And then it jumps.   And we

16  believe this is a significant omission.   And I am not going to

17  go over it again.   It jumps to September 18.   It goes from

18  nothing to September 18.   And then in September 18, we talk

19  about what's wrong with it from then on.

20          **THE COURT:**   Okay.   Thank you.

21          **MR. KEKER:**   Your Honor, before I sit down, we're

22  working out this Jencks Act material with the Government, but I

23  just wanted to put on the record that the Government has agreed

24  to give us the 302s of Agent Delaney's interviews that he had

25  referred to during his testimony and the interviews with Lackey

1  on April 24, May 3rd, and September 18.  And we'd like to get

2  it before he's excused while this motion hearing is still going

3  on in case there's something in there that we need to ask him

4  if we can reopen based on what we have.  And I think we're

5  getting it as soon as possible.

6         THE COURT:  They've agreed to give it to you now?

7         MR. KEKER:  Yes, sir.

8         THE COURT:  Well, that's very generous of them.

9         MR. KEKER:  Following the law is never generous, Your

10 Honor.  It's just the law.

11        THE COURT:  Well, it says after direct examination,

12 before cross-examination, they're required to give it to you.

13 Now they're giving it to you about a month before the trial

14 date.  So I think that is generous.  Do you have anything else

15 you want to add to this search warrant --

16        MR. KEKER:  Your Honor, if I can just get this

17 straight.  It was May 3rd, April 24, and May 22.

18        THE COURT:  Very well.

19        MR. SANDERS:  Your Honor, I can.  I can clear up a

20 couple of things that Agent Delaney talked about.  But frankly,

21 Your Honor, I think everything the Court needs to find probable

22 cause is in the search warrant itself.

23        THE COURT:  Well, I'm sure you feel that way.

24        MR. SANDERS:  I can clear up those points, Your

25 Honor.

1            THE COURT:  If you want to, for the record, you may.

2            MR. SANDERS:  Yes, sir.

3            THE COURT:  The affidavit, however, speaks for itself

4  based on the record so far.  But you may proceed.

5            MR. SANDERS:  Okay.

6                    REDIRECT EXAMINATION

7  BY MR. SANDERS:

8  Q.   Agent Delaney, you talked about -- and I want to clarify

9  this language in your 302 with respect to what you believe

10 Balducci told you in the first meeting and what Balducci told

11 you about in the second meeting.  All right?  You know what I'm

12 talking about?

13 A.   Yes, sir.

14 Q.   All right.  Explain what you thought Balducci said the

15 first time you met with Balducci with respect to what

16 Mr. Scruggs said to him at that first meeting.

17 A.    In the first meeting, I -- he told me -- or what I

18 believed he told me was, in that meeting on March 28 when it

19 was him and Mr. Patterson and Mr. Scruggs and I believe

20 Mr. Backstrom and the other Mr. Scruggs, Mr. Scruggs said he

21 wanted him to go see Judge Lackey but would not ask him to do

22 anything illegal.

23     I wrote a draft of that report.  I subsequently showed

24 that to Mr. Balducci to have him read it.  And he advised me

25 and said, I don't -- that was not the content of that meeting

1  in March, that he was asking me to do something illegal.

2  Q.   Okay.  So what -- let me -- I'm trying to clarify this.

3  Let me see if I'm correct.  Is Tim saying that Mr. Scruggs told

4  him, don't do anything illegal?

5  A.   That was my interpretation of what he said on the first

6  meeting on November 2nd.  When he looked at the draft of my

7  report, he saw that and said, "No, that's not accurate.  That's

8  not what happened at that March meeting.  He didn't tell me not

9  to do anything illegal."

10 Q.   And that's what you came to believe when you signed the

11 affidavit?

12 A.   Yes.

13 Q.   All right.  Now, a couple of things that he mentioned in

14 passing.  He said that it took Judge Lackey six months to

15 figure out if anything corrupt was taking place.  Did it take

16 Judge Lackey six months to determine whether anything corrupt

17 was taking place?

18 A.   No.  By corrupt, I mean, are we talking about illicit or

19 are we talking about criminal?

20 Q.   He said corrupt.  I don't know what he meant.

21 A.   I mean, corrupt -- certainly illicit in those first

22 meetings from Judge Lackey's perspective.

23 Q.   And also, they've referred to a couple of different times

24 on the May 3rd statements made that you put it in quotes in the

25 affidavit, statements made by, I believe, Balducci on May 3rd.

