UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

v.  CRIMINAL CASE NO. 3:07CR192-b-a

DAVID ZACHARY SCRUGGS

### PETITIONER'S MOTION FOR DEPOSITIONS

Following on this Court's Order setting a hearing on "all issues" presented in the Petition, the Petitioner moved to conduct limited discovery in this case, asking the Government to admit or deny certain facts, and to explain their basis for doing so, providing any documents or other things that supported their contentions. D.E., 316. Petitioner explicitly stated that, "depending on whether the Government will admit certain points, the Defendant reserves the right also to ask for depositions of key persons." *Id*., at 4. To date, the Government has not been required to address those points or provided any evidentiary basis for its tacit denials. Petitioner therefore must now request depositions of key persons in order to allow him to discover material facts pertaining to the three issues on which this Court has ordered a hearing.

I.  **The Court's Duty to Allow Discovery**

The Rules for Section 2255 Proceedings provide that, "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure." Rule 6. The Supreme Court has said that, "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.' *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (ellipsis in original; quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969))(emphasis added). The Fifth Circuit has

1

warned that, "While the district court generally has discretion to grant or deny discovery requests under Rule 6, a court's blanket denial of discovery is an abuse of discretion if discovery is 'indispensable to a fair, rounded, development of the material facts.'" *East v. Scott*, 55 F.3d 996, 1001 (5th Cir., 1995) (quoting *Coleman v. Zant*, 708 F.2d 541, 547 (11th Cir.1983) (quoting *Townsend v. Sain*, 372 U.S. 293, 322 (1963))(emphasis added).  Depositions, in particular, are an important mechanism for such factual development.  *Id.*  Just last year, for example, in the habeas case of *Hodges v. Epps*, Chief Judge Michael Mills allowed the petitioner to conduct four depositions.  *See* Case No. 1:07CV66-MPM, Docket Entry 38, Feb. 1, 2010.  *See generally*, *Dollar v. Long Mfg., N.C., Inc.,* 561 F.2d 613, 615-617 (5th Cir., 1977)(describing the "vital" role of depositions in particular, and holding that it was an abuse of discretion for the court to refuse to compel them).

## II.  The Depositions Requested

The following states the name of each person whose deposition is requested, along with illustrative (but not exhaustive) information explaining the discoverable information that person is likely to provide.  For the sake of brevity, each entry incorporates the knowledge stated for prior witnesses.

**Sidney Backstrom** – Mr. Backstrom was a co-defendant in this case, who worked in the Scruggs Law Firm across the hall from the Petitioner.  Mr. Backstrom has discoverable knowledge concerning the Scruggs Katrina Group and their assessment of the *Jones* case, whether Petitioner ever knew about an alleged bribery scheme or whether there was any such bribery scheme.  This Court has previously suggested that Mr. Backstrom would surely have discussed a bribery scheme with Petitioner (*see* Petition, D.E. 303 at 33), and Mr. Backstrom will put such speculation to rest.  Specifically, Mr. Backstrom can provide context to the November 1

recording, testifying as to whether Petitioner was present during key moments. Mr. Backstrom is also a witness regarding the existence of certain alleged conversations and emails, about which Timothy Balducci has testified falsely. Mr. Backstrom can also testify to whether Petitioner ever did anything to join the conspiracy, in support thereof, or to conceal the same, along with the state of mind of the Petitioner regarding Judge Lackey's order compelling arbitration. Mr. Backstrom also has knowledge of exculpatory discussions he had with federal authorities concerning Petitioner both before and after he became a cooperating witness, as well as about the existence or absence of any documentation of such discussions, which should have been disclosed to Petitioner. Mr. Backstrom will also impeach testimony and representations previously given to this Court by both Government witnesses and the Government itself. Mr. Backstrom presently resides in Texas, outside the civil subpoena power of this Court, making a deposition the only practicable way to get his testimony for this Court. *See* Fed. R. Civ. Proc. 45(b)(2) (stating the limits of the subpoena power). *White v. Thaler*, 610 F.3d 890, 897 (5th Cir., 2010) (holding that civil procedures apply to Section 2255 petitions).

