IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

V.                                                    CRIMINAL CASE NO. 3:07CR192-B-A

DAVID ZACHARY SCRUGGS

## <u>MEMORANDUM OPINION</u>

Presently before the court is Petitioner's Motion to Vacate his conviction pursuant to

Title 28 U.S.C. § 2255.  Upon due consideration of the motion, response, testimony, exhibits,

and supporting and opposing authority, the court is ready to rule.

### <u>Procedural Background</u>

The Petitioner, David Zachary Scruggs, was indicted on November 28, 2007, along with

co-defendants, Richard F. Scruggs, Sidney A. Backstrom, Timothy R. Balducci, and Steven A.

Patterson on a six-count indictment arising from an attempt to bribe Judge Henry L. Lackey, a

Mississippi circuit court judge, for a favorable ruling in a civil lawsuit styled *Jones, et al. v.*

*Scruggs, et al.* in the Circuit Court of Lafayette County, Mississippi.  The *Jones* civil suit was

filed against The Scruggs Law Firm, Richard Scruggs, and others, in a dispute over the division

of $26.5 million in attorneys' fees arising from a settlement with State Farm Insurance Company

over numerous Hurricane Katrina damage claims.  David Zachary Scruggs, Petitioner herein,

Richard Scruggs, and Sidney Backstrom were all partner attorneys in The Scruggs Law Firm,

who had worked for the firm on the Hurricane Katrina litigation against State Farm that resulted

in the *Jones* suit.[1]  Timothy Balducci was an attorney who worked regularly with The Scruggs

---

[1]The fourth partner in The Scruggs Law Firm, David Shelton, testified that he "didn't do much of any work on the Katrina-related litigation," that he did not actively participate in the *Jones* case, and that he never discussed the *Jones* case with Balducci.  On the other hand, Petitioner, Richard Scruggs, and Backstrom met with Balducci and Patterson to discuss influencing the outcome of the *Jones* case in late March 2007, and it was at this meeting when the scheme was launched to have Balducci attempt to

Law Firm.  Steven Patterson, a non-attorney and former State Auditor of Mississippi, was Balducci's partner and also worked regularly for The Scruggs Law Firm on various projects and joint ventures.

Petitioner retained counsel and pleaded "not guilty" to all six charges on November 28, 2007.  Subsequently, all of Petitioner's co-defendants pleaded guilty to Count I of the Indictment, which charged two offenses:  conspiracy to commit federal program bribery in violation of 18 U.S.C. §§ 2 and 666(a)(2)(b), and conspiracy to commit honest services fraud in violation of the wire fraud statute, 18 U.S.C. §§ 2, 1343, 1346.  Thereafter, Petitioner, as the lone remaining defendant, entered into a plea bargain with the U.S. Attorney's office whereby he waived indictment and pleaded "guilty" to a one-count information charging misprision of a felony on March 31, 2008.  On July 2, 2008, Petitioner was sentenced on the reduced charge of misprision of a felony.  He appealed neither his conviction nor his sentence.  Petitioner successfully served his sentence, and his period of supervised release ended on August 18, 2010 .

On August 18, 2010, Petitioner filed a motion to vacate his conviction pursuant to 28 U.S.C. § 2255, asserting that the United States Supreme Court's 2010 decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010), decriminalized the conduct upon which his conviction for misprision of a felony was based.  In *Skilling*, the Supreme Court narrowed the application of the honest services fraud statute, 18 U.S.C.A. § 1346, to criminalize only schemes to defraud involving bribery and kickbacks.

Petitioner admits that he knew about and was involved in the scheme with his co-defendants to attempt to influence Judge Lackey's rulings in the *Jones* civil lawsuit.  Petitioner

---

influence Judge Lackey.

claims, however, that he did not know that his co-defendants paid Judge Lackey a bribe to secure a favorable ruling, and therefore, he argues that his conduct was not illegal pursuant to *Skilling* because the "felony" he admitted to have misprisioned is not a felony after *Skilling*. Petitioner claims that he is "actually innocent" of the misprision of a felony conviction to which he pleaded guilty because he did not know about the bribe. Inapposite to his position that he did not know about the bribe, Petitioner argues in the alternative that even if he did know about the money paid to Judge Lackey, he would have assumed that the payment was a gratuity and not a bribe.

Along with his *Skilling* "actual innocence" claim, Petitioner contends that his conviction should be vacated because his plea was involuntary due to (1) Government coercion and misrepresentation and (2) because he received ineffective assistance of counsel.

An evidentiary hearing was held on May 23-25, 2011, on Petitioner's Motion to Vacate his conviction pursuant to 28 U.S.C. § 2255, at which eight witnesses testified, including Petitioner's alleged co-conspirators, Timothy Balducci, Sidney Backstrom, and Steven Patterson.

Prior to the evidentiary hearing, the court, in a partial summary judgment order, ruled that the *Skilling* decision should be applied retroactively to petitioner's case, since the *Skilling* decision is substantive and narrows the scope of a criminal statute by interpreting its terms. *See Schriro v. Summerlin,* 542 U.S. 348 (2004); *Bousley v. United States*, 523 U.S. 614, 620-21 (1998). The court also ruled that petitioner's *Skilling* "actual innocence claim" is timely under the one-year statute of limitations for Section 2255 motions, because *Skilling* was decided on June 24, 2010, and Petitioner filed his Section 2255 motion within one year of that decision. *See* 28 U.S.C.A. § 2255(f). The court reserved judgment on the timeliness of Petitioner's Government misrepresentation claim and did not address Petitioner's ineffective assistance of counsel claim in the partial summary judgment order.

<u>Standard of Review</u>

"Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley v. United States*, 523 U.S. 614, 620-21 (1998). The U.S. Supreme Court has "strictly limited the circumstances under which a guilty plea may be attacked on collateral review." *Id.* at 621. "Indeed, the concern with finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas." *Id.*

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice' or that he is 'actually innocent.'" *Id.* at 622.

<u>*Skilling:* Actual Innocence</u>

Petitioner procedurally defaulted on his "actual innocence" claim by filing no direct appeal of his conviction or sentence, and he submitted no argument in attempt to demonstrate cause and actual prejudice for his default. In order to overcome procedural default and prevail on a motion to set aside a conviction pursuant to § 2255, Petitioner must prove his "actual innocence" of the crime to which he pleaded guilty as well as the charges dismissed in the original indictment. *United States v. Bousley,* 523 U.S. 614, 624 (1998). Petitioner's burden is substantial. He must prove that it is more likely than not that no reasonable juror would have voted to convict him in light of the evidence, not only of the charge to which he pleaded guilty, but also of the original charges in the indictment which were dismissed as a result of the plea bargain. *Id.* at 623; *Schlup v. Delo*, 513 U.S. 298, 329 (1995); *Bosley v. Cain*, 409 F.3d 657, 664 (5th Cir. 2005) (proceeding under 28 U.S.C.A. § 2254). For an actual innocence claim to be credible, a petitioner must support his claim with new, reliable evidence "whether it be

4

exculpatory, scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Schlup*, 513 U.S. at 324; *Bosley*, 409 F.3d at 662. There is no presumption of innocence at a habeas proceeding, and therefore Petitioner "bears the burden of establishing that it is more likely than not that no reasonable juror would have convicted him." *Bosley*, 409 F.3d at 664. Petitioner "comes before the court with a strong – and in the vast majority of cases conclusive – presumption of guilt." *Id.*

Petitioner pleaded guilty to misprision of a felony in violation of 18 U.S.C. § 4. The remaining charges in the indictment are Count One as it pertains to conspiracy to commit honest services fraud and Count Five and Count Six, which charge honest services fraud. The court has already dismissed Counts Two, Three, and Four and part of Count One of the indictment, which were federal program bribery charges in violation of 18 U.S.C. § 666, based on the Fifth Circuit's decision in *United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009).[2]

The "actual innocence" standard "requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." *Schlup*, 513 U.S. at 329; *Bosley*, 409 F.3d at 662. A "reasonable juror would consider fairly all of the evidence presented" and "would conscientiously obey the instructions of the trial court in requiring proof beyond a reasonable doubt." *Schlup,* 513 U.S. at 329. The actual innocence standard "does not merely require a showing that a reasonable doubt exists in light of the new evidence, but rather that **no** reasonable juror would have found the defendant guilty." *Id.* at 664 (emphasis added). The standard is not satisfied where at least one juror, acting reasonably and properly instructed,

---

[2] The Fifth Circuit's decision was subsequent to Petitioner's conviction and held that Section 666 does not apply to bribes offered to a state court judge in connection with his judicial decisions.

would vote to convict the petitioner.  For example, in *Bosley v. Cain*, 409 F.3d 657, 665 (5th Cir. 2005), the Fifth Circuit found that the petitioner's evidence showed that a reasonable doubt could have been found to exist but affirmed the petitioner's conviction, holding that the evidence did not show that no reasonable juror would have found petitioner guilty.  In reaching this conclusion, the Fifth Circuit found:

> At best, Bosley's new evidence shows that a reasonable doubt could have been found to exist; it fails, however, to satisfy his burden of showing that no reasonable juror would have found him guilty.  When we view all the evidence – both the new evidence and the evidence offered at trial – we are left with a classic swearing match.  Bosley has not adduced any *reliable* new evidence, such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence."  In reviewing the testimony before him, the magistrate judge found the testimony to be in equipoise, i.e., he found all of the witnesses equally credible, or, more accurately, equally lacking in credibility.  Bosley therefore failed to establish that it is more likely than not that no reasonable juror would choose to believe Tabitha's account over those accounts offered by Tacoma, Kee Kee, Kendra, and Irma.  As a result, we cannot conclude that it is more likely than not that no reasonable juror would have convicted Bosley.