1   Did you put them in quotes to mislead the Court as if it were a

2   recording?

3   A.   No.

4   Q.   Why did you put it in quotes?

5   A.   That was taken from a statement from Judge Lackey.

6   Q.   And finally, what date did you sign this search warrant

7   affidavit?

8   A.   I believe it was November 26th.

9   Q.   All right.  It was after November 1st?

10  A.   Yes.

11  Q.   And did Balducci wear a wire into the Scruggs Law Firm on

12  November 1st?

13  A.   Yes, he did.

14  Q.   And did he talk to each of the defendants?

15  A.   Yes, he did.

16  Q.   Did he talk to each of the defendants about the bribe he

17  was paying to Judge Lackey?

18  A.   He discussed the order that he'd picked up from Judge

19  Lackey earlier the morning of November 1st after he delivered

20  $10,000.

21  Q.   Did he discuss the bribe they were paying to Judge Lackey

22  to Zach Scruggs?

23  A.   Yes.

24  Q.   What did he say exactly?

25  A.   He showed him the order; and sounds like from the

1   recording of the conversation, that they read the new paragraph

2   that Judge Lackey had inserted into that order that he picked

3   up November 1st and discussed the language in that order.

4   Q.    Did he talk about paying for it?

5   A.    Well, Mr. Balducci made the comment that -- saying, you

6   know, let's get this right; you're paying for it; let's get it

7   the way you want it.

8   Q.    Who was standing with him when he said that?

9   A.    I believe it was Mr. Backstrom and Mr. Zach Scruggs.

10  Q.    All right.  And then did he talk to Mr. Dick Scruggs?

11  A.    Afterwards, yes, in private.

12  Q.    And did he talk about a bribe they were paying to Judge

13  Lackey with Mr. Scruggs?

14  A.    Yes.

15  Q.    What did he say about the bribe in that instance?

16  A.    Basically, to paraphrase the conversation --

17              THE COURT:  Counsel, the affidavit speaks for itself.

18              MR. SANDERS:  Yes, sir, Your Honor.  No further

19  questions.

20              THE COURT:  We've already gone over that.  You may

21  step down.

22              MR. KEKER:  May I question, Your Honor, just about

23  that redirect?

24              THE COURT:  What part of the redirect?

25              MR. KEKER:  Just looking at the draft report.

DAILY COPY   RECROSS - DELANEY

1              THE COURT:   Okay.

2              MR. KEKER:   That he just talked about.

3                    RECROSS-EXAMINATION

4    BY MR. KEKER:

5    Q.   Agent Delaney, when did you write the draft report that

6    later Mr. Balducci had trouble with?  I don't think we have

7    that one for you.

8    A.   I've got it.  It's dated November 12th.

9    Q.   So on November 12, you wrote your -- what became your 302;

10   and then you say you had Balducci read it?

11   A.   Yes.

12   Q.   He said this morning that he never saw it.  He said that

13   you read it to him.  Do you remember which is the truth?

14   A.   No.  I specifically -- I gave those reports to him and had

15   him read it.

16   Q.   And there was some disagreement on his part about this

17   part of the report where Dick Scruggs said he didn't want him

18   to do anything illegal?

19   A.   Yes.

20   Q.   And you then went back to your original notes from the

21   interview, as well as consulted the other FBI person there,

22   Agent Surles?

23   A.   Yes.

24   Q.   And you decided you were right and Balducci was wrong?

25   A.   I felt more comfortable that that was the accurate

1  reflection of what he said that evening, yes.

2  Q.    Do you still have those notes?

3  A.    Yes.

4  Q.    Do you have the draft 302 that you showed to Mr. Balducci

5  and had him read?

6  A.    No, I don't have the draft.

7  Q.    But you have the notes?

8  A.    Yes.

9          MR. KEKER:  Your Honor, we'd ask for an order

10 reserving all notes in the case, specifically those.

11         THE COURT:  I'll take that under advisement.

12         MR. KEKER:  Nothing further.  Thank you.

13         THE COURT:  All right.  You may step down.  Give that

14 to Mr. Keker.  That's your affidavit, Mr. Keker.

15         MR. KEKER:  Yes, sir.

16         THE COURT:  As to these motions concerning the

17 adequacy of the probable cause in the affidavits for these

18 wiretaps and for the search warrant, the defendants attacked

19 the adequacy of the probable cause by bringing out alleged

20 omissions and alleged false statements.