**Richard Scruggs** – Mr. Scruggs was the primary defendant in this case, and has discoverable knowledge about the foregoing issues. Mr. Scruggs is also in the best position to testify about who created the alleged bribery scheme, when, and how, and most importantly, whether Petitioner was ever told about that alleged bribery scheme. In addition, Mr. Scruggs knows whether Petitioner was ever informed about the $40,000 and $10,000 payments to Mr. Balducci, or whether Petitioner was informed that the legal work assigned to Mr. Balducci on a Hurricane Katrina case was a mere sham, as the Government alleges, to provide cover for reimbursing the alleged bribery funds. Mr. Scruggs can also testify to whether Petitioner ever did anything to join the conspiracy, in support thereof, or to conceal the same. This testimony

3

will also serve to impeach testimony and representations previously given to this Court by both Government witnesses and the Government itself. Mr. Scruggs resides in a Federal Correctional Institution in Ashland, Kentucky, outside the civil subpoena power of this Court, making a deposition the only practicable way to get his testimony for this Court. *See* Fed. R. Civ. Proc. 45(b)(2) (stating the limits of the subpoena power).

**Steven Patterson** – Mr. Patterson was a co-defendant in this case, and has discoverable knowledge about many of the foregoing issues. In particular, various tape recordings include statements by Mr. Patterson showing that he intended to get reimbursement of the $40,000 from P.L. Blake, without him or the Scruggs defendants ever knowing the purpose of the reimbursement. Further, Mr. Patterson is expected to testify that, contrary to the Government's representations, Mr. Patterson himself (rather than Petitioner) initially suggested that Balducci approach Judge Lackey *ex parte*. Mr. Patterson has knowledge about whether Petitioner ever knew about the bribery scheme. Mr. Patterson also has knowledge of exculpatory discussions he had with federal authorities concerning Petitioner both before and after he became a cooperating witness, as well as about the existence or absence of any documentation of such discussions. Mr. Patterson further has knowledge about the legitimacy of the Katrina *voir dire* work Mr. Balducci was hired to do. Such testimony will go directly to the state of mind of Petitioner, showing whether he had any knowledge of the Government's bribery scheme, and whether he was entrapped by the Government. This testimony will also serve to impeach testimony and representations previously given to this Court by both Government witnesses and the Government itself.

**Timothy Balducci** – Mr. Balducci is the government's star witness in this case, and Petitioner was never allowed to question him in the criminal proceedings. In addition to the

4

foregoing, Balducci will testify about his false statement to the grand jury that he told Petitioner about a "$10,000" payment to Judge Lackey and that Petitioner explicitly assented that it was "not a problem," statements which are refuted by the tape recording. Concerning that November 1 recording, Mr. Balducci will also testify about why he stated his intentions to speak with Mr. Backstrom and Richard Scruggs, but not Petitioner, and why he chose to speak in "sweet potato" code on that day rather than speak explicitly about his plan to bribe Judge Lackey. Balducci will also testify about what portions of the November 1 conversation Petitioner heard, versus the portions in which he was distracted or absent. Mr. Balducci will also testify concerning his candid, tape-recorded comments prior to his collaboration with the Government, which explicitly stated that the Scruggs defendants did not know, and would never know, about his bribery plan. Mr. Balducci will also testify about whether the Scruggs Defendants ever had an intention or predisposition to bribe Judge Lackey, or whether the Government entrapped them all. Mr. Balducci will also testify about a May 4 email, which the Government claims exists, but has never been found, and Mr. Balducci will testify about whether *any* email was sent in furtherance of the Government's conspiracy. Mr. Balducci will also testify about certain in-person and telephone conversations with Sid Backstrom, which Balducci claims happened, but which are rebutted by documentary evidence. Mr. Balducci will also testify about a November 19 meeting at the Scruggs Law Firm, for which the Government has concealed tape recordings, but where Petitioner explicitly asked Balducci for the fruits of his labor on the Katrina case, which the Government claims was a mere sham. Mr. Balducci will testify that Petitioner had no knowledge of or involvement in any wrongdoing in the Delaughter case. Mr. Balducci also has knowledge of exculpatory discussions he had with federal authorities concerning Petitioner after he became a cooperating witness, as well as about the existence or absence of any documentation

5

of such discussions, which the Government has concealed to this day. This testimony will also serve to impeach testimony and representations previously given to this Court by both Government witnesses and the Government itself.

**Judge Henry Lackey** – Judge Lackey was the state court judge that demanded a bribe from Timothy Balducci, at the request and direction of the Government. Judge Lackey has personal knowledge as to whether there was any real dispute as to whether he should order arbitration, whether Mr. Balducci ever offered him a bribe, who first conceived of there being a bribe, and whether Mr. Balducci ever implicated Petitioner (or anyone else in the Scruggs Law Firm) in a bribe. The preliminary discussions between Mr. Balducci and Judge Lackey were not recorded, and Petitioner has not been provided with any FBI 302 reports for those discussions, making Judge Lackey's testimony all the more important. Judge Lackey has also has knowledge of exculpatory discussions he had with federal authorities concerning Petitioner as well as about the existence or absence of any documentation of such discussions. This testimony could also serve to impeach testimony and representations previously given to this Court by both Government witnesses and the Government itself. Because this Court did not allow Judge Lackey to take the stand at the February 2008 Hearing, Petitioner has not had a previous opportunity to question Judge Lackey regarding these issues.

**William Delaney** – Mr. Delaney was the FBI Special Agent in charge of the Lackey investigation. He is the person who, along with Tom Dawson and John Hailman, first conceived of a plan to bribe Judge Lackey, and who pressured Judge Lackey to demand such a bribe. Mr. Delaney had regular and continuous contact with both Judge Lackey and later Tim Balducci, and was charged with documenting all such contacts in standard FBI 302 Reports. Thus, Mr. Delaney has knowledge of exculpatory discussions concerning Petitioner as well as about the

6

existence or absence of any documentation of such discussions. In particular, after Judge Lackey withdrew from the *Jones* case, there was a May 22, 2007 meeting in which Mr. Delaney talked Judge Lackey into getting back in the investigation. Mr. Delaney was also responsible for recording Judge Lackey's conversations with Balducci and later, Balducci's conversations with members of the Scruggs Law Firm. In particular, Mr. Delaney can speak to the November 19 meeting in which Petitioner asked Mr. Balducci about his work on the Katrina case (which the Government insists was a sham). Mr. Delaney can resolve the mystery of this missing evidence, explaining why he chose not to create (or retain) a recording, and why he did not create (or retain) a 302 report for this key event exculpating the Movant despite FBI policy that every contact be the subject of a report. Mr. Delaney can also explain the instructions he gave to Balducci about the words and methods he used to try to trap people on tape, and Mr. Delaney will explain the absence of bugs in the Scruggs Law Firm offices and their telephones, which would have provided further exculpatory evidence. Such selective creation of evidence, if unexplained, will allow inferences adverse to the Government.

**Joseph Langston** – Mr. Langston was a government witness in this case, and in the Delaughter case, which the Government successfully threatened to use as 404(b) evidence against Petitioner. Mr. Langston will speak directly to the Government's false representation to the Court that Mr. Langston would "implicate" Petitioner in the Delaughter other case, and Mr. Langston will speak to the Government's state of knowledge and willfulness concerning that misrepresentation to the Court. Mr. Langston will explain why neither he, nor Mr. Farese, nor the prosecutors corrected the record, and specifically whether he was threatened by the Government to remain silent, while this Court was misled. Mr. Langston will also testify concerning the secret negotiations in which Anthony Farese represented both Mr. Langston and

Petitioner, and specifically about whether Mr. Langston, Mr. Farese, and the Government understood the conflict of interest created by such dual-representation. Mr. Langston also has knowledge of exculpatory discussions he had with federal authorities concerning Petitioner both before and after he became a cooperating witness, as well as about the existence or absence of any documentation of such discussions. His testimony will also serve to impeach testimony and representations previously given to this Court by both Government witnesses and the Government itself. Mr. Langston resides in a Federal Correctional Institution in Montgomery, Alabama, outside the civil subpoena power of this Court, making a deposition the only practicable way to get his testimony for the Court. *See* Fed. R. Civ. Proc. 45(b)(2) (stating the limits of the subpoena power).

**Anthony Farese** – Mr. Farese can speak directly to the Government's efforts to use him to procure Mr. Langston's cooperation against Petitioner and the other Defendants. Mr. Farese can explain why he never disclosed his dual representation to the Petitioner, the others in the joint-defense pact, or the Court. Mr. Farese can speak to the Government's new representation in this Section 2255 proceeding that they secured an alleged "verbal waiver" from Petitioner. Mr. Farese will explain whether and why the Government pressured him not to secure a written waiver for over a month, specifically until after Mr. Langston's plea agreement had been finalized. Mr. Farese can further testify that in obtaining a written waiver from Petitioner on January 7, 2007, he did not disclose the nature of his dual representation of Mr. Langston, that Mr. Langston had been considered a criminal "target" for a month, his and Mr. Langston's negotiations with the Government, or Mr. Langston's agreement to plead and testify as a Government witness in Petitioner's case. All of which was directly adverse to Petitioner, and thus clearly material to the waiver. Mr. Farese will also speak to the Government's

8

misrepresentation concerning Mr. Langston's implicating Petitioner in the Delaughter case and why Mr. Farese, Mr. Langston, or the prosecutors never corrected the record until long after Petitioner went to prison. Overall, it appears that Mr. Farese self-servingly disagrees with certain facts stated in Mr. Dawson's book, so testimony is necessary to resolve that dispute.

**Thomas Dawson** – Mr. Dawson was the lead prosecutor in this case, and published a book in 2009 detailing the government's knowledge of an un-waivable ethical conflict in Mr. Farese representing both Petitioner and Mr. Langston. Mr. Dawson has knowledge that despite that awareness, the government co-opted Petitioner's counsel and secretly negotiated with Mr. Farese and Langston in order to secure a purported witness against Petitioner and his co-defendants. Mr. Dawson has also specifically written about the prejudice that these tactics caused to Petitioner's case, stating that they Mr. Langston's (false) testimony created an "insurmountable" challenge to Petitioner, one that "blew a hole" in his case. Mr. Dawson will further explain that the Government knew all along that Mr. Langston would be adverse to the Scruggs Defendants, and that they even understood the conflict of interest that created, facts which go to the Government's willfulness in wrongdoing. Mr. Dawson's testimony will provide a foundation for many of the statements in that book, which otherwise may not be admissible. Mr. Dawson has already provided an affidavit in Mr. Farese's bar proceeding, showing that he has discoverable information. Mr. Dawson also has knowledge of exculpatory discussions key government witnesses had with federal authorities concerning Petitioner as well as about the existence or absence of any documentation of such discussions. Mr. Dawson's testimony will also serve to impeach testimony and representations previously given to this Court by both Government witnesses and the Government itself.

**Judge David Sanders** – Judge Sanders was an assistant prosecutor in this case, and has previously submitted an affidavit showing that he has discoverable knowledge concerning the Government's efforts to co-opt Petitioner's counsel Mr. Farese, to secure a purported witness against Petitioner, and concerning the Government's misrepresentation about Mr. Langston. In his affidavit for Mr. Farese's bar proceeding, Judge Sanders says that Langston "always maintained that Zach Scruggs was uninvolved in the Wilson matter," and "at no time" said "anything to me that would have implicated Zach in the Wilson matter." *See* Petition at 9. Thus, Judge Sanders can speak directly to the state of mind of the Government, showing whether the misrepresentation was negligent or willful. Judge Sanders also has knowledge of exculpatory discussions key government witnesses had with federal authorities concerning Petitioner as well as about the existence or absence of any documentation of such discussions.

**Robert Norman** – Mr. Norman can speak to all of the above, but his testimony is particularly material to the Government's misrepresentation to this Court concerning Mr. Langston. What Mr. Norman knew, and when he knew it, is thus highly material, even though the Government will be held responsible for the knowledge of all the attorneys in the prosecutors' office. Mr. Norman has already filed an affidavit for Mr. Farese, showing that he has discoverable information, and has repeatedly made unsworn representations to this Court that there was "verbal waiver" from Petitioner regarding Mr. Farese's dual-representation, that there was a "misunderstanding" between him and Mr. Langston concerning Petitioner, and that an email was actually the basis for Mr. Norman's representation rather than Mr. Langston's testimony, which goes directly to the Government's state of mind. Mr. Norman will also testify with regard to why the Government never corrected the record, given Mr. Sanders' representation as to his knowledge of the truth all along (*supra*). Mr. Norman also has

knowledge of exculpatory discussions key government witnesses had with federal authorities concerning Petitioner as well as about the existence or absence of any documentation of such discussions.

**Other** -- Petitioner also requests depositions of any witnesses or other persons that the Government intends to rely upon at the hearing on this matter. The Government should be required to disclose those intentions immediately, so as to allow time for such depositions.

### III. Conclusion

These depositions are "indispensable to a fair, rounded, development of the material facts." *East*, 55 F.3d at 1001. Petitioner respectfully requests leave of Court to put these gentlemen under oath, so that the truth of this case can be readily determined and proven.

Respectfully submitted, this 4th day of March, 2011.

/s/Edward D. Robertson, Jr.
Pro hac vice
Bartimus, Frickleton, Robertson & Gorny, P.C.
715 Swifts Highway
Jefferson City, Missouri 65109
573-659-4454
573-659-4460 (fax)
chiprob@earthlink.net

Christopher T. Robertson
Attorney at Law
MS Bar # 102646
christophertrobertson@gmail.com
6342 N Via Lomas de Paloma
Tucson, AZ 85718

CERTIFICATE OF SERVICE

    I, Edward D. Robertson, Jr., hereby certify that on March 4, 2011, I served copies of this Motion the Office of the United States Attorney for the Northern District of Mississippi by way of the Electronic Court Filing (ECF) system.

                                              /s/ Edward D. Robertson, Jr.