*Bosley*, 409 F.3d at 665 (internal citation omitted) (emphasis in original).  Pursuant to *Bosley*, where the evidence of the petitioner's guilt is contradictory and equally credible or incredible, the petitioner has not met his burden of proving "actual innocence."

A.      **Misprision of a Felony and the Foregone Charges**

Petitioner pleaded guilty to misprision of a felony in violation of 18 U.S.C. § 4, in exchange for the Government dismissing a six-count indictment against him.  Petitioner faced a maximum of seventy-five years for the charges in the indictment, and the plea agreement reduced Petitioner's maximum exposure in prison to three years.

"The elements of misprision of a felony are: (1) knowledge that a felony was committed; (2) failure to notify the authorities of the felony; and (3) an affirmative step to conceal the felony." *United States v. Walkes*, 2011 WL 396485, at *2 (5th Cir. 2011) (citing *United States v. Adams*, 961 F.2d 505, 508 (5th Cir.1992)). The mere failure to report a felony is not sufficient to constitute a violation of the misprision statute. *United States v. Davila*, 698 F.2d 715, 717 (5th Cir. 1983).

The federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, criminalize schemes to defraud that deprive another of money and property or the intangible right to honest services. 18 U.S.C. § 1346; *United States v. Herron*, 825 F.2d 50, 55 (5th Cir. 1987). Petitioner argues that he pleaded guilty to misprision of his co-defendants' conspiracy to commit wire fraud under an honest services theory only, and he claims that he knew nothing about the bribe paid to Judge Lackey. The Government contends that the information and factual basis supporting Petitioner's plea of guilty contain an alternative money/property theory of wire fraud, for which Petitioner is guilty. The distinction between an honest services theory and a money/property theory of wire fraud is important in this case because the *Skilling* decision only affects honest services cases, and Petitioner's "actual innocence" argument is timely and procedurally viable because of the *Skilling* decision. *Skilling* narrowed honest services fraud to encompass only schemes involving bribes or kickbacks. Money/property theories of wire-fraud are *Skilling*-proof. The Government contends that so long as there is a factual basis to support Petitioner's guilt, his conviction should not be vacated. The Government contends that the factual basis clearly establishes that Petitioner was involved in a scheme and artifice to deprive the plaintiffs in the *Jones* suit of their money and property. Petitioner, on the other hand,

contends that the Government is attempting to convert an honest services fraud case to a money/property fraud case after-the-fact. It is not evident from reviewing the factual basis and information supporting Petitioner's plea that the Government intended to charge Petitioner for misprision of a conspiracy to commit wire fraud on a money/property theory. This issue would be simplified if the Government had set out in its factual basis or information what felony Petitioner had misprisioned, but the factual basis and information state only that Petitioner committed misprision of a felony without referencing the underlying felony. A portion of the factual basis states:

> At this time, Scruggs was aware that the order would send the *Jones v. Scruggs* matter to arbitration, and he was aware that the plaintiffs were unaware of both Balducci's involvement and that Judge Lackey's ruling was based, in part, on something other than the merits of the lawsuit. Scruggs was also aware that such an act deprived the State of Mississippi of its intangible right to the honest services of Judge Henry Lackey, performed free from deceit, bias, self-dealing, and concealment. . . . After receiving and examining the order, Scruggs failed to inform the firm's counsel of record of the manner in which the order had been obtained, thereby concealing this fact from the plaintiffs, whom the firm's counsel would have been bound to inform.

The factual basis directly references "honest services" but does not directly reference a money/property loss. The Government contends that it is obvious that had the bribe been successful in securing a favorable ruling, it would have affected the amount that the plaintiffs in the *Jones* case would have been able to collect against The Scruggs Law Firm and Richard Scruggs. The law requires the court to "construe the challenged information liberally and [to] uphold its sufficiency if *by any reasonable construction* it can be said to charge an offense." *U.S. v. Dyer*, 136 F.3d 417 (5th Cir. 1998). The court, however, declines to reach the merits of

the Government's money/property theory of the case, although it is arguably viable, finding that it is not necessary to determine this issue in order to resolve the case.

The elements of conspiracy under 18 U.S.C. § 371, are: (1) an agreement between two or more persons to commit an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one of the conspirators in furtherance of the agreement. *United States v. Fernandez,* 559 F.3d 303, 322 (5th Cir. 2009).

## B. Findings of Fact and Conclusions of Law

### i. Conspiracy

It is established by their guilty pleas that all of Petitioner's co-defendants engaged in a conspiracy scheme to bribe Circuit Judge Henry Lackey by paying him $50,000 for a favorable ruling sending the *Jones, et al. v. Scruggs, et al.* civil suit to arbitration. All of Petitioner's co-defendants pleaded guilty to Count One of the indictment, which charged each of the co-defendants with committing a conspiracy involving Zachary Scruggs.

The genesis of the scheme was a late March 2007 meeting at The Scruggs Law Firm where Timothy Balducci and Steven Patterson met with three members of The Scruggs Law Firm – Petitioner, Petitioner's father Richard Scruggs, and Sidney Backstrom. The parties to the meeting discussed that The Scruggs Law Firm and Richard Scruggs had been sued in the *Jones* suit. They discussed that the suit had been assigned to Judge Henry L. Lackey, a Mississippi circuit court judge in the Circuit Court of Lafayette County, Mississippi. Petitioner and Patterson knew that Balducci had a close personal relationship with Judge Lackey, and one of

them raised this issue in the meeting.[3]  It was decided that Balducci would approach Judge

Lackey in an ex parte manner and speak favorably about Richard Scruggs and The Scruggs Law

Firm in relation to the *Jones* suit.  Backstrom testified that Balducci was supposed to "let [the

judge] know that we were good guys" and "[l]evel the playing field."  Balducci testified that he

was supposed to approach Judge Lackey and "feel him out" to see if he would be willing to rule

in favor of The Scruggs Law Firm and Richard Scruggs by sending the case to arbitration or by

dismissing certain causes of action from the suit and sending the remainder of the suit to

arbitration.  Everyone at the meeting was aware that Balducci had not made an official entry of

appearance in the *Jones* case, and everyone was aware that approaching Judge Lackey in an ex

parte matter was a severe breach of ethics.

On March 28, 2007, Balducci met with Judge Lackey and explained that he would

consider it a personal favor if the judge could resolve the *Jones* lawsuit in favor of The Scruggs

Law Firm and Richard Scruggs, by sending the entire case to arbitration or by dismissing certain

causes of action from the suit and then sending the case to arbitration.  Balducci also expressed a

desire to have Judge Lackey become "Of Counsel" with his law firm upon his retirement – a

position which would result in Judge Lackey being paid by the firm simply to allow the use of

his name on the firm's letterhead.

Judge Lackey became suspicious that he was being asked for an illegal decision and

talked to Judge Andy Howorth, a colleague on the state bench, about Balducci's visit.[4]  After

---

[3]Balducci testified that Petitioner raised the topic.  Backstrom testified that Balducci and
Patterson raised the issue.  Patterson testified that he raised the issue and that Petitioner stated that he also
knew of Balducci's close relationship with Judge Lackey.

[4]Pet'r's § 2255 Motion, Ex. K and Ex. N.

consultation with his colleague and others, Judge Lackey sought the counsel of the U.S. Attorney's Office. As a result, the U.S. Attorney's Office and FBI installed recording devices on Judge Lackey's telephone and in his chambers. Several months later, the FBI applied for and received a court order to tap Balducci's cell phone and a land line of Patterson's.

On or around May 3, 2007, Backstrom contacted Balducci and told him that the strategy had changed and that the firm wanted Judge Lackey to send the *Jones* civil suit to arbitration as opposed to dismissing any of the claims.

On May 4, 2007, according to the testimony of Balducci, Backstrom emailed a proposed order to him to present to Judge Lackey that directed the *Jones* suit to arbitration. At the evidentiary hearing on this motion, Backstrom testified that he did not recall emailing Balducci this proposed order.

On May 9, 2007 and June 5, 2007, Balducci visited Judge Lackey in his chambers to discuss the order.

On September 18, 2007, Judge Lackey on a recorded call with Balducci asked: "If I help them, will they help me?," "Just kinda help me over a little hump I've got." Balducci replied, "I know that I can get that done."

After another meeting between Balducci and Judge Lackey on September 21, 2007, Balducci immediately placed a four-minute phone call to The Scruggs Law Firm and, according to Balducci's testimony, he told Sidney Backstrom that Judge Lackey wanted $40,000 to enter an order compelling arbitration in the *Jones* case. Balducci testified that he asked Backstrom whether "y'all" or "they" would reimburse him for the $40,000. Balducci testified that Backstrom replied that he would get back to him and let him know.

At the evidentiary hearing, Backstrom denied that this call ever took place, and he denied knowing that a bribe had been paid until a later date. Balducci testified that he remembered the call clearly, and the record shows that a four-minute call from Balducci to The Scruggs Law Firm did occur at 10:08 a.m. on that date. A reasonable juror could choose to believe Balducci over Backstrom and could conclude that this call discussing the bribe did take place based on Balducci's testimony and the telephone records introduced into evidence. The question of credibility of conflicting testimony is solely the responsibility of the jurors. *See United States v. Abuhasan*, 402 Fed. Appx. 905, 907, 2010 WL 4746224, at *1 (5th Cir. 2010); Fifth Circuit Pattern Jury Instructions (Criminal Cases), No. 1.08, (2001 ed.), cited *infra*.

Balducci testified that two or three days after September 21, 2007, he talked to Backstrom again on the phone about the $40,000, and Backstrom stated: "You're covered." Again, Backstrom denies that this call occurred. Phone records were introduced at the evidentiary hearing showing that on September 21, 2007, Balducci placed a two-minute call to The Scruggs Law Firm, which Balducci testified was to Backstrom; and, again, a reasonable juror could find from this record and Balducci's testimony that this call and conversation did take place.

On September 27, 2007, Balducci visited The Scruggs Law Firm to pick up an arbitration order for Judge Lackey to sign that was left for him by Backstrom. Backstrom admitted at the hearing that he left this order for Balducci. Balducci then traveled to Calhoun City and delivered the order with an initial installment of $20,000 in cash to Judge Lackey.

On October 18, 2007, Balducci delivered $10,000 in cash to Judge Lackey and picked up the order. Balducci testified that he was at Steven Patterson's office later that day when

Patterson was on the phone with Richard Scruggs. Balducci stated that Patterson gave him the phone to speak with Richard Scruggs. Richard Scruggs told Balducci on that call that he had developed a cover story on how to reimburse Balducci and Patterson for the $40,000 payment to Judge Lackey. Balducci testified that Richard Scruggs told him that he would reimburse them under the cover of hiring Balducci for $40,000 to create a voir dire template for an upcoming jury trial. On a recorded call from October 18, 2007, Patterson advised Balducci that Richard Scruggs wanted Balducci to drop off the order at The Scruggs Law Firm and to pick up a package and a $40,000 check off of Richard Scruggs' desk. Balducci, when delivering the corrupt order to The Scruggs Law Firm for editing and approval, saw Zachary Scruggs, Petitioner herein, and gave the order to Petitioner. Balducci testified that Petitioner stated to him: "Thanks," "You're a good friend; you've done a good job." Balducci then picked up the package containing voir dire materials and a $40,000 check from Richard Scruggs' desk.

After leaving the firm, Balducci called Backstrom, who was out of town. The telephone conversation was recorded. Balducci told Backstrom that he had delivered a copy of "those papers we've been waiting on." Backstrom asked if "[e]verything looked just right, just like we wanted it?," and Balducci stated, "Yeah." Balducci told Backstrom, "[J]ust so you'll know . . . Dick hired me to prepare voir dire for the upcoming Katrina trial y'all got in Jackson County." Backstrom replied: "Oh great. Well. Well, that uh, that's a good deal for everyone." Balducci then stated: "So all that worked out uh, it all worked out good for everybody, if you know what I mean." Balducci testified that when he stated "you know what I mean," it was a reference to the fact that "we had completed the sham transaction and the order had been delivered and the money had been paid." Backstrom, on the other hand, testified that he did not know about the

bribe at this point and did not understand this conversation to be regarding a bribe. Balducci testified that it was never intended that he do the voir dire work and that the work was simply the cover under which Richard Scruggs reimbursed him for the bribe payments to Judge Lackey. Patterson testified that he thought the jury assignment was legitimate but also the method by which Richard Scruggs was reimbursing them for the bribe money. A reasonable juror could conclude, as Balducci testified, that the voir dire assignment was nothing more than a cover and dismiss Backstrom's testimony that he did not understand Balducci to be referencing the bribe scheme. In order to conclude that the voir dire assignment was legitimate, one would have to reach the unlikely conclusion that Balducci was expected to perform the work for no remuneration since $40,000 was the exact amount of the bribe at this time. (An additional $10,000 was later added.)

Balducci also called Patterson after dropping off the order and picking up the $40,000 check. The recorded telephone conversation went as follows: Patterson asked: "You leave it on his desk?" Balducci replied: "I did better than that. I left it with Zach." Patterson responded: "Oh, okay. Very good. Alright, thanks. Alright."

On October 31, 2007, the arbitration order had not been entered by Judge Lackey, and Balducci called Backstrom and told him that he was dropping by the next day. Backstrom stated: "I wanted to ask you too . . . oh, um, about that thing that you been working on, the jury research?" "Um, I, I still haven't gotten that document." "And Dick's about to melt down 'cause you know, you know why." Balducci replied that he was dropping by the next day to resolve the matter. Backstrom admitted at the evidentiary hearing that in this telephone exchange, he and Balducci were talking in code and not really discussing the voir dire

assignment.  Backstrom admitted that in this conversation, his reference to "jury research" was really a reference to the order from Judge Lackey.

On November 1, 2007, Balducci met Judge Lackey in his chambers and delivered the remaining $10,000 payment.  Balducci picked up a newly revised arbitration order.  After the meeting, an FBI agent approached Balducci, escorted him to an FBI vehicle, and showed him the video of him paying the bribe to Judge Lackey.  Balducci immediately agreed to cooperate with the Government.

Balducci wore a body microphone to The Scruggs Law Firm later that afternoon, and engaged Backstrom, Zachary Scruggs, and Richard Scruggs in a recorded conversation.

During the recorded conversation between Balducci and Backstrom in Backstrom's office, Balducci told Backstrom that before Judge Lackey could file the previous order that Balducci had delivered to Petitioner on October 18, 2007, the plaintiffs in the *Jones* litigation had filed a motion opposing sending the case to arbitration.  Balducci told Backstrom that Judge Lackey had amended the order to reflect his consideration of the new filing.  At this point, Petitioner entered Backstrom's office, and Balducci told him:  "Zach, let me bring you up to speed.  Alright, this is on the Judge Lackey deal.  Ok?"  He told Petitioner and Backstrom that Judge Lackey wanted the new language in the order approved before it was entered.  Balducci stated, "I mean, we can do whatever we wanna do if you wanna clean that up any . . . ."  Petitioner Zachary Scruggs replied, "I don't know how to clean it up other than, uh, 'cause I don't know what he's trying to say.  I mean it's not bad, but I'm not sure what his intent was."  The three discussed filing a motion to seal the *Jones* case to keep unflattering emails regarding members of The Scruggs Law Firm from reaching the public.  Balducci stated:  "I think the

proper way to approach him would be let's get this order entered, and then you wanna go back to the well later and get it, get an order sealing the file or closing the file or whatever, we can do that later." The three discussed whether they wanted the *Jones* case dismissed by Judge Lackey and sent to arbitration, as opposed to merely stayed pending arbitration. Zachary Scruggs replied: "Well, what if Judge Lackey retires on the bench and some other [expletive] gets a hold of it?" "I, that's what I think and thought the court was gonna do." Zachary Scruggs stated: "I mean, Lackey's uh, uh, fine, but you know who the [expletive] else is gonna get this thing." Balducci responded: "I don't know that I'll have the stroke with the next one."

At this time in the conversation, a receptionist named Ashley Young knocked on and opened the door of Backstrom's office and told Petitioner that he had a phone call. The recording device clearly recorded the knock and opening of the door and the conversation that followed. Petitioner told Young to tell the caller that he was not there and to take a message. Petitioner asserts through counsel's argument and Young's testimony that he then changed his mind and followed Young out of the office. The recording of this conversation, however, is clear. Young agreed to take the message. Petitioner said, "Thanks," and the door to the office closed loudly. Then Petitioner immediately spoke again, stating, "I don't wanna answer a Tracy Lott who I don't know anything about by off chances." The conversation continued:

> Balducci:     Um, the other piece of this puzzle I hadn't told you yet is
> uh, get it how you want it because I've got to uh, I've gotta
> go back for another delivery of sweet potatoes down there.
> So. Because of all of this that has come up.
>
> Backstrom:    Mm-hmm.
>
> Balducci:     So get it right. Get it how you want it 'cause we're
> payin' for it to get it done right.

Balducci testified that Petitioner was in Backstrom's office, three or four feet away from him, when Balducci stated, "I've gotta go back for another delivery of sweet potatoes down there," and "Get it how you want it 'cause we're payin' for it to get it done right." The record is clear, and a reasonable juror could conclude, that "sweet potatoes" was used among the conspirators as code for "money." Balducci testified at the evidentiary hearing as follows:

| | |
|---|---|
| Petitioner's Attorney: | Any way he would know what sweet potatoes was? |
| Balducci: | I'm fairly certain that it was obvious I wasn't talking about actual sweet potatoes. |
| Attorney: | Okay. But what could it have been? |
| Balducci: | Money. |
| Attorney: | Money? What else? |
| Balducci: | I can't imagine that anyone would interpret it any other way. |

Backstrom strangely testified that he had no recollection of the meeting "beyond what's on the tape" and that based on "hearing the tape," he "felt" like Petitioner was not in the room when Balducci made these statements because Petitioner had no response to Balducci's statements. Backstrom admitted on cross-examination that he did not recall whether Petitioner was in the room or not.

Ashley Young, the receptionist referenced above, now a resident of Birmingham, testified at the hearing that she had not discussed this event in three and a half years but that she remembers this call and event clearly, although on cross-examination she could not remember what courses she was taking in college that year. She testified that Petitioner followed her out to

take the phone call, even after telling her to tell the caller that he was not there and to take a message. Young's version of the events that Petitioner immediately followed her out of the room is directly contradicted by the words spoken on the tape, i.e., "just tell her I'm not here and try to get a, make sure who their name is and their number if you don't mind." Young's testimony is also contradicted by the sound of a door closing as she exits, since the next voice on the tape, after the door has closed, is Petitioner's.

Three people were in the room when the receptionist Young approached the door – Balducci, Backstrom, and Petitioner. Balducci testified that Petitioner did not leave the room. Backstrom testified that he "felt like" Petitioner left the room. Petitioner did not testify. While the receptionist Young stated that Petitioner left the room, the tape is clear that Petitioner told the receptionist to take a message, the door closed, and the conversation continued with Petitioner making the next statement. A reasonable juror could easily conclude based on the tape and Balducci's eyewitness testimony that Petitioner remained in Backstrom's office when the "another delivery of sweet potatoes" and "we're payin for it" statements were made and that Petitioner understood these statements to be regarding a bribe.

A reasonable, properly instructed juror could find from the direct evidence of the November 1, 2007 tape that Petitioner had knowledge about the bribery scheme and helped to interpret and revise the bought order. When Balducci stated regarding the order that "we can do whatever we wanna do if you wanna clean that up any," and when he referenced "going back to the well" later to get another favorable order, Petitioner did not remonstrate. Balducci spoke about "another delivery of sweet potatoes" and told Petitioner and Backstrom to "Get it how you want it 'cause we're payin' for it to get done right," and again, Petitioner did not remonstrate,

nor ask for an explanation of what was meant by "we're payin' for it." Petitioner did not make a statement of disapproval or react in any way that would leave one to reasonably believe that he was not already aware of the bribery scheme. Balducci testified that he always understood Petitioner to be aware of the bribe from the beginning based on his discussions with Backstrom and interactions with Petitioner. That Petitioner was aware of the bribery and participated in the conspiracy is a reasonable conclusion that a juror could make from the direct and circumstantial evidence in this case.

On the November 1, 2007 tape and after Petitioner ultimately did leave the room, Balducci and Backstrom continued their conversation. Balducci asked if Richard Scruggs was angry over how long it had taken to get the order from Judge Lackey. Backstrom responded that he had placated Richard Scruggs, telling him that there was a lack of urgency. Backstrom stated:

> You know and uh, and **they** bought that for a little while. **They** were good with that for a little while, but then um, it just, you know, when you gonna get that order? We need that order? Well, we really don't. Our lawyers aren't billing us anything, 'cause they ain't doing anything. It just . . . anyway but you know, **they** just got it in **their** heads that **they** wanted it, you know? And uh, so **they** were like, can you call Tim and I was like. Yeah, I can call Tim. No problem.

(emphasis added). Balducci spoke openly about the bribe and stated: "I can put his concerns to rest that it's, it's all done. And too, he had paid the money too and he was probably upset, you know, or concerned that you know, it wasn't getting delivered either."

A reasonable juror could conclude from this real-time evidence that Backstrom referred to Richard Scruggs and Zachary Scruggs when he referred to "they" multiple times. Backstrom talked openly about the bribery with Balducci and never once intimated that Petitioner was not "in on" the bribery scheme.

Balducci then left Backstrom's office and visited Richard Scruggs in the elder Scruggs' office.  He explained that Judge Lackey needed another $10,000 payment on the "Johnny Jones order business" because the recent filings by the opposing party made "a decent argument" for not sending the case to arbitration and because the judge "thinks he's a little more exposed on the facts and the law than he was before."  Balducci then told Richard Scruggs that Judge Lackey asked "did I think that you would do a little something else, you know, 'bout ten or so more?" Balducci asked, "[D]o you want me to cover that or not," and Richard Scruggs responded:  "I'll take care of it."  Richard Scruggs told Balducci that he would reimburse him for the $10,000 bribe by hiring him to do jury instructions in addition to the already-discussed voir dire research. Richard Scruggs followed up on this meeting by sending Balducci a letter dated November 1, 2007, stating that he appreciated Balducci's suggestion to draft proposed jury instructions and enclosing a $10,000 check.

On November 2, 2007, Richard Scruggs directed his paralegal, Angela Edwards, to send Balducci an email and to attach a transcript regarding jury instructions as part of the documentation to cover the additional $10,000 payment to Judge Lackey.  Shortly afterwards, Balducci picked up a $10,000 check from the Scruggs' firm's financial office and cashed the funds while under FBI surveillance.

On November 13, 2007, to secure further evidence of the bribery scheme, the Government directed Balducci to call Backstrom.  Balducci stated to Backstrom:  "I was just gonna come see you, **but I could go see Zach or Dick.**  Um, I've, Judge Lackey is in town, has been in town today and I've got that order and uh, he's he's signed it, uh, I've got a copy of it and I was just gonna bring it over there, kinda debrief with you about it, uh."  (emphasis added).

Backstrom asked if the order was "signed, sealed, and delivered?"  Balducci asked Backstrom, "[D]o you really want this to go to arbitration or do you want him to keep it and try to fix it?  You know . . . I think, you know, he's, the judge is ready to play ball with us.  You know?  And we've got an opportunity probably to kill this thing now, um, you know, if you wanna do it that way . . . .You know, it'll take more money, is the other side you know, I mean, we've given him fifty to, to get us to where we are now, but you know, for a little bit more, you know, he's willing to play ball I think and get this thing like we want it, so.  I mean, I guess may you, **maybe you should talk to, to Dick and Zach** about it and see what they, you know, before we enter this order, it might be better served, you guys might wanna just keep it there."  (emphasis added).  Backstrom replied that he did not want to "get ourselves in trouble" and did not want to "overreach again."  Backstrom stated, "I think if it goes to arbitration, it's gonna take the wind out of their sails and I think, um, it's, it's, you know, probably on a path to, you know, a quick dismissal there too."  He told Balducci he wanted to "stay the course, especially 'cause it's taken as long as, I mean, and, and some of that's been uh, you know, fine, you know, but I think there is general concern now that um, you know, there is, there has been some waffling and hand wringing going on that's unnecessary and we just don't know that that's always gonna work to our advantage, you know?"

Fifteen days later, on November 28, 2007, Petitioner, Richard Scruggs, Sidney Backstrom, Steven Patterson, and Timothy Balducci were indicted.

The court finds that Petitioner has not demonstrated that in light of all the evidence, it is more likely than not that no reasonable juror would have voted to convict him of the conspiracy

21

charge.[5]  A reasonable, properly instructed juror could consider fairly all of the evidence

presented, circumstantial and direct, and conclude that Petitioner knew about the bribery and

participated knowingly in the bribery scheme.  It is clear from the evidence presented that

Petitioner shared the interest of his co-defendants in securing a favorable ruling from Judge

Lackey in the *Jones* lawsuit and sought by his actions to make the venture succeed.  The record

is clear that Petitioner not only agreed to but encouraged Balducci's ex parte contacts with Judge

Lackey for a favorable ruling, when Balducci was not even an attorney in the case.  When the

scheme escalated to involve paying the judge for a ruling, Balducci's testimony and recorded

conversations can be found by a reasonable juror as evidence that Petitioner continued

contributing to the scheme and helped draft the bought order with no reluctance.  He took no

steps to withdraw from the conspiracy.  A reasonable juror could conclude that Petitioner shared

in his co-conspirators' criminal intent and engaged in conduct designed to aid the venture by

actively examining and suggesting revisions for the order on November 1, 2007.  Steven

Patterson testified that members of The Scruggs Law Firm, including Petitioner Zachary

Scruggs, made "several inquiries" by calling him "looking for Tim" "about a status date on the

voir dire."  A reasonable juror could conclude that there was no legitimate voir dire research and

that these "status inquiries" were attempts to communicate regarding the bought order.

Though Backstrom testified that he never told Petitioner that Richard Scruggs was paying

tens of thousands of dollars to secure a favorable order from Judge Lackey, a reasonable juror

could choose not to believe Backstrom and instead choose to believe Balducci.  Balducci

testified that, based on his interactions with Petitioner, including but not limited to the recorded

---

[5]*Bousley*, 523 U.S. at 623; *Bosley*, 409 F.3d at 664.

conversation of November 1, 2007, Petitioner was always aware of the bribe. A reasonable juror

could believe Balducci's testimony and conclude that Backstrom was the point man between

Balducci and the members of The Scruggs Law Firm implicated in the *Jones* civil suit.

Backstrom admitted when he pleaded guilty that he actively conspired to bribe Judge Lackey,

and a reasonable juror could find that Backstrom's belated attempts to disconnect himself and his

friend and former law partner, the petitioner, from the bribery scheme are incredulous and self-

serving.

"[T]he jury [is] responsible for determining the weight of the evidence and the credibility

of the witnesses . . . ." *United States v. Abuhasan*, 402 Fed. Appx. 905, 907, 2010 WL 4746224,

at *1 (5th Cir. 2010), and the court cannot find that all jurors would choose to believe Backstrom

over Balducci. The Fifth Circuit pattern jury instruction regarding credibility of witnesses reads

as follows:

> I remind you that it is your job to decide whether the
> government has proved the guilt of the defendant beyond a
> reasonable doubt. In doing so, you must consider all of the
> evidence. This does not mean, however, that you must accept all
> of the evidence as true or accurate.
>     You are the sole judges of the credibility or "believability" of
> each witness and the weight to be given the witness's testimony.
> An important part of your job will be making judgments about the
> testimony of the witnesses who testified in this case. You should
> decide whether you believe all or any part of what each person had
> to say, and how important that testimony was. In making that
> decision I suggest that you ask yourself a few questions: Did the
> person impress you as honest? Did the witness have any particular
> reason not to tell the truth? Did the witness have a personal
> interest in the outcome of the case? Did the witness have any
> relationship with either the government or the defense? Did the
> witness seem to have a good memory? Did the witness clearly see
> or hear the things about which he testified? Did the witness have
> the opportunity and ability to understand the questions clearly and
> answer them directly? Did the witness's testimony differ from the

testimony of other witnesses?  These are a few of the
considerations that will help you determine the accuracy of what
each witness said.

Fifth Circuit Pattern Jury Instructions (Criminal Cases), No. 1.08, (2001 ed.).

The record contains both direct and circumstantial evidence to support a reasonable

conclusion by a properly instructed juror that Petitioner conspired to bribe Judge Lackey along

with his co-indictees.  "Circumstantial evidence may establish the existence of a conspiracy, as

well as an individual's voluntary participation in it, and '[c]ircumstances altogether inconclusive,

if separately considered, may, by their number and joint operation . . . be sufficient to constitute

conclusive proof.'"  *United States v. Garcia Abrego,* 141 F.3d 142, 155 (5th Cir.1998) (quoting

*United States v. Roberts,* 913 F.2d 211, 218 (5th Cir.1990)).  Each element of a Section 371

conspiracy may be inferred from circumstantial evidence.  *See United States v. Faulkner*, 17

F.3d 745, 768 (5th Cir.1994).  A model jury instruction, normally given to jurors in cases of this

type, addresses the lack of distinction between direct and circumstantial evidence and states in

pertinent part:

In considering the evidence you may make deductions and reach
conclusions which reason and common sense lead you to make;
and you should not be concerned about whether the evidence is
direct or circumstantial.  "Direct evidence" is the testimony of one
who asserts actual knowledge of a fact, such as an eye witness.
"Circumstantial evidence" is proof of a chain of facts and
circumstances tending to prove, or disprove, any fact in dispute.
The law makes no distinction between the weight you may give to
either direct or circumstantial evidence.

*See United States v. Clark*, 506 F.2d 416 (5th Cir. 1975).  Circumstantial evidence is enough to

prove an agreement, and even minor participation may support a conviction.  *United States v.*

*Bieganowski,* 313 F.3d 264, 276 (5th Cir.2002).  "An agreement may be inferred from concert of

24

action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *Id.*

A juror could reasonably and properly find that the totality of the circumstances belie the defense's claim that Petitioner happened to walk into a meeting where the bribe was discussed and did not understand the discussion to be about the bribe, even though the discussion included talk of taking "another delivery of sweet potatoes" and "Get it how you want it 'cause we're payin for it to get it done right." Petitioner admitted by his plea that he was intimately involved in the scheme when it began in March 2007, and a reasonable juror, from the evidence following that meeting, could justifiably believe that Petitioner continued to participate knowingly in the scheme after it escalated into a full-blown bribery scheme, just as his four co-defendants did.

The court cannot conclude that **no** reasonable juror would have found Petitioner guilty of conspiracy to bribe Judge Lackey. Like the Fifth Circuit case of *Bosley,* the evidence in this case creates "a classic swearing match" primarily between Balducci's version of the events versus Backstrom's. Petitioner urges the court to discredit the testimony of Balducci, pejoratively referring to him as the Government's "star witness," but it is ironic and inapposite to this position that it was the threat of Balducci's testimony, largely corroborated by audio and video tape, that most contributed to the guilty pleas of Petitioner's co-defendants. Petitioner has failed to establish that it is more likely than not that no reasonable juror would choose to believe Balducci's version of the events over the account of Backstrom. Therefore, he has not proved his actual innocence. *Bosley,* 409 F.3d at 665.

Petitioner next argues that even if he did know about the bribe money being paid, he could have concluded it was a gratuity and not a bribe. He asserts that this is so because

arbitration was legally required in the *Jones* matter and Judge Lackey had no discretion to deny the motion to compel arbitration. A reasonable juror could easily conclude that Petitioner understood that the money being paid to Judge Lackey was a bribe versus a gratuity. Foremost, Petitioner admitted in the factual basis supporting his plea, that on October 18, 2001, he "was aware . . . that Judge Lackey's ruling was based, in part, on something other than the merits of the lawsuit; that is, Balducci's personal relationship with Judge Lackey." Direct evidence throughout the evidentiary hearing established that Judge Lackey's favorable ruling was a quid pro quo for the $50,000 payment. Balducci testified that it was a quid pro quo, Patterson testified that it was a quid pro quo, and Judge Lackey's statements on the tapes establish that it was a quid pro quo. The order was revised numerous times, and Petitioner, it can be concluded from the audio tape, knew he could revise it any way he wanted to. The numerous revisions to the order by the co-defendants belie the conclusion advanced by Petitioner that Judge Lackey had no discretion in his ruling. The payments themselves contradict Petitioner's argument that Judge Lackey's ruling was a foregone conclusion. The court finds unpersuasive Petitioner's argument that even if Petitioner did know about the $50,000 paid to Judge Lackey, he would have assumed the money paid was a gratuity.

### ii. *Misprision of a Felony*

Misprision of a felony is not normally committed by one of the perpetrators of the underlying offense. Here, Petitioner pleaded to misprision of a felony in exchange for the Government dropping more serious charges in a six-count indictment against him. A juror could reasonably conclude, as discussed *supra*, that Petitioner was more than a bystander with knowledge of the bribery. The Fifth Circuit has recognized that applying the misprision statute

to one of the perpetrators of the underlying offense "is not centered in the traditional mold," but nevertheless, participants in a conspiracy can also undertake positive acts to conceal their crime in violation of the misprision law. *United States v. Davila*, 698 F.2d 715, 720 (5th Cir. 1983).

Petitioner received corrupt orders from Tim Balducci on October 18, 2007, and November 1, 2007 – after a bribe had been paid to Judge Lackey. Petitioner openly commented on revisions to be made to the order in Backstrom's office on November 1, 2007. Patterson testified that Petitioner called him at least once looking for Balducci and checking on the status of the "jury research," which a reasonable juror could conclude were calls regarding the bought order. The methods engaged in by Petitioner and his co-defendants to secure the favorable order were purposefully clandestine and underhanded in order to conceal the criminal nature of the venture. Petitioner's affirmative acts to conceal the bribery scheme from discovery coupled with his knowledge of the underlying purpose of the bribery scheme constitute an adequate factual basis supporting guilt of misprision.

### iii. An Interstate Wire

Having established that a reasonable, properly-instructed juror could conclude that Petitioner was a knowing participant in the bribery scheme and committed misprision of a felony, the evidence also establishes the existence of an interstate wire sent in connection with the bribery scheme that is sufficient to establish federal jurisdiction. Petitioner accepted responsibility for an interstate wire during his plea hearing, and "it is beyond debate that Internet and email are facilities or means of interstate commerce" for the purposes of an interstate nexus to support federal charges. *United States v. Barlow*, 568 F.3d 215, 220 (5th Cir. 2009). Petitioner's factual basis states: "And on November 5 an e-mail was sent via wire transmission

in interstate commerce from the Scruggs Law Firm to Tim Balducci containing documents related to the order sending the case to arbitration." The referenced email was sent by a paralegal and forwarded a trial transcript regarding voir dire to Balducci. Though the evidence at the hearing established that Petitioner was not a party to the email, the law still holds Petitioner liable for causing the wires to be used in furtherance of the bribery scheme under these circumstances since the use of the wires was reasonably foreseeable. By pleading guilty to a factual basis stating the email was really "related to the order sending the case to arbitration," Petitioner accepted responsibility for this email and conceded that the email's intent was to give a false impression, i.e., to conceal. Indeed, the November 1, 2007, audio tape makes clear that the email was used to help cover up the fact that Balducci received money from The Scruggs Law Firm to pay Judge Lackey for a favorable ruling.

For the foregoing reasons, the court finds that Petitioner has not met his burden to prove that no reasonable, properly-instructed juror would vote to convict Petitioner based on the evidence presented.

Ineffective Assistance of Counsel

As an alternative basis for relief, Petitioner asserts a claim for ineffective assistance of counsel, alleging that his initial representation in this case was constitutionally defective due to a conflict of interest on the part of his attorney. He contends that his original attorney, Anthony Farese, while retained by Petitioner, secretly negotiated with the Government to procure a plea for Farese's client, Joey Langston, in another judicial bribery case which also charged Richard Scruggs with judicial bribery. The second bribery case involved the Hinds County Circuit Court

case styled *Wilson v. Scruggs*[6] and resulted in the guilty pleas of Judge Bobby DeLaughter and

Richard Scruggs.[7]  Petitioner argues that the cooperation of Farese's client in the

DeLaughter/*Wilson* case was adverse to Petitioner in the Lackey/*Jones* case.  It was this

cooperation, according to Petitioner, that led to the Government's misrepresentation regarding

the Rule 404(b)[8] evidence addressed below.

This court has already determined in ruling on Petitioner's motion for summary judgment

that Petitioner's ineffective assistance of counsel claim is not subject to procedural default.  *See*

*Massaro v. United States*, 538 U.S. 500, 505 (2003) ("[A]n ineffective assistance of counsel

claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner

could have raised the claim on direct appeal.").  A procedural bar for failure to raise an issue on

appeal, however, is distinct from a time bar for failure to adhere to the applicable statute of

limitations – in this case found at 28 U.S.C. § 2255(f), and ineffective assistance claims are

subject to the statute of limitations.  *See United States v. Lopez*, 248 F.3d 427, 430-34 (5th Cir.

2001) (analyzing § 2255(f) statute of limitations separately from the procedural bar); *United*

*States v. Gonzalez*, 592 F.3d 675, 678 (5th Cir. 2009) (finding that petitioner "must overcome the

time-bar on the [ineffective assistance] claim raised in his proposed amendment" to his § 2255

---

[6]This judicial bribery case is generally referred to as *Scruggs II* or the DeLaughter/*Wilson* matter. *See United States v. Langston*, No. 1:08CR003-M-D (N.D. Miss. 2008); *United States v. Scruggs, et al.*, No. 3:09CR002-D-A (N.D. Miss. 2009).

[7]Richard Scruggs pleaded guilty to the bribery of Judge DeLaughter, and Judge DeLaughter pleaded guilty to attempting to obstruct, influence, and impede an official proceeding in violation of 18 U.S.C. § 1512(c)(2).  Both have been sentenced on these convictions.

[8]Federal Rule of Evidence 404(b) addresses the admissibility of evidence of "other crimes, wrongs, or acts."

motion).  The court finds that Petitioner's ineffective assistance of counsel claim is barred by the statute of limitations, since it was not filed by July 14, 2009.[9]

Petitioner argues that his petition is not subject to the statute of limitations because it is a request for *coram nobis* relief – not a motion to vacate pursuant to 28 U.S.C. § 2255.  In ruling on Petitioner's motion for summary judgment, this court acknowledged that "Petitioner moves alternatively for issuance of a writ of error *coram nobis*, '[i]f for any reason § 2255 is inadequate.'"  The court addressed the distinction between Section 2255 and *coram nobis* relief – most notably that *coram nobis* applies to a petitioner who is no longer in custody[10] – and noted that for the purposes of the summary judgment motion, where Petitioner had presented no arguments based on the distinction, the distinction was irrelevant.  The court stated that it would proceed under Section 2255, and it continues to do so here.

Petitioner filed his motion pursuant to 28 U.S.C. § 2255, while he was on supervised release, not in prison, and specifically asserted that he was "in the custody of his probation officer, and such supervised release satisfies the 'custody' requirement of § 2255," citing *Coronado v. U.S. Bd. of Parole*, 540 F.2d 216, 217 (5th Cir. 1976).  Petitioner's claim of ineffective assistance of counsel is therefore subject to the one-year statute of limitations set forth  in Section 2255(f), which provides in pertinent part:

> A 1-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of (1) the date on which the judgment of conviction becomes final . . . or

---

[9]That is, within one year of Petitioner's deadline for filing a direct appeal.  Petitioner's motion was filed August 18, 2010.

[10]"A writ of error *coram nobis* is a remedy available to vacate a conviction when the petitioner has served his sentence and is no longer in custody, as is required for post-conviction relief under 28 U.S.C. § 2255."  *United States v. Esogbue*, 357 F.3d 532, 534 (5th Cir. 2004).

> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Petitioner argues that the statute of limitations did not begin to run until Tom Dawson and Alan Lange's book, *Kings of Tort*, was published in December 2009, since it revealed information he alleges was previously unknown to him.

Petitioner's claim of ineffective assistance is based on the assertion that Anthony Farese simultaneously represented Petitioner and Joey Langston when Langston agreed to plead guilty in the DeLaughter/*Wilson* matter, thereby making Langston a potential 404(b) witness against Petitioner in the Lackey/*Jones* matter. Petitioner alleges that Farese and Langston began secret plea negotiations with the Government on December 10, 2007, and that Petitioner signed his January 7, 2008 waiver of any conflict in Farese also representing Langston without being advised of the full extent of the circumstances surrounding that representation. He asserts that his waiver was therefore not knowing, voluntary, and intelligent and that his claim for ineffective assistance did not come to light until the publication of Dawson and Lange's book. The book was not introduced into evidence, and the court is not persuaded that the book apprised Petitioner of any accurate information relevant to this claim of which he was not already aware. The court rejects Petitioner's argument based on the evidence presented and finds that Petitioner's ineffective assistance claim is barred by the one-year statute of limitations set forth in 28 U.S.C. § 2255(f)(1).

December 10, 2007, is the date the Government executed a search warrant on Joey Langston's law office. According to the testimony of then prosecutor, now Magistrate Judge David Sanders, the Government met with Langston and Farese later that same day and "had no

indication at that point in the proceedings that Zach Scruggs had any knowledge of the *Wilson* matter." Sanders Aff., Pet'r's Ex. 87. Sanders testified at the evidentiary hearing on the petition herein that the Government's next contact with Langston and Farese was on January 4, 2008, when they came to the U.S. Attorney's Office at the Government's request. "At no point prior to that meeting did [the Government] negotiate with Joey Langston and Tony Farese." Sanders Aff., Pet'r's Ex. 87. Sanders further testified as follows:

> [W]e discussed it with Tony and Joey at that time, the conflict – the potential conflict or the appearance of a conflict or anything on that date. And the two cases, *Scruggs I* and *Scruggs II*, were entirely separate cases; and that's what we talked about. And there was no conflict.

> At that time, we didn't have any indication that Joey knew anything. I mean, down the line, Joey told us that Zach knew about Ed Peters being hired and not being of counsel. At that time, we didn't even know that. We had nothing to indicate that Zach even knew of the existence of the *Wilson* case down there. So we talked about it with Tony; "Tony, this is an entirely separate case."

> [W]hat took place was we told them at that time [on January 4, 2008] we don't have any evidence whatsoever that Zach is involved in *Scruggs II* at all.

Hearing Tr. vol. 3 at 88-89.

The court is satisfied, based on Sanders' testimony, that whatever information Petitioner may have allegedly gleaned from Dawson's book is irrelevant. Petitioner has presented no evidence to contradict Sanders' testimony besides the book, which was not introduced into evidence, and the affidavit of John Keker, Richard Scruggs' lead counsel.[11] The court finds that

---

[11]Keker states in his affidavit that during the period from December 10, 2007, until January 7, 2008, "Farese never stated that he was representing Langston in connection with the DeLaughter/*Wilson* allegations." Keker Aff. 4. Keker further states, "Between January 4, 2008, and January 7, 2008, Farese did not inform me that he was engaged in plea negotiations with the Government on Langston's behalf in connection with the DeLaughter/*Wilson* allegations." *Id.* at 3. According to Sanders, plea negotiations on

Keker's affidavit is irrelevant and provides no help to Petitioner's position, as it does not substantively contradict Sanders' testimony nor does it contradict, as Petitioner urges, a January 9, 2008 letter from Farese to Petitioner setting forth the details of Farese's dual representation of Petitioner and Langston. Based on the evidence before it, the court finds that no secret plea negotiations occurred to Petitioner's detriment. The court therefore finds that 28 U.S.C. § 2255(f)(1) applies to Petitioner's motion to vacate, and Petitioner's ineffective assistance claim is barred by the statute of limitations.

The court also finds that Petitioner's claim fails on the merits. Petitioner ignores *Strickland v. Washington*,[12] asserting that it is inapposite to the present case. He instead relies on *Cuyler v. Sullivan*, 446 U.S. 335 (1980), and its progeny. Under *Cuyler*, "[p]rejudice is presumed . . . where a 'defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance.'" *Bostick v. Quarterman*, 580 F.3d 303, 306 (5th Cir. 2009) (quoting *Strickland*, 466 U.S. at 692 (citing *Cuyler*, 446 U.S. at 350)). "Multiple representation does not always create an impermissible conflict." *Bostick*, 580 F.3d at 307. "'Something more than a speculative or potential conflict' must be shown." *Id.* (quoting *United States v. Culverhouse*, 507 F.3d 888, 892 (5th Cir. 2007)). "A conflict will exist only when counsel is 'compelled to compromise his

---

Langston's behalf did begin on January 4, 2008. Langston pleaded guilty on January 7, 2008, and Petitioner signed a waiver of conflict of interest on that same date. The court finds no relevance to the fact that Farese did not advise another defendant's counsel of plea negotiations with Langston during the three days between January 4 and January 7, 2008, nor does it find relevance to Farese's failure to apprise Keker of his representation of Langston prior thereto.

[12]*Strickland* sets forth a two-pronged test for determining ineffective assistance claims. The successful petitioner must demonstrate that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced petitioner's defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client.'" *Id.*

Farese's January 9, 2008 letter to Petitioner, when read in conjunction with Sanders' testimony, makes clear that Farese was candid with Petitioner regarding his dual representation of Petitioner and Langston. As a result of that candor, Petitioner ultimately decided to terminate Farese on that same day and subsequently to hire a former U.S. Attorney, a former Assistant U.S. Attorney, and a former Attorney General of the State of Mississippi to represent him.

The evidence properly before the court shows that Farese had no actual conflict between Langston and Petitioner because, as Sanders' testimony makes clear, Langston provided the Government with no information regarding Petitioner during the period of Farese's dual representation. The court finds that Farese met his duty to disclose to Petitioner all the circumstances surrounding his dual representation such that Petitioner's waiver of conflict of interest was knowing, voluntary, and intelligent.

Finding no actual conflict, the court finds *United States v. Newell*, 315 F.3d 510 (5th Cir. 2002), cited by Petitioner, inapplicable to the present case since that case did involve an actual conflict in which an attorney representing two defendants in the same trial argued to the jury that the innocence of one client turned on the guilt of the other. *Id.* at 519. Langston and Petitioner were never defendants in the same case. Langston never testified against Petitioner. Langston never gave the Government any information against Petitioner before the waiver. Petitioner waived any potential conflict of interest on January 7, 2008. Farese's dual representation of Petitioner and Langston ended on January 9, 2008. Petitioner hired a highly competent team of attorneys immediately thereafter and entered a guilty plea over two months later.

The court again finds Sanders' testimony, set forth above, dispositive of Petitioner's claim. Petitioner has presented no evidence to this court – only speculation and conjecture – that an impermissible conflict existed. He has therefore failed to satisfy *Cuyler v. Sullivan*, *supra*. Since he has not attempted to satisfy *Strickland v. Washington*, *supra*, the court finds that Petitioner's claim of ineffective assistance of counsel is without merit. It is also time-barred. For these reasons, it shall be dismissed.

Involuntary Plea due to Alleged Government Misconduct

Petitioner claims that the Government falsely represented to him and to the court that Joey Langston was prepared to offer 404(b) evidence against him to the effect that Petitioner had full knowledge of and participated in another judicial bribery scheme involving the case styled *Wilson v. Scruggs* before then Hinds County Circuit Judge Bobby DeLaughter. Petitioner argues that by the Government's false statement to the court concerning the 404(b) evidence against Petitioner in the DeLaughter/*Wilson* bribery scheme, the Government coerced him to enter his plea for misprision of a felony, that the plea was given involuntarily, and that the conviction based upon the plea should be vacated.

On February 21, 2008, the court conducted a hearing on defendants' motion in limine to exclude 404(b) evidence against Richard and Zachary Scruggs and Sidney Backstrom. On that date, the Government stated to the court that "[t]he testimony at trial from Mr. Langston . . . would also implicate Zach Scruggs. Joey Langston is prepared to testify that Zach Scruggs was fully aware of what was going on in the *Wilson* case." Attorney Anthony Farese testified in the May 9, 2011 hearing on Petitioner's motion to disqualify an Assistant U.S. Attorney that after the court adjourned the February 21, 2008 hearing, he approached the prosecutor who had stated

35

to the court that Langston would testify Zach Scruggs was "fully aware" and told him that the prosecutor had misconstrued what Langston had stated in regard to Petitioner. The prosecutor admits that he ignored Farese's admonishment and failed to investigate and correct the matter with the court and Petitioner. (As a result, this court on May 11, 2011, on motion of Petitioner, disqualified said prosecutor from further participation in this case.) At the February 21, 2008 hearing, the court denied Petitioner's motion in limine on the 404(b) evidence; and then, after Richard Scruggs and Sidney Backstrom pleaded guilty, Petitioner renewed the in limine motion. In response to the renewed motion, the Government stated, "There have been no substantial changes in the instant case that would require a reevaluation of the court's previous ruling that the proffered 404(b) evidence is admissible against Zachary Scruggs." The court scheduled a hearing on the renewed motion to resolve the issue as to whether Langston's potential testimony would still apply to Petitioner since Richard Scruggs and Sidney Backstrom were out of the case. Petitioner forewent the opportunity to further contest the 404(b) evidence and chose instead to plead guilty to the reduced charge of misprision of a felony on March 21, 2008.

Petitioner argues that "[a]t this point, [he] literally did not know what Mr. Langston was intending to say if he testified, since Petitioner was (at most) receiving divergent information: private, oral suggestions that Mr. Langston would not implicate Petitioner in the criminal behavior, clashing against public, written statements in open court stating the opposite."

Petitioner must again overcome the statute of limitations set forth in Section 2255, so he argues that his misrepresentation claim is not barred since the limitations period may run from "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4). Petitioner argues that

he can overcome procedural default for failing to raise the alleged misconduct issue on direct appeal by showing "cause" and "actual prejudice." *See Bousley*, 523 U.S. at 622; *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991) (A defendant "may not raise an issue for the first time on collateral review without showing both 'cause' for his procedural default, and 'actual prejudice' resulting from the error." (quoting *United States v. Frady*, 456 U.S. 152, 168 (1982))). Petitioner asserts that his "cause" is that the Government concealed its alleged wrongdoing, and he asserts that he suffered "prejudice" when he was allegedly coerced to plead guilty in the face of 404(b) evidence misrepresented by the Government.

In evaluating the statute of limitations issue, the court must first determine whether Petitioner, through the exercise of due diligence, could have discovered his alleged basis for the claim and could have filed his motion within the one-year statute of limitations. Similarly, in examining the procedural default question, the court must determine whether the evidence allegedly supporting the claim was "reasonably available" to Petitioner. *See Miller v. Dretke*, 431 F.3d 241, 245 (5th Cir. 2005). If so, "cause" cannot be shown. *Id.* "Prejudice" requires a showing that the alleged misconduct "so infect[ed] 'the entire trial that the resulting conviction violat[ed] due process.'" *United States v. Lopez*, 248 F.3d 427, 434 (5th Cir. 2001) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

Petitioner again relies on the book authored by Tom Dawson and Alan Lange, *Kings of Tort*, and asserts that the alleged misrepresentation did not come to light until the book was published in December 2009, and affidavits by Langston, Sanders, and others were published in May 2010 in response to Petitioner's bar complaint against Farese. Petitioner contends that he could not have known of the Government's concealment until it was publically aired in the book

and affidavits.  Petitioner argues that he has established "good cause" for his procedural default by "showing that some objective factor external to the defense prevented him from raising on direct appeal the claim he now advances."  *United States v. Guerra*, 94 F.3d 989, 993 (5th Cir. 1996).  Again citing the Dawson/Lange book, Petitioner argues that the Government has conceded that the purported 404(b) evidence against petitioner was an "overwhelming force" that effectively "compelled" petitioner to plead guilty.

The Government argues that despite its misstatement to the court, Petitioner, in fact, knew that Joey Langston would not implicate him criminally in the *Wilson* case before he filed his motion for rehearing on March 19, 2008, and before he pleaded guilty.  David Sanders' testimony on this matter is unequivocal.  The following colloquy took place between Sanders and Petitioner's counsel, Mike Moore, at the evidentiary hearing:

| | |
|---|---|
| Moore: | Mr. Sanders, on January the 4th, did you ask this simple question to Joey Langston – |
| Sanders: | Okay. |
| Moore: | – Mr. Langston, what involvement does Zach Scruggs have in the *Wilson*/DeLaughter matter? |
| Sanders: | I don't recall asking that specific question. |
| Moore: | Had you asked that question, maybe we wouldn't be here today with this problem. |
| Sanders: | Well, what took place was we told them at that time we don't have any evidence whatsoever that Zach is involved in *Scruggs II* at all. |

* * *

| | |
|---|---|
| Sanders: | I'm saying that we told them at that time we have no evidence to believe, guys, that there's any conflict of interest because Zach doesn't have anything to do with *Scruggs II*. |

Moore:        Zach Scruggs, frankly, was faced with having two trials. You're going to have to get tried for this 404(b) evidence y'all call; but basically, that's getting tried for the *Wilson*/DeLaughter matter, the judgeship and all this. That's what this young fellow was faced with. And he was faced with that because somebody didn't do what they needed to do on January the 4th.

Sanders:     Right. But as I testified, I had cleared that up with either you or Nathan [Garrett, Petitioner's attorney] before he agreed to plead guilty. I mean, y'all knew what Joey knew before the date of the plea. Because before you agreed to the plea – because we talked about that. I don't remember whether it was with you or Nathan, like I say. But it was cleared up.

Moore:        It may or may not have been cleared up as to what you say, what you told somebody, Mr. Sanders. But Joey Langston was still out there, and the representation of the Government of the United States of America was pure and simple, and still is, still is, no pleading's ever been filed since then, still is, that Zach Scruggs was fully aware. And our position is – you can agree and say yes or no – is this should have been cleared up before this Court, then the defendant could feel secure . . . . And we never got that cleared up. Is that true?

Sanders:     We never got that cleared up? I've already said we got it cleared up. You, me, and Nathan or Nathan and me, we got it cleared up. I understand what you're saying about on the record. But outside of the court docket, I'm certain I know we got it cleared up.

Hearing Tr. vol 3, 88-90, May 25, 2011.

Nathan Garrett, another of Petitioner's defense attorneys, did not contradict Sanders' testimony. Garrett testified, "I mean, I just don't have a personal recollection of it. I don't doubt Dave." *Id.* at 173. Garrett further testified that he was not focused on the 404(b) issue during the latter part of the case. He stated, "[Y]ou should understand that my focus and attention

throughout this 404 and throughout all of this latter part of the case was on seeking to reach a plea resolution with the Government. That's where – and perhaps particularly attributable to my lack of acute memory with regard to the 404. My focus was on that." *Id.* at 142-43.

In addition to the testimony of Sanders and Garrett, Langston's attorney, Anthony Farese, testified at the hearing on Petitioner's motion to disqualify Assistant U.S. Attorney Robert Norman from the case that he wrote a letter to Petitioner on January 9, 2008, before Petitioner's renewed motion in limine regarding the 404(b) evidence, assuring Petitioner that Langston would not testify that Petitioner was criminally involved in the *Wilson* case. He further testified that Petitioner's counsel, Mike Moore, followed up on this letter by calling Farese twice for assurance that Farese and his client stood by the this position. Farese testified as follows:

> I talked to Mr. Moore twice. He specifically referenced a January 9, 2008 letter of mine to Mr. Zach Scruggs and asked me if I stuck with what was written in that letter regarding what the Government had represented to me on January 7 with regard to Zach Scruggs not being involved in *Wilson*, not being a target nor a suspect. And I maintained that, yes, sir, that was my understanding on January 9. And the only thing that had changed was after that date, and after Mr. Langston had pled and I'd been fired by Zach Scruggs, was the discovery of the Johnny Jones e-mail.[13] And that was the only difference, and that Mr. Langston had been questioned after the Johnny Jones e-mail had been discovered. And his position was what was stated in this pleading, what we've just stated, which was that the only thing that Zach knew was that Ed Peters was hired because of his long-standing relationship with Mr. DeLaughter – or Judge DeLaughter; and Zach was unaware of any criminal – criminality.

Hearing Tr. vol. 1, 103-04, May 9, 2011.

---

[13]Zachary Scruggs authored an email referencing the *Wilson v. Scruggs* case where he stated: "But I can tell you that you could file briefs on a napkin right now and get it granted given the Judge's view of the case . . . ."

The court is satisfied that Petitioner was apprised of the extent of Langston's 404(b) evidence and that he was on notice of a potential claim and could have, through the exercise of due diligence, brought that claim within the statute of limitations provided by 28 U.S.C. § 2255(f)(1). Because Petitioner did not bring his claim within one year of July 14, 2009, the court finds that the claim is barred by the statute of limitations.

The court also finds that Petitioner cannot overcome the procedural default. Petitioner has shown neither "cause" for the default nor "prejudice" as to the alleged misconduct claim. *See Bousley*, 523 U.S. at 622. The court finds that the Government, although it may have done so negligently, did not intentionally mislead the court and Petitioner and that the Government's mistake was learned by Petitioner long before the publication of *Kings of Tort*, although the Government did not advise the court that its statements made on the record regarding Langston's testimony were incorrect. Langston would have been required to testify at the 404(b) in limine hearing, which the court had set for March 21, 2008, and if Petitioner had availed himself of that hearing, the record regarding Langston's testimony would have been corrected. Instead, Petitioner chose to forego the hearing and plead guilty. Because he cannot overcome his procedural default, Petitioner's plea stands, and "[t]he plea waives claims of governmental misconduct during the investigation and improper motives for prosecution." *United States v. Cothran*, 302 F.3d 279, 285-86 (5th Cir. 2002).

Even if the court were to find that Petitioner could overcome both the statute of limitations and the procedural default, Petitioner's claim that his plea was involuntary fails on the merits. The Supreme Court has distinguished a voluntary plea from an involuntary one, and the resulting consequences, as follows:

> A plea of guilty entered by one fully aware of the direct
> consequences, including the actual value of any commitments
> made to him by the court, prosecutor, or his own counsel, must
> stand unless induced by threats (or promises to discontinue
> improper harassment), misrepresentation (including unfulfilled or
> unfulfillable promises), or perhaps by promises that are by their
> nature improper as having no proper relationship to the
> prosecutor's business (e.g. bribes).

*Brady v. United States*, 397 U.S. 742, 755 (1970). As the Government asserts, courts are

particularly concerned with defendants who plead guilty due to misrepresentations regarding

guarantees of unfulfillable promises from the Government or the court. *See, e.g.*, *Correale v.

United States*, 479 F.2d 944, 947 (1st Cir. 1973); *United States v. Amaya*, 111 F.3d 386, 388-89

(5th Cir. 1997); *United States v. Sanders*, 98 F.3d 1338 (5th Cir. 1996). In *Correale*, for instance,

the court reversed and remanded for resentencing in a case where a prosecutor had promised an

impermissible sentence in the plea bargain. *Correale*, 479 F.2d at 947. In the case sub judice,

however, the alleged Government misrepresentation was a vague overstatement of potential

404(b) evidence against Petitioner at a time when he was focused on negotiating a plea deal,

which he successfully accomplished without a promise of any guarantee from the Government,

and the overstatement was clearly well in advance of Petitioner's plea of guilty.

A *Brady* claim requires that (1) the prosecutor suppress evidence, (2) favorable to the

defense, (3) and material to guilt or punishment. *Miller*, 431 F.3d at 245 (citing *Brady v.

Maryland*, 373 U.S. 87 (1963)). The Government contends that it made no intentional

misrepresentations to the court and that a miscommunication between Government counsel and

Joey Langston led to the Government's statement that Langston's testimony would implicate

Petitioner. The Government now concedes that Langston had limited knowledge about

Petitioner as related to the DeLaughter/*Wilson* case.[14]  Assuming arguendo that the prosecutor

suppressed evidence favorable to the defense, the court's analysis in the present case focuses on

the third *Brady* factor:  whether the allegedly suppressed information was material to guilt or

punishment.  "Evidence is *material* if there is 'a *reasonable probability* that, had the evidence

been disclosed to the defense, the result of the proceeding would have been different.'"  *Id.*

(quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  As discussed at length above, the

court finds that Petitioner was apprised of the extent of the 404(b) evidence against him well

before he pleaded guilty to misprision of a felony.  The evidence has further shown that

Petitioner, his counsel, and the Government were focused on working out a plea deal – a very

favorable one for Petitioner – during the latter part of the case.  The court is convinced that the

result of the proceeding would have been no different despite the Government's representations.

As mentioned, this court has disqualified one prosecutor from this case because of the

Government's failure to correct its mistake on the record with the court.  In doing so, the court

applied "one of the very lowest standards in the law,"[15] the standard of "reasonable possibility" –

that is, "[a]n attorney may be disqualified only when there is a reasonable possibility that some

specifically identifiable impropriety actually occurred . . . ."  *United States v. Kitchin*, 592 F.2d

900, 903 (5th Cir. 1979).  The standard here is more stringent, and Petitioner has not met it.  For

---

[14]The Government asserts that Zachary Scruggs' apparent knowledge of the corrupt influence being exerted in *Wilson v. Scruggs*, even without any active involvement, was enough to make evidence of that corruption admissible against him, to show knowledge, intent, and state of mind, but this court never got to that issue because Petitioner pleaded guilty before the hearing on that issue was held, although it was scheduled for later in the day on which Petitioner announced he wanted to enter a plea of guilty to the reduced charge.

[15]Pet'r's Motion to Disqualify 9 (citing *Mwembie v. Gonzales*, 443 F.3d 405, 415 (5th Cir. 2006) ("A 'reasonable possibility' standard is less than a 'more likely than not' standard.")).

the foregoing reasons, Petitioner's claim that his guilty plea was involuntary due to alleged Government misconduct fails.

## Conclusion

In accordance with the foregoing analysis, the court finds that Petitioner's Motion to Vacate his conviction pursuant to Title 28 U.S.C. § 2255 should be denied.  A separate order in accord with this opinion shall issue this day.

This, the 3rd day of August, 2011.

*/s/ Neal Biggers*
**NEAL B. BIGGERS, JR.**
**UNITED STATES DISTRICT JUDGE**