21     The law, of course, is to the effect that, when deciding,

22 that the Court should look at whether the affidavits establish

23 probable cause with those statements included, if they had been

24 included.  And, so, what I would like to see -- have from

25 counsel on both sides is -- I've taken notes, and I know

1   basically from those notes basically what the defendants claim

2   were the omitted statements that should have been put in and

3   what the statements are that the defendants claim were false.

4   But I would like -- I'd like a memorandum from the defendants

5   listing those alleged false and omitted statements that you

6   claim make the probable cause defective.

7            **MR. KEKER:**  Would it be helpful if we -- rather than

8   just argue about this, if we just wrote the affidavit with

9   highlighting this was -- this part is omitted, should have been

10  there.  And then this part is false.  I mean, just sort of

11  rewrote the affidavit?  Or do you want just a legal memorandum?

12           **THE COURT:**  Well, I just want a listing of what you

13  claim.  And the Government, also, if you want to do that also.

14  You seem to have already listed them from your argument here.

15       Also, there's still this question in the Court's mind

16  about what established probable cause, for example, the

17  Patterson wiretap and the Balducci wiretap.  It's not contested

18  by either party that if someone is aggrieved over a wiretap

19  they have a standing to complain about it.

20       But the question in the Court's mind at this time is, What

21  do they complain about?  Do they complain about the probable

22  cause to establish the wiretap of the person who owned the

23  phone or against whom the wiretap was sought, or can they

24  complain about whether any probable cause existed against the

25  person who was complaining about it, the aggrieved party whose

1  phone was not tapped?

2      In other words, there's no question that the three

3  defendants in this case have standing to complain about the

4  legality of the Patterson wiretap.  Now, what can they complain

5  about?  Can they complain about whether probable cause existed

6  against these three defendants when that wiretap was sought?

7  Or can they only complain about whether probable cause existed

8  to tap Patterson's phone?

9      Now, that's a question I'd like to hear some law about.

10 As I mentioned earlier, the three defendants in this case never

11 had any of their phones tapped.  And if the Patterson wiretap,

12 for example, were illegal, then they have the right to attack

13 it.  But to prove it was -- but was it illegal if it did not

14 have probable cause against these three defendants in the

15 affidavit, since it was only the Patterson phone that was

16 wiretapped?

17     I think there's an arguable basis to conclude that -- to

18 justify that wiretap, the Government has to show there was

19 probable cause to tap Patterson's phone and did not have to

20 show probable cause that there was a crime being committed by

21 these three defendants.  So I'd like to hear your memorandum on

22 that.  All right.  And I'd like to get that -- I'd like to get

23 that by Monday.

24         **MR. KEKER:**  End of the day Monday or --

25         **THE COURT:**  End of the day.  All right.  Let's see.

1   It's four o'clock.  I think we've gotten through the longest

2   motions that will be involved.  We have left the motion to

3   dismiss Counts 2, 3, and 4 because of alleged lack of

4   jurisdiction.  And the motion to exclude the 404(b) evidence,

5   that is, the prior bad acts evidence, prior similar bad acts.

6        And then we also have the motion of Zachary Scruggs and

7   Sid Backstrom to sever their trial from that of Richard Scruggs

8   and the motion for change of venue.  I think we'll recess

9   today.  We've been in Court a pretty good while today.  And

10  take those up at nine-thirty tomorrow morning.  We'll start

11  with the motion to dismiss Counts 2, 3, and 4 for lack of

12  jurisdiction and then go from that to the 404(b) motion.

13       All right, gentlemen, thank you very much.  We'll be in

14  recess until nine-thirty.

15       (THE HEARING RECESSED AT 3:54 p.m.)

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3        I, Rita Davis Sisk, RPR, BCR, CSR #1626, Official Court

4   Reporter for the United States District Court, Northern

5   District of Mississippi, was present in court during the

6   foregoing matter and reported said proceedings

7   stenographically.

8        I further certify that thereafter, I, Rita Davis Sisk,

9   RPR, BCR, CSR #1626, have caused said stenographic notes to be

10  transcribed via computer, and that the foregoing pages are a

11  true and accurate transcription to the best of my ability.

12       Witness my hand, this 20th day of February, 2008.

13

14

15

16

17                        RITA DAVIS SISK, RPR, BCR, CSR #1626

18                        Official Court Reporter

19

20

21

22

23

24